**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PRESERVATION SOCIETY OF NEWPORT COUNTY, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Case No.:  1:23-cv-03510-APM |
| DEB HAALAND, *et al.*, | ) ) | Hon. Amit P. Mehta |
| *Defendants*, | ) ) | |
| and | ) ) | |
| SOUTH FORK WIND, LLC, | ) ) | |
| *Defendant-Intervenor*. | ) ) | |
| SOUTHEAST LIGHTHOUSE FOUNDATION, | ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Case No.:  1:23-cv-03514-APM |
| DEB HAALAND, *et al.*, | ) ) | Hon. Amit P. Mehta |
| *Defendants*, | ) ) | |
| and | ) ) | |
| SOUTH FORK WIND, LLC, | ) ) | |
| *Defendant-Intervenor*. | ) ) | |
| GREEN OCEANS, *et al.*, | ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No.: 1:24-cv-01087-APM |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) ) ) | Hon. Amit P. Mehta |
| *Defendants*, | ) ) | |

and                                    )
                                       )
SOUTH FORK WIND, LLC,                  )
                                       )
    *Defendant-Intervenor*.            )
─────────────────────────────────────)

**Hearing Requested**

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

TABLE OF ABBREVIATIONS ................................................................................. v

TABLE OF EXHIBITS ............................................................................................. vi

SUMMARY OF ARGUMENT ................................................................................. 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ......................................... 4

    Newport County, Block Island, and Historic Surroundings ............................... 5

    The South Fork Wind Project .............................................................................. 7

    The Rushed Agency Approval Process ................................................................ 8

    Proceedings in this Court .................................................................................... 11

ARGUMENT ............................................................................................................ 11

    1.    Standard of Review .................................................................................... 11

    2.    The Preservation/Green Oceans Plaintiffs Have Standing ........................ 12

        2.1    Plaintiff, Preservation Society of Newport County, Has Standing to Maintain this Suit ............................................................................................ 15

        2.2    Plaintiff, Southeast Lighthouse Foundation, Inc., Has Standing to Maintain this Suit ............................................................................................ 16

        2.3    Plaintiffs Who Own Properties Within the Ocean Drive Historic District Have Standing to Maintain this Suit ............................................................... 17

        2.4    Plaintiffs Who Own Properties Within the Bellevue Avenue Historic District Have Standing to Maintain this Suit ................................................. 20

        2.5    Plaintiffs Who Own Properties Within the Town of Little Compton Have Standing to Maintain this Suit ......................................................................... 21

        2.6    Plaintiffs Who Own Properties in Middletown Have Standing to Maintain This Suit ......................................................................................................... 22

    3.    BOEM Violated the National Historic Preservation Act By Failing to Notify and Consult With Historic Property Owners, and to Take Necessary Measures to Protect the Historic Context of Newport and Block Island Including its Unobstructed Ocean Views ................... 24

        3.1    BOEM Failed to Comply With Section 110(f), Which Mandated That BOEM Undertake Planning and Actions Necessary to Minimize Harm to National Historic Landmarks ......................................................................................... 24

        3.2    BOEM Violated Section 106 By Failing to Notify Historic Property Owners, Identify All Historic Properties, and Take Into Account the Adverse Effects of South Fork On Historic Properties .......................................................................... 27

        3.3    BOEM Failed to Assess the Adverse Effects of the Project ...................... 32

        3.4    BOEM Failed to Avoid, Minimize, or Mitigate Harm Prior to Approving the Project ......................................................................................................... 35

4.   BOEM Violated NEPA By Failing to Adequately Analyze the Adverse Impacts of the Project on Preservation's and Green Oceans' Historic Properties, and Failing to Analyze Alternatives That Would Have Reduced Those Adverse Impacts............................................ 37

   4.1    BOEM Violated NEPA by Failing to Properly Analyze the Project's Significant Impacts on Plaintiffs' Historic Properties.............................................................................. 37

   4.2    The EIS Fails to Consider Cumulative Effects on Historic and Cultural Resources as Required by NEPA ........................................................................................................... 40

   4.3    The EIS Fails to Properly Analyze the No-Action Alternative ................................ 43

CONCLUSION.................................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Accord Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014) .................... 41

*Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197 (1st Cir. 1999) ................................................ 12

*Alaska Wilderness Recreation & Tourism Ass'n v. Morrison,* 67 F.3d 723 (9th Cir.1995) ........ 44

*Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146 (D.C. Cir. 1993) ............ 45

*Amgen, Inc. v. Smith*, 357 F.3d 103 (D.C. Cir. 2004) ................................................................... 14

*Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87 (1983) 38

*Blue Ocean Institute v. Gutierrez*, 585 F.Supp.2d 36 (D.D.C. 2008); ........................................... 12

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................................................. 12

*Cent. S. Dakota Co-op. Grazing Dist. v. Sec'y of U.S. Dep't of Agric.*, 266 F.3d 889 (8th Cir. 2001). ......................................................................................................................................... 14

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971) ...................................... 12, 25

*City of Dania Beach v. Federal Aviation Admin.*, 485 F.3d 1181 (D.C. Cir. 2007) .................... 13

*CSL Plasma Inc. v. U.S. Customs and Border Prot.*, 33 F.4th 584 (D.C. Cir. 2022). ................. 14

*Environmental Defense Fund v. Corps of Eng'rs of the U.S. Army,* 470 F.2d 289 (8th Cir.1972)44

*Friends of the Earth v. Laidlaw*, 528 U.S. 167, 180-81 (2000) ............................................. 12, 13

*Greater Box. Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970). ...................................... 37

*Gunpowder Riverkeeper v. FERC*, 807 F.3d 267 (D.C. Cir. 2015). ............................................. 14

*Lujan v. Defendants of Wildlife*, 504 U.S. 555 (1992) ................................................................. 12

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990). .................................................................... 14

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023). ...... 12

*Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360 (1989) ........................................................... 39

*Metcalf v. Daley*, 214 F.3d 1135 (9th Cir. 2000) ................................................................. 40, 44

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983). 12

*Munoz-Mendoza v. Pierce*, 711 F.2d 421 (1st Cir. 1983) .............................................................. 12

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301 (D.C. Cir. 2015) .............. 42

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058 (9th Cir. 2010). ... 44

*National Park Conservation Ass'n v. Semonite*, 916 F.2d 1075 (D.C. Cir. 2019). ............... 26, 38

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009). .......... 3

*NRDC v. Hodel*, 865 F.2d 288 (D.C.Cir. 1988) ........................................................................... 41

*Oregon Nat. Res. Council Action v. U.S. Forest Serv.*, 445 F. Supp. 2d 1211 (D. Or. 2006) ...... 44

*Reed v. Salazar*, 744 F. Supp. 2d 98 (D.D.C. 2009). ................................................................... 12

*Robertson v. Methow Valley Citizens Counsel*, 490 U.S. 332 (1989). ................................... 38, 39

*Save the Yaak Committee v. Block,* 840 F.2d 714 (9th Cir. 1988) ................................................ 40

*Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31 (D.C. Cir. 2015) ............................ 38

*Weinberger v. Catholic Action of Hawaii/Peace Education Project,* 454 U.S. 139 (1981). ........ 38

## Statutes

23 U.S.C. § 138(a) ....................................................................................................................... 25

42 U.S.C. § 4331(b). ...................................................................................................................... 3

42 U.S.C. § 4332(2)(C). ............................................................................................................... 43

42 U.S.C. § 4332(C)(ii) ................................................................................................................ 38

42 U.S.C. § 4332(C). .................................................................................................................... 40

42 U.S.C. §§ 4321-4345 ............................................................................................................... 37

42 U.S.C. §§ 4321–4370m ........................................................................................................... vii

49 U.S.C. § 303(c) ....................................................................................................................... 25

5 U.S.C. § 706(2). .................................................................................................. 39
5 U.S.C. § 706. .................................................................................................... 12
5 U.S.C. §§ 701–706 ............................................................................................. vii
5 U.S.C. § 706(2). .................................................................................................. 45
54 U.S.C. § 306107 ................................................................... 3, 9, 24, 25, 27
54 U.S.C. § 306108. ............................................................... 3, 9, 24, 28, 36
54 U.S.C. §§ 300101–320303 ............................................................................. vii
Pub. L. No. 89-665, 80 Stat. 915 (Oct. 15, 1966) ............................................. 24

**Rules**

Fed. R. Civ. P. 56(c) ............................................................................................. 12

**Regulations**

36 C.F.R. § 800.1(a). ............................................................................................ 29
36 C.F.R. § 800.16(d). .......................................................................................... 29
36 C.F.R. § 800.2(c)(5). ........................................................................................ 28
36 C.F.R. § 800.2(d)(1). ........................................................................................ 28
36 C.F.R. § 800.2(d)(2). ........................................................................................ 28
36 C.F.R. § 800.3 .................................................................................................. 28
36 C.F.R. § 800.3(e). ............................................................................................ 29
36 C.F.R. § 800.3(f). ............................................................................................. 29
36 C.F.R. § 800.4(a)(3). ........................................................................................ 29
36 C.F.R. § 800.4(b)(1). ........................................................................................ 30
36 C.F.R. § 800.5 .................................................................................................. 28
36 C.F.R. § 800.5(a)(1). ........................................................................................ 32
36 C.F.R. § 800.5(a)(2). ........................................................................................ 32
36 C.F.R. § 800.5. ................................................................................................. 32
36 C.F.R. § 800.6. ................................................................................................. 28
36 C.F.R. § 800.6(a)(2). .................................................................................. 29, 35
36 C.F.R. § 800.6(a)(4). ........................................................................................ 29
36 C.F.R. § 800.6(c). ............................................................................................ 36
36 C.F.R. § 800.6. ................................................................................................. 35
36 C.F.R. §§ 65.2(a). ............................................................................................ 25
36 C.F.R. §§ 800.4(a)(1)-(a)(2) ........................................................................... 29
36 C.F.R. Part 800 ................................................................................................ 28
40 C.F.R. § 1500.1(a). .......................................................................................... 37
40 C.F.R. § 1502. .................................................................................................. 43
40 C.F.R. § 1502.1. ............................................................................................... 39
40 C.F.R. § 1502.2(g). .......................................................................................... 39
40 C.F.R. § 1508.25(a)(2). .................................................................................... 40
40 C.F.R. § 1508.25(a)(3). .................................................................................... 41
40 C.F.R. § 1508.7. .......................................................................................... 41, 43
40 C.F.R. §§ 1500-15184 ...................................................................................... 37
43 C.F.R. § 46.30. ................................................................................................. 43
63 Fed. Reg. 20495 ............................................................................................... 25
83 Fed. Reg. 53104. .............................................................................................. 9

**TABLE OF ABBREVIATIONS**

| Abbreviation | Definition |
| --- | --- |
| APA | Administrative Procedure Act |
| BOEM | Bureau of Ocean Energy Management |
| COP | Construction and Operations Plan |
| DOI | Department of the Interior |
| EIS | Environmental Impact Statement |
| MOA | Memorandum of Agreement |
| NEPA | National Environmental Policy Act |
| NHL | National Historic Landmark |
| NHPA | National Historic Preservation Act |

**TABLE OF EXHIBITS**

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| Ex. 1 | Declaration of Stephen Lewinstein (May 20, 2024) |
| Ex. 2 | Declaration of Charlotte DuHamel (May 18, 2024) |
| Ex. 3 | Declaration of Barbara Chapman (May 17, 2024) |
| Ex. 4 | Declaration of Gerald Abbott (May 18, 2024) |
| Ex. 5 | Declaration of Trudy Coxe (May 20, 2024) |
| Ex. 6 | Declaration of Sandra Craig (May 17, 2024) |
| Ex. 7 | Declaration of Howard Cushing III (May 20, 2024) |
| Ex. 8 | Declaration of Andrew McKee (May 18, 2024) |
| Ex. 9 | Declaration of Katrina Gewirz (May 20, 2024) |
| Ex. 10 | Declaration of Karen Blanchard (May 18, 2024) |
| Ex. 11 | Declaration of Dee Gordon (May 18, 2024) |
| Ex. 12 | Declaration of Elizabeth Vitton (May 20, 2024) |

Defendants, the United States, acting through the Bureau of Ocean Energy Management ("BOEM"), rushed to approve the construction of 12 massive wind turbines in the Atlantic Ocean off Newport, Rhode Island, known as the South Fork Wind Project, without taking a "hard look" at the project's impacts on the environment, including the human environment, in violation of the National Environmental Policy Act ("NEPA"). The Government also approved the Project without considering the Project's adverse effects on National Historic Landmarks and other historic properties within one of the most historically and culturally significant communities in the country in violation of the National Historic Preservation Act.

Plaintiffs in these consolidated cases are two Rhode Island historic preservation organizations, Preservation Society of Newport County and Southeast Lighthouse Foundation, together with a number of owners of some of the most historic properties in Rhode Island, collectively referred to as Green Oceans (a local environmental group to which they all belong). All Plaintiffs, collectively Preservation/Green Oceans, ask this Court to grant their motion for summary judgment and vacate the permits and approvals BOEM issued for the South Fork Wind Project as arbitrary and contrary to law—the National Historic Preservation Act,[1] the National Environmental Policy Act,[2] and the Administrative Procedure Act.[3]

**SUMMARY OF ARGUMENT**

Adjacent to Newport and Block Island's protected and historic properties is the South Fork Wind Project, an industrial-scale-offshore-wind-turbine project in an area of the Atlantic Ocean leased by the United States to two major offshore energy companies, Orsted (Danish) and Eversource (U.S.). Located off the coast of Rhode Island, the Project is intended to provide

---

[1] 42 U.S.C. §§ 4321–4370m.
[2] 54 U.S.C. §§ 300101–320303.
[3] 5 U.S.C. §§ 701–706.

intermittent electricity to New York.[4] The wind turbines will connect to the power grid through an underwater cable to East Hampton, New York, and span 13,700 acres.[5] South Fork's wind turbines will be 840 feet tall.[6]

South Fork is the first phase of a single industrial wind farm project, originally known as Deepwater Wind, and now approved as Revolution Wind and Sunrise Wind.[7] Revolution Wind proposed to add up to 100 turbines at 873 feet tall[8] and Sunrise Wind will proposed to add up to 94 turbines at 968 feet tall.[9] The combined visual impacts of South Fork, Revolution Wind, and Sunrise Wind, are will devastate the integrity of historic properties by creating an industrialized viewshed that will despoil pristine views of the Atlantic Ocean.[10]

The lead agency, BOEM, approved the South Fork Wind Project without considering the impact of the Project on these historic and landmark structures and the community, and without notice and an opportunity to consult on the Project prior to its approval in violation of federal law:

---

[4] Because the wind does not always blow, fossil fuel plants must be built or relied on to provide a supplemental, reliable source of electricity. *See* World Economic Forum, *How Reliable Are Wind Farms?* (Jan. 5, 2015), https://www.weforum.org/agenda/2015/01/how-reliable-is-wind-power/.

[5] SFW 86916.

[6] SFW 87054.

[7] *See* SFW 73993 ("Through a competitive leasing process under 30 CFR 585.211, Deepwater Wind New England, LLC was awarded Commercial Lease OCS-A0486 for a leased area offshore Rhode Island," which comprises the combined lease areas for the current South Fork, Revolution, and Sunrise Wind projects.).

[8] *See* Bureau of Ocean Energy Management, *Revolution Wind Record of Decision* (Aug. 21, 2023), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_3.pdf (Revolution Wind Record of Decision).

[9] *See* Bureau of Ocean Energy Management, *Sunrise Wind Record of Decision* (Mar. 25, 2024), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/05579_Record%20of%20Decision_Sunrise%20Wind_OCS-A%200487.pdf (Sunrise Wind Record of Decision).

[10] Ex. 1, Decl. of S. Lewinstein ¶ 12 (May 20, 2024); *see also* Ex. 2, Decl. of C. DuHamel ¶ 8 (May 18, 2024).

- Section 106 of the Historic Preservation Act provides:

  The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State and the head of any Federal department or independent agency having authority to license any undertaking, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property.[11]

- Section 110(f) of the National Historic Preservation Act provides:

  Prior to the approval of any Federal undertaking that may directly and adversely affect and National Historic Landmark, the head of the responsible Federal agency shall *to the maximum extent possible* undertake such planning and actions as may be necessary *to minimize harm to the landmark*.[12]

BOEM also failed to comply with NEPA by failing to take a hard look at the impacts of the Project on the human environment and the marine environment prior to its approving the Project.[13] Congress drafted NEPA to protect the environment by "fulfill[ing] the responsibilities of each generation as trustee of the environment for succeeding generations [and] attain[ing] the widest range of beneficial uses of the environment [human environment] without degradation."[14]

Preservation/Green Oceans has standing to sue and ask this Court to grant their motion for summary judgment, holding as a matter of law that the Government violated the National Historic Preservation Act, NEPA, and the Administrative Procedure Act in approving the South Fork Wind Turbine Project.

---

[11] 54 U.S.C. § 306108.
[12] 54 U.S.C. § 306107 (emphasis added).
[13] *See*, *e.g.*, *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 704 (10th Cir. 2009).
[14] 42 U.S.C. § 4331(b).

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.       Rhode Island's coastline is home to some of the nation's most significant historic and cultural resources, including Newport and Block Island, Rhode Island.[15] For more than a century, the federal government, the state of Rhode Island, and local governments have worked to protect and maintain the historic character of this area so that present and future generations can study and appreciate the architecture and design features unique to Newport County and Block Island.[16] Until the South Fork Project was constructed, that effort has succeeded: Newport's National Historic Landmark Districts[17] and Block Island's National Historic Landmark Southeast Lighthouse House, traditional cultural properties, and National Natural Monuments connected to Native American tribes have kept their historic context and scenic attributes. Millions of visitors come each year to see first-hand this remarkably intact historical treasure.[18]

2.       On November 23, 2021, Defendant, BOEM authorized Defendant-Intervenor, South Fork Wind, LLC, to build the South Fork Offshore Wind Turbine Project, an industrial-scale turbine field of 12 wind turbines placed in the ocean only 19 miles from the Southeast Lighthouse National Historic Landmark 25 miles from the historic homes.[19] South Fork Wind,

---

[15] *See generally* Ex. 5, Decl. of Trudy Coxe (May 20, 2024); Ex. 4, Decl. of Gerald Abbott (May 18, 2024.

[16] *See* The Preservation Society of Newport County, *History of Newport and the Mansions*, https://www.newportmansions.org/gilded-age/history-of-newport-mansions/ (last visited May 20, 2024).

[17] *See* National Parks Service, *National Historic Landmarks Program*, https://www.nps.gov/orgs/1582/index.htm (last visited May 18, 2024).

[18] *See* The Providence Journal, *Report: Historic preservation generates $1.4 billion for R.I.*, https://www.providencejournal.com/story/news/politics/2018/03/21/report-historic-preservation-generates-14-billion-for-ri/12931752007/ (last visited May 20, 2024).

[19] *See* SFW 86912—87041.

LLC is jointly owned by Orsted, a Danish wind energy company, and Eversource Energy, a U.S.-based commercial energy company.[20]

3.    Orsted and Eversource grand plan is to construct nearly 200 more wind turbines nearby.[21] Once built, these turbines will form a mass of giant wind turbines immediately offshore and visible from the coastline equipped with flashing and stationary lights and other infrastructure,[22] permanently marring one of the historically significant and best-preserved cultural areas along the Atlantic Ocean. This landscape also includes areas important to Tribes who depend on this context to maintain their cultural heritage.[23] The South Fork Project will also eliminate dark night skies, interfering with the migrating birds and fish species that are part of the aesthetics of the area valued by homeowners.[24]

**Newport County, Block Island, and Historic Surroundings**

4.    Newport County and Block Island are well-preserved areas not only known for their high concentration of National Historic Landmarks and properties listed in the National Register of Historic Places, but are living communities that continue to preserve, maintain, and associate these properties with cultural practices, traditions, and lifestyles.[25] Residents and visitors enjoy and value the unobstructed ocean views of the Cliff Walk, Brenton Point, and Sachuest National Wildlife Refuge.[26]

---

[20] *See* SFW 74380 (listing Orsted as an owner of 12 current or planned wind power plant projects along the east coast, including South Fork Wind).

[21] *See* Revolution Wind Record of Decision *supra* note 8 (approving construction of up to 100 giant turbines); *see also* Sunrise Wind Record of Decision *supra* note 9 (approving construction of up to 94 turbines).

[22] SFW 74048.

[23] SFW 78490 (listing federally recognized tribes impacted by the proposed project).

[24] *See* SFW 74048 (Discussing impact of project related artificial lighting on species).

[25] *See* Green Oceans Amended Complaint (May 8, 2024), ECF No. 34 at ¶¶ 47-49; *see also id*. at ¶¶ 290-295.

[26] *See*, *e.g.*, Green Oceans Amended Complaint (May 8, 2024), ECF No. 34 at ¶ 15.

5.    Newport is inseparable from the Atlantic Ocean and its uninterrupted views. Known as "The City-By-The-Sea," Newport's beauty and connections to the sea have inspired not only writers and other artists, but also property owners whose families have treasured their houses and history for hundreds of years, as well as those who preserve sporting traditions, including world class ocean sailing—all part of Newport's look, feel, and association that gives it a unique sense of place that places a premium on historic preservation. Plaintiffs Preservation Society and Green Oceans Plaintiffs own historic properties within two of the most recognized NHL districts in the country: Bellevue Avenue Historic District and Ocean Avenue Historic District.

6.    Block Island represents the traditional, historic relationship that historic seafaring communities continue to maintain to their pristine ocean settings.[27] Like Newport, Block Island maintains a high concentration of historic and culturally significant resources. Block Island is commonly described as a place of landscapes of sandy beaches, oceanfront bluffs, historic harbors, historic lighthouses and inns, historic oceanfront houses, and "spectacular panoramas."[28] One of the most famous panoramas can be experienced by looking to and from the Southeast Lighthouse, a National Historic Landmark, one of the most sophisticated lighthouses in the nation of the nineteenth century.[29]

7.    Perched on the Mohegan Bluffs overlooking the Atlantic Ocean, historic descriptions call the Southeast Lighthouse "one of the wonders our coast."[30] The Southeast

---

[27] Block Island has already had its historic landscape adversely affected by the Block Island Wind Farm, a five-turbine test project located 3.8 miles from the Southeast Lighthouse NHL and now owned by Orsted.

[28] *See generally* GERARD P. CLOSSET, BLOCK ISLAND REVEALED (2020); GERALD P. BLOCK ISLAND: ONE OF THE LAST GREAT PLACES (2020).

[29] *Id*.

[30] Mariana M. Tallman, *Pleasant Places in Rhode Island, Providence* (1893).

Lighthouse and its surrounding structures have been the focus of preservation campaigns at the local and national level. Today they serve as a popular tourist attraction and important historic site for the area. The Southeast Lighthouse is the highest in New England and has served as a primary coastal light within the U.S. Lighthouse Service and its successor organization, the U.S. Coast Guard. In 1991, the Nature Conservancy named Block Island one of "12 Last Great Places in the Western Hemisphere" because of its unique connection to conservation.[31] As one commentator wrote: "There may be no better place to salute the summer on the Eastern Seaboard than at sunset . . . as the sky turns hues of orange, purple and red."[32]

8.       The Green Oceans Plaintiffs own many of the historic properties at issue here, and they actively work to preserve their homes and many of the most treasured relics of the Gilded Age for which this area is famous.[33]

**The South Fork Wind Project**

9.       The South Fork Wind Project is an industrial-scale offshore wind farm project within a 97,498-acre-lease area granted by the United States and now held by Orsted  and Eversource  off the coast of Rhode Island to provide intermittent electricity to New York.[34] Fitted with flashing and stationary red, yellow, and white lights,[35] the 12-turbine wind turbine will be constructed 19 miles southeast of Rhode Island's Block Island and about 25 miles from

---

[31] *See* The Nature Conservancy, *Block Island*, https://www.nature.org/en-us/get-involved/how-to-help/places-we-protect/block-island/.

[32] David G. Allen, *On Tiny Block Island, Summer Lasts Longer*, THE NEW YORK TIMES (Sept. 10, 2009).

[33] Ex. 3, Decl. of B. Chapman ¶ 3 (May 17, 2024).

[34] Because the wind does not always blow, fossil fuel plants must be built or relied on to provide a supplemental, reliable source of electricity. *See* World Economic Forum, *How Reliable Are Wind Farms?* (Jan. 5, 2015), https://www.weforum.org/agenda/2015/01/how-reliable-is-wind-power/.

[35] SFW 86996.

Newport.[36] The wind farm will connect to the power grid through an underwater cable to East Hampton, New York, and span 13,700 acres.[37] South Fork's wind turbines will be 840 feet tall.[38] South Fork is only the first phase of a single industrial wind farm project, originally known as Deepwater Wind, and now approved as Revolution Wind and Sunrise Wind—as well as other proposed wind power plants in the vicinity.[39] Revolution Wind as proposed will include 96 turbines at 873 feet tall[40] and Sunrise Wind as proposed will add up to 94 turbines at 968 feet tall.[41] The combined visual impacts of South Fork, Revolution Wind, and Sunrise Wind will devastate the integrity of historic properties by creating an industrialized viewshed that will despoil the historic oceanfront context.[42]

**The Rushed Agency Approval Process**

10.    On October 19, 2018, BOEM issued a Notice of Intent to prepare an Environmental Impact Statement (EIS) for the South Fork Project, as required by the National Environmental Policy Act (NEPA).[43] In response, many stakeholders complained about the Project's impacts on both the natural and human environment, including Rhode Island's historic properties.[44]

11.    BOEM issued the Final EIS for the South Forks Project on August 8, 2021, before completing the consultation required by the National Historic Preservation Act.[45] The EIS states

---

[36] SFW 86920.
[37] SFW 86916.
[38] SFW 87054.
[39] BOEM, *Rhode Island Activities*, https://www.boem.gov/renewable-energy/state-activities/rhode-island-activities (last visited May 20, 2024).
[40] *See* Revolution Wind Record of Decision *supra* note 8.
[41] *See* Sunrise Wind Record of Decision *supra* note 9.
[42] Ex. 1 ¶ 12; *see also* Ex. 2 ¶ 8.
[43] 83 Fed. Reg. 53104.
[44] *See, e.g.,* SFW 85844–SFW 85895.
[45] 54 U.S.C. § 306108; 54 U.S.C. § 306107.

that "BOEM remains in consultation with Native American tribes and other consulting parties under NHPA Section 106 on identified historic properties, adverse effects, and the resolution of adverse effects[.]"[46]

12.     BOEM held three virtual webinars regarding historic properties affected by the South Wind Project between September 2020 and June 2021. Even though they received no notice of these proceedings from BOEM or Defendant-Intervenor, South Fork Wind, LLC, about the consultation, Plaintiffs, The Preservation Society and Southeast Lighthouse Preservation, participated in these webinars as consulting parties.[47]

13.     During the consultation process, the Preservation Society and Southeast Lighthouse raised significant concerns about the Project's impacts on historic and cultural resources, which include the historic properties owned by Green Oceans Plaintiffs because they form many properties within the Ocean Drive Historic District NHL, the historic context of which the Project will adversely affect. They also pointed out BOEM's failure to identify historic properties, failure to adequately assess adverse effects on property owners—such as the Green Oceans Plaintiffs who own historic properties—and failure to comply with Section 110(f) of the NHPA. The Preservation Society and the Southeast Lighthouse also noted that the Project poses a grave threat to their local economies, revenues, and property values, which is largely based on heritage tourism.[48] They were not alone in voicing these concerns. Other interested parties submitted comments criticizing BOEM's analysis and approach.[49]

---

[46] SFW 74159.
[47] Ex. 4 ¶ 4 ; s*ee also* Ex. 5 ¶ 10.
[48] SFW 84984.
[49] *See, e.g.,* SFW 85844–SFW 85895.

14.     The Green Oceans Plaintiffs who own historic properties adversely affected by the South Fork Wind Project received no notice of the Project or the Historic Preservation Act consultation, were unaware of these facts, and so were left out of any Section 106 consultation process regarding the South Fork Wind Project.[50]

15.     BOEM also failed to notify other affected historic property owners as well. For example, BOEM did not notify Preservation Rhode Island, the only statewide historic preservation advocacy group, and did not notify the Newport Restoration Foundation.[51]

16.     On June 1, 2021, the Southeast Light Foundation and Town of New Shoreham, Rhode Island, advised BOEM that it had not provided property owners of historic properties with the Project's Area of Potential Effect with notice of the Section 106 consultation process.[52]

17.     BOEM issued the Final EIS for the Project on August 8, 2021, and issued the Record of Decision approving the Project on November 23, 2021.[53] On that same day, BOEM executed a Memorandum of Agreement to conclude the Section 106 consultation process—on which the Final EIS depends.[54]

18.     The November 23, 2021 Agreement acknowledged that the Project will adversely affect a wide swath of many historic sites within a 40-mile radius.[55] The Agreement also purported to resolve those adverse effects by including a combination of a few minimization measures and undetermined compensatory mitigation, leaving negotiation of this mitigation in the hands of South Fork Wind.[56] The Agreement, however, has no findings explanation or

---

[50] Ex. 2 ¶ 10; Ex. 1 ¶ 10.
[51] SFW 73280.
[52] SFW 73280.
[53] SFW 79688–SFW 79694; SFW 86912–SFW 87041.
[54] SFW 87011.
[55] SFW 87090.
[56] *See* SFW 87057.

analysis addressing how BOEM analyzed cumulative effects or satisfied Section 110(f) of the National Historic Preservation Act (NHPA).

**Proceedings in this Court**

The Preservation Society and Southeast Lighthouse filed their challenge to BOEM's decision to approve the South Fork project on November 22, 2023. The Green Ocean Plaintiffs, including dozens of historic property owners, filed a single complaint challenging BOEM's South Fork and Revolution Wind decisions on January 16, 2024, and that case was assigned to Judge Lamberth, who granted the Government's motion to sever and transfer the South Fork claims to this Court,[57] whereupon the Green Oceans' claims were consolidated with the Preservation Society and Southeast Lighthouse claims.[58] On May 3, 2024, the Court ordered Preservation/Green Oceans to file their consolidated motion for summary judgment.[59] On May 8, 2024, Green Oceans filed an amended complaint in this Court stating its South Forks claims including the historic preservation claims that are the subject of this motion for summary judgment.[60]

**ARGUMENT**

**1.  Standard of Review**

The Administrative Procedure Act authorizes a court to "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law."[61] "Summary judgment is the proper mechanism for

[57] *See* Mem. and Order Granting Mot. to Sever and Mot. to Intervene (Apr. 10, 2024), Case No. 1:24-cv-00141-RCL (D.D.C.), ECF No. 25.
[58] *See* Minute Order (Apr. 18, 2024), Case No. 1:24-cv-01087-APM (D.D.C.).
[59] *See* Minute Order (May 3, 2024), Case No. 1:23-cv-03510-APM (D.D.C.).
[60] *See* Green Oceans Amended Complaint (May 8, 2024), ECF No. 34.
[61] 5 U.S.C. § 706.

11

deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review."[62]

Under the arbitrary-and-capricious standard, courts engage in a "thorough, probing, in-depth review" of agency decision-making.[63] Courts do not substitute their judgment for that of agencies, but neither should they "rubber-stamp" agency decisions.[64] An agency's decision may only be upheld on grounds articulated in the administrative record of the decision.[65] Courts may not make up for deficiencies in an agency decision by "supply[ing] a reasoned basis for the agency's action that the agency itself has not given."[66] And where, as here, the claim is failure to comply with the law, the Court does not defer to the Government agency's opinions of the lawfulness of its actions.[67]

### 2. The Preservation/Green Oceans Plaintiffs Have Standing

To establish Article III standing, an individual or an organization must show (1) an injury-in-fact that is actual or imminent, (2) that is fairly traceable to the challenged action, and (3) that can probably be "redressed by a favorable decision."[68] The principles of standing are aimed at determining whether "a particular plaintiff is the type of person the law intends to protect against the type of harm about which he complains."[69]

---

[62] *Blue Ocean Institute v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008); *see* Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 202–03 (1st Cir. 1999).

[63] *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415-16 (1971).

[64] *Reed v. Salazar*, 744 F. Supp. 2d 98, 110 (D.D.C. 2009).

[65] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

[66] *Id.*

[67] *See Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 597 (D.C. Cir. 2023).

[68] *See Friends of the Earth v. Laidlaw*, 528 U.S. 167, 180-81 (2000); *Lujan v. Defendants of Wildlife*, 504 U.S. 555, 560-61 (1992).

[69] *Munoz-Mendoza v. Pierce*, 711 F.2d 421, 424 (1st Cir. 1983) (citations omitted).

An organization has standing to sue on behalf of its members if the members "would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."[70]

To have standing under the National Historic Preservation Act, a plaintiff must show an interest in the historic property being threatened. This can be done by showing ownership or injuries to aesthetics, architecture, culture, the environment, historic values, or injury to the plaintiff's enjoyment or use of the property. Here, Preservation/Green Oceans can show protectable interests in historic properties they own, historic landmarks, and properties within historic districts, and an interest in the historic values, aesthetics, use, enjoyment, and the environment which are jeopardized by the South Fork Wind Project. This Project has—and will continue to cause—concrete and particularized injuries to Preservation/Green Oceans including their ability to preserve, maintain, and enjoy their historic properties and communities, and will adversely affect their property values.[71]

The harm to these historic properties that South Fork will cause is directly traceable to BOEM's issuance of permits and approvals for the South Fork Wind Project. A favorable decision requiring BOEM to comply with applicable federal historic preservation law and NEPA would redress Plaintiffs' injuries because it could lead to the modification and moving of the turbines, or removal of the Project's turbines as part of the Court's equitable relief.[72]

---

[70] *Laidlaw*, 528 U.S. at 181.
[71] *See* Ex. 6, Decl. of S. Craig ¶ 14 (May 17, 2024); *see also* Ex. 1 ¶ 12; *see also* Ex. 7, Decl. of H. Cushing III ¶ 9 (May 20, 2024).
[72] *See City of Dania Beach v. Federal Aviation Admin.*, 485 F.3d 1181, 1185-87 (D.C. Cir. 2007).

To have standing under NEPA, Plaintiffs must fall within the statute's zone of interests.[73] NEPA's zone of interests "encompasses environmental values" and is construed "very broadly."[74] NEPA's protected environmental values include human health and welfare, the quality of urban life (socio-economic effects, historic and cultural resources), and aesthetic values.

The Supreme Court has held that NEPA protects a broad range of harms, including recreational or aesthetic enjoyment of the environment.[75] While purely economic injuries do not meet the NEPA zone of interest, plaintiffs who allege environmental and economic injuries have satisfied the zone of interest test.[76] Courts

> have often observed that a party is not precluded from asserting cognizable injury to environmental values because his real or obvious interest may be viewed as monetary or disqualified from asserting a legal claim under NEPA because the 'impetus' behind the NEPA claim may be economic. []. Parties motivated purely by commercial interests routinely satisfy the zone of interests test . . . [w]e have even observed that it surely does not square with the broad Congressional purpose in NEPA of assuring that environmental values would be adequately and pervasively considered in federal decision-making for private parties who may not be pure of heart to be excluded from vindicating the Act.[77]

Preservation/Green Oceans have cognizable aesthetic and conservation interests and injuries resulting from the Government's approval to construct the South Fork Wind Project. The construction of this project, which could only happen with the Government's approval, has

---

[73] *CSL Plasma Inc. v. U.S. Customs and Border Prot.*, 33 F.4th 584, 588 (D.C. Cir. 2022).

[74] *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267 (D.C. Cir. 2015).

[75] *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990).

[76] *See Cent. S. Dakota Co-op. Grazing Dist. v. Sec'y of U.S. Dep't of Agric.*, 266 F.3d 889, 896 (8th Cir. 2001).

[77] *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Engineers*, 417 F.3d 1272, 1287–88 (D.C. Cir. 2005) (citing *Realty Income Tr. v. Eckerd*, 564 F.2d 447 (D.C. Cir. 1977); also citing *Amgen, Inc. v. Smith*, 357 F.3d 103 (D.C. Cir. 2004)).

degraded the previously pristine, unimpeded views of the ocean that Preservation/Green Oceans enjoyed.

### 2.1    Plaintiff, Preservation Society of Newport County, Has Standing to Maintain this Suit

Plaintiff, Preservation Society of Newport County, headquartered at 424 Bellevue Avenue, Newport, Rhode Island, is the state's largest cultural organization. Preservation was founded in 1945 to protect Newport County's architectural heritage. The Preservation Society owns and works to preserve historic properties within one of the National Historic Landmark Districts that South Fork Wind will adversely affect. Six of its historic properties are National Historic Landmarks.[78] Through its historic properties, educational programs, and related preservation advocacy, the Preservation Society fosters public engagement in America's heritage.[79]

Preservation Society has legal and economic interests in South Fork's outcome because, in addition to its historic preservation mission, it owns several properties that will be adversely affected by the Project and that are designated as National Historic Landmarks. Those properties include the Breakers, Marble House, the Elms, Chateau-sur-Mer, Kingscote, Isaac Bell House, and Hunter House.[80]

The Preservation Society also participated as a consulting party in BOEM's historic property review for South Fork.[81]

---

[78] *See* National Parks Service, *National Historic Landmarks Program*, https://www.nps.gov/orgs/1582/index.htm.
[79] Ex. 5 ¶ 3.
[80] The Preservation Society of Newport County, *Mansions & Gardens*, https://www.newportmansions.org/plan-a-visit/mansions-gardens/.
[81] *See* Ex. 5 ¶ 10.

**2.2    Plaintiff, Southeast Lighthouse Foundation, Inc., Has Standing to Maintain this Suit**

Plaintiff, Southeast Lighthouse Foundation, Inc., is the non-profit owner of the Southeast Lighthouse, the only National Historic Landmark within the Town of New Shoreham, Rhode Island, on Block Island.[82] The Southeast Lighthouse is also listed in the National Register of Historic Places, the nation's official list of historic places worthy of preservation.[83] The Foundation's mission is to "restore, preserve and protect the Southeast Lighthouse on Block Island" and to support its ongoing maintenance.[84] The Southeast Lighthouse is the first and only National Historic Landmark in the country to have been subjected to the adverse effects of offshore wind development due to its proximity to the South Fork Project.[85]

Established in 1986, the Foundation was created to guide a ten-year campaign to save the historic Southeast Lighthouse on Block Island from being lost due to erosion at the edge of Block Island's Mohegan Bluff. Because of the Foundation's efforts, historic preservation advocacy and stewardship, the Foundation successfully lobbied Congress to pass legislation to authorize the Southeast Lighthouse's relocation three times, raised $2 million, and coordinated national, state, and local agencies to assist in achieving the Foundation's goals. The Foundation's continued mission is to serve as the steward of the Southeast Lighthouse and maintain a public museum about the lighthouse. The Foundation has a direct interest in preserving the Southeast Lighthouse as a national cultural and historic treasure, which it owns. The Foundation and its members have concluded that Southeast Lighthouse, a National Historic Landmark, will be

---

[82] *See* Ex. 4 ¶ 3.
[83] *See* National Parks Service, *National Historic Landmarks Program*, available at https://www.nps.gov/orgs/1582/index.htm.
[84] *See* Ex. 4 ¶ 3.
[85] *See id.* ¶ 7.

adversely affected by the Project. For that reason, the Foundation participated as a consulting party in BOEM's South Fork consultation and now participates as a Plaintiff in this lawsuit.[86]

### 2.3    Plaintiffs Who Own Properties Within the Ocean Drive Historic District Have Standing to Maintain this Suit

Ocean Drive is a roadway that bounds the city of Newport, Rhode Island. Ocean Avenue is bordered on one side by beaches, ocean inlets, and cliffs and on the other side by ponds, swamps, fields, and sizeable residences.[87] The roadway "epitomizes the period's picturesque aesthetic by both traversing and circumscribing the hilly terrain and closely following the handsome, rugged coastline."[88] Each plaintiff has an aesthetic interest in preserving the historic and cultural values of their properties, and each believes that the construction of these turbines has decreased and will continue to decrease their property values.

Plaintiffs, Dee and Richard Gordon, Cornwall Lodge LLC (Duncan and Barbara Chapman), Howard G. Cushing III, 226 Ocean Avenue, Moonwatch LLC, Kathryn K. and Jerome R. Kirby, Mary Cushing Coleman, Allison Gulbrandsen, and Betsy and Michael Vitton (through B2B LLC), all own properties and are listed in Rhode Island's historic property register within the Ocean Drive Historic District.

None of the Plaintiffs were notified by BOEM about the Section 106 historic property consultation, and BOEM gave none of them an opportunity to voice their objections to the Project and fight for the preservation of their homes and properties in the Ocean Drive Historic District.

---

[86] *Id.* ¶ 4.
[87] Dept. of Interior, *National Register of Historic Places*, available at https://www.cityofnewport.com/CityOfNewport/media/City-Hall/Departments/Plan%20-%20Eco%20Dev/Ocean-Drive-Nomination-Forms.pdf
[88] *Id.* at 27.

Each Plaintiff believes that the construction and placement of the 12 South Fork turbines have already altered and impaired the unique coastal vantage point and ocean views from all of the Plaintiffs' properties.[89] By doing so, the construction and placement of the 12 South Fork turbines have had a significant, adverse impact on each Plaintiffs' property value.[90] The South Fork turbines that dramatically and adversely altered the treasured, unimpeded historic views from the homes, and is especially notable at night with the Project's lighting of the turbines.[91]

- Plaintiff, Cornwall Lodge, LLC, owns Cornwall Lodge, which is in the Ocean Drive Historic District.[92] The Lodge is "a late example of the picturesque rustic cottage of the 1920s and early 1930s."[93] Mr. Fritz was an amateur preservationist who collected artifacts of the Gilded Age and installed them in Cornwall Lodge, resulting in "beautiful paneling and sculptures decorating the dining room and living room that once decorated the homes of the 19th Century robber barons."[94] Nearly every window of Cornwall Lodge "offers beautiful views of the ocean, tidal estuary, and wetlands, giving the house a sense of communion" with "the Atlantic Ocean and the forested mounds and peninsulas that make up Gooseneck Cove."[95]

Barbara Chapman, a member of Cornwall Lodge LLC and a resident of the property, avidly works to protect her ocean view and the historic nature of the property.[96] Barbara and her husband, Duncan, are members of Plaintiff, Preservation Society of Newport, and her husband is

---

[89] *See, e.g.*, Ex. 6 ¶ 14; *see also* Ex. 1 ¶ 12; *see also* Ex. 7 ¶ 9.
[90] Ex. 7 ¶ 11. ("The majority of the Ledges' value, perhaps up to 90%, comes from the value of the land and the view.").
[91] *Id.* ¶ 9.)
[92] *See* Ex. 3 ¶ 2.
[93] *Id.* ¶ 3 (citing the National Register of Historic Places Continuation Sheet at 12, https://www.cityofnewport.com/CityOfNewport/media/City-Hall/Departments/Plan%20-%20Eco%20Dev/Ocean-Drive-Nomination-Forms.pdf.).
[94] *Id.* ¶ 3.
[95] *Id.* ¶ 9.
[96] *Id.* ¶ 11.

on the Society's board.[97] Part of Cornwall Lodge's value as a historic property comes from its

"unimpeded views of the ocean that have been unchanged since its construction."[98] Barbara

Chapman believes that losing the ocean view will severely affect the property's value.[99]

- Plaintiff, Ledges 66, LLC, is one of the most historic and prominent properties in

Newport, Ocean Drive, and America.[100] The property is perched on one of Newport's peninsulas

overlooking the Atlantic Ocean.[101] The property is one of the original Ocean Drive homes and

one of the few remaining properties still owned by the original family.[102] The Ledges was home

to the famous painter Howard Gardiner Cushing and has been featured in several feature films

and magazines.[103]

The Ledges has one of the best views of the ocean in Newport. It is on the promontory

between historic Bailey's Beach and Hazards and Gooseberry Beach. The ledges boast over 180-

degree views of the Atlantic Ocean to the Southeast, South, Southwest, and West.[104] South Fork's

turbines severely impair the previously unimpeded ocean view, destroying a historic viewshed

that the owners of and visitors to the property have enjoyed for more than 150 years.[105] Howard

Cushing III, who is the managing member of Ledges 66, LLC, believes that most of the

property's remaining value is in part its views.[106]

---

[97] *Id.*
[98] *Id.* ¶ 15.
[99] *Id.*
[100] Ex. 7 ¶ 2.
[101] *Id.* ¶ 5.
[102] *Id.* ¶ 6.
[103] *Id.* ¶ 7.
[104] *Id.* ¶ 5.
[105] *Id.* ¶ 10-11.
[106] *Id.* ¶ 11.

19

### 2.4    Plaintiffs Who Own Properties Within the Bellevue Avenue Historic District Have Standing to Maintain this Suit

Plaintiffs, Waves S, LLC, Alumni East Associates, EC Properties, Stephen Lewinstein, Lisa Foley, Michael and Paige Pieroni, Karen Blanchard, and Randy Panagakis, own properties in the Bellevue Avenue Historic District. Construction of South Fork has also destroyed the unimpeded ocean views from these properties. Each plaintiff has an aesthetic interest in preserving the historic and cultural values of their properties, and each believes that constructing these turbines has decreased and will continue to decrease their property values.

The Bellevue Avenue Historic District is a Historic District in Newport, Rhode Island, formed around a two-mile stretch that runs from Memorial Boulevard in the north to Bailey's Beach in the south. The District is home to several magnificent homes and resorts developed starting in the 1830s by illustrious architects such as Richard Morris Hunt, Horace Trumbauer, and McKim, Mead, and White. This district has the Breakers, Marble House, and Chateau-sur-Mer properties, which are independently listed as National Historic Landmarks.[107]

- Plaintiffs, Waves S, LLC, Alumni East Associates, EC Properties, Stephen Lewinstein, Lisa Foley, Michael and Paige Pieroni, Karen Blanchard, and Randy Panagakis, all own units of the Waves, which is southernmost house on Aquidneck Island in Newport. This property is an approximately 20,000-square-foot residence built by the renowned architect John Russell Pope in 1926.[108] The property sits on nearly 10 acres of undeveloped property and boats an uninterrupted 270-degree ocean view.[109]

---

[107] Ex. 1 ¶ 3.
[108] *Id.* ¶ 2.
[109] *Id.*

The Government identified the Waves as one of the most impacted properties,[110] but none of the Plaintiffs that own condominium units at the Waves were notified of consultation.[111]

### 2.5    Plaintiffs Who Own Properties Within the Town of Little Compton Have Standing to Maintain this Suit

Charlotte DuHamel owns 581 West Main Road in Little Compton, Rhode Island.[112] This property, also known as the Windmill, is eligible to be placed on the National Register.[113] The Windmill was originally constructed in 1812 and converted into a residence in 1890, with an interior designed by Sidney Burleigh, a renowned Rhode Island artist.[114] Since its construction, the Windmill has had unimpeded, pristine ocean views; views that have been damaged by the construction of South Fork's turbines and views that will continue to be degraded with the construction of future projects.[115] DuHamel believes that losing this viewshed will significantly decrease her property's value and denigrate all the work she and her family has done to preserve her property and the surrounding areas.[116]

BOEM never contacted DuHamel regarding the historic property consultation, and she was not given an opportunity to object to the project and voice her concerns regarding the impacts on her historic property.[117]

---

[110] *Id.* ¶ 10 ("We learned that BOEM had identified our property, described as site A103, as the most adversely affected property on Aquidneck Island, but we were never contacted directly regarding consultation for any of the offshore wind projects.").
[111] *Id.*
[112] Ex. 2 ¶ 1.
[113] *Id.* ¶ 6 (citing State of Rhode Island Historic Property Search, Search: 581 West Main Road, available at https://www.ri.gov/preservation/search/view.php?idnumber=LTCO00042).
[114] *Id.* ¶ 2.
[115] *Id.* ¶ 8.
[116] *Id.*
[117] *Id.* ¶ 10.

Plaintiffs, Doug and Virginia Marzonie, Kristin and Andrew McKee, and Ben and Leigh Carpenter own properties within the Warren's Point Historic District. Construction of South Fork has destroyed the unimpeded ocean views from these properties. Each plaintiff believes that constructing these turbines has decreased and will continue to decrease their property values.[118] Warren's Point Historic District started as an informal summer colony in the late 1880s. Warren's Point was a strategic outpost for the U.S. military during WWII, as the southern exposure and views provided excellent surveillance locations.[119]

Plaintiffs, Andrew and Kristin McKee, own 9 Kempton Place within Warren's Point, which is home to the iconic Radar House. Radar House was built in 1942 as an observation blockhouse during World War II.[120] South Fork's turbines destroy the open ocean view from the property, and future offshore development will further degrade this view.[121] The McKee's were never informed that consultation was underway, so they could not voice their objections to the project or advocate for further protections for their property.[122]

### 2.6    Plaintiffs Who Own Properties in Middletown Have Standing to Maintain This Suit

Plaintiffs, Steven Gewirz and Katrina Hamilton Gewirz, own property within the Indian Avenue Historic District in Middletown, Rhode Island. The Indian Avenue Historic District is in the eastern part of Middletown along the Sakonnet River. The District is named for the many Indian artifacts found in the area. The District was first settled in the early 18th century through

---

[118] *See* Ex. 8, Decl. of A. McKee (May 18, 2024).
[119] *Id.* ¶ 2.
[120] *Id.* ¶ 3.
[121] *Id.* ¶ 7.
[122] *Id.* ¶ 8.

the mid-century and now is home to around "a dozen noteworthy late Victorian and early 20th-century summer houses and a picturesque stone chapel built in 1884."[123]

Plaintiff, Veter et Nova Trust (Sandra Craig), owns 501 Indian Avenue, which is in the Stonybrook Estate Historic District, in Middletown, Rhode Island. The Stonybrook Estate Historic District is an 8.6-acre, lushly vegetated tract covering both sides of Indian Avenue in Middletown, Rhode Island.[124] The District is home to the Stonybrook Historic Estate, which is "majestically perched on the edge of the seashore."[125] Construction on the manor finished in 1929, and the home is the centerpiece of "an elegant complex of similarly designed field stone buildings and appurtenances."[126] "The quintessential feature of Stonybrook is its dramatic open ocean view of the Atlantic Ocean, including the South Fork lease areas and beyond."[127] "The manor house was purposely and dramatically sited as close as possible to the edge of the shore in close proximately to the shore. . . to take advantage of the breathtaking sea views."[128]

Craig values the pristine, natural beauty of the open sea that she can view from the property. Construction of these turbines will destroy the open view that has been open and undisturbed for more than a hundred years,[129] destroying her aesthetic interests in the property and gutting her property's value. She believes that the construction of South Fork and the construction of the other offshore wind projects—Sunrise Wind and Revolution Wind—will reduce her property's fair market value by over 50%.[130]

---

[123] Ex. 9, Declaration of Katrina Gewirz (May 20, 2024).
[124] Ex. 6 ¶ 2
[125] *Id.* ¶ 5.
[126] *Id.* ¶ 6.
[127] *Id.* ¶ 8.
[128] *Id.* ¶ 10.
[129] *Id.* ¶ 14.
[130] *Id.* ¶ 17.

Craig only learned of the South Fork and other projects from a friend with a home in another historic district. She was never told that historic property consultation was underway and was not asked to consult or provide input on the Project's impacts on her property value. Had she been given an opportunity, she would have strenuously opposed the Project.

**3. BOEM Violated the National Historic Preservation Act By Failing to Notify and Consult With Historic Property Owners, and to Take Necessary Measures to Protect the Historic Context of Newport and Block Island Including its Unobstructed Ocean Views**

Congress enacted the National Historic Preservation Act in 1966 to preserve "the historical and cultural foundations of the United States" and "ensure future generations a genuine opportunity to appreciate and enjoy the rich heritage of our Nation: in the face of proposals to extend "urban centers, highways, and residential, commercial, and industrial developments."[131] But in approving the South Forks Project, BOEM failed to comply with two of the key provisions of the Preservation Act: Section 110(f),[132] and Section 106[133]

BOEM's hasty and half-hearted efforts to comply with the Preservation Act fall far short of its requirements—a condition precedent to approving the South Fork Project. BOEM's Record of Decision should therefore be vacated and set aside as arbitrary, capricious, and otherwise not in accordance with the statutory and regulatory requirements of the Preservation Act.

**3.1    BOEM Failed to Comply With Section 110(f), Which Mandated That BOEM Undertake Planning and Actions Necessary to Minimize Harm to National Historic Landmarks**

Section 110(f) of the National Historic Preservation Act mandates that "[p]rior to the approval of any Federal undertaking that may directly and adversely affect any National Historic

---

[131] Pub. L. No. 89-665, 80 Stat. 915 (Oct. 15, 1966).
[132] 54 U.S.C. § 306107.
[133] 54 U.S.C. § 306108.

24

Landmark, the head of the responsible Federal agency shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark.[134]

The Section 110(f) Guidelines, applicable to all federal agencies,[135] state that Section 110(f) "requires that Federal agencies exercise a higher standard of care when considering undertakings that may directly and adversely affect NHLs [National Historic Landmarks]."[136] In addition, the Guidelines further mandate that agencies "consider all prudent and feasible alternatives to avoid an adverse effect on the NHL [National Historic Landmark]."[137] This directive, read in light of Section 110(f)'s plain language and legislative history, provides clear guidance as to the statute's mandate—to set the strongest and highest standard of care possible for the protection of National Historic Landmarks, including those owned by Preservation Society and Southeast Lighthouse, as well as the historic districts where many Green Oceans property owners reside.[138]

National Historic Landmarks are properties that have "exceptional value to the nation as a whole rather than to a particular State or locality," must retain a high degree of historic integrity, and may only be designated by the Secretary of the Interior.[139] The National Park Service maintains a National Register of Historic Places, "the official list of the Nation's historic places worthy of preservation," which "is part of a national program to coordinate and support

---

[134] 54 U.S.C. § 306107.
[135] 63 Fed. Reg. 20495, 20496 (Apr. 24, 1998).
[136] *Id.* at 20503.
[137] *Id.*
[138] The requirement that agencies "consider all prudent and feasible alternatives to avoid an adverse effect on [an] NHL" mirrors that of Section 4(f) of the Department of Transportation Act (23 U.S.C. § 138(a); 49 U.S.C. § 303(c)), which the Supreme Court has referred to as a "plain and explicit bar" prohibiting damage to historic resources. *Citizens to Preserve Overton Park*, 401 U.S. at 411.
[139] 36 C.F.R. §§ 65.2(a), 65.4.

public and private efforts to identify, evaluate, and protect America's historic and archeological resources."[140]

The D.C. Circuit has held that adverse visual effects are direct effects on landmark properties, and trigger Section 110(f)'s application.[141] Yet BOEM utterly failed to even identify the numerous historic properties owned by preservation and Green Oceans, let alone take any measures to minimize the devastating, adverse visual effects that hundreds of giant wind turbines will cause to these irreplaceable historic landmarks.

As Green Oceans Plaintiffs have stated, they received no notice that South Fork historic consultation was underway,[142] nor were they asked to provide their input on how the South Fork Wind project would affect their historic properties.[143] Preservation Society Plaintiffs participated in the consultation process, despite lack of notice from BOEM, only because they requested to be a consulting party.[144]

The administrative record proves, and BOEM admits, that South Fork will adversely affect designated landmark properties, including the Plaintiffs' historic properties.[145] The Record reveals, however, that the only communication BOEM had with the National Park Service, with whom BOEM was required to consult for Section 110(f) purposes, is a smattering of emails and phone call references, that do nothing but reference the name of the statute.[146]

---

[140] *See* National Parks Service, *National Historic Landmarks Program*, available at https://www.nps.gov/orgs/1582/index.htm.
[141] *National Park Conservation Ass'n v. Semonite*, 916 F.2d 1075, 1088-89 (D.C. Cir. 2019).
[142] *See* Ex. 10, Declaration of K. Blanchard ¶ 9 (May 18, 2024); Ex. 3 ¶ 17; Ex. 6 ¶ 16; Ex. 7 ¶ 12; Ex. 2 ¶ 10; Ex. 9 ¶ 8; Ex. 11, Declaration of D. Gordon ¶ 8 (May 18, 2024); Ex. 1 ¶ 10; Ex. 8 ¶ 9; Ex. 12, Declaration of E. Vitton ¶ 14 (May 20, 2024).
[143] *Id.*
[144] SFW 81774.
[145] SFW 78504.
[146] *See* SFW 76631, SFW 75446, SFW 60827.

BOEM cannot point to any evidence within the Administrative Record to show how it complied with Section 110(f). Even the Record of Decision—BOEM's decision document—fails to address the issue. It provides no explanation as to how BOEM complied with Section 110(f)'s stringent mandates to exercise a "higher standard of care,"[147] "consider all prudent and feasible alternatives to avoid an adverse effect on the NHL[,]"[148] and "to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm."[149] As BOEM admits, "the only alternative that BOEM was able to identify that avoids any effects on the Block Island South East Lighthouse NHL was the no-action alternative."[150]

For that reason alone, Plaintiffs are entitled to summary judgment and BOEM's decision to authorize the South Fork Project is arbitrary, capricious, and contrary to law. Therefore, the Court should vacate South Fork's permit and remand the matter to BOEM with directions that BOEM redo the Record of Decision so that it complies with Section 110(f) as to all adversely affected NHLs, including those in Newport and the Southeast Lighthouse.

### 3.2 BOEM Violated Section 106 By Failing to Notify Historic Property Owners, Identify All Historic Properties, and Take Into Account the Adverse Effects of South Fork On Historic Properties

Independently of Section 110(f), Section 106 of the Preservation Act mandates that federal agencies must consider the effects on historic properties before issuing a license (here,

---

[147] 63 Fed. Reg. 20503.
[148] *Id.*
[149] 54 U.S.C. § 306107. The most obvious way to minimize harm to NHLs like Newport's Bellevue Avenue and Ocean Drive Historic Districts and the Southeast Lighthouse would have been at the earliest stage of planning to consider lease areas that were far enough from shore—40-45 miles—so that all wind turbines would be invisible. But BOEM (or BOEM's predecessor agency, MMS) never did this. Instead, federal wind energy leasing was segmented in such a way so lease area siting would never receive the full scrutiny that NEPA and NHPA would provide.
[150] SFW 78505.

BOEM's record of decision): "prior to the issuance of any license, shall take into account the effect of the undertaking on any historic property."[151] This BOEM failed to do.

Section 106 regulations require federal agencies to follow a sequencing process where the legal correctness of each step depends on correct application of the one before it.[152] These steps include providing notice that Section 106 review is underway, identifying historic properties, determining how those historic properties will be affected, and exploring ways to avoid, minimize, or mitigate harm.[153]

Section 106 contemplates the need for federal agencies to consult with "certain individuals and organizations with a demonstrated interest in the undertaking [who] may participate as consulting parties due to the nature of their legal and economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties."[154] This is because agencies must provide a plan for public participation, whose views are "essential to informed Federal decisionmaking in the section 106 process,"[155] and "provide the public with information about an undertaking and its effects on historic properties and seek public comment and input."[156] The plan to involve the public "shall identify appropriate points for seeking public input and for notifying the public of proposed actions," and the agency must consult with the relevant state historic preservation officer and tribal historic preservation officer to identify other consulting parties to notify.[157] Agencies must also provide notice to

---

[151] 54 U.S.C. § 306108.
[152] 36 C.F.R. Part 800.
[153] 36 C.F.R. § 800.3 (initiation of the process), § 800.4 (identification of historic properties), § 800.5 (assessment of adverse effects), and § 800.6 (resolution of adverse effects).
[154] 36 C.F.R. § 800.2(c)(5).
[155] 36 C.F.R. § 800.2(d)(1)
[156] 36 C.F.R. § 800.2(d)(2).
[157] 36 C.F.R. § 800.3(e); 36 C.F.R. § 800.3(f).

consulting parties and involve the public at later stages of the Section 106 process during consultation to explore ways to avoid, minimize, or mitigate adverse effects and invite anyone to consult who will assume a role or responsibility in a memorandum of agreement.[158]

Although agencies have flexibility in terms of how to develop a comprehensive list, identification of historic properties always requires reviewing existing information about historic properties within the area of potential effect, the geographic area or zone within which an undertaking may directly or indirectly cause alterations in their character or use.[159] But BOEM violated Section 106 when it authorized South Fork because it never notified and identified all historic properties, which meant it could never assess all adverse effects to those properties, including cumulative effects.[160] BOEM failed to act in good faith in providing notice about the Section 106 process, the whole point of which is to identify historic properties potentially affected by the undertaking, assess its effects, and seek ways to avoid, minimize, or mitigate any adverse effects on those properties.[161]

In addition to using existing research, federal agencies are expected to seek information from consulting parties, individuals, Tribes, and organizations likely to have knowledge or concerns with historic properties in the area and identify issues related to the undertaking's potential effects on those properties.[162] In all cases, federal agencies are expected to make a "good faith effort" to carry out appropriate identification efforts.[163] Making a good faith effort means taking into account past planning, research and studies, the magnitude and nature of the

---

[158] 36 C.F.R. § 800.6(a)(2), 36 C.F.R. § 800.6(a)(4).
[159] 36 C.F.R. §§ 800.4(a)(1)-(a)(2); 36 C.F.R. § 800.16(d).
[160] *See* Ex. 10 ¶ 9; Ex. 3 ¶ 17; Ex. 6 ¶ 16; Ex. 7 ¶ 12; Ex. 2 ¶ 10; Ex. 9 ¶ 8; Ex. 11 ¶ 8; Ex. 1 ¶ 10; Ex. 8 ¶ 9; Ex. 12 ¶ 14.
[161] 36 C.F.R. § 800.1(a).
[162] 36 C.F.R. § 800.4(a)(3).
[163] 36 C.F.R. § 800.4(b)(1).

undertaking, the nature and extent of potential effects on historic properties, and nature and location of historic properties within the area of potential effects.[164]

On June 1, 2021, after it became apparent that virtually no one on Block Island or in Newport knew about the Government's plans to authorize the South Fork Project, Preservation Society and the Town of New Shoreham notified BOEM:

> [We] have serious concerns about whether all relevant preservation advocacy groups and property owners were notified about the South Fork Wind Farm. Their participation is needed so that BOEM and the public can understand the full range of South Fork's adverse effects with the Area of Potential Effect. . . . For example, it appears that Preserve Rhode Island, Rhode Island's only stateside preservation advocacy group was not notified, nor were the Preservation Society of Newport County or the Newport Restoration Foundation, even though they own properties in Newport within historic districts listed in the National Register of Historic Places and designated as National Historic Landmarks. These omissions are especially surprising in light of the fact that [BOEM's research and reports] specifically list The Breakers, Marble House, Bellevue Avenue Historic District, and Ocean Drive historic District—all located in Newport and several owned by the above organizations—as being within the Area of Potential Effect. *Id.* at 11, 15. However, these properties do not appear in the list of properties (Finding of Adverse Effect at 1), expected to experience adverse effects, even though they appear with the Area of Potential Effect and face the ocean. **It is highly probable that the owners of these properties—if invited to participate—would have a different opinion than BOEM about the significance of South Fork's expected visual effects.** (emphasis added).[165]

BOEM never addressed their concerns.

Preservation Society, which BOEM never notified, had to write to BOEM on October 19, 2021, requesting consulting party status on South Fork, Revolution, and Sunrise Wind, even

---

[164] *Id.*
[165] Letter from William J. Cook, Cultural Heritage Partners, PLLC, to Mary Boatman, BOEM (June 1, 2021), SWF 73280.

though the Preservation Society is Rhode Island's largest historic preservation organization and owns three National Historic Landmark properties that face the ocean.[166]

In identifying historic properties, BOEM also failed to notify Green Oceans Plaintiffs who own historic properties that will be adversely impacted by the project. Although these properties are designated National Historic Landmarks and within historic districts that BOEM admitted would be adversely affected by the project, BOEM failed to notify these owners of their opportunity to comment on proposed action, depriving them of the opportunity to participate in the Section 106 consultation process. Because each step of the Section 106 process depends on the correct application of the one before it, BOEM's failure to notify and solicit input from these owners of historic property owners impermissibly narrowed the NHPA review process.

BOEM never made a good faith effort to identify historic properties and never arrived at anything close to a comprehensive list. This is important to the Section 106 process because every decision flows from it. Nevertheless, the Administrative Record shows that when BOEM started the Section 106 process, BOEM identified only a handful of historic properties out of hundreds in the area that South Fork had the potential to adversely affect.[167] Plaintiff Southeast Lighthouse Foundation, along with the Town of New Shoreham (also a consulting party), pointed out the error, noting that BOEM had missed dozens of other historic properties with direct views of South Fork's proposed location, including another historic lighthouse, the Block Island North Light.[168] BOEM never corrected the error.

---

[166] Letter from Trudy Coxe, Preservation Society of Newport County, to Michelle Morin, BOEM, and Scott Phillips, SWCA Environmental Consultants (Oct. 19, 2021), SFW 81772-81773.

[167] Notwithstanding the massive size and scale of South Fork and its adjacency to Revolution Wind and Sunrise Wind, BOEM managed to identify only seven historic properties on Block Island. SFW 78494 at 20.

[168] SFW 73279 (missing Block Island historic properties that BOEM never considered).

Because BOEM never completed the identification of historic properties in good faith, South Fork's Record of Decision is arbitrary, capricious, and contrary to law.

### 3.3    BOEM Failed to Assess the Adverse Effects of the Project

Assessing adverse effects requires agencies to "apply the criteria of adverse effect to historic properties within the area of potential effects.  The agency official shall consider any views concerning such effects that have been provided by consulting parties and the public."[169] The Section 106 regulations provide:

> An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association. . . . Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative.[170] Adverse effects include "introduction of visual atmospheric elements that diminish the integrity of the property's historic features.[171]

Here, BOEM erred in assessing adverse effects because BOEM (1) failed to identify historic properties; (2) used inadequate visual simulations designed to minimize the appearance of South Fork's impact, and (3) failed to consider adequately the cumulative effects of Revolution Wind and Sunrise Wind, two much larger projects immediately adjacent to South Fork, that BOEM was in the process of authorizing.[172]

One of the major flaws in BOEM's Section 106 process is that no one ever understood the full extent of South Fork's adverse visual effects because BOEM's visual simulations did not account for South Fork's worst-case scenarios, only its best-case ones on hazy, low-contrast days

---

[169] 36 C.F.R. § 800.5.
[170] 36 C.F.R. § 800.5(a)(1).
[171] 36 C.F.R. § 800.5(a)(2).
[172] *See* Revolution Wind Record of Decision *supra* note 8; *see also* Sunrise Wind Record of Decision *supra* note 9.

from an inappropriately narrow set of observation points.[173] For this reason Preservation requested repeatedly for BOEM to provide additional visual simulations to and from historic properties because without them, it is impossible for anyone to comprehend South Fork's direct, indirect, and cumulative effects.[174]

BOEM had a duty to provide this information during consultation so that BOEM, consulting parties, and the public would understand how South Fork's direct, indirect, and cumulative effects might harm historic properties. The number and density of the South Fork, Revolution, and Sunrise Wind Farms will create a visual mass that will have a presence of large-scale modern infrastructure on the horizon that cannot be avoided.[175] These wind farms will inexorably change the historic nature of these communities, their feeling, their association, and the connections of these historic places to the ocean and its unimpeded horizon, all of which were purpose built to take advantage of the view.[176]

The visual simulations BOEM provided were in a format and quality impossible to judge or interpret and far too limited in scope.[177] There were no simulations depicting construction impacts, for example, and all simulations used a single viewpoint at ground level.[178] For this reason, consulting parties requested additional simulations representing each season at different times of day, including high sunlight contrast, with strict adherence to guidelines and methodology recommended by BOEM.[179] Likewise, consulting parties called for additional

---

[173] *See* SFW 70518 (describing the approach to visual simulations for South Fork).

[174] *See also* SFW 91286, SFW 79690 (objections to South Fork's visual simulations).

[175] SFW 91286.

[176] SFW 14062; SFW 14062.

[177] SFW 70526-SFW 70547.

[178] *Id.*; *see also* SFW 91286, SFW 79690.

[179] U.S. BUREAU OF OCEAN ENERGY MANAGEMENT, RENEWABLE ENERGY VIEWSHED ANALYSIS AND VISUAL SIMULATIONS FOR THE NEW YORK OUTER CONTINENTAL SHELF CALL AREA:

visual simulations to and from Newport-based properties and the Southeast Lighthouse because the public experiences the views of historic properties to and from the ocean, especially in maritime communities like Newport and Block Island. BOEM refused.

Southeast Lighthouse lodged repeated objections during the Section 106 process because BOEM never adequately assessed effects to the Southeast Lighthouse NHL or to Block Island as a whole.[180] Although the Preservation Society Objected, BOEM excluded Newport County's historic properties from its assessment of adverse effects.[181] Moreover, BOEM based its decision on South Fork being 25 miles from Newport. However, BOEM included Newport County's historic properties in its Section 106 review of Sunrise Wind, which will be 28.9 miles from Newport. This is direct evidence of BOEM's mistake.[182]

BOEM completely overlooked that these properties were purpose-built to take advantage of uninterrupted ocean views, an inseparable part of their historic context, setting, location, and atmosphere. The development of these properties also demonstrates broad patterns of history, particularly in terms of the evolution, preservation, and maintenance of summer resort communities.[183] Furthermore, their historic properties maintain connections to living communities who visit Newport and Block Island for multiple generations.[184] Yet BOEM never took these connections into account. Yet BOEM never took these connections into account even though BOEM acknowledged that the Breakers NHL, Marble House NHL, Bellevue Avenue Historic District and Ocean Drive Historic District were given a rating

---

COMPENDIUM REPORT, *available at* https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/NY/Visual-Simulations/Compendium-Report.pdf.

[180] SFW 70507.

[181] SFW 70507; SFW 78487.

[182] Sunrise Wind Record of Decision *supra* note 9.

[183] *See*, *e.g.*, Ex. 5; SFW 81774-SFW 81775.

[184] *Id.*

34

of *moderate* to *major* potential for adverse visual effects due to their "location on the seafront, historic relationship with views of the ocean, and the high level of sensitivity to visual effect."[185]

Nor did BOEM correctly assess the cumulative effects of Revolution Wind and Sunrise Wind, two projects by Orsted, South Fork's developer, of two hundred additional turbines that wrap around South Fork, even though BOEM was required to do so under Section 106 and NEPA.[186] Nor did BOEM provide any analysis of economic impacts to the owners of historic properties who often depend on tourism revenues or a potential loss in property values that could be diminished by South Fork and other wind farms' cumulative effects, even though consulting parties requested the information.[187] Because BOEM failed to assess adverse effects to all historic properties as Section 106 requires, its Record of Decision approving South Fork was arbitrary, capricious, and contrary to law.

### 3.4    BOEM Failed to Avoid, Minimize, or Mitigate Harm Prior to Approving the Project

The final step in the Section 106 process, which depends on the correctness of the steps before it, is to "resolve" adverse effects in a binding memorandum of agreement ("MOA"). Resolution of adverse effects is the technical term that describes how federal agencies are required to find ways through consultation to avoid, minimize, or mitigate adverse effects and execute a memorandum of agreement that memorializes these measures.[188] The agency shall invite any individual or organization that will assume a specific role or responsibility in a memorandum of agreement to participate as a consulting party.[189] The MOA "evidences the

---

[185] SFW 66458
[186] SFW 70507.
[187] BOEM also failed to analyze economic impacts to Newport and Block Island and cumulative impacts, a NEPA violation. *See* Section 4 below.
[188] 36 C.F.R. § 800.6.
[189] 36 C.F.R. § 800.6(a)(2).

agency official's compliance with [Section 106] and shall govern the undertaking and all of its parts."[190] Section 106 makes clear that agencies must complete this final step to resolve adverse effects *prior to* issuing a permit.[191]

Here, on top of BOEM's failure to assess all adverse effects on all historic properties, BOEM failed to avoid, minimize, or mitigate adverse effects prior to issuance of the Project's permit because of all of the errors discussed above resulting in failure to resolve adverse effects prior to issuing a permit.[192] Then BOEM erred again in terminating the Section 106 process with an unenforceable MOA[193] that kicked BOEM's decisions on how to mitigate adverse effects nine months after issuance of the Record of Decision—instead of a completed one prior to the Record of the Decision that Section 106 requires.

As the Administrative Record shows, not a single material thing changed about South Fork in terms of harm to historic properties from BOEM's beginning of the Section 106 process until the end of the Section 106 process—not the turbines' height, scale, or massing; not their color; not their lighting; not their proximity to shore; or not the footprint on thousands of acres of ocean. After ignoring the views of consulting parties and their objections to the MOA, BOEM executed it anyway, leaving open how to resolve adverse effects to historic properties in Newport and on Block Island as well as how BOEM intended to comply with Section 110(f).

The MOA also leaves unresolved mitigation of the adverse effects of the South Fork Project. Instead, the MOA merely states that sometime in the future "BOEM, with the assistance of [South Fork Wind], will develop and implement Historic Preservation Treatment Plans. . . in

---

[190] 36 C.F.R. § 800.6(c).
[191] 54 U.S.C. § 306108.
[192] *Id.*
[193] *See* SFW 87055- SFW 87064 (describing unresolved mitigation proposals).

consultation with the signatories, invited signatories, and property owners and consulting parties who have a demonstrated interest in a specific historic property."[194] BOEM ignored the objections of Preservation Society and took the incredible step of putting South Fork (the fox) in charge of mitigation (the henhouse). Even if BOEM had devised a mitigation plan prior to South Fork's approval, it could not have mitigated all adverse effects because of the failed Section 106 process. For these reasons BOEM's Section 106 process was arbitrary, capricious, and contrary to law.

**4. BOEM Violated NEPA By Failing to Adequately Analyze the Adverse Impacts of the Project on Preservation's and Green Oceans' Historic Properties, and Failing to Analyze Alternatives That Would Have Reduced Those Adverse Impacts**

Congress passed the National Environmental Policy Act ("NEPA") so that the federal agencies and the public could understand the anticipated environmental effects of major infrastructure projects on the human environment prior to their approval.[195] As with other effects on the environment, NEPA requires that BOEM take a "hard look" at the effects of offshore wind energy developments on historic and cultural resources before approving it for construction.[196]

**4.1 BOEM Violated NEPA by Failing to Properly Analyze the Project's Significant Impacts on Plaintiffs' Historic Properties[197]**

NEPA serves as our "basic national charter for the protection of the environment"[198] and requires "the federal government to identify and assess in advance the likely environmental

---

[194] SFW 87055.

[195] 42 U.S.C. §§ 4321-4345; 40 C.F.R. §§ 1500-15184.

[196] *See Greater Box. Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970).

[197] Green Oceans plaintiffs raise additional NEPA issues in their Amended Complaint but, as ordered by the Court, here address only those NEPA issues that overlap with the historic preservation issues raised by the Preservation Society Plaintiffs. *See* Minute Order (May 3, 2024), Case No. 1:23-cv-03510-APM (D.D.C.).

[198] 40 C.F.R. § 1500.1(a).

impact of its proposed actions, including its authorization or permitting of private actions" like the South Fork Wind Project.[199] NEPA achieves its purpose by "action forcing procedures . . . requir[ing] that agencies take a hard look at environmental consequences" of their proposed actions.[200] NEPA's "hard look" requires federal agencies to analyze and consider "any adverse environmental effects which cannot be avoided."[201] To comply with NEPA, agencies must consider "[b]oth short- and long-term effects . . . [b]oth beneficial and adverse effects . . . [e]ffects on public health and safety . . . [and e]ffects that would violate Federal . . . law protecting the environment."[202]

As the D.C. Circuit has held, Government authorizations like the approval of the South Fork Project require the action agency to prepare an Environmental Impact Statement (EIS) that analyzes the project's significant impacts on our nation's historic heritage:

> In order to "create and maintain conditions under which man and nature can exist in productive harmony," the National Environmental Protection Act (NEPA), 42 U.S.C. § 4331(a), requires any federal agency issuing a construction permit, opening new lands to drilling, or undertaking any other "major" project to take a hard look at the project's environmental consequences, id. § 4332(2)(C), including the impacts it may have on "important historic . . . aspects of our national heritage," id. § 4331(b).[203]

The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's "action-forcing" purpose in two important respects.[204] NEPA

---

[199] *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 36 (D.C. Cir. 2015).
[200] *Robertson v. Methow Valley Citizens Counsel*, 490 U.S. 332, 350 (1989).
[201] 42 U.S.C. § 4332(C)(ii).
[202] *Id.*
[203] *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1077 (D.C. Cir.).
[204] *See Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 97 (1983); *Weinberger v. Catholic Action of Hawaii/Peace Education Project,* 454 U.S. 139, 143 (1981).

ensures that the agency, in reaching its decision, will have available and will carefully consider detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision.[205]

NEPA regulations require that environmental impact statements "shall provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."[206] The regulations further require that environmental impact statements "shall be . . . supported by evidence that the agency has made the necessary environmental analyses[]"[207] and "shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made."[208]

So, "[b]y so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."[209]

As described in Argument 3, Here, BOEM's haphazard procedure for notifying owners of historic properties and analyzing South Fork's impacts on Rhode Island's numerous historically important properties and districts fell far short of NEPA's requirements, rendering BOEM's Record of Decision arbitrary, capricious, and not in accordance with law.[210]The Environmental Impact Statement fails to address and mitigate the impacts on historic properties owned by Preservation and Green Oceans Plaintiffs, instead punting the analysis for an undefined later date. The EIS does not assess the impacts on the many National Historic Landmarks in the

---

[205] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).
[206] 40 C.F.R. § 1502.1.
[207] *Id.*
[208] 40 C.F.R. § 1502.2(g).
[209] *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989) (citing *Robertson,* 490 U.S., at 349).
[210] *See* 5 U.S.C. § 706(2).

Newport area—a fact that BOEM admits but claims this critical analysis of impacts on the

human environment can be postponed because of "BOEM's determination that the approval of

the Project COP is subject to the Section 106 consultation process under the NHPA [National

Historic Preservation Act]."[211] As a consequence, BOEM's November 23, 2021 approval of the

South Fork Project was predicated on an incomplete EIS that did not analyze impacts on historic

landmarks—and a Preservation Act analysis that failed to even acknowledge the existence of

many National Historic Landmarks adversely affected by the Project.

By shirking its duty to ensure that adverse effects to historic properties are analyzed,

considered, and mitigated to the maximum degree possible during its environmental review

process, BOEM unlawfully committed to approving the project before resolving adverse effects

to historic properties.[212] Such circumstances show that "the agency did not comply with NEPA's

requirements concerning the timing of their environmental analysis, thereby seriously impeding

the degree to which their planning and decisions could reflect environmental values."[213]

### 4.2    The EIS Fails to Consider Cumulative Effects on Historic and Cultural Resources as Required by NEPA

NEPA regulations require that an Environmental Impact Statement include an analysis of

"[c]umulative actions [that] when viewed with other proposed actions have cumulatively

significant impacts and should therefore be discussed in the same impact statement"[214] and

"[s]imilar actions [that] when viewed with other reasonably foreseeable or proposed agency

actions, have similarities that provide a basis for evaluating their environmental consequences

---

[211] SFW 74155.

[212] 42 U.S.C. § 4332(C).

[213] *Metcalf v. Daley*, 214 F.3d 1135, 1143–44 (9th Cir. 2000) (citing *Save the Yaak Committee v. Block,* 840 F.2d 714, 718–19 (9th Cir. 1988)).

[214] 40 C.F.R. § 1508.25(a)(2).

together."[215] This cumulative impact requirement ensures that agencies consider the collective effects of individually minor but related actions over time when analyzing the environmental impacts of a proposed government action.[216]

> The cumulative impact is
>
> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency ... or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time."[217]

BOEM's South Fork Environmental Impact Statement improperly analyzes the impacts of the Project as though they were isolated. But South Fork is merely the first phase of the much larger Deepwater Wind Project that, together with the adjacent Sunrise Wind Project, will fill the ocean panorama from Plaintiffs' historic properties with hundreds of giant turbines standing nearly twice the height of the Washington Monument and covering thousands of acres of ocean surface.

The Deepwater Wind Project lease covers a 97,498-acre area offshore Rhode Island.[218] The Project owners later decided to build in two phases, which they renamed South Fork Wind and Revolution Wind, describing the latter as an "additional, adjacent, and/or concurrent offshore wind project."[219] And adjacent to South Fork/Revolution Wind (consisting of up to 112 giant turbines) is yet another project, Sunrise Wind, which BOEM recently approved to construct

---

[215] 40 C.F.R. § 1508.25(a)(3).

[216] *Accord Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1314 (D.C. Cir. 2014) ("The justification for the rule against segmentation is obvious: it "prevent[s] agencies from dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.") (quoting *NRDC v. Hodel,* 865 F.2d 288, 297 (D.C.Cir.1988)).

[217] 40 C.F.R. § 1508.7.

[218] Bureau of Ocean Energy Management, *Lease for OCS-A 0486* (Sept. 9, 2013).

[219] SFW 42740; *see also* SFW 496

up to 94 additional giant wind turbines. When fully built out, these three projects (South Fork, Revolution, and Sunrise) will present a unified vista of giant windmills sprawling across the sea and marring the formerly pristine ocean view from Preservation/Green Oceans' historic properties.

But, instead of analyzing the Government's action as authorization of the massive 200-turbine installation it will be when completed, BOEM chose to segment out the 12 South Fork turbines and analyze them as though the other 194 giant turbines would not exist side-by-side with the 12 in the near future.

BOEM's conclusion that the Project would not adversely affect historic properties owned by the Preservation Society, Green Oceans landmark owners,  and others located within Newport's Bellevue Avenue Historic District, Ocean Drive Historic District, or other historic properties on Block Island,[220] not only lacks any factual analysis but is contradicted by BOEM's own opposite conclusions in its own Historic Resources Visual Effects Analysis, which found these properties would be adversely affected.[221]

NEPA regulations ensure that an agency cannot "impermissibly segment its NEPA analysis" by "dividing one project into multiple individual actions each of which individually has an insignificant environmental impact, but which collectively have a substantial impact."[222] Because BOEM segmented the South Fork portion of the Deepwater Project for separate analysis, and failed to analyze these cumulative effects of the South Fork Project—that is, "the

---

[220] SFW 78494.

[221] *See* SFW 14049 (identifying Bellevue Avenue Historic District and Ocean Drive Historic District as historic properties within the adverse effects area with "views of the ocean [] essential to the planning and construction of the contributing buildings").

[222] *Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1326 (D.C. Cir. 2015) (internal quotations and citations omitted).

incremental impact of the action when added to other past, present, and reasonably foreseeable future actions"[223]—the EIS failed to comply with NEPA's requirement to fully inform the decision maker, BOEM, of the Project's "significant impacts on the human environment[.]"[224] BOEM's Record of Decision was thus arbitrary, capricious, and not in accordance with the law.

### 4.3    The EIS Fails to Properly Analyze the No-Action Alternative

NEPA requires that the final Environmental Impact Statement include analysis of the "No-Action alternative," which NEPA regulations define as either "no ground-disturbance" or "no project."[225] NEPA regulations also state that the consideration of alternatives is "the heart of the environmental impact statement."[226] Yet, even though BOEM states in its Final Environmental Impact Statement for South Fork Wind that the No-Action Alternative is an environmentally preferable alternative that "causes the least damage to the biological and physical environment and best protects, preserves, and enhances historical, cultural, and natural resources,"[227] BOEM summarily rejected the no-action alternative without further analysis on the erroneous grounds that "it would not allow for the development of DOI-managed resources and would not meet the purpose and need" of the South Fork Project.[228] In short, BOEM failed to offer the decision-maker the true no-action alternative of deciding not to authorize construction of the Project—a flat violation of NEPA's no-action alternative requirement.

---

[223] 40 C.F.R. § 1508.7.
[224] 42 U.S.C. § 4332(2)(C).
[225] 43 C.F.R. § 46.30.
[226] 40 C.F.R. § 1502.
[227] 43 C.F.R. § 46.30.
[228] South Fork Record of Decision *supra* note 1 at 16.

"Informed and meaningful consideration of alternatives, including a no-action alternative, is central to the NEPA statutory scheme."[229]

The consequence of eliminating the no-action alternative, as BOEM did here, is to unlawfully limit the decision-maker's choices to different ways of proceeding with the Project—not offering the choice of deciding not to authorize South Fork at all. By eliminating the no-action alternative, the EIS impermissibly limited its analysis of reasonable alternatives to a few variations on how to construct the South Fork Wind Project "by adopting private interests to draft a narrow purpose and need statement that excludes alternatives that fail to meet specific private objectives" and "craft a purpose and need statement so narrowly drawn as to foreordain approval of" a project proposed by a private party."[230] Courts have recognized that the "'[t]he unequivocal intent of NEPA is to require agencies to consider and give effect to the environmental goals set forth in the Act, not just to file detailed impact studies which will fill governmental archives.'"[231]

In its Record of Decision, BOEM ostensibly admits that in considering and selecting an alternative for the project, the No Action Alternative was never actually considered: "The No Action Alternative was not selected because it would not allow expeditious and orderly development of DOI-managed resources and would not meet the purpose and need of the Proposed Action."[232] Thus, no matter how environmentally preferable, the No Action Alternative

---

[229] *Oregon Nat. Res. Council Action v. U.S. Forest Serv.*, 445 F. Supp. 2d 1211, 1223 (D. Or. 2006) (citing *Alaska Wilderness Recreation & Tourism Ass'n v. Morrison,* 67 F.3d 723, 729 (9th Cir.1995)).

[230] *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010).

[231] *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000) (citing *Environmental Defense Fund v. Corps of Eng'rs of the U.S. Army,* 470 F.2d 289, 295 (8th Cir.1972)).

[232] SFW 86929.

was never an option for BOEM because by definition it would not meet the purpose and need of the project.

**CONCLUSION**

Plaintiffs, Preservation/Green Oceans ask this Court to grant their Motion for Summary Judgment, vacate the Government's Project approvals and permits, and remand the matter to Defendant, the Bureau of Ocean Energy Management for further proceedings consistent with the National Historic Preservation Act and National Environmental Policies Act.[233]

May 20, 2024                            Respectfully submitted,

_s/ William J. Cook_
William J. Cook, Bar No. SC0009
CULTURAL HERITAGE PARTNERS, PLLC
2101 L St. NW; Ste. 300
Washington, DC 20037
(202) 567-7594
will@culturalheritagepartners.com

Attorneys for Plaintiffs Preservation Society of Newport County and Southeast Lighthouse Foundation

_/s Roger J. Marzulla_
Roger J. Marzulla, Bar No. 394907
Nancie G. Marzulla, Bar No. 400985
MARZULLA LAW, LLC
1150 Connecticut Ave., NW, Suite 1050
Washington, DC 20036
Tel: (202) 822-6760
roger@marzulla.com
nancie@marzulla.com

Attorneys for Green Oceans Plaintiffs

---

[233] Remand with vacatur is the presumptively appropriate remedy for violations of the APA. 5 U.S.C. § 706(2). The rare circumstances justifying remand without vacatur are not present here because Plaintiffs' claims identify serious deficiencies at the heart of BOEM's decision-making process and because vacatur will not disrupt BOEM's statutory mission. _See Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n_, 988 F.2d 146, 150 (D.C. Cir. 1993).