**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| PRESERVATION SOCIETY OF NEWPORT COUNTY,<br>        *Plaintiff*,<br><br>        v.<br><br>DEB HAALAND, *et al.*,<br>        *Defendants*,<br><br>    and<br><br>SOUTH FORK WIND, LLC,<br>        *Defendant-Intervenor*. | Case No.:  1:23-cv-03510-APM |
| SOUTHEAST LIGHTHOUSE FOUNDATION,<br>        *Plaintiff*,<br><br>        v.<br><br>DEB HAALAND, *et al.*,<br>        *Defendants*,<br><br>    and<br><br>SOUTH FORK WIND, LLC,<br>        *Defendant-Intervenor*. | Case No.:  1:23-cv-03514-APM |
| GREEN OCEANS, *et al.*,<br>        *Plaintiff*,<br><br>        v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.,*<br>        *Defendants*,<br><br>    and<br><br>SOUTH FORK WIND, LLC,<br>        *Defendant-Intervenor*. | Case No.:  1:24-cv-01087-APM |

## <u>DEFENDANT-INTERVENOR SOUTH FORK WIND, LLC'S</u>
## <u>CROSS-MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Federal Rule of Civil Procedure 56 and Local Rule 7(h), Defendant-Intervenor South Fork Wind, LLC ("South Fork Wind") respectfully requests that the Court grant South Fork Wind's motion for summary judgment and deny Plaintiffs' motion for summary judgment on the claims at issue in these motions, because: (1) Plaintiffs have failed to meet their burden to show standing; (2) the *Green Oceans* Plaintiffs[1] claims under the National Environmental Policy Act ("NEPA") and National Historic Preservation Act ("NHPA") are untimely under the applicable statute of limitations; (3) construction of the South Fork Wind Project is complete and Plaintiffs' claims are therefore moot; and (4) the administrative record demonstrates that Defendant Bureau of Ocean Energy Management ("BOEM") satisfied the requirements of the NHPA and NEPA when reviewing and approving the South Fork Wind Project.  In support of this motion, South Fork Wind relies on the attached memorandum of law.

---

[1] The Court sua sponte consolidated *Green Oceans v. United States Department of the Interior,* Case No. 1:24-cv-01087-APM, with *Preservation Society of Newport County v. Haaland*, Case No. 1:23-cv-03510-APM, and *Southeast Lighthouse Foundation v. Haaland*, Case No. 1:23-cv-03514-APM.  *See* Apr. 18, 2024 Minute Order.

Dated:  June 20, 2024

Respectfully submitted,

By */s/ Janice M. Schneider*

Janice M. Schneider (D.C. Bar No. 472037)
Stacey L. VanBelleghem (D.C. Bar No. 988144)
Devin M. O'Connor (D.C. Bar No. 1015632)
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington, D.C. 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: janice.schneider@lw.com
       stacey.vanbelleghem@lw.com
       devin.o'connor@lw.com

*Counsel for Defendant-Intervenor*
*South Fork Wind, LLC*

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PRESERVATION SOCIETY OF NEWPORT COUNTY,<br>　　　　*Plaintiff*,<br><br>　　v.<br><br>DEB HAALAND, *et al.*,<br>　　　　*Defendants*,<br><br>　　and<br><br>SOUTH FORK WIND, LLC,<br>　　　　*Defendant-Intervenor*. | Case No.:  1:23-cv-03510-APM |
| SOUTHEAST LIGHTHOUSE FOUNDATION,<br>　　　　*Plaintiff*,<br><br>　　v.<br><br>DEB HAALAND, *et al.*,<br>　　　　*Defendants*,<br><br>　　and<br><br>SOUTH FORK WIND, LLC,<br>　　　　*Defendant-Intervenor*. | Case No.:  1:23-cv-03514-APM |
| GREEN OCEANS, *et al.*,<br>　　　　*Plaintiff*,<br><br>　　v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.,*<br>　　　　*Defendants*,<br><br>　　and<br><br>SOUTH FORK WIND, LLC,<br>　　　　*Defendant-Intervenor*. | Case No.:  1:24-cv-01087-APM |

**DEFENDANT-INTERVENOR SOUTH FORK WIND, LLC'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.    INTRODUCTION ........................................................................................................1

II.   BACKGROUND AND STATEMENT OF FACTS ...................................................3

    A.    Project Background...........................................................................................3

    B.    Multi-Year Federal Review and Approval Processes ......................................4

        1.    National Environmental Policy Act Process...........................................4

        2.    National Historic Preservation Act Process............................................5

    C.    Procedural Background.....................................................................................8

III.  STANDARD AND SCOPE OF REVIEW ................................................................9

IV.   ARGUMENT.............................................................................................................10

    A.    Plaintiffs Have Failed to Meet Their Burden to Show Standing ...................10

        1.    No Newport Plaintiff Has Established An Injury In Fact........................11

            a.    Individual Plaintiffs .................................................................11

            b.    Organizational Plaintiffs ..........................................................13

        2.    No Newport Plaintiff Has Established Causation....................................14

        3.    No Plaintiff Has Established Redressability............................................15

    B.    *Green Oceans* Plaintiffs' Claims Are Barred By the Statute of Limitations.........16

    C.    Plaintiffs' Claims Are Moot...........................................................................17

    D.    The Record Demonstrates That BOEM Complied With the NHPA .................18

        1.    BOEM Complied with the Requirements of NHPA Section 106..............18

            a.    BOEM Adequately Notified the Public of the Section 106 Process and Consulted With the Necessary Parties ......................18

            b.    BOEM Adequately Identified Historic Properties.........................20

            c.    BOEM Adequately Assessed Adverse Effects on Historic Properties ........................................................................23

                (1)    BOEM Relied on Extensive Visual Simulations ...............24

                (2)    BOEM Adequately Responded to Plaintiffs' Comments Regarding Historic Properties .........................25

                (3)    BOEM Properly Analyzed Cumulative Visual Effects ..........................................................................26

                (4)    BOEM Adequately Analyzed Economic Impacts, including Tourism Revenues ...........................................26

        d.      BOEM Adequately Resolved Adverse Effects ..............................27

    2.    BOEM Complied With the Requirements of NHPA Section 110(f).........30

E.    The Record Demonstrates BOEM Conducted a Thorough NEPA Review...........34

    1.    BOEM Adequately Considered the Project's Effects on Historic Properties .................................................................................................34

    2.    BOEM Adequately Considered Cumulative Impacts ..............................39

    3.    The FEIS Properly Considered the No Action Alternative .......................42

V.    CONCLUSION...................................................................................................45

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Advocs. for Transp. Alternatives, Inc. v. U.S. Army Corps of Eng'rs*,
453 F. Supp. 2d 289 (D. Mass. 2006) .......................................................................27

*Already, LLC v. Nike, Inc.*,
568 U.S. 85 (2013)....................................................................................................17

*Arizonans for Official English v. Arizona*,
520 U.S. 43 (1997)....................................................................................................17

*Birckhead v. FERC*,
925 F.3d 510 (D.C. Cir. 2019)..................................................................................37

*Booth v. Bowser*,
597 F. Supp. 3d 1 (D.D.C. 2022) ..............................................................................11

*Citizens Against Burlington, Inc. v. Busey*,
938 F.2d 190 (D.C. Cir. 1991)............................................................................44, 45

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)........................................................................................9, 10, 31

*City of Bos. Delegation v. FERC*,
897 F.3d 241 (D.C. Cir. 2018)............................................................................41, 42

*City of Dania Beach v. Fed. Aviation Admin.*,
485 F.3d 1181 (D.C. Cir. 2007)..........................................................................14, 16

*City of Oxford, Ga. v. F.A.A.*,
428 F.3d 1346 (11th Cir. 2005) ................................................................................23

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013)..................................................................................................13

*Coal. on Sensible Transp., Inc. v. Dole*,
826 F.2d 60 (D.C. Cir. 1987)....................................................................................41

*Davis v. Latschar*,
202 F.3d 359 (D.C. Cir. 2000)............................................................................28, 30

*Delaware Riverkeeper Network v. FERC*,
753 F.3d 1304 (D.C. Cir. 2014).................................................................................42

*Eagle Cnty. v. Surface Transp. Bd.*,
    82 F.4th 1152 (D.C. Cir. 2023)......................................................................................20

*Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
    878 F.3d 371 (D.C. Cir. 2017).......................................................................................11

*Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*,
    62 F. Supp. 3d 1 (D.D.C. 2014).....................................................................................17

*Food & Water Watch v. FERC*,
    No. 22-1214, 2024 WL 2983833 (D.C. Cir. June 14, 2024) .......................................35

*Food & Water Watch, Inc. v. Vilsack*,
    808 F.3d 905 (D.C. Cir. 2015).......................................................................................14

*Fund for Animals, Inc. v. Bureau of Land Mgmt.*,
    460 F.3d 13 (D.C. Cir. 2006).........................................................................................17

*Grunewald v. Jarvis*,
    776 F.3d 893 (D.C. Cir. 2015).......................................................................................35

*Hammond v. Norton*,
    370 F. Supp. 2d 226 (D.D.C. 2005)..........................................................................43, 44

*HonoluluTraffic.com v. Fed. Transit Admin.*,
    742 F.3d 1222 (9th Cir. 2014) ......................................................................................21

*Karuk Tribe v. Kelley*,
    No. C 10-02039 WHA, 2011 WL 2444668 (N.D. Cal. June 13, 2011)........................30

*Linda R.S. v. Richard D.*,
    410 U.S. 614 (1973).......................................................................................................15

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)..................................................................................................10, 11

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*,
    70 F.4th 582 (D.C. Cir. 2023)......................................................................................9, 10

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989)..................................................................................................10, 35

*Maryland Chapter of Sierra Club v. Fed. Highway Admin.*,
    No. 22-2597, 2024 WL 1194382 (D. Md. Mar. 20, 2024) ...........................................21

*Massachusetts v. EPA*,
    549 U.S. 497 (2007).......................................................................................................15

*Metcalf v. Daley*,
    214 F.3d 1135 (9th Cir. 2000) .................................................................................37

*Metro. Edison Co. v. People Against Nuclear Energy*,
    460 U.S. 766 (1983)...............................................................................................43

*Mid States Coal. for Progress v. Surface Transp. Bd.*,
    345 F.3d 520 (8th Cir. 2003) ..................................................................................20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983)..................................................................................................18

*Myersville Citizens for a Rural Cmty., Inc. v. FERC*,
    783 F.3d 1301 (D.C. Cir. 2015)..........................................................................42, 44

*Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*,
    606 F.3d 1058 (9th Cir. 2010) ................................................................................44

*Nat'l Parks Conservation Ass'n v. Semonite*,
    422 F. Supp. 3d 92 (D.D.C. 2019)..........................................................................45

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996)...............................................................................13

*Nat'l Trust for Historic Pres. v. Blanck*,
    938 F. Supp. 908 (D.D.C. 1996)..........................................................................28, 30

*\*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*,
    407 F. Supp. 2d 323 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006)
    ........................................................................................................20, 23, 27, 31

*Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*,
    552 F. Supp. 2d 97 (D.N.H. 2008)...........................................................................27

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
    45 F.4th 291 (D.C. Cir. 2022)............................................................................10, 38

*Okinawa Dugong (Dugong Dugon) v. Mattis*,
    330 F. Supp. 3d 1167 (N.D. Cal. 2018) ...................................................................20

*Oregon Natural Resource Council Action v. U.S. Forest Service*,
    445 F. Supp. 2d 1211 (D. Or. 2006) ........................................................................43

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
    797 F.3d 1087 (D.C. Cir. 2015)...............................................................................14

*\*Presidio Historical Ass'n v. Presidio Trust*,
    811 F.3d 1154 (9th Cir. 2016) ................................................................................31

*Pub. Citizen v. Foreman*,
    471 F. Supp. 586 (D.D.C. 1979) ................................................................................15

*\*Pub. Citizen, Inc. v. F.A.A.*,
    988 2d 186, 197 (D.C. Cir. 1993) ............................................................................18

*Pub. Emps. for Env't Resp. v. Beaudreau*,
    25 F. Supp. 3d 67 (D.D.C. 2014) .............................................................................45

*Roberts v. United States*,
    883 F. Supp. 2d 56 (D.D.C. 2012) .............................................................................9

*\*Robertson v. Methow Valley Citizens*,
    490 U.S. 332 (1989) .....................................................................................35, 38, 39

*Save the Wekiva River & Headwaters, Inc. v. U.S. Army Corps of Eng'rs*,
    No. 6:17-CV-1902-ORL-DCI, 2017 WL 10086128 (M.D. Fla. Dec. 29, 2017) .....................18

*Sharp v. Rosa Mexicano, D.C., LLC*,
    496 F. Supp. 2d 93 (D.D.C. 2007) ...........................................................................41

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    803 F.3d 31 (D.C. Cir. 2015) ...............................................................................18, 40

*Sierra Club v. U.S. Army Corps of Eng'rs*,
    277 F. App'x 170 (3d Cir. 2008) ..............................................................................18

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ..............................................................................................11

*Stand Up for California! v. U.S. Dep't of Interior*,
    410 F. Supp. 3d 39 (D.D.C. 2019), *aff'd*, 994 F.3d 616 (D.C. Cir. 2021) .................................9

*Stand Up for California! v. U.S. Dep't of the Interior*,
    204 F. Supp. 3d 212 (D.D.C. 2016), *aff'd*, 879 F.3d 1177 (D.C. Cir. 2018) ..........................44

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    985 F.3d 1032 (D.C. Cir. 2021) ...............................................................................15

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    301 F. Supp. 3d 50 (D.D.C. 2018) ...........................................................................18

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ..........................................................................................12, 13

*Swanson Grp. Mfg. LLC v. Jewell*,
    790 F.3d 235 (D.C. Cir. 2015) .................................................................................12

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   616 F.3d 497 (D.C. Cir. 2010) ..................................................................................9

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   661 F.3d 66 (D.C. Cir. 2011) .................................................................................45

*United States v. W.T. Grant Co.*,
   345 U.S. 629 (1953) ...............................................................................................18

*Weiss v. Sec'y of Dep't of Interior*,
   459 F. App'x 497 (6th Cir. 2012) ...........................................................................17

*WildEarth Guardians v. Provencio*,
   923 F.3d 655 (9th Cir. 2019) ..................................................................................21

## CONSTITUTIONAL PROVISIONS

U.S. Const.
   Article III ..........................................................................................................10, 17
   Article III, § 2 ........................................................................................................17

## STATUTES

5 U.S.C. § 706(2) ..............................................................................................................9

42 U.S.C.
   § 4332(C)(ii) ..........................................................................................................35
   § 4370m-6(a)..........................................................................................................16
   § 4370m-6(a)(1)(A) ..........................................................................................16, 17

54 U.S.C. § 306107...........................................................................................................30

## RULES

Federal Rule of Civil Procedure 56(a) ..............................................................................9

Local Civil Rule 7(h)(2)......................................................................................................3

## REGULATIONS

36 C.F.R.

§ 800.1(c) ...............................................................................................................38
§ 800.2(b) ...............................................................................................................19
§ 800.2(c) ...............................................................................................................19
§ 800.2(c)(5) ...........................................................................................................19
§ 800.2(d)(2) ....................................................................................................19, 20
§ 800.2(d)(3) ......................................................................................................5, 19
§ 800.3 ....................................................................................................................19
§ 800.3(f)(3) .....................................................................................................19, 20
§ 800.4(a)-(b) ..........................................................................................................21
§ 800.4(b)(1) ...........................................................................................................21
§ 800.5 ....................................................................................................................23
§ 800.5(a) ................................................................................................................24
§ 800.5(a)(1) .....................................................................................................23, 26
§ 800.6(b)(2) .....................................................................................................27, 29
§ 800.6(c) ................................................................................................................29
§ 800.10 .............................................................................................................30, 34
§ 800.10(b)-(c) ........................................................................................................34
§ 800.16(d) ........................................................................................................21, 23
§ 800.16(l) ...............................................................................................................23

40 C.F.R.

§ 1501.3(b)(2) .........................................................................................................35
§ 1502.13 .................................................................................................................45
§ 1502.14(d) ............................................................................................................42
§ 1502.16 .................................................................................................................35
§ 1508.7 .............................................................................................................35, 39
§ 1508.8 ...................................................................................................................35
§ 1508.25 .................................................................................................................35
§ 1508.25(a)(1) ........................................................................................................41
§ 1508.25(a)(2) ........................................................................................................39
§ 1508.25(a)(3) ..................................................................................................40, 41
§ 1508.25(c)(3) ........................................................................................................39

43 C.F.R. § 46.30 ......................................................................................................42

## OTHER AUTHORITIES

83 Fed. Reg. 53,104 (Oct. 19, 2018) ..........................................................................5

84 Fed. Reg. 43,304 (July 16, 2020) ........................................................................35

86 Fed. Reg. 67,969 (Nov. 30, 2021) ...................................................................5, 16

Advisory Council, Meeting the "Reasonable and Good Faith" Identification
    Standard in Section 106,
    https://www.achp.gov/sites/default/files/guidance/2018-
    05/reasonable_good_faith_identification.pdf .......................................................................21

*Standards and Guidelines for Federal Agency Historic Preservation Programs
    Pursuant to the National Historic Preservation*,
    U.S. Department of the Interior, 63 Fed. Reg. 20,496 (Apr. 24, 1998)............................31, 33

## I.    INTRODUCTION

The South Fork Wind Farm and South Fork Export Cable (together, the "Project") are an offshore wind energy project that is now fully constructed, operational, and providing clean renewable power to New York.  Originally proposed for 15 wind turbine generators ("WTGs"), after environmental review, the Project was reduced in size in the Bureau of Ocean Energy Management's ("BOEM") approval by 20 percent, down to 12 WTGs.  In their motion, Plaintiffs ask the Court to set aside approvals issued by Federal Defendants for the Project, alleging that Federal Defendants violated the National Historic Preservation Act ("NHPA"), the National Environmental Policy Act ("NEPA"), and the Administrative Procedure Act ("APA").[1]  However, Plaintiffs' arguments that BOEM failed to follow the requirements of these procedural statutes rely on gross mischaracterizations and ignore BOEM's extensive review and consultation process. Plaintiffs' mere dissatisfaction with BOEM's reasoned decision-making is not a basis to overturn the agency's approvals and Plaintiffs' claims fail for numerous reasons:

**First**, Plaintiffs lack standing to pursue their claims because they have not met the requirements for standing—injury in fact, causation, and redressability.

**Second**, the *Green Oceans* Plaintiffs' NEPA and NHPA claims are barred by the two-year FAST-41 Act statute of limitations.

**Third**, the Project is fully constructed and operational and is providing clean, renewable energy to the people of New York.  Plaintiffs stood idly by while construction commenced in January 2022 and is now complete.  As a result, their claims are now moot.

---

[1] On May 3, 2024, the Court directed the *Green Oceans* Plaintiffs to participate in this briefing on these claims that overlap with those brought by the Preservation Society of Newport County ("PSNC") and Southeast Lighthouse Foundation ("SELF") Plaintiffs in these consolidated cases (collectively "Plaintiffs" except where specifically indicated).  *See* May 3, 2024 Minute Order.

**Fourth**, the administrative record demonstrates that BOEM complied with the NHPA. After an extensive process, involving many stakeholders and the public, the federal and state agencies developed a memorandum of agreement ("MOA"), agreed to and signed by BOEM, South Fork Wind, the federal Advisory Council on Historic Preservation ("Advisory Council"), and the State Historic Preservation Officers ("SHPO") for Rhode Island, New York, and Massachusetts—documenting their agreement that BOEM complied with the NHPA. The MOA includes extensive avoidance, minimization, and mitigation measures to resolve adverse effects to historic properties, including visual effects.

The record also shows BOEM complied with NHPA Section 110(f), which does not mandate particular substantive outcomes, for national historic landmarks ("NHLs"). BOEM determined the Project would have direct visual effects on one NHL, the Block Island Southeast Lighthouse NHL in New Shoreham on Block Island, Rhode Island. BOEM correctly applied Section 110(f)'s heightened procedural standard in planning and minimizing harm to this NHL and included minimization and mitigation measures for the NHL in the MOA. BOEM also extensively evaluated potential effects on six other NHLs and determined, in consultation with other parties, that the Project would have no visual or other direct adverse effects on other NHLs.

**Fifth**, the administrative record shows that BOEM complied with NEPA, taking the requisite "hard look." The Project's Final Environmental Impact Statement ("FEIS") analyzed impacts to historic properties, including cumulative impacts. And, contrary to *Green Oceans* Plaintiffs' claim, which is barred by the statute of limitations, BOEM adequately considered the no action alternative. Rather than identify any legal inadequacies in the record, Plaintiffs simply disagree with BOEM's decision to approve the Project. This is insufficient to meet their burden.

The Court should deny Plaintiffs' motion for summary judgment and grant South Fork Wind's cross motion for summary judgment.

## II.    BACKGROUND AND STATEMENT OF FACTS

### A.    Project Background[2]

The effort to develop the Project began over a decade ago.  BOEM initiated the leasing process for parcels offshore Rhode Island and Massachusetts to develop the Nation's first offshore wind project in federal waters in 2011.  SFW 0086915.  After federal environmental review and extensive public engagement and outreach, South Fork Wind's predecessor in interest won the lease at auction in July 2013.  SFW 0086916.  The Project was developed following a successful bid into a request for proposals conducted by the Long Island Power Authority in 2016 and consists of 12 WTGs with a capacity to generate approximately 130 megawatts ("MW") of electricity. SFW 0086928, 0076853.  The WTGs and offshore substation are sited in federal waters within the area of the U.S. Outer Continental Shelf ("OCS") covered by BOEM Renewable Energy Lease No. OCS-A 0517 in the Atlantic Ocean, approximately 19 miles southeast of Block Island, Rhode Island, and approximately 25 miles from Newport, Rhode Island.  SFW 0076836.  The South Fork Export Cable connects the wind farm to the Long Island electric transmission grid at a substation in East Hampton, New York.  SFW 0086916.  After BOEM's approval, South Fork Wind began

---

[2] South Fork Wind objects to Plaintiffs' "Statement of Undisputed Material Facts," which is procedurally improper, irrelevant, and contains mischaracterizations contradicted by the administrative record.  *See* Local Civil Rule 7(h)(2).  As just one example, there are not "nearly 200 turbines" approved for the Revolution and Sunrise Wind Projects as Plaintiffs wrongly assert (at 5).  As *Green Oceans* Plaintiffs cite in their own pleadings in their separate case challenging Revolution Wind, that Record of Decision approves up to 65 WTGs.  Similarly, the Record of Decision for Sunrise Wind approves up to 84 WTGs.  *See* BOEM Revolution Wind ROD (Aug. 21, 2023) at 22, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Revolution-Wind-Record-of-Decision-OCS-A-0486_3.pdf; BOEM, Sunrise Wind ROD (Mar. 25, 2024) at 55, https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/05579_Record%20of%20Decision_Sunrise%20Wind_OCS-A%200487.pdf.

construction in January 2022 and completed construction in March 2024.  The Project is currently operating and delivering power to New York.  Declaration of Melanie Gearon in Support of South Fork Wind, LLC's Intervention as a Defendant, Dkt. 30-1, ¶¶ 5-7.

**B.      Multi-Year Federal Review and Approval Processes**

The environmental review process to support the Project took over six years.  South Fork Wind developed and submitted to BOEM a Site Assessment Plan, which BOEM approved in October 2017.  SFW 0000371-72.  South Fork Wind undertook extensive field surveys.  SFW 0071917, 0077019-20, 0077026-28.  Based on that information, in June 2018 South Fork Wind prepared and submitted to BOEM a detailed Construction and Operations Plan ("COP").  SFW 0000983, 0000389-982.

**1.      National Environmental Policy Act Process**

On October 19, 2018, BOEM issued a Notice of Intent ("NOI") to prepare an Environmental Impact Statement ("EIS") for its review of the Project's COP.  SFW 0018533-34. The notice began a three-and-a-half-year environmental review involving South Fork Wind, ten federal agencies, five state and local agencies, and an extensive array of stakeholders, including the fishing industry, local communities, Indian tribes, historic preservation organizations, and the public.  SFW 0077122.  BOEM published the draft EIS ("DEIS") on January 4, 2021.  SFW 0065082-99.

Appendix A to the FEIS describes the extensive consultations and public involvement BOEM undertook in its NEPA review, including three public scoping meetings held in November 2018 in Amagansett, NY, New Bedford, MA, and Narragansett, RI, where interested parties were invited to offer feedback on a broad range of topics, including potential EIS alternatives. SFW 0077120.  In 2021, BOEM held three more public meetings on the DEIS.  *Id*.  Prior to publishing the FEIS on August 16, 2021, SFW 0076832-78148, BOEM received, reviewed, and responded to

the 388 written comments on the DEIS and the verbal comments from three public meetings, in which over 400 people participated.  SFW 0077602.  On November 24, 2021, BOEM approved the Project in its Record of Decision ("ROD"), SFW 0086912-7041, 0086928 ("DOI has decided to approve, with modifications, the COP for South Fork Wind."), 0086932 ("My approval of this decision constitutes the final decision of the Department of the Interior"), and consistent with this decision issued the COP[3] approval on January 18, 2022, *see* SFW 0087536-628.  On November 30, 2021, BOEM published in the Federal Register a Notice of Availability of the Project's ROD.  SFW 0087121-22; 86 Fed. Reg. 67,969-70 (Nov. 30, 2021).

### 2.    National Historic Preservation Act Process

BOEM's 2018 NOI also invited public input regarding the identification of historic properties and potential effects to historic properties.  SFW 0078488, 0077119; 83 Fed. Reg. 53,104-05 (Oct. 19, 2018) ("BOEM will also use the NEPA commenting process to initiate the Section 106 consultation process under the National Historic Preservation Act (54 U.S.C. 300101 et seq.), as permitted by 36 CFR 800.2(d)(3)").  Each of BOEM's scoping meetings included opportunities to engage on issues related to NHPA Section 106.  SFW 0078489.  BOEM also gathered public input for Section 106 in hearings and public comment on the DEIS.  SFW 0087053, 0078489.  BOEM posted a draft MOA on its website for public comment on August 23, 2021, and posted an updated version on October 22, 2021.  SFW 0087053.  BOEM provided detail responses to comments on the MOA.  SFW 0085119, 0085167-79, 0082062-94.

BOEM invited numerous stakeholders to participate as Section 106 consulting parties and granted consulting party status to anyone who requested it, including the Plaintiffs that so requested.  SFW 0081771-75, 0085860, 0078292-326.  BOEM invited 45 parties to participate in

---

[3] South Fork Wind's revised COP is in the record, SFW 0071490-72119, and on BOEM's website, https://www.boem.gov/renewable-energy/state-activities/south-fork.

the Section 106 process, including the Advisory Council, Rhode Island, Massachusetts and New York SHPOs and other state agencies, Federal agencies, federally recognized Indian tribes, non-federally recognized Indian tribes, local governments, and nongovernmental organizations. SFW 0087091. Thirty-two parties participated, and 14 were invited but did not participate. *Id.* BOEM fulfilled its Section 110(f) responsibilities by providing the National Park Service ("NPS") and the Advisory Council invitations to consult and notice of the adverse effect to the Southeast Lighthouse NHL and by sending materials to NPS throughout the consultation. SFW 0078504-05, 0078507, 0019820-21, 0057585-612, 0057305-32, 0078787-89, 0079604-07, 0079648-78, 0085389-401, 0087051.

Furthermore, BOEM held multiple Section 106 consultation meetings, including a September 29, 2020 Section 106 kickoff meeting about the identification of historic properties, SFW 0061333-415, a March 11, 2021 meeting to review technical reports, SFW 0069415-25, 0069362-414, a June 29, 2021 meeting regarding the assessment of adverse effects, SFW 0075763-832, an August 31, 2021 meeting to review the finding of effects and the draft MOA, SFW 0078693-738, a September 22, 2021 meeting focused on the NHLs, SFW 0079648-78, and a September 30, 2021 meeting to further review the draft MOA, SFW 0080086-106. BOEM accepted comments from consulting parties both during and after the consultation meetings, evaluated those comments, and prepared responses. SFW 0078292-470.

In its Finding of Adverse Effect ("FoAE") for the Project, SFW 0078471-522, BOEM evaluated and provided consulting parties visual simulations from up to 29 key observation points, SFW 0081679, and other data and analysis to define the area of potential effects ("APE") and assess potential adverse effects, including in: (1) the 2019 Historic Resources Visual Effects Analysis - South Fork Wind Farm New York/Rhode Island, US ("2019 HRVEA"), SFW 0042331-

6

583; (2) the 2021 Historic Resources Visual Effects Analysis - Revised - South Fork Wind Farm New York/Rhode Island, US ("2021 HRVEA"), SFW 0066379-685; (3) the 2020 Memorandum: South Fork Wind Farm Cumulative Visual Simulations, SFW 0060490-96; (4) the 2020 Visual Impact Assessment for South Fork Wind Farm ("VIA"), SFW 0055907-6268; (5) the Cumulative Historic Resources Visual Effects Analysis - South Fork Wind Farm and South Fork Export Cable Project ("CHRVEA"), SFW 0070484-547; and (6) the Historic Resources Visual Effects Assessment Summary in Rhode Island for the South Fork Wind Farm and South Fork Export Cable Project ("HRVEA Summary"), SFW 0081667-725, 0078486-87, 0078508; *see also* SFW 0087052. BOEM accepted comments from consulting parties on drafts of these reports and evaluations and revised them, as appropriate. *See, e.g.*, SFW 0078302 (HRVEA and CHRVEA were revised to add detail on traditional cultural properties), 0078314 (BOEM revisited the HRVEA's initial assessment of historic properties "in response to information and comments received from consulting parties").

BOEM also planned and took action to avoid adverse effects to six NHLs in the viewshed APE, and BOEM has, to the maximum extent possible, undertaken planning and actions to minimize harm to the one NHL (Block Island Southeast Lighthouse) directly and adversely affected by the undertaking, including consultation on and execution of the MOA. SFW 0078505. BOEM proceeded under the distinct and heightened requirements of Section 110(f) and applied the Secretary of the Interior's relevant guidelines to evaluate each of the five NHLs identified by Plaintiffs: Southeast Lighthouse NHL on Block Island and the Breakers NHL, Marble House NHL, Bellevue Avenue NHL District, and Ocean Drive NHL District in Newport, Rhode Island. SFW 0078497, 0078505-07. BOEM concluded, in consultation with the Advisory Council, NPS, and Rhode Island SHPO, that the four Newport, Rhode Island properties would not be adversely

7

affected as these properties were at distances of 25 to 26 miles from the nearest South Fork Wind WTGs, had limited to no views of the South Fork WTGs, and could continue to convey their architectural significance and history.  SFW 0078497-98, 0081696, 0081721-22.  The Rhode Island SHPO concurred in BOEM's finding that these four NHLs were not adversely affected by the Project.  SFW 0081751-59.  In addition to the heightened consideration of NHLs, BOEM identified 113 aboveground historic properties in the offshore Project components' portion of the viewshed APE, SFW 0087051, found that ten of those historic properties would have adverse visual effects from the Project and cumulative effects, and consulted on those properties to resolve the adverse effects.  SFW 0078488, 0078494-98.

On November 23, 2021, before the ROD was issued and after extensive consultations, BOEM, South Fork Wind, the Advisory Council, and the SHPOs for New York, Massachusetts, and Rhode Island entered into an MOA with binding avoidance, minimization, and mitigation measures to resolve adverse effects to historic properties.  SFW 0087049-94.

C.    Procedural Background

On November 22, 2023—nearly two years after BOEM issued the ROD and when Project construction was well underway—Plaintiffs PSNC and SELF each filed nearly identical complaints, which the Court consolidated on December 20, 2023.  Dkt. 17.  On January 16, 2024, *Green Oceans* Plaintiffs filed a complaint challenging numerous federal approvals issued for the South Fork Wind Project and the separate Revolution Wind Project.  *Green Oceans v. U.S. Dep't of Interior,* No. 1:24-cv-01087-APM, Mem. and Order, Dkt. 1.  That case was initially assigned to the Honorable Judge Royce C. Lamberth.  Federal Defendants filed a motion to sever *Green Oceans* Plaintiffs' claims challenging Federal Defendants' South Fork Wind approvals from claims challenging Revolution Wind, which Judge Lamberth granted on April 10, 2024.  *Id*., Dkt. 25.  *Green Oceans* Plaintiffs filed an amended complaint on May 8, 2024.  Dkt. 34.  Plaintiffs filed

8

their motion for summary judgment on May 20, 2024.  Per the Court's February 17, 2024 and May 3, 2024 orders, Plaintiffs' motion and Federal Defendants' and South Fork Wind's cross-motions for summary judgment address all claims by Plaintiffs PSNC and SELF, as well as NEPA, NHPA and APA claims by *Green Oceans* Plaintiffs to the extent their complaint asserts claims that overlap with those of the other two plaintiffs.[4]

## III.    STANDARD AND SCOPE OF REVIEW

Although Federal Rule of Civil Procedure 56(a) requires a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," this Court does not apply that standard in challenges to agency action, instead reviewing the agency's decision under the APA, which limits judicial review to the administrative record.  *See Stand Up for California! v. U.S. Dep't of Interior*, 410 F. Supp. 3d 39, 46 (D.D.C. 2019), *aff'd*, 994 F.3d 616 (D.C. Cir. 2021); *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 514 (D.C. Cir. 2010); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (APA review "is to be based on the full administrative record that was before the [agency] at the time [it] made [its] decision.").  Summary judgment "serves as the mechanism for deciding . . . whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review."  *Roberts v. United States*, 883 F. Supp. 2d 56, 62-63 (D.D.C. 2012).

A court may not set aside an agency action under the APA unless it is arbitrary and capricious, an abuse of discretion, in excess of statutory authority, or otherwise not in accordance with law.  *See* 5 U.S.C. § 706(2).[5]  "The court is not empowered to substitute its judgment for that

---

[4] South Fork Wind intends to file a motion to dismiss the *Green Oceans* Plaintiffs' complaint in its entirety shortly.

[5] Plaintiffs rely (at 12 n.67) on *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 597 (D.C. Cir. 2023) to argue that BOEM is not entitled deference, but that case is inapposite.

of the agency," *Citizens to Preserve Overton Park,* 401 U.S. at 416, and must consider "whether the [agency's] decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989) (internal quotations and citation omitted).  The Court's role is not to "flyspeck an agency's environmental analysis" but rather "to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 299 (D.C. Cir. 2022) ("Under these standards, we do not supplant an agency's 'technical judgments and predictions' so long as the agency's decision is 'reasoned and rational.'") (citation omitted).

## IV.    ARGUMENT

### A.    Plaintiffs Have Failed to Meet Their Burden to Show Standing

PSNC and the *Green Oceans* Plaintiffs (collectively, "Newport Plaintiffs"[6]) cannot demonstrate Article III standing for their historic properties claims because (1) they have not suffered any concrete, particularized, actual, or certainly impending injuries, (2) their unproven alleged injuries are not fairly traceable to the alleged misconduct of the Federal Defendants, and (3) granting them the relief they seek would not redress their supposed injuries.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also id.* at 560 (showing Article III standing is "an indispensable part of the plaintiff's case," and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof").  SELF also lacks standing

---

There, the Court evaluated whether an agency's regulatory interpretation of the statute it administers is entitled deference. *Id.* at 597-99.  Here, Plaintiffs ask the Court to evaluate BOEM's procedural compliance with the NHPA and the Advisory Council's NHPA implementing regulations and with NEPA and the implementing regulations from the Council on Environmental Quality ("CEQ"), based on the administrative record for the Project.

[6] The motion separately argues standing for SELF (at 16-17), PSNC (at 15), and *Green Oceans* property plaintiffs (at 17-24).  The latter two plaintiff groups are all located in Newport County.

10

because it cannot establish redressability.  "Standing is not dispensed in gross" and thus must be established "claim by claim."  *Elec. Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 377 (D.C. Cir. 2017).  Each Plaintiff (or each Complaint) alleges its own, property-specific NEPA and NHPA claims, so their claims are not "identical," and a finding of standing for one Plaintiff is not sufficient for the remainder.  *See Booth v. Bowser*, 597 F. Supp. 3d 1, 12 (D.D.C. 2022).  Additionally, "when the plaintiff is not himself the object of the government action or inaction he challenges, standing . . . is ordinarily 'substantially more difficult' to establish."  *Lujan*, 502 U.S. at 562 (citation omitted).  At summary judgment, the Court looks to "specific facts" provided "by affidavit or other evidence".  *Id*. at 561.  SELF, PSNC, and ten *Green Oceans* Plaintiffs submitted declarations, which all fail to establish standing.

### 1.    No Newport Plaintiff Has Established An Injury In Fact

#### a.    Individual Plaintiffs

To establish injury in fact, an individual must prove "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).  All the interests Newport Plaintiffs assert stem from viewshed impacts.  Yet at the conclusion of BOEM's extensive analysis of potential visual impacts, *see infra* Section IV.D.1, BOEM concluded that adverse visual impacts would tend to result within 20 miles of turbines.  *See* SFW 0078496.[7]  Though the 2021 HRVEA evaluated historic properties in Newport County, Rhode Island, these properties are all at distances of 25 to 26 miles from the nearest of the Project's turbines.  SFW 0081703-04, 0081696-711.  BOEM concluded there would be no adverse visual

---

[7] The Southeast Lighthouse is 19 miles from the nearest Project WTG, and BOEM concluded it would experience visual impacts, SFW 0078505, but SELF still lacks standing because it has not established redressability.  *See infra* Section IV.A.3.

11

effects to historic properties in Newport County, Rhode Island, due to limited (or no) Project visibility, and the Rhode Island SHPO concurred in that finding.  SFW 0078497, 0081751-59.

Newport Plaintiffs' dissatisfaction with these agency conclusions does not establish cognizable injury.  *See Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).  In fact, Newport Plaintiffs' declarations concede this critical point.  Though the declarants describe their properties in great detail, only one of these eleven Plaintiffs actually claims that the Project is visible from their property.  *See* Ex. 7 ¶ 9.  Because Plaintiffs' claims all turn on purported viewshed impacts, that deficiency alone is fatal for standing.  *See Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) ("at summary judgment a court will not presume the missing facts necessary to establish an element of standing") (citation and quotation marks omitted).  Further, the single plaintiff who alleges the Project can even be seen from his property emphasizes nighttime lighting impacts, *see* Ex. 7 ¶ 9—which will be mitigated once the BOEM-mandated aircraft detection lighting system ("ADLS") on hazard lights is operational in the coming weeks.  *See* SFW 0077093 (concluding that with ADLS, the hazard lights will be illuminated "less than 1% of the normal operating time that would occur without using ADLS").  Although Newport Plaintiffs' declarations provide photos, not one shows a single WTG visible from any property, much less evidences a viewshed "destroyed."

Moreover, Plaintiffs do not adequately allege injury even if they alleged the Project was visible from their properties.  That is not surprising, given that BOEM's analysis concluded that from distances of Newport properties, "[t]he Project is unlikely to be discernible to the casual viewer (even under clear conditions), and only concentrated viewing will reveal the existence of elements on the horizon. During high humidity, fog, and other weather events, visibility of WTGs and WTG lighting at these distances will be diminished or completely eliminated."  SFW 0081701,

12

04, 05, 07. Newport Plaintiffs' purported harm to property values is purely speculative—even in their own words. *See*, *e.g.*, Mot. at 17 ("Each plaintiff . . . believes that the construction of these turbines has decreased and will continue to decrease their property values."); Ex. 6 ¶ 17 ("I believe the presence of these massive offshore wind turbine farms will reduce the fair market value of my property[.]").[8] These conclusory assertions would be insufficient even at the motion to dismiss stage. *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) ("[T]here is a difference between accepting a plaintiff's allegations of fact as true and accepting as correct the conclusions plaintiff would draw from such facts."). Indeed, Plaintiffs' "concerns" regarding the Project are precisely the sort of "speculative chain of possibilities" that are insufficient to establish injury-in-fact. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013). Finally, to the extent Plaintiffs allege procedural injuries under NEPA or NHPA, alleged procedural harms, standing alone, are not sufficient to prove injury-in-fact; without an accompanying concrete injury, claimed procedural violations do not provide standing. *See Summers*, 555 U.S. at 496.

    b.  Organizational Plaintiffs[9]

To show injury in fact to an organization, a plaintiff "must allege more than a frustration of its purpose because frustration of an organization's objectives 'is the type of abstract concern

---

[8] Indeed, a 2019 study of the Block Island Wind Farm, cited in the FEIS, found increased nightly reservations, occupancy rates, and monthly revenues for rental properties in Block Island during the peak-tourism months of July and August. SFW 0077579, 0146503-39. Academic studies have also found that views of the Block Island Wind Farm—which is far closer to land than South Fork Wind is to the Newport properties—had no impact on local property values. L. Dong and C. Lang, *Do views of offshore wind energy detract? A hedonic price analysis of the Block Island wind farm in Rhode Island*, Energy Policy (2022), https://digitalcommons.uri.edu/enre_facpubs/65/.

[9] The motion references representational standing, *see* Mot. at 13, but PSNC argues it has standing only as a property owner and an organization, *see id.* at 15. Barbara Chapman purports to be a member of PSNC, *see* Ex. 4 ¶ 11, but lacks individual standing herself, *see supra* Section IV.A.1.a. Accordingly, Plaintiffs have not demonstrated representational standing.

that does not impart standing.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015); *see also People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093-94 (D.C. Cir. 2015) (a court will evaluate whether challenged agency action injured the organization's interests). As an organization,[10] PSNC has not alleged, much less proven, that its activities have been impeded in any way by the Project or the challenged Project approvals. In fact, PSNC admits to having participated in the extensive public process during the Project's review process, which provided a forum for PSNC to comment on the Project. *See* PSNC Compl. ¶¶ 1, 8; Mot. at 15; Ex. 5 ¶ 10; *supra* Section II.B.2. None of the challenged approvals prevents PSNC's advocacy or mission, and it has failed to demonstrate a direct injury from those approvals.

### 2.     No Newport Plaintiff Has Established Causation

Even if Newport Plaintiffs had alleged cognizable injuries, they fail to establish causation for any such harms. Newport Plaintiffs cite (at 13) *City of Dania Beach v. Federal Aviation Administration* for the purported sufficiency of their standing allegations, but in that case, unlike here, the plaintiffs were requesting environmental review where *none* had been performed. *See* 485 F.3d 1181, 1185-86 (D.C. Cir. 2007) (finding Plaintiffs' injuries causally linked to the FAA action of allowing jets to use different runways based upon the location of Plaintiffs' homes).

Newport Plaintiffs (at 13) assert, "[t]he harm to these historic properties that South Fork will cause is directly traceable to BOEM's issuance of permits and approvals for the South Fork Wind Project." But the only declarations provided in support of this assertion conflate South Fork Wind with other projects to which Plaintiffs object, mischaracterizing the distinct projects.[11] There is no "Deepwater Wind Project" or "single industrial wind farm project" as Plaintiffs erroneously

---

[10] As a property owner, PSNC's interests and claims are no different than the other individual Plaintiffs, so the analysis above applies to PSNC in that capacity as well.
[11] *See* Ex. 1 ¶¶ 10-12; Ex. 2 ¶ 8; Ex. 3 ¶¶ 15-16; Ex. 6 ¶¶ 13-15; Ex. 7 ¶ 10; Ex. 8 ¶¶ 7-8; Ex. 9 ¶ 7; Ex. 10 ¶ 8; Ex. 11 ¶ 7; Ex. 12 ¶ 12.

assert (at 2, 8, 41-42).  Rather, Plaintiffs' complain of three separate Projects, with independent onshore and offshore infrastructure, being developed to serve distinct contractual commitments to provide power to separate entities in different locations.  Newport Plaintiffs fail to isolate alleged harm attributable to the Project's 12 existing WTGs from the alleged effects of future projects.

### 3.       No Plaintiff Has Established Redressability

Redressability exists only where the requested relief would remedy a plaintiff's alleged injury directly.  *Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973); *Pub. Citizen v. Foreman*, 471 F. Supp. 586, 590 (D.D.C. 1979) ("[A] plaintiff must show 'an injury to himself that is likely to be redressed by a favorable decision.'") (citation omitted).  None of the Plaintiffs show that any of their alleged injuries would be redressable by the relief they seek from this Court.  Even in procedural rights cases, there must still be at least "some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

As above, however, here the Newport Plaintiffs allege a unified, ostensibly indivisible viewshed harm from the Project *and other projects*.[12]  SELF similarly fails to identify any harm specific to the Project itself, conflating any impacts from the Project *with other projects—* including the Block Island Wind Farm, which has been operating since 2016.  *See* Ex. 4 ¶¶ 7-9. None of those other projects' approvals are before this Court, so the requested relief in this case would not redress any Plaintiff's alleged harm (even if it were cognizable).[13]  Additionally, the

---

[12] Ex. 1 ¶¶ 11-12; Ex. 2 ¶ 8; Ex. 3 ¶¶ 15-16; Ex. 6 ¶¶ 7, 12-15; Ex. 7 ¶¶ 9-10; Ex. 8 ¶ 7-8; Ex. 9 ¶ 7; Ex. 10 ¶¶ 6, 8; Ex. 11 ¶ 7; Ex. 12 ¶ 12.

[13] Although they have not requested such relief in their Complaints, as to Plaintiffs' suggestion (at 13) that "removal" of the Project's turbines would be an appropriate remedy, while injunctive relief is within the Court's discretion, it does not automatically follow vacatur.  *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1053 (D.C. Cir. 2021) ("a court must determine that an injunction should issue under the traditional four-factor test") (cleaned up). Plaintiffs have not even attempted to carry their burden to justify that outcome, and they are

*Green Oceans* Plaintiffs cannot establish redressability because their claims are time-barred, and thus no relief is legally permissible. *See infra* Section IV.B.

**B.**      ***Green Oceans* Plaintiffs' Claims Are Barred By the Statute of Limitations**

The *Green Oceans* Plaintiffs' NEPA and NHPA claims are untimely under the applicable FAST-41 Act two-year statute of limitations. *See* 42 U.S.C. § 4370m-6(a). Because the South Fork Wind Project is a "covered project" under FAST-41, SFW 0077114,[14] any "claim arising under Federal law seeking judicial review of any authorization issued by a Federal agency for a covered project" must be "filed not later than 2 years after the date of publication in the Federal Register of notice of final agency action on the authorization." *Id*. § 4370m-6(a)(1)(A). On November 30, 2021, BOEM published in the Federal Register a Notice of Availability of the ROD for the Project, which constitutes the applicable "notice of final agency action on the authorization" for the approvals challenged here. SFW 0087121; 86 Fed. Reg. 67,969. At that point, the two-year statute of limitations began to run on Plaintiffs' claims. This notice states "[t]he joint ROD concludes the National Environmental Policy Act (NEPA) process for each agency." *Id*. The notice also provides a link to the ROD, which describes the NHPA process for the Project and explicitly states that BOEM finalized the NHPA MOA for the South Fork Wind Project on November 23, 2021.[15] SFW 0087121, 0086930, 0086975-76. The *Green Oceans* Plaintiffs filed their initial complaint challenging the Project's federal approvals on January 16, 2024, more than

---

unlikely to be able to do so. *City of Dania Beach* does not support this outcome or that additional procedure would somehow result in moving or modifying the already installed WTGs which must be placed within the defined boundaries of the lease.

[14]      *See also* Fed. Permitting Improvement Steering Council, https://www.permits.performance.gov/permitting-project/fast-41-covered-projects/south-fork-wind-farm-and-south-fork-export-cable (last visited June 20, 2024).

[15] Plaintiffs' motion specifically challenges BOEM's *ROD* on NHPA and NEPA compliance grounds. *See, e.g.*, Mot. at 24, 27, 28, 32, 35, 36, 39, 43, 44; *id*. at 27-28 ("Section 106 of the Preservation Act mandates that federal agencies must consider the effects on historic properties before issuing a license (here, BOEM's record of decision) . . . .").

two years after "notice of final agency action on the authorization." *See Green Oceans v. U.S. Dep't of Interior*, No. 1:24-cv-00141, Dkts. 1, 34 (D.D.C. Jan. 16, 2024); 42 U.S.C. § 4370m-6(a)(1)(A).[16] *Green Oceans* Plaintiffs' NEPA and NHPA claims are therefore barred by the two-year statute of limitations. *See* 42 U.S.C. § 4370m-6(a)(1)(A).

### C.    Plaintiffs' Claims Are Moot

Federal courts have jurisdiction to decide only actual cases and controversies. U.S. Const. art. III, § 2. An "'actual controversy must be extant at all stages of review. . . .'" *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997) (citations omitted). "A case becomes moot— and therefore no longer a 'Case' or 'Controversy' for purposes of Article III [of the Constitution]— 'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the outcome.'" *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted).

The Project completed construction and was operational as of March 2024. *See supra* Section II.A. Therefore, Plaintiffs' NEPA and NHPA claims challenging the Project are moot because construction is now complete. *See, e.g.*, *Fund for Animals, Inc. v. Bureau of Land Mgmt.*, 460 F.3d 13, 18-19 (D.C. Cir. 2006) (NEPA challenge moot where the matter in dispute had already been implemented and completed); *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 62 F. Supp. 3d 1, 4 (D.D.C. 2014) (finding moot NHPA and NEPA challenges to flood control project for which construction was completed); *Weiss v. Sec'y of Dep't of Interior*, 459 F. App'x 497, 501-02 (6th Cir. 2012) (holding NEPA and NHPA claims moot and any declaratory judgment would be an impermissible "advisory opinion" where "construction on the [project] has been

---

[16] *Green Oceans* Plaintiffs filed their amended complaint four months later on May 8, 2024. The NEPA and NHPA Claims in the *Green Oceans* Plaintiffs' amended complaint are broader than those raised by PSNC and SELF and raised by the Plaintiffs in their motion for summary judgment. For example, only the *Green Oceans* Plaintiffs allege a NEPA violation associated with the No Action Alternative, *see* Dkt. 34, Compl. at 61, or the Purpose and Need, *id.* These broader claims are also barred by the statute of limitations.

substantially completed"). In *Sierra Club v. U.S. Army Corps of Engineers*, the court held a NEPA, Clean Water Act and APA challenge prudentially moot "[b]ecause all but 0.12 acres of the 7.69 acres of wetlands have been filled and construction on top of the former wetlands is substantially complete." 277 F. App'x 170, 172 (3d Cir. 2008). Similarly, in *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, where construction of the project was complete and already operational, those developments were sufficient to moot the NHPA claims because "consultation would no longer be 'meaningful.'" 301 F. Supp. 3d 50, 63 (D.D.C. 2018). The same holds true here.[17]

### D.   The Record Demonstrates That BOEM Complied With the NHPA

#### 1.   BOEM Complied with the Requirements of NHPA Section 106

Plaintiffs assert that BOEM violated NHPA Section 106 for a litany of reasons, none of which is supported by the administrative record. *See* Mot. at 27-37. Indeed, BOEM responded to each of these allegations during the Section 106 process, providing a reasoned basis for its decision taking into account all relevant factors. *See infra* Sections D.1.a, b, c(1), c(2), c(4), d; *see also Pub. Citizen, Inc. v. F.A.A.,* 988 2d 186, 197 (D.C. Cir. 1993) (agency action is not arbitrary and capricious if "agency adequately explain[s] its result . . . and respond[s] to 'relevant' and 'significant' public comments") (citations omitted); *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Plaintiffs' dissatisfaction with the outcome is not a basis to overturn BOEM's decisions.

> a.   BOEM Adequately Notified the Public of the Section 106 Process and Consulted With the Necessary Parties

---

[17] This case is unlike *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31, 42-44 (D.C. Cir. 2015), in which the court found that although an oil pipeline was completed, it had not begun operation. *See Save the Wekiva River & Headwaters, Inc. v. U.S. Army Corps of Eng'rs*, No. 6:17-CV-1902-ORL-DCI, 2017 WL 10086128, at *5 (M.D. Fla. Dec. 29, 2017). In any event, the Court should dismiss this case on prudential mootness grounds. *See United States v. W.T. Grant Co.*, 345 U.S. 629 (1953).

Plaintiffs argue (at 27-31) that BOEM violated the NHPA by failing to provide adequate notice of the Section 106 process and by failing to consult with various Plaintiffs. Neither of these arguments is supported by the administrative record. Under NHPA implementing regulations, BOEM had a duty to "provide the public with information about [the] undertaking and its effects on historic properties and seek public comment and input." 36 C.F.R. § 800.2(d)(2). As BOEM did here, the agency is permitted to use its procedures for public involvement under NEPA to "provide adequate opportunities for public involvement." *See id*. § 800.2(d)(3); SFW 0077119. The record is replete with evidence that BOEM provided more than adequate public notice of the Project's Section 106 process and opportunities for involvement. *See supra* Section II.B.

The record also demonstrates BOEM's compliance with Section 106 regulatory requirements for involving other parties in the process. *See* 36 C.F.R. § 800.3. In addition to the Advisory Council, consulting parties entitled to participate in the Section 106 consultation process include: relevant SHPOs, who "reflect[] the interests of the State and its citizens in the preservation of their cultural heritage," Indian tribes, the applicant for federal approval, and representatives of local governments with jurisdiction over properties in the APE. *Id*. § 800.2(b), (c). BOEM invited those parties to participate in the Section 106 consultation for the Project. *See, e.g.*, SFW 0056829-56, 0056885-912, 0056941-68, 0057081-192, 0057585-612, 0057305-32, 0087091-93.

Additionally, "[c]ertain individuals and organizations with a demonstrated interest in the undertaking *may* participate as consulting parties" if they request participation in writing and the agency determines that they should be granted consulting party status. *See* 36 C.F.R. §§ 800.2(c)(5), 800.3(f)(3) (emphasis added). Contrary to Plaintiffs' suggestions, the NHPA does not require the lead federal agency to invite and consult with all property owners of historic properties that could be affected by the project. *See, e.g., Mid States Coal. for Progress v. Surface*

19

*Transp. Bd.*, 345 F.3d 520, 553 (8th Cir. 2003) (no violation of NHPA where agency failed to invite owners of historic properties that could have been affected by a project). Rather, the lead federal agency has an obligation to provide the public with notice of the Section 106 process and to consider requests for consulting party status at the agency's discretion. *See* 36 C.F.R. §§ 800.2(d)(2), 800.3(f)(3); *see also Mid States Coal. for Progress*, 345 F.3d at 553; *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 334 (D. Mass. 2005), *aff'd*, 463 F.3d 50 (1st Cir. 2006); *Okinawa Dugong (Dugong Dugon) v. Mattis*, 330 F. Supp. 3d 1167, 1184-85 (N.D. Cal. 2018).

During the Section 106 process, Plaintiffs alleged that BOEM's public involvement process was insufficient and that BOEM failed to notify various parties, including PSNC and the Newport Restoration Foundation. SFW 0078316, 0082076-77. BOEM responded, explaining how its process followed the regulatory requirements for public involvement, SFW 0078316, 0082076-77, and BOEM granted consulting party status to individuals and organizations who made such requests, including Plaintiff PSNC, SFW 0084984, 0085844-66, 0085877-83, 0078292-326. BOEM also invited Preservation Rhode Island to participate in consultation, and BOEM granted Newport Restoration Foundation's request to participate as a consulting party. SFW 0087091-93; *see also* SFW 0075626-27. Similarly, early in the Section 106 process, BOEM invited the City of Newport to consult. SFW 0062730-31, 0087091-92. Nothing more was required. *See Eagle Cnty. v. Surface Transp. Bd.*, 82 F.4th 1152, 1189 (D.C. Cir. 2023) (upholding consultation process where the agency contacted numerous state entities, including the SHPO, and invited the public to provide feedback throughout the EIS process).

b.       BOEM Adequately Identified Historic Properties

Plaintiffs allege that "BOEM never made a good faith effort to identify historic properties." *See* Mot. at 31. But the record shows BOEM identified historic properties within the Project's

20

APE, which is the "geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties . . . ." 36 C.F.R. § 800.16(d). NHPA implementing regulations require BOEM to "make a reasonable and good faith effort" to identify historic properties within the Project's APE. *Id*. § 800.4(a)-(b). To do so, BOEM must consider "past planning, research and studies, the magnitude and nature of the undertaking and the degree of Federal involvement, the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the area of potential effects"; the regulations also refer to applicable guidelines for identification. *Id.* § 800.4(b)(1). The Advisory Council's guidelines[18] provide that "[i]dentification is reasonable when it is logically designed to identify eligible properties that may be affected by the undertaking, without being excessive or inadequate" and clearly state that "a reasonable and good faith identification effort does not require . . . [i]dentification of every historic property within the APE." Advisory Council Reasonable and Good Faith Guidance at 2-3; *see also* 36 C.F.R. § 800.4(b)(1); *Maryland Chapter of Sierra Club v. Fed. Highway Admin.*, No. 22-2597, 2024 WL 1194382, at *21 (D. Md. Mar. 20, 2024) ("Section 106's 'reasonable and good faith effort' requirement does not demand that Agencies identify every possible [historic property]" within the APE) (citing *HonoluluTraffic.com v. Fed. Transit Admin.*, 742 F.3d 1222, 1234 (9th Cir. 2014)); *WildEarth Guardians v. Provencio*, 923 F.3d 655, 677-78 (9th Cir. 2019).

As detailed in the Project's FoAE, SFW 0078471-522, 078292-470, through consultation with the SHPOs and implementation of BOEM's *Guidelines for Providing Archaeological and*

---

[18] Advisory Council, Meeting the "Reasonable and Good Faith" Identification Standard in Section 106 ("Advisory Council Reasonable and Good Faith Guidance"), https://www.achp.gov/sites/default/files/guidance/2018-05/reasonable_good_faith_identification.pdf.

*Historic Property Information Pursuant to 30 CFR Part 585*, BOEM defined the Project's viewshed portion of the APE ("viewshed APE") to incorporate the viewshed from which onshore or offshore renewable energy structures would be visible as well as any temporary or permanent construction or staging areas.  SFW 0078480.  As an initial step, BOEM conservatively used a 40-mile radius as the limit of theoretical Project visibility based on the curvature of the earth.  SFW 0066393.[19]  BOEM used Light Detection and Ranging ("LIDAR") data to prepare a highly-detailed surface model for viewshed analysis.  SFW 0066394.  The geographic information system ("GIS") analysis supporting the viewshed APE accounted for distance and curvature of the Earth impeding visibility as the distance increases between the viewer and WTGs and then a mapping effort removed all areas with obstructed views toward the Project WTGs, including views obscured by intervening topography, vegetation, and structures.  SFW 0078481.  Areas with unobstructed views of offshore Project elements then comprised the viewshed APE.  *Id*.

BOEM identified 113 historic properties within the viewshed APE through its evaluation of the revised 2021 HRVEA and the CHRVEA, among other materials, and BOEM concluded that 10 historic properties could be adversely affected by the Project.  SFW 0066379-685, 0066468, 0070484-547, 0078487-88.  BOEM also consulted with various federal, state, local, and tribal government parties, other consulting parties, and the general public to identify historic properties.  SFW 0078488-93.  Contrary to Plaintiffs' assertions (at 31), BOEM did not "miss[] dozens of historic properties."  Rather, Plaintiff SELF identified these properties during the consultation, and BOEM explained for each property that the property was evaluated in the context of the historic

---

[19] Contrary to Plaintiffs' mischaracterization (at 10 (citing SFW 0087090)), the MOA did not find that the Project will adversely affect historic sites within a 40-mile radius.  Rather Plaintiffs cite to the map depicting the much broader area of "potential" effect that was subsequently refined based upon further analysis, resulting in the significantly narrower findings of adverse effect.

district containing it or why there was no adverse effect to the property.  SFW 0078314-16.  The record, therefore, demonstrates that BOEM met the "reasonable and good faith effort" standard.

c.        BOEM Adequately Assessed Adverse Effects on Historic Properties

Plaintiffs allege that BOEM failed to adequately assess adverse effects of the Project by using inadequate visual simulations, by failing to identify the context of historic properties, and by failing to adequately consider the cumulative effects of the separate Revolution Wind and Sunrise Wind projects.  *See* Mot. at 32-35.  Each of these allegations fail.

The NHPA regulations require BOEM to assess adverse effects on "historic properties" within the Project's geographic APE.  *See* 36 C.F.R. § 800.5 ("Assessment of adverse effects" process); *id*. § 800.16(d), (l) (defining APE and "historic property").  "[A]n adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register of Historic Places ("National Register") in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association."  *Id*. § 800.5(a)(1).  BOEM's assessment of adverse effects is entitled to deference under the APA.  *See Neighborhood Ass'n of the Back Bay*, 463 F.3d at 59 ("we owe deference to the [agency]'s no adverse effect finding under sections 106 and 110, since the [agency] has jurisdiction to make the finding"); *see also City of Oxford, Ga. v. F.A.A.*, 428 F.3d 1346, 1356-57 (11th Cir. 2005).

To assess adverse visual effects, BOEM considered numerous technical analyses including: (1) the 2019 HRVEA; (2) the revised 2021 HRVEA; (3) the 2020 Memorandum: South Fork Wind Farm Cumulative Visual Simulations; (4) the 2020 VIA; (5) and the CHRVEA and documented its findings in the FoAE.  *See supra* Section II.B.2; SFW 0078486-87, 0078508, 0087052.  BOEM determined that ten historic properties would have adverse viewshed effects

23

from the Project, including Block Island Southeast Lighthouse NHL in which Plaintiff SELF claims an interest. SFW 0078488, 0078494-98. BOEM concluded that adverse effects would tend to result within 20 miles of the WTGs to properties on elevated seaside bluffs that offer open vantage points within the APE and through the introduction of modern visual elements that diminish the integrity of the properties' character-defining elements. SFW 0078496. BOEM determined these ten properties, including historic districts, were the only historic properties identified within approximately 20 miles from Project WTG locations and that retain a maritime setting that contributes to the respective property's National Register eligibility. *Id*. However, even for these properties included in the finding of adverse effect, BOEM determined that due to the distance and open viewshed, the integrity of the properties would not be so diminished as to disqualify any of them for National Register eligibility. SFW 0078497. Other historic properties, including those in Newport County, were not adversely affected. *Id.*

(1)    BOEM Relied on Extensive Visual Simulations

Consistent with 36 C.F.R. § 800.5(a), BOEM applied the criteria of adverse effects, in consultation with the SHPOs, the Advisory Council, and consulting parties, including Plaintiffs, as documented in the FoAE. SFW 0078494-500. Plaintiffs erroneously claim (at 32-33) that BOEM's simulations only account for best-case scenarios using hazy, low-contrast days, ignoring "worst-case" conditions using a "narrow set of observation points." But the record reflects that high-contrast lighting was used in simulations. *See, e.g.*, SFW 0070524. Moreover, BOEM considered and relied on broad visual analyses, which incorporate 44 simulations from 29 key observation points, including 29 daytime conditions, nine sunset conditions, and five nighttime simulations. SFW 0081679-80. Contrary to Plaintiffs' assertions (at 33) that these analyses did not include any simulations depicting construction impacts, the record makes clear there was a construction simulation from Southeast Lighthouse NHL. SFW 0081680.

24

Moreover, the visual assessments upon which BOEM relied took a conservative approach in assessing adverse effects to historic properties. For example, both the HRVEA and the VIA considered a Maximal Design Scenario, which represents the largest geographic footprint occupied by the largest potential Project WTGs (*e.g.*, 15 WTGs of 12 MW each) and, thus, the largest potential percentage of the visible horizon from shoreline locations that may be affected by Project (e.g., 20 percent more than was ultimately approved). SFW 0081674. And although Plaintiffs criticized the simulations during the regulatory process, BOEM provided detailed rebuttals and defense of its analysis. SFW 0078292-470; *see also* SFW 0078004. Moreover, GIS modeling of the viewshed and visibility of the Project from historic properties in the APE was field verified per the HRVEA. SFW 0078319. BOEM confirmed that "[e]ach historic property that may be visually affected by SFWF visibility was assessed in the HRVEA." SFW 0078298.

(2)      BOEM Adequately Responded to Plaintiffs' Comments Regarding Historic Properties

BOEM adequately addressed each of the 17 properties Plaintiffs' identified in comments and which Plaintiffs now complain were purportedly "missed" here. *See supra* Section IV.D.1.b; *see also* SFW 0078307-08, 0078315. BOEM provided detailed analysis on a property-by-property basis regarding the effects determinations for properties in Rhode Island. SFW 0081682-711; *see also* SFW 0078300-02. Importantly, the Rhode Island SHPO concurred in BOEM's determination that the Project would not adversely affect other historic properties that Plaintiffs claim an interest in, *see* Mot. at 34, including those in Newport, *e.g.*, the "Breakers NHL, Marble House NHL, Bellevue Avenue Historic District and Ocean Drive Historic District." SFW 0081754-56; *see also* SFW 0081696, 0081721-22, 0078497-98.

25

                  (3)        BOEM Properly Analyzed Cumulative Visual Effects

Contrary to Plaintiffs' assertion (at 35) BOEM fully analyzed the Project's cumulative visual effects, including the cumulative effects of two projects that had not yet been approved— Revolution Wind and Sunrise Wind. These two projects were specifically evaluated assuming a maximum design scenario for the South Fork Wind Project, including in the cumulative visual simulations in the revised CHRVEA. *See, e.g.*, SFW 0078488, 0078496-97, 0070488, 0070503; *see also* SFW 0078303. BOEM concluded that the Project would result in cumulative effects to the above-referenced ten properties and that the contribution of the Project to cumulative visual effects[20] would be proportionately small in magnitude and extent (three percent of the visible WTGs). SFW 0078488, 0078496-97; *see also* SFW 0070488, 0070508.

                  (4)        BOEM Adequately Analyzed Economic Impacts, including Tourism Revenues

Although Plaintiffs briefly allege (at 35) that BOEM failed to "provide any analysis of economic impacts to the owners of historic properties who often depend on tourism revenues or a potential loss in property values," this allegation is belied by the record. The FEIS includes extensive consideration of potential economic impacts (Chapter 3.5.3) and potential tourism impacts (Section 3.5.8 of Appendix H), including evaluation of numerous studies. SFW 0077036-51 (FEIS Chapter 3.5.3), 0077570-84 (Appendix H, Section 3.5.8), 0141931-88 (G. Parsons and J. Firestone, *Atlantic Offshore Wind Energy Development: Values and Implications for Recreation and Tourism* (2018)), 0142811-3110 (T. Smythe, H. Smith, A. Moore, D. Bidwell, and J. McCann, *Analysis of the Effects of Block Island Wind Farm (BIWF) on Rhode Island Recreation and Tourism Activities* (2018)); 0146503-39 (A. Carr-Harris and C. Lang, *Sustainability and tourism:*

---

[20] Under NHPA regulations, "adverse effects may include reasonably foreseeable effects *caused by the undertaking* that may . . . be cumulative." 36 C.F.R. § 800.5(a)(1) (emphasis added).

*The effect of the United States' first offshore wind farm on the vacation rental market* (2019)). BOEM also addressed these issues in responses to comments, including from Plaintiff SELF, on the FEIS. *See, e.g.*, SFW 0077699, 0077944, 0078034-35. BOEM concluded that the Project impacts on tourism would range from negligible to minor. SFW 0077572, 81. Plaintiffs' speculative concerns were fully evaluated by BOEM.

### d.    BOEM Adequately Resolved Adverse Effects

Plaintiffs argue that BOEM violated Section 106 by failing to resolve adverse effects to identified historic properties prior to approving the Project, claiming that the MOA provision allowing for development and implementation of Historic Property Treatment Plans ("HPTPs") after issuance of the MOA renders the MOA unenforceable. *See* Mot. At 35-37. However, as extensively detailed in the record, BOEM, the Advisory Council and the SHPOs for Rhode Island, Massachusetts, and New York signed the Project MOA, which incorporated BOEM's FoAE, and "agree[d], consistent with 36 CFR 800.6(b)(2), that adverse effects will be resolved in the manner set forth in [the] MOA." SFW 0087051-54. BOEM's resolution of adverse effects in consultation with the consulting parties should be afforded a substantial degree of deference by a reviewing court—especially where, as here, that process culminated in an MOA concurred in by other expert historic property agencies. *See, e.g.*, *Neighborhood Ass'n of the Back Bay,* 463 F.3d at 59; *Nw. Bypass Grp. v. U.S. Army Corps of Eng'rs*, 552 F. Supp. 2d 97, 130 (D.N.H. 2008) (upholding an agency's Section 106 process where the MOA demonstrates consultation); *Advocs. for Transp. Alternatives, Inc. v. U.S. Army Corps of Eng'rs*, 453 F. Supp. 2d 289, 312-13 (D. Mass. 2006) (upholding an agency's Section 106 process where "the [MOA] signifies that the agencies responsible for historic resources were satisfied that the impacts to the historic resources have been minimized to an acceptable level").

Contrary to Plaintiffs' assertion, the NHPA does not mandate a particular result from the consultation process, nor does it mandate specific types or amounts of mitigation to resolve adverse effects to historic properties under Section 106. *See, e.g.*, *Davis v. Latschar*, 202 F.3d 359, 370 (D.C. Cir. 2000) ("Section 106 only requires that the [agency] consult the SHPO and Advisory Council and consider the impacts of its undertaking."); *Nat'l Trust for Historic Pres. v. Blanck*, 938 F. Supp. 908, 918 (D.D.C. 1996) ("Section 106 is universally interpreted as requiring agencies to consult and consider and not to engage in any particular preservation activities per se.").

Nonetheless, the MOA required extensive avoidance and minimization and established a substantive baseline of mitigation measures to resolve the Project's adverse effects to historic properties. SFW 0087053-64, 94. To maintain avoidance, the MOA required Project structures to be within the BOEM-approved project design envelope, sizes, scale, and distances that BOEM used to define the APE and determine Project effects in the Section 106 consultation process. SFW 0087054-62. To further minimize adverse effects to historic properties, including the Southeast Lighthouse NHL, the MOA included numerous minimization measures, including: reducing the number of Project WTGs to be installed by 20 percent, from 15 to 12; the use of uniform WTG design, placement (*e.g.*, 1 nautical mile apart), speed, height, and rotor diameter to reduce visual contrast; requiring that the WTGs be painted off white/gray color to reduce visual contrast during daytime hours; and installation of an ADLS to limit time in which WTG aviation lights would be on and visible from affected properties at night, which will reduce flashing aviation lights from the nacelle and mid-tower of the WTGs to less than 1 percent of the normal operating time. SFW 0087055.

Further, to mitigate adverse effects, the MOA established a substantive baseline of mitigation measures sufficient to resolve adverse effects to the historic properties. SFW 0087055.

28

Per Attachment 3 to the MOA, mitigation measures proposed were developed by individuals who meet the qualifications specified in the Secretary of the Interior's Qualifications Standards for Archeology, History, Architectural History, and/or Architecture (36 C.F.R. pt. 61). SFW 0087094. The proposed mitigation measures consider, among other things, the nature, scope, and magnitude of adverse effects caused by the Project and the qualifying characteristics of each historic property that would be affected. *Id.* While MOA Stipulation III.A does also require development of HPTPs, these documents must "provide the details and specifications" for mitigation that must "consist of or at least equivalent to those substantive baseline mitigation measures BOEM has identified in Stipulation III.B and III.C . . . to resolve the adverse effects to each historic property." SFW 0087055. Plaintiffs' suggestion that South Fork Wind somehow had sole discretion to determine the content of the HPTPs is unfounded. Rather, BOEM's approach to resolving adverse effects in the MOA established clear, binding substantive baseline mitigation requirements. And the signatories, including the SHPOs, Advisory Council, and BOEM, among others, in executing the MOA, agreed that the MOA fulfilled Section 106 requirements to resolve adverse effects. *See* SFW 0087053 ("the signatories agree, consistent with 36 CFR 800.6(b)(2), that adverse effects will be resolved in the manner set forth in this MOA."); 36 C.F.R. § 800.6(c) ("A memorandum of agreement executed and implemented pursuant to this section evidences the agency official's compliance with section 106 and this part . . . .").

During the Section 106 consultation, BOEM repeatedly asked for feedback on potential mitigation measures. *See, e.g.*, SFW 0078489-93. But Plaintiffs SELF and PSNC failed to put forth specific, substantive proposals during the consultation process for how adverse effects from the Project should be resolved, and instead requested that a community benefit be established that would be deposited into their counsel's trust account and transferred to a non-profit (minus

29

attorney's fees and expenses) to fund future, unspecified activities. *See* SFW 0084984-89, 0084998 (November 8, 2021 letter from counsel stating that "[i]f Orsted agrees to establish a Community Benefit Fund . . . , then our clients will consider supporting the MOA and waiving their objections."). BOEM considered and responded to these recommendations and proposals, SFW 0085172-75, and nothing more was required. *See Davis*, 202 F.3d at 370; *see also Nat'l Trust for Historic Pres.*, 938 F. Supp. at 918; *Karuk Tribe v. Kelley*, No. C 10-02039 WHA, 2011 WL 2444668, at *14 (N.D. Cal. June 13, 2011) (rejecting plaintiff claims that the agency had not taken steps to mitigate harm; providing although "Plaintiffs may not be satisfied with the speed or extent of the remedial mitigation measures that were taken in response to those impacts[,] . . . *plaintiffs' satisfaction is not the legal standard by which defendants' acts are to be reviewed*") (emphasis added).

### 2.    BOEM Complied With the Requirements of NHPA Section 110(f)

Plaintiffs allege (at 1, 24-27) that BOEM failed to comply with NHPA Section 110(f) requirements for NHLs, erroneously asserting (at 27) that "BOEM cannot point to any evidence within the Administrative Record to show it complied with Section 110(f)." To the contrary, the record demonstrates that BOEM gave special consideration to the Project's potential adverse effects on NHLs and followed the process required under NHPA Section 110(f). *See supra* at Section II.B.2; SFW 0078504-05, 0078507, 0019820, 0057585-612, 0057305-32, 0078787-88, 0079604-07, 0079648-78, 0085389-401, 0087051.

NHPA Section 110(f) requires BOEM, prior to approving an undertaking that "may directly and adversely affect" a NHL, "to the *maximum extent possible* [to] undertake such planning and actions as may be necessary to *minimize harm to*" the NHL and afford the Advisory Council a reasonable opportunity to comment. 54 U.S.C. § 306107 (emphasis added); 36 C.F.R. § 800.10. Like Section 106, Section 110(f) does not mandate particular substantive outcomes.

*See, e.g.*, *Presidio Historical Ass'n v. Presidio Trust*, 811 F.3d 1154, 1170 (9th Cir. 2016) (holding that "Section 110(f) does not impose a substantive obligation"); *Neighborhood Ass'n of the Back Bay*, 463 F.3d at 64.   Under Section 110(f), federal agencies must "thoroughly consider" alternatives, but "it would be difficult to interpret [the Congressional intent of Section 110(f)] as suggesting anything other than an intent to require agencies to canvass their options with a keen eye." *Presidio Historical Ass'n*, 811 F.3d at 1170.  Contrary to Plaintiffs' assertion otherwise (at 25 n.138), Section 110(f) does not mandate complete avoidance of adverse effects.  *See Standards and Guidelines for Federal Agency Historic Preservation Programs Pursuant to the National Historic Preservation Act* ("Standards and Guidelines"), U.S. Department of the Interior, Standard 4, 63 Fed. Reg. 20,496 (Apr. 24, 1998).  Rather, "[w]here such alternatives appear to require undue cost or to compromise the undertaking's goals and objectives, the agency must balance those goals and objectives with the intent of section 110(f)." *Id*. at 20,496.

Plaintiffs rely on *Citizens to Preserve Overton Park*, 401 U.S. at 411, which is inapposite, given the absence of any discussion of the NHPA in that case.  Indeed, rather than "prohibiting damage to historic resources" as Plaintiffs erroneously assert, *see* Mot. at 25 n.138, that case states that the language of Section 4(f) of the Transportation Act and Section 138 of the Federal-Aid Highway Act "is a plain and explicit bar to the use of federal funds for construction of highways through parks."  401 U.S. at 411; *see also Presidio Historical Ass'n*, 811 F.3d at 1170 ("Congress's decision to strip the mandatory language about exhausting prudent and feasible alternatives from the bill that eventually became Section 110(f) . . . is evidence of Congress's intent to distinguish Section 110(f) from Section 4(f) of the transportation legislation.").

Plaintiffs' allegation (at 1) that BOEM approved the Project "without considering the Project's adverse effects on [NHLs]" is patently false and contradicted by the record.  BOEM

31

determined that all Project alternatives would avoid adverse effects to NHLs in the viewshed APE in Newport County due to the distance of 25 miles or more between the Project lease area and the respective NHLs. SFW 0078505, 0081696, 0081721-22. The Rhode Island SHPO concurred with BOEM's determination that the Project will have no adverse effects on any of these NHLs, providing a detailed discussion of its determination for each property. SFW 0081754-56.

The FoAE and the MOA also evidence BOEM's compliance with NHPA Section 110(f) for the Southeast Lighthouse NHL—the one NHL that BOEM concluded would be adversely affected by the Project. SFW 0078504-05, 0078507, 0087051. Although BOEM determined that all feasible alternatives, including all feasible turbine layouts, would result in adverse visual effects to the Southeast Lighthouse NHL, BOEM concluded that for this property, the magnitude of the visual effects on the NHL was minor, in part given the small number of WTGs associated with the Project, their distance from the NHL (*i.e.*, over 19 miles away), and the presence of five existing WTGs from the Block Island Wind farm in state waters visible from the NHL (four miles from the NHL). SFW 0078505, 0087053. BOEM planned and undertook action to minimize effects to the Southeast Lighthouse NHL, including uniform WTG design, spacing, speed, height, and rotor diameter to reduce visual contrast, uniform spacing of WTGs to decrease visual clutter, reduced number of WTGs (from 15 to 12), and lighting (including ADLS), painting, and marking requirements to minimize visibility. SFW 0087055 (Stipulations II.B.1). BOEM also undertook planning and action to mitigate adverse effects, including by requiring that substantive baseline mitigation be implemented through development of HPTPs. SFW 0087055, 0087057-61 (Stipulations III.A, III.C). BOEM noted that "[m]itigation measures for adverse effects to [the] NHL must be reasonable in cost and not be determined using inflexible criteria, as described by the NPS[.]" SFW 0078506.

32

BOEM explained that the Secretary of the Interior's Standards and Guidelines provide that "the agency must balance" the goals and objectives of the undertaking "with the intent of section 110(f)" and the agency "should consider": "(1) [t]he magnitude of the undertaking's harm to the historical, archaeological and cultural qualities of the NHL; (2) [t]he public interest in the NHL and in the undertaking as proposed[;] and[] (3) [t]he effect a mitigation action would have on meeting the goals and objectives of the undertaking." 63 Fed. Reg. at 20,503. Here, BOEM determined "the magnitude of the visual effects on the NHL is minor given the small number of turbines, their distance from the NHL, and the presence of existing WTGs visible from the NHL." SFW 0078505. BOEM also concluded that "while the undertaking would affect the historic setting of the NHL, it would not affect any other character-defining features or aspects of the NHL's historic integrity" and that the NHL "would still illustrate its regional and national maritime significance, and continue to exemplify its importance as a rare surviving example of its rare architectural design." SFW 0078505-06. Regarding the public interest, BOEM "recognized there is a general and substantial and highly supportive public interest in using the OCS to develop clean energy sources," including "Executive Order 14008 [which] declares the policy of the United states *[sic]*" to deploy clean energy technologies and infrastructure, and concluded that "[t]his undertaking contributes to these goals." SFW 0078506. BOEM also identified the various minimization measures to reduce harm from visual effects to the NHL and the other aboveground historic properties adversely affected by the Project. SFW 0078506-07. BOEM stated that measures to avoid, minimize, and mitigate adverse effects on the Southeast Lighthouse NHL, as required under Section 110(f), would be included in the MOA, implemented by the MOA signatories, and adopted as conditions of Project approval. SFW 0078506-07.

BOEM took all legally required actions to "fulfill[] its responsibilities to give a higher level of consideration to minimizing harm" to the NHL. 36 C.F.R. § 800.10.  As required by NHPA implementing regulations, *id*. §§ 800.10(b)-(c), BOEM requested that the Advisory Council participate in any consultation to resolve adverse effects on NHLs, notified NPS of the consultation involving an NHL, and invited NPS to participate in the consultation.  SFW 0057305-313, 0078504; *see also* SFW 0082074 ("BOEM has included the NPS in consultation under NHPA Section 106 and in relation to NHPA Section 110 on matters concerning NHLs . . . .").

Contrary to Plaintiffs' assertion (at 26) that the record indicates the only communication BOEM had with NPS is "a smattering of emails and phone call references," the record clearly shows that NPS participated extensively as a consulting party, including participating in a consultation meeting held on September 22, 2021 that focused specifically on NHLs and that was attended by both NPS and the Advisory Council as well as by counsel for Plaintiff SELF.  *See, e.g.*, SFW 0078787-88, 0079648-78, 0085389-401; *see also* SFW 0058033-40, SFW 0069415-25, SFW 0075833-49.  BOEM complied with the NHPA and Plaintiffs' claims should therefore be rejected.

**E.      The Record Demonstrates BOEM Conducted a Thorough NEPA Review**

**1.      BOEM Adequately Considered the Project's Effects on Historic Properties**

Plaintiffs argue that the FEIS "fail[ed] to address and mitigate the impacts on historic properties owned by Preservation and Green Oceans Plaintiffs," and "does not assess the impacts on the many National Historic Landmarks in the Newport area."  Mot. at 39-40.  But the record shows BOEM took the requisite "hard look" at potential impacts to historic properties.  Plaintiffs

34

overstate (at 38-39) the "action-forcing" nature of NEPA.[21]   The case law Plaintiffs cite explains "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens*, 490 U.S. 332, 350 (1989).   And NEPA "is not a suitable vehicle for airing grievances about the substantive polices adopted by an agency[.]"   *Grunewald v. Jarvis*, 776 F.3d 893, 903 (D.C. Cir. 2015) (internal citations and quotations omitted).   Courts will review an agency's NEPA "analysis of environmental effects" under the arbitrary and capricious standard, which is "highly deferential to the agency," and will "give deference to agency judgments as to how best to prepare an EIS."   *Food & Water Watch v. FERC*, No. 22-1214, 2024 WL 2983833, at *3 (D.C. Cir. June 14, 2024) (citations omitted); *see also Marsh*, 490 U.S. at 378.

CEQ's NEPA implementing regulations require an EIS to consider the "reasonably foreseeable" direct, indirect, and cumulative impacts of the proposed action and its alternatives. *See* 40 C.F.R. §§ 1502.16, 1508.7, 1508.8, 1508.25 (1978).   BOEM did precisely that in the FEIS, *see, e.g.*, SFW 0077016-32 (cultural resources, including historical "viewshed resources"), SFW 0077090-101 (non-historic visual resources), SFW 0077246-47 (cumulative cultural and visual resources analysis), SFW 0078003-04, 0078006-09, 0078011-15 (response to comments on visual impacts to cultural resources), 0078031-34 (response to comments on cumulative visual resource analysis), 0078035 (response to comments on mitigation measures for visual resources), following

---

[21] Plaintiffs (at 38 n.202) incorrectly attribute a quotation to 42 U.S.C. § 4332(C)(ii).   However, the quoted text is from the 2020 version of CEQ's NEPA implementing regulations, which are not applicable here.   *See* 40 C.F.R. § 1501.3(b)(2) (2020).   The applicable version of CEQ's NEPA implementing regulations—the 1978 NEPA regulations—are the regulations in place before the 2020 amendments took effect.   *See* SFW 0076837 ("Because work on the EIS began before September 14, 2020, BOEM has followed the 1978 CEQ NEPA regulations"); 84 Fed. Reg. 43,304, 43,340 (July 16, 2020) ("For NEPA reviews in process that agencies began before the final rule's effective date, agencies may choose whether to apply the revised regulations or proceed under the 1978 regulations and their existing agency NEPA procedures.").

a robust public process and input from other government agencies, *see supra* at Section II.B.1.[22] BOEM considered and incorporated into the FEIS numerous technical studies, *see*, *e.g.*, SFW 0077019-20, 0077173-74, including "[v]iewshed analysis apply[ing] GIS modeling to take into account the true visibility of the Project[,]" SFW 0077019.  As explained in Section IV.D.1.c(1) above, these studies included visual simulations from multiple key observation points, and this analysis was incorporated into the FEIS.  *See* SFW 0077173-74 (FEIS cultural resources references), 0077019-20 (FEIS discussing HRVEA and CHRVEA).  Based on these simulations, BOEM concluded "WTGs would be visible in the distant background only on clear days" and that the Project "would have the potential for moderate to major impacts to historic properties in its viewshed within 20 miles, minor visual impacts beyond 20 miles, and negligible impacts beyond 25 miles."  SFW 0077027-28.

BOEM did not "fail to address and mitigate impacts on historic properties owned by Preservation and Green Oceans Plaintiffs."  *See* Mot. at 39.  With respect to Plaintiff SELF, the FEIS identified Southeast Lighthouse NHL as one of the ten historic properties "along the coastline or bluffs with open ocean views, within approximately 20 miles" of the Project, which are "anticipated to experience moderate visual impacts[.]"  SFW 0077028.  BOEM found that "if adverse visual effects are experienced from [the Project] they would not be new but would add to existing adverse visual effects" from the Block Island Wind Farm WTGs, which are four miles from the Southeast Lighthouse NHL and were constructed years ago, while the Project is 19 miles from the lighthouse in roughly the same direction.  SFW 0077699, 0078013.  BOEM concluded that any adverse impact to the NHL would be minor, with the exception of nighttime visual effects;

---

[22] The FEIS considered a variety of alternatives to the "Proposed Action," including a "Habitat Alternative," which was ultimately adopted by BOEM.  *See* SFW 0086928.

the Southeast Lighthouse, notably, is closed to the public at night.  SFW 0077096, 0078006.

Finally, BOEM addressed SELF's comments on the DEIS regarding cultural resources.  *See, e.g.*,

SFW 0077699, 0078006-08, 0078011-14, 0078031.

The Newport County, Rhode Island properties associated with the other Plaintiffs are

within the geographic radius BOEM used to assess visual effects, but these historic properties were

located far enough away to minimize impacts.  The HRVEA and CHRVEA that BOEM

incorporated into the FEIS specifically identified and considered potential impacts to Plaintiff-

owned properties (or related historic districts) identified in their motion.  SFW 0066459

(addressing The Breakers, Marble House, Bellevue Avenue Historic District, Ocean Drive Historic

District and Ocean Road Historic District but noting "[t]he Breakers and Marble House . . . do not

feature direct, unobstructed views of the Project."), SFW 0066520 (finding no adverse effect to

501-521 Indian Avenue and Stonybrook Estate Historic District due to "[l]imited areas of

visibility, minimal visual effect due to distance from project, land masses obscuring view of

project"), SFW 0070507 (recognizing "The Breakers NHL, Marble House NHL, Bellevue Avenue

Historic District NHL, Ocean Road Historic District NHL, and Ocean Drive Historic District . . .

are all at distances of between 25 and 26 miles from the nearest proposed [Project] WTG" and

"that the Project would result in no adverse effects to these and other historic properties within the

viewshed APE with limited to no views of [Project] WTGs").  Here, the record demonstrates that

BOEM "adequately considered and disclosed" the foreseeable visual impacts of the Project on

historical and cultural resources.  *See Birckhead v. FERC*, 925 F.3d 510, 515 (D.C. Cir. 2019).[23]

---

[23] *Metcalf v. Daley*, 214 F.3d 1135, 1143-44 (9th Cir. 2000), which Plaintiffs argue (at 40 n.213)
demonstrates BOEM's environmental review was untimely is inapposite.  Unlike in *Metcalf*,
BOEM did not "bind" itself to Project approval before its environmental review was complete.

Moreover, BOEM did not unlawfully fail to "mitigate" impacts on these historic properties, *see* Mot. at 39, for two reasons.  First, although [d]iscussing mitigation measures is an important aspect of an EIS," NEPA is a procedural statute that does not  "require an agency to have 'actually formulated and adopted . . . a fully developed plan that will mitigate harm before an agency can act.'" *Oglala Sioux Tribe,* 45 F.4th at 305 (citing *Robertson*, 490 U.S. at 352-53).  Under NEPA, BOEM plainly does not have a "duty to ensure that adverse effects to historic properties are . . . mitigated to the maximum degree possible during its environmental review process," as Plaintiffs wrongly claim.  *See* Mot. at 40.  Second, the FEIS *did* consider mitigation measures for visual impacts to historic properties.  *See, e.g*., SFW 0077036 (FEIS section regarding mitigation for cultural resources), SFW 0077438-41 (describing siting WTGs to "restrict[] available views from visually sensitive above-ground historic properties"), SFW 0078008.

Finally, Plaintiffs appear to argue (at 39) that the FEIS was "incomplete" because Section 106 consultation was ongoing when the FEIS was published, but Plaintiffs fail to cite any authority for the claim that Section 106 consultation must be completed before EIS publication.[24] No such authority exists.  The NHPA implementing regulations require only that "[t]he agency official must complete the section 106 process 'prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license.'"  36 C.F.R. § 800.1(c). As required, BOEM initiated Section 106 consultation early in its review and "[t]hroughout 2020 and 2021, BOEM consulted on the identification of historic properties and the assessment of

---

[24] Plaintiffs claim that BOEM "admits" the FEIS does not assess impacts to historic properties in the Newport area but justified this exclusion by noting that approval of the Project is subject to Section 106 consultation.  *See* Mot. at 39-40 (citing SFW 0074155).  BOEM made no such "admission."  The FEIS simply explains that, at the time, BOEM "remain[ed] in consultation . . . under NHPA Section 106 on identified historic properties, adverse effects, and the resolution of adverse effects," SFW 0077028, and that "[h]istoric properties, if adversely affected, would be mitigated through the Section 106 process."  SFW 0077032.

effects on those properties." SFW 0086930, 0077119.  This consultation was completed after the FEIS but before the ROD, and, in the ordinary course, BOEM "modified some measures identified in the FEIS as an outcome of consultations under . . . Section 106."  SFW 0086927.

In sum, BOEM fulfilled its "essentially procedural" obligation to take a "hard look" at the Project's anticipated impacts to historic properties.  *See Robertson*, 490 U.S. at 350.

### 2.    BOEM Adequately Considered Cumulative Impacts

In arguing that the FEIS impermissibly "segment[ed] out" the Project from two other offshore wind farms, *see* Mot. at 42, Plaintiffs confuse the concepts of cumulative impacts and "connected actions" under NEPA regulations.  In any event, however, BOEM satisfied its NEPA obligations. "Cumulative actions" are actions assessed together because they have "cumulatively significant impacts." 40 C.F.R. § 1508.25(a)(2) (1978).  A "cumulative impact" is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions. . . ."  *Id*. § 1508.7; *see also id*. § 1508.25(c)(3) (scope of an EIS includes consideration of cumulative impacts).

Contrary to Plaintiffs' claim, *see* Mot. at 41-42,[25] the FEIS carefully considered potential impacts of reasonably foreseeable other future offshore wind activities, including the separate Revolution Wind and Sunrise Wind projects, that could contribute to the Project's cumulative viewshed impacts.  SFW 0076856, 0077030-32, 0077244, 0077247, 0077248-51.  The FEIS explains that BOEM's cumulative impact analysis considered a total of 25 active and future offshore wind projects, expressly including the Revolution Wind and Sunrise Wind projects.  SFW 0077248-51, 0077294.  As explained in Section IV.D.1.c(3), BOEM also analyzed cumulative

---

[25] Plaintiffs incorrectly state that the total number of WTGs for the South Fork Wind, Revolution Wind, and Sunrise Wind projects is "nearly 200," 200, or 206, when in fact it is far lower. *See supra* note 2.

visual effects of the Project on historic properties through a CHRVEA, which concluded that the cumulative visibility of Project with other offshore wind projects, including Revolution Wind and Sunrise Wind, "is anticipated to intensify the level of adverse effect to the 10 historic properties" but noted that the Project itself "would contribute only approximately 3 percent of the cumulative adverse effect." SFW 0070508. BOEM relied on the CHRVEA to support its conclusion that the Project, "when combined with past, present, and reasonably foreseeable activities would result in long-term, negligible to moderate cumulative impacts on historic properties in the viewshed." SFW 0077031.[26] BOEM determined that the cumulative visual impacts of the Project—predominantly consisting of offshore lighting impacts from navigational and aviation hazard lighting systems on the WTGs and offshore substation—when combined with past, present, and reasonably foreseeable activities could have intermittent, short-term to long-term, negligible to moderate impacts on viewshed resources. SFW 0077031.

Plaintiffs point to no particular deficiencies in the FEIS's cumulative impacts analysis but instead mistakenly claim BOEM improperly "segmented" its review of the South Fork Wind, Revolution Wind, and Sunrise Wind projects.[27] *See* Mot. at 40-43. But each of these projects have independent utility and are not "connected actions" under NEPA regulations.[28] BOEM was under

---

[26] Plaintiffs argue that BOEM contradicted itself because it did not identify adverse impacts to historic properties located "within Newport's Bellevue Avenue Historic District, Ocean Drive Historic District, or other historic properties on Block Island," when the HRVEA purportedly found these properties would be adversely affected. *See* Mot. at 42 (citing SFW 0078494 and SFW 0014049). Although Plaintiffs do not actually cite to the FEIS or the most recent HRVEA, which was revised in 2021, *see* SFW 0070484-547, there is no inconsistency in BOEM's conclusions as described in Section IV.D.1.b, *supra*. *See* SFW 0078497-98.

[27] Courts have made clear that assessment of the adequacy of cumulative effects analysis within an EIS is different from alleged "segmentation" of NEPA reviews. *See, e.g.*, *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 51 (D.C. Cir. 2015) ("The cumulative actions doctrine is not concerned with geographic segmentation . . . .").

[28] Plaintiffs make a passing reference to the regulatory provision describing NEPA review for "similar actions," without argument. *See* Mot. at 40-41 (citing 40 C.F.R. § 1508.25(a)(3)). The

no obligation to review these three distinct projects in the same EIS.  Actions are "connected" under NEPA regulations only if they: (1) "[a]utomatically trigger other actions that may require environmental impact statements"; (2) "[c]annot or will not proceed unless other actions are taken previously or simultaneously"; or (3) "are interdependent parts of a larger action and depend on the larger action for their justification."  40 C.F.R. § 1508.25(a)(1) (1978).  A proposed action is not a "connected action" if the proposed action has "substantial independent utility" from the other action.  *See, e.g.*, *City of Bos. Delegation v. FERC*, 897 F.3d 241, 252 (D.C. Cir. 2018); *Coal. on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 69 (D.C. Cir. 1987) ("independent utility" depends on "whether one project will serve a significant purpose even if a second related project is not built").

Here, the notion (at 2) that the separate South Fork Wind, Revolution Wind, and Sunrise Wind projects are actually a "single industrial wind farm project, originally known as Deepwater Wind" is pure fabrication.  And the projects are certainly not "connected actions" requiring analysis within the same EIS because they do not meet any of the above criteria under 40 C.F.R. § 1508.25(a)(1).  Each project was developed at different times, in response to requests for proposals conducted by different state agencies, and will deliver its power to different locations (via different transmission cables) pursuant to different offtake agreements.  Plainly, each project has substantial independent utility and significant purpose independent of the other projects.  The South Fork Wind Project, which is fully operational, does not rely upon either the onshore or offshore infrastructure of the other two projects, and operates to satisfy South Fork Wind's

---

regulation states only that "[a]n agency *may* wish to analyze these actions in the same [EIS]." 40 C.F.R. § 1508.25(a)(3) (emphasis added).  These three separate projects do not share "common timing or geography" and are not "similar actions" that would benefit from combined review in a single EIS.  Finally, Plaintiffs did not raise this argument in their Complaints and cannot do so now.  *See, e.g., Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93, 97 n.3 (D.D.C. 2007) (plaintiff "may not, through summary judgment briefs, raise [] new claims . . . because plaintiff did not raise them in his complaint, and did not file an amended complaint").

contractual commitments pursuant to a 2017 power purchase agreement ("PPA") delivering power to East Hampton, on the South Fork of Long Island.  SFW 0076852-53, 0077250 (Revolution Wind being constructed to satisfy its own PPAs to deliver power to utilities in Connecticut and Rhode Island, and Sunrise Wind will be constructed to fulfill a contract with the New York State Energy Research and Development Authority, delivering power to Suffolk County, New York). Therefore, BOEM was not required to analyze those projects as "connected actions" in the South Fork Wind Project FEIS.  *See City of Bos. Delegation*, 897 F.3d at 252; *see also Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1326 (D.C. Cir. 2015) (holding that projects were not "connected actions" when "neither depend[ed] on the other for its justification").[29]

BOEM adequately address cumulative impacts and did not act arbitrarily and capriciously and in declining to consider the South Fork Wind, Revolution Wind, and Sunrise Wind projects in a single EIS. *See City of Bos. Delegation*, 897 F.3d at 252.

### 3.    The FEIS Properly Considered the No Action Alternative

NEPA requires an EIS to analyze project alternatives, including "the alternative of no action," *see* 40 C.F.R. § 1502.14(d) (1978); *see also* 43 C.F.R. § 46.30 (Department of the Interior NEPA regulations).  Contrary to *Green Oceans* Plaintiffs' claims (at 43-45), which are barred by the statute of limitations, *see supra* at Section IV.B, the FEIS included a robust analysis of the "No Action Alternative."  BOEM described the No Action Alternative in detail, *see, e.g.,* SFW 0076873, 0076880-82, and thoroughly analyzed the No Action Alternative throughout the

---

[29] Plaintiffs also cite *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1306 (D.C. Cir. 2014), where this Court found that FERC improperly segmented NEPA review of a series of the "connected, closely related, and interdependent" pipeline projects that "constituted a complete upgrade of almost 200 miles of continuous pipeline." *See* Mot. at 41 n.216.  As explained above, unlike *Delaware Riverkeeper Network*, the South Fork Wind, Sunrise Wind, and Revolution Wind projects are not "inextricably intertwined," each project has its own utility, and each would be built—indeed, the Project *already has been* built–irrespective of the others. *See* 753 F.3d at 1317.

Environmental Consequences analysis in FEIS Section 3 and Appendix H. *See, e.g.,* SFW 0076896-900, SFW 0076995-0077003, SFW 0077021-24, SFW 0077043-45, SFW 0077091-93. Therefore the record amply disproves Plaintiffs' claims that the "the No Action Alternative was never actually considered" and that "BOEM failed to offer the decision-maker the true no-action alternative of deciding not to authorize construction of the Project." *See* Mot. at 43, 44. Plaintiffs' dissatisfaction with the outcome is not a valid basis on which to obtain relief. *See, e.g.*, *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 777 (1983) (NEPA not vehicle for "policy objections"); *Hammond v. Norton*, 370 F. Supp. 2d 226, 242 (D.D.C. 2005) ("brief" discussion of no action alternative, "lay[ing] out the costs and benefits of the no action alternative with enough specificity to allow meaningful comparison with other alternatives," was all that was required; Plaintiffs' disagreement was insufficient).[30]

Plaintiffs point to no deficiency in the FEIS's No Action Alternative analysis itself, and, indeed, they fail to cite to the FEIS entirely in their argument. *See* Mot. at 43-45. By selectively quoting a single sentence from the ROD, Plaintiffs (at 43) erroneously argue that "BOEM summarily rejected the no-action alternative." Plaintiffs also misleadingly omit the portion of the ROD where BOEM explained that "selection of the No Action Alternative would be expected to result in moderate, long-term adverse impacts on air quality due to the need to construct and operate new energy generation facilities to meet future power demands," which might "emit more air pollutants and produce greater impacts on air quality in the region in comparison to the Project," SFW 0086929, 0077749, 0077469. Based on this analysis, BOEM concluded that the No Action

---

[30] Plaintiffs identified only a single out-of-Circuit case—*Oregon Natural Resource Council Action v. U.S. Forest Service*, 445 F. Supp. 2d 1211 (D. Or. 2006)—that found that a NEPA document's "no action" alternative analysis was deficient. *See* Mot. at 44 n.229, n.230, n.231. In that case, the no action alternative was entirely missing from supplemental environmental assessments at issue. *See Or. Nat. Res. Council Action*, 445 F. Supp. 2d at 1223-25. That is not the case here.

43

Alternative "would not allow expeditious and orderly development of DOI-managed resources and would not meet the purpose and need of the Proposed Action." SFW 0086929.

Further, it is inconsequential that the No Action Alternative was identified by the FEIS as an "environmentally preferrable alternative." *See Myersville Citizens*, 783 F.3d at 1324 ("NEPA does not compel a particular result. Even if an agency has conceded that an alternative is environmentally superior, it nevertheless may be entitled under the circumstances not to choose that alternative."). In fact, the "Habitat Alternative," which BOEM adopted in the ROD, was also identified as an environmentally preferable alternative as it would "reduce impacts to complex habitat" but "still allow for the generation of electricity from sources that do not adversely affect the air quality." SFW 0086923. Plaintiffs' disagreement with BOEM "does not render [BOEM's] conduct of the process arbitrary or capricious." *See Hammond*, 370 F. Supp. 2d at 242.

Finally, Plaintiffs claim that "eliminating the no-action alternative" in the FEIS (which did not happen) led BOEM to "craft a purpose and need statement so narrowly drawn as to foreordain approval of" the Project. *See* Mot. at 44 (quoting *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010)).[31] This argument fails. First, this Green Oceans allegation is barred under the FAST-41 statute of limitations. Second, the FEIS *did* consider the No Action Alternative in considerable detail. Third, the argument is backwards: it is the purpose and need for a project that informs the range of alternatives to be considered, not the other way around.[32] Under NEPA regulations, the purpose and need statement in an EIS "shall briefly specify

---

[31] Plaintiffs argue that BOEM's purpose and need statement was inappropriately tied to the developer's goals. But the D.C. Circuit has made clear that "[a]n agency cannot redefine the goals of the proposal that arouses the call for action; it must evaluate alternative ways of achieving its goals, shaped by the application at issue and by the function that the agency plays in the decisional process." *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 199 (D.C. Cir. 1991).

[32] *See, e.g., Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212, 306 (D.D.C. 2016), *aff'd*, 879 F.3d 1177 (D.C. Cir. 2018) ("[T]he agency's 'purpose and need for action . . .

the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 C.F.R. § 1502.13 (1978); *see also Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 73 (D.C. Cir. 2011); *Pub. Emps. for Env't Resp. v. Beaudreau,* 25 F. Supp. 3d 67, 122-23 (D.D.C. 2014) (upholding similar purpose and need statement for an offshore wind project). In any event, courts have held that—particularly when an agency is considering an application for approval of a project (rather than sponsoring it)—an agency's "consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project." *Citizens Against Burlington*, 938 F.2d at 208 (emphasis added). BOEM's purpose and need statement satisfied these NEPA requirements. *See* SFW 0076837-38.

## V.    CONCLUSION

South Fork Wind respectfully asks the Court to deny Plaintiffs' motion for summary judgment and grant South Fork Wind's cross-motion for summary judgment.[33]

---

will determine the range of alternatives and provide a basis for the selection of an alternative in a decision.'") (citations omitted).

[33] Plaintiffs argue that vacatur is the presumptive remedy. *See* Mot. at 45. But even were the Court to rule in Plaintiffs' favor on the merits (it should not), the appropriate remedy in this circumstance would be remand to BOEM without vacatur. *See Nat'l Parks Conservation Ass'n v. Semonite*, 422 F. Supp. 3d 92, 100 (D.D.C. 2019) (granting remand without vacatur even when an agency failed to conduct certain environmental review). South Fork Wind requests briefing on the remedy if the Court were to rule in Plaintiffs' favor on the merits.

45

Dated:  June 20, 2024                    Respectfully submitted,

                                         By */s/ Janice M. Schneider*

                                             Janice M. Schneider (D.C. Bar No. 472037)
                                             Stacey L. VanBelleghem (D.C. Bar No. 988144)
                                             Devin M. O'Connor (D.C. Bar No. 1015632)
                                             LATHAM & WATKINS LLP
                                             555 11th Street NW, Suite 1000
                                             Washington, D.C. 20004
                                             Tel: (202) 637-2200
                                             Fax: (202) 637-2201
                                             Email: janice.schneider@lw.com
                                                      stacey.vanbelleghem@lw.com
                                                      devin.o'connor@lw.com

                                             *Counsel for Defendant-Intervenor*
                                             *South Fork Wind, LLC*

46