## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PRESERVATION SOCIETY OF NEWPORT COUNTY, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No.:  1:23-cv-03510-APM |
| | ) | |
| DEB HAALAND, *et al.*, | ) | Hon. Amit P. Mehta |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SOUTH FORK WIND, LLC, | ) | |
| | ) | |
| *Defendant-Intervenor*. | ) | |
| SOUTHEAST LIGHTHOUSE FOUNDATION, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No.:  1:23-cv-03514-APM |
| | ) | |
| DEB HAALAND, *et al.*, | ) | Hon. Amit P. Mehta |
| | ) | |
| *Defendants*, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SOUTH FORK WIND, LLC, | ) | |
| | ) | |
| *Defendant-Intervenor*. | ) | |
| GREEN OCEANS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | Case No.: 1:24-cv-01087-APM |
| | ) | |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) | Hon. Amit P. Mehta |
| | ) | |
| *Defendants*, | ) | |

and                                             )
                                                )
SOUTH FORK WIND, LLC,                            )
                                                )
        *Defendant-Intervenor.*                  )
_____)

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTIONS FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

William J. Cook, Bar No. SC0009
CULTURAL HERITAGE PARTNERS, PLLC
2101 L St. NW; Ste. 300
Washington, DC 20037
(202) 567-7594
will@culturalheritagepartners.com

Attorneys for Plaintiffs Preservation Society of
Newport County and Southeast Lighthouse
Foundation


Roger J. Marzulla, Bar No. 394907
Nancie G. Marzulla, Bar No. 400985
MARZULLA LAW, LLC
1150 Connecticut Ave., NW
Suite 1050
Washington, DC 20036
Tel: (202) 822-6760
roger@marzulla.com
nancie@marzulla.com

Attorneys for Green Oceans Plaintiffs

July 11, 2024

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

TABLE OF EXHIBITS ...................................................................................................... v

TABLE OF ABBREVIATIONS ........................................................................................ vi

ARGUMENT ...................................................................................................................... 1

   1.   Preservation/Green Oceans Have Met Their Burden of Showing Standing ...................... 1

      1.1    The Government Concedes That Southeast Lighthouse Foundation Has Standing ... 3

      1.2    Preservation/Green Oceans Have Suffered Injuries-in-Fact to Their Aesthetic, Cultural, and Environmental Interests in Their Historic Ocean Viewshed ........................... 6

      1.3    The Government's Approval of the South Fork Wind Project Caused Preservation/Green Oceans' Injuries ................................................................................. 14

      1.4    Preservation/Green Oceans' Claims Are Redressable ............................................ 17

   2.   Green Oceans' Claims Are Not Time-Barred .................................................................. 18

   3.   Preservation/Green Oceans' Claims Are Not Moot .......................................................... 20

   4.   This Court No Longer Owes *Chevron* Deference to BOEM's Interpretations of the Law ...................................................................................................................................24

   5.   BOEM Failed to Comply with Section 110(f) and Section 106 of the National Historic Preservation Act's Statutory Requirements ........................................................................... 26

      5.1    BOEM Failed to Comply with Section 110(f) by Failing to Minimize Impacts to National Historic Landmarks to the Maximum Extent Possible ......................................... 27

      5.2    BOEM also Violated Section 106 By Failing to Consider Impacts to All Properties ...................................................................................................................................31

   6.   BOEM's Environmental Impact Statement Failed to Take a Hard Look at the Project's Adverse Impacts on Viewshed Resources, as NEPA Requires ................................................ 40

CONCLUSION .................................................................................................................. 43

## TABLE OF AUTHORITIES

**Cases**

*Airport Neighbors All., Inc. v. United States*, 90 F.3d 426 (10th Cir. 1996) ................................ 22

*Alabama v. United States Army Corps of Engineers*, No. CV 15-699 (EGS), 2023 WL 7410054
    (D.D.C. Nov. 9, 2023) ................................................................................................................ 40

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87 (1983) ......................... 40

*Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018) ................................................................. 3, 8

*Benton Franklin Riverfront Trailway & Bridge Comm. v. Lewis*, 701 F.2d 784 (9th Cir. 1983).... 6

*Blue Grass Land & Nature Trust, Inc. v. Adams*, No. 77065 (E.D. Ky. Sept. 7, 1979) ................ 2

*Bowsher v. Synar*, 478 U.S. 714 (1986) ......................................................................................... 3

*Brewery Dist. Soc. v. Fed. Highway Admin.*, 996 F. Supp. 750 (S.D. Ohio 1998) ............. 6, 7, 18

*Cato Inst. v. Sec. & Exch. Comm'n*, 4 F.4th 91 (D.C. Cir. 2021) ............................................... 14

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984) ............................... 24

*Church of Scientology of Cal. v. United States*, 506 U.S. 9 (1992) ........................................... 22

*City of Dania Beach, Fla. v. F.A.A.*, 485 F.3d 1181 (D.C. Cir. 2007) ............................... 5, 6, 18

*Columbia Basin Land Prot. Ass'n v. Schlesinger*, 643 F.2d 585 (9th Cir. 1981) .................. 20, 22

*Corner Post, Inc. v. Board of Governors, FRS*, 603 U.S. __ (July 1, 2024) ................................ 19

*Ctr. for Food Safety v. Salazar*, 900 F. Supp. 2d 1 (D.D.C. 2012) ............................................. 21

*Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014) ................................. 42

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59 (1978) .................................. 3, 4

*El Rancho La Comunidad v. United States*, No. 90-113 (D.N.M. May 21, 1991) ...................... 21

*Ely v. Velde*, 451 F.2d 1130 (4th Cir. 1971) .............................................................................. 2, 6

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024) ............... 1, 6, 15, 17, 18

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) .............. 6, 7

*Historic Preservation of Shreveport v. Dep't of Health, Educ. & Welfare*, No. 78-0905 (W.D.
    Oa. Sept. 11, 1978) ..................................................................................................................... 2

*Karst Env't Educ. & Prot., Inc. v. E.P.A.*, 475 F.3d 1291 (D.C. Cir. 2007) ................................. 5

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) ............................................................................... 42

*Lemon v. Geren,* 514 F.3d 1312 (D.C. Cir. 2008) ....................................................................... 21

*Loper Bright Enterprises v. Raimondo*, 603 U.S. ___, No. 22-451 (June 28, 2024) .............. 25, 35

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) ....................................................................... 6, 7

*Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582 (D.C. Cir. 2023) ........ 2

*McMillan Park Comm. v. Nat'l Cap. Plan. Comm'n*, 968 F.2d 1283 (D.C. Cir. 1992) ................ 7

*Mil. Toxics Project v. E.P.A.*, 146 F.3d 948 (D.C. Cir. 1998) .................................................. 3, 4

*Montana Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127 (D. Mont. 2004) ................................ 6

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999) ........................... 23

*Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019).......... 18, 22, 23, 30

*Neighborhood Ass'n of the Back Bay, Inc. v. Federal Transit Admin.*, 463 F.3d 50 (1st Cir. 2006)
    ................................................................................................................................................ 26

*North Oakland Voters Alliance v. City of Oakland*, No. C-92-0743 MHP (N.D. Cal. Oct. 6, 1992)
    ................................................................................................................................................. 2

*Nuclear Energy Inst., Inc. v. Env't Prot. Agency*, 373 F.3d 1251 (D.C. Cir. 2004) ................. 3, 4

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520 (D.C. Cir. 2018) ................. 40

*Oregon Nat. Desert Ass'n v. Dombeck*, 172 F.3d 1092 (9th Cir. 1998) ...................................... 7

*Pye v. United States*, 269 F.3d 459 (4th Cir. 2001) ...................................................... 5, 6, 7, 18

*Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10 (D.D.C. 2021) .......................... 17

*Richards v. Jefferson Cnty., Ala.*, 517 U.S. 793 (1996)........................................................... 19

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989).......................................... 40

*Role Models Am., Inc. v. Harvey*, 459 F. Supp. 2d 28 (D.D.C. 2006)........................................ 7

*Ry. Lab. Executives' Ass'n v. United States*, 987 F.2d 806 (D.C. Cir. 1993) .............................. 4

*S. Yuba River Citizens League & Friends of the River v. Nat'l Marine Fisheries Serv.*, No. CIVS06-2845 LKK/JFM, 2007 WL 3034887 (E.D. Cal. Oct. 16, 2007)................................... 7

*Save Our Heritage, Inc. v. F.A.A.*, 269 F.3d 49 (1st Cir. 2001) ............................................... 6

*Save the Courthouse Comm. v. Lynn*, 408 F. Supp. 1323 (S.D.N.Y. 1975) ................................ 2

*Sec'y of the Interior v. California*, 464 U.S. 312 (1984) .......................................................... 3

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ......................................................................... 7

*Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31 (D.C. Cir. 2015)...................... 21, 22

*Sierra Club v. U.S. Dep't of Agric.*, 777 F. Supp. 2d 44 (D.D.C. 2011) ..................................... 21

*Slockish v. U.S. Fed. Highway Admin.*, 682 F. Supp. 2d 1178 (D. Or. 2010) .............................. 20

*Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269 (2008)................................... 17

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998)..................................................... 14

*Tyler v. Cisneros*, 136 F.3d 603 (9th Cir. 1998).................................................................... 23

*United States v. Mayendia-Blanco*, 905 F.3d 26 (1st Cir. 2018) ............................................... 4

*Van Abbema v. Fornell*, 807 F.2d 633 (7th Cir. 1986) ............................................................ 20

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519 (1978)..... 40

*Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 875 F.2d 453 (5th Cir. 1989) .. 6, 21

## Statutes

42 U.S.C. § 4370m-1. ......................................................................................................... 20

42 U.S.C. § 4370m-6(a)(1). ................................................................................................. 18

5 U.S.C. § 703 .................................................................................................................... 18

5 U.S.C. § 706 .................................................................................................................... 25

5 U.S.C. § 706(2) ............................................................................................................... 17

54 U.S.C. § 300101.............................................................................................................. 7

54 U.S.C. § 300308............................................................................................................. 31

54 U.S.C. § 306107............................................................................................. 26, 27, 28, 30

54 U.S.C. § 306108............................................................................................. 26, 31, 35, 39

## Other Authorities

115 Cong. Rc. 40416 .......................................................................................................... 40

Alexander Hergott, *Ensuring that Permitting Council Member Agencies and Covered Project Sponsors Receive Full Benefit of 2-Year Limitations Period Provided in Title 41 of the Fixing America's Surface Transportation Act (FAST-41)* (Jan. 12, 2021) ..................................... 19, 20

CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 at 304 (1990)................................................................................................................................ 18

Executive Office of the President and Council on Environmental Quality, *Memorandum for Heads of Federal Departments and Agencies* (Jan. 13, 2017) ................................................. 19

## Regulations

36 C.F.R. § 800(a)(3)........................................................................................................... 34

36 C.F.R. § 800.10 ........................................................................................................ 28, 30

36 C.F.R. § 800.2(c)(5)................................................................................................... 33, 34

36 C.F.R. § 800.2(d)(1) ................................................................................................... 33
36 C.F.R. § 800.4(a)(3) ................................................................................................... 32
36 C.F.R. § 800.4(b)(1) ............................................................................................. 35, 36
36 C.F.R. § 800.6 ............................................................................................................ 26
40 C.F.R. § 1502.1 (1978) ............................................................................................. 40

**TABLE OF EXHIBITS**

| EXHIBIT NO. | DESCRIPTION |
|---|---|
| Ex. 1 | Second Declaration of Elizabeth Vitton |
| Ex. 2 | Second Declaration of Stephen Lewinstein |
| Ex. 3 | Second Declaration of Dee Gordon |
| Ex. 4 | Second Declaration of Barbara Chapman |
| Ex. 5 | Second Declaration of Sandra Craig |
| Ex. 6 | Declaration of Miles Bidwell |
| Ex. 7 | Orsted Tourism Study for the Ocean Wind Project |
| Ex. 8 | BOEM Correspondence Regarding South Fork HPTP Resolution of Dispute |

**TABLE OF ABBREVIATIONS**

| Abbreviation | Definition |
| --- | --- |
| APA | Administrative Procedure Act |
| BOEM | Bureau of Ocean Energy Management |
| EIS | Environmental Impact Statement |
| MOA | Memorandum of Agreement |
| NEPA | National Environmental Policy Act |
| NHPA | National Historic Preservation Act |

Federal Defendants' and South Fork Wind, LLC (collectively Defendants) base their arguments in support of their cross motions for summary judgment on incorrect factual assertions and a misunderstanding of the claims brought by Plaintiffs, Preservation Society of Newport County, Southeast Lighthouse Foundation, and Green Oceans et al. (collectively Preservation/Green Oceans). Defendants improperly interpret the National Historic Preservation Act (NHPA) and the National Environmental Policy Act (NEPA) and rely on a now-overruled policy of agency deference. Under Defendants' arguments, consulting parties participating in environmental review and historic properties owners of impacted properties—who were never notified that environmental review was underway—would lose their ability to challenge whether federal agencies took a "hard look" at the impacts of a major federal action. Such a result would gut the mandated environmental and historic preservation policies embodied in the NHPA and NEPA. The Court should reject Defendants' arguments and deny their motions for summary judgment.

**ARGUMENT**

**1.      Preservation/Green Oceans Have Met Their Burden of Showing Standing**

The fundamentals of standing are well-known and firmly rooted in American constitutional law. To establish standing, "a plaintiff must demonstrate (i) that she has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."[1] Standing is not an inquiry into the merits, but a question of the right to sue. Or, as the D.C. Circuit recently described: "'[S]tanding is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.' . . . The analysis of standing to sue 'in no way

---

[1] *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

1

depends on the merits.'. . . When determining standing, therefore, 'we assume the merits in favor

of the plaintiff.'"[2] Courts have allowed standing more liberally where—as here—plaintiffs can

demonstrate a real interest in a case through involvement in the administrative process.[3]

Defendants argue that Preservation/Green Oceans lack standing because BOEM claims

that none of South Fork's turbines are visible from Plaintiffs' properties,[4] which means that no

Plaintiffs can show (assuming this incorrect fact were true) an injury, causation, or redressability.

Defendants are wrong for two reasons. First, BOEM determined that all the historic properties

owned by the Plaintiffs are within South Fork's Area of Potential Effects[5] and that South Fork's

adverse visual effects to Newport properties, due to their location on the oceanfront and "high

level of sensitivity to visual effects," would be "moderate to major"[6]—findings that South Fork

never contested.[7] Second, the South Fork turbines are visible from Plaintiffs' historic properties.[8]

Defendants' argument that Preservation/Green Oceans cannot show injury or causation is fatally

flawed and must be rejected.

---

[2] *Maine Lobstermen's Ass'n v. Nat'l Marine Fisheries Serv.*, 70 F.4th 582, 592 (D.C. Cir. 2023) (internal citations omitted).

[3] *See, e.g., North Oakland Voters Alliance v. City of Oakland*, No. C-92-0743 MHP (N.D. Cal. Oct. 6, 1992); *Ely v. Velde*, 451 F.2d 1130 (4th Cir. 1971); *Blue Grass Land & Nature Trust, Inc. v. Adams*, No. 77065 (E.D. Ky. Sept. 7, 1979); *Historic Preservation of Shreveport v. Dep't of Health, Educ. & Welfare*, No. 78-0905 (W.D. Oa. Sept. 11, 1978); *Save the Courthouse Comm. v. Lynn*, 408 F. Supp. 1323 (S.D.N.Y. 1975).

[4] Gov't Memo. in Support of Cross-Mot. for S.J. (June 20, 2024), ECF No. 47 at 26; Def.-Intervenors Cross-Mot. for S.J. (June 20, 2024), ECF No. 50 at 12–13.

[5] SFW_0078481; SFW_0078515 (Figure A-5. Viewshed Area of Potential Effects).

[6] SFW_0066458; SFW_0078487 ("Properties that EDR (2021) concluded to be adversely affected consist of Block Island South East Lighthouse NHL, Gay Head Light, Gay Head — Aquinnah Shops, The Breakers, Marble House, Bellevue Avenue Historic District, Ocean Drive Historic District, Ocean Road Historic District, Capt. Mark L. Potter House, and Vineyard Sound and Moshup's Bridge TCP.").

[7] SFW_0066458

[8] *See* Ex. 1, Second Decl. of E. Vitton; Ex. 2, Second Decl. of S. Lewinstein; Ex. 3, Second Decl. of D. Gordon; *see* Decl. of G. Abbot (May 20, 2024), ECF No. 39-5; Decl. of T. Coxe (May 20, 2024), ECF No. 39-6.

### 1.1 The Government Concedes That Southeast Lighthouse Foundation Has Standing

The Government acknowledges the standing of Southeast Lighthouse Foundation.[9] Even if the Court were to find that only Southeast Lighthouse Foundation has standing, that would be sufficient to meet Plaintiffs' burden because in consolidated cases such as this, once one plaintiff is found to have standing, a court need not decide the standing of the other plaintiffs.[10]

"[N]umerous decisions by the D.C. Circuit and Supreme Court have treated a showing that a single plaintiff has standing as sufficient" in consolidated cases, and the Court has jurisdiction "and need not evaluate standing on a plaintiff-by-plaintiff basis."[11] In *Bowsher v. Synar*,[12] which included consolidated suits brought by members of Congress, members of the National Treasury Employees Union, and the union itself, the Supreme Court found that because the union members had standing, the Court did not need to "consider the standing issue as to the Union or Members of Congress."[13] In *Duke Power Co. v. Carolina Environmental Study Group, Inc.*,[14] which involved concerns over whether one plaintiff was a proper party, the Supreme Court held that because it had found standing for one plaintiff, the court "need not resolve the question of whether Duke Power is a proper party since jurisdiction over appellees' claims against NRC is established, and Duke's presence or absence makes no material difference to

---

[9] Gov't Mot. for S.J. (June 20, 2024), ECF No. 47 at 15 n. 4.
[10] *See Bauer v. DeVos*, 325 F. Supp. 3d 74, 91 (D.D.C. 2018); *Sec'y of the Interior v. California*, 464 U.S. 312 (1984); *Bowsher v. Synar*, 478 U.S. 714 (1986); *Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59 (1978); *Nuclear Energy Inst., Inc. v. Env't Prot. Agency*, 373 F.3d 1251 (D.C. Cir. 2004); *Mil. Toxics Project v. E.P.A.*, 146 F.3d 948 (D.C. Cir. 1998).
[11] *Bauer*, 325 F. Supp. 3d at 91.
[12] *Bowsher*, 478 U.S. 714.
[13] *Id.* at 721.
[14] *Duke Power Co.*, 438 U.S. 59.

3

either our consideration of the merits of the controversy or our authority to award the requested relief."[15]

The D.C. Circuit in *Nuclear Energy Institute, Inc. v. Environmental Protection Agency*,[16] a consolidated case brought by Nevada and two political subdivisions and seven environmental groups, also held that only one plaintiff needed to establish standing: "Since only one petitioner requires standing, we need not consider the Government's separate challenge to Nevada's standing."[17] And in *Military Toxics Project v. Environmental Protection Agency*,[18] the D.C. Circuit determined that the finding of standing for one plaintiff meant that it did not need to determine whether the other intervenor-applicants also had standing because "'if one party has standing in an action, a court need not reach the issue of standing of other parties when it makes no difference to the merits of the case.'"[19]

South Fork does not concede that the Southeast Lighthouse Foundation has standing. Rather, it contends that the Foundation's injury is not redressable by the Court. But having failed to develop its redressability argument beyond mere conclusory statements, South Fork has waived its redressability argument.[20]

And even if South Fork had developed the redressability argument, the company's argument on the redressability of the injury to Southeast Lighthouse Foundation and other historic property owners would be wrong. BOEM's failure to adequately protect Southeast

---

[15] *Id.* at 72 n.16.

[16] *Nuclear Energy Inst., Inc. v. Env't Prot. Agency*, 373 F.3d 1251 (D.C. Cir. 2004).

[17] *Id.* at 1266.

[18] *Mil. Toxics Project v. E.P.A.*, 146 F.3d 948 (D.C. Cir. 1998).

[19] *Id.* at 954 (quoting *Ry. Lab. Executives' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993)).

[20] *See United States v. Mayendia-Blanco*, 905 F.3d 26, 32 (1st Cir. 2018) ("[I]t is a well-settled principle that arguments not raised by a party in its opening brief are waived.").

Lighthouse Foundation's historic lighthouse, a National Historic Landmark—which BOEM specifically identified as being adversely affected by the South Fork Project[21]—is redressable by an order requiring the relocation of the turbines, removal of the turbines, or more mitigation measures.[22] Or the Court could invalidate and set aside the Record of Decision and remand to the agency for further proceedings to determine how best to redress the Plaintiffs' injuries created by the Project.[23]

        The same is true of other Green Oceans Plaintiffs, including many owners of important historic properties, in designated historic districts—including National Historic Landmark Districts—who suffer the same injuries and rely on the same redress from this Court under the Administrative Procedure Act (APA) on which the Foundation relies. Denying standing to interested persons such as the Plaintiffs in this case, who attempt to exercise or enforce their procedural rights to object to decisions affecting historic resources, would severely undermine the requirements of Section 106 and Section 110(f) of the NHPA. As the Third and Fourth Circuits have recognized, without the ability to seek judicial review when federal agencies violate the NHPA, the role of the public would be reduced to a mere "procedural calisthenic," providing no repercussions for the failure by federal agencies to abide by Section 106.[24] Finally, federal courts have routinely addressed the issue of whether plaintiffs have standing to enforce the NHPA. Virtually all of them have upheld the plaintiffs' standing to bring NHPA claims— even when those courts have ruled against the plaintiffs on the merits.[25]

---

[21] SFW_0078488.
[22] *See City of Dania Beach, Fla. v. F.A.A.*, 485 F.3d 1181, 1185–87 (D.C. Cir. 2007).
[23] 5 U.S.C. § 706(2).
[24] *Pye v. United States*, 269 F.3d 459, 468 (4th Cir. 2001).
[25] *See, e.g., Karst Env't Educ. & Prot., Inc. v. E.P.A.*, 475 F.3d 1291, 1294–95 (D.C. Cir. 2007) (plaintiffs had standing to sue agencies for alleged violations of NHPA); *Pye*, 269 F.3d at 468 (adjacent property owners had standing to enforce Army Corps of Engineers' compliance with

### 1.2    Preservation/Green Oceans Have Suffered Injuries-in-Fact to Their Aesthetic, Cultural, and Environmental Interests in Their Historic Ocean Viewshed

To establish standing, "a plaintiff must show that he or she has suffered or likely will suffer an injury in fact."[26] To have standing under the NHPA, a plaintiff must show an interest in the historic property that is being threatened or injured by a federal action.[27] Plaintiffs do not have to prove economic injury or even ownership of the historic property, but may base standing on a variety of factors such as adverse visual effects, injury to plaintiffs' enjoyment or use of the property, or injury to aesthetic, architectural, cultural, environmental, or historic values. Plaintiffs alleging such injury are within the zone of interest protected by the NHPA and other historic preservation statutes.[28] Plaintiffs must demonstrate "individual concerns about the integrity and cohesiveness of historical sites in their own backyard."[29] Because NHPA protects aesthetics, aesthetic injuries from adverse visual effects are sufficient.[30] As owners of historic properties, Preservation/Green Oceans Plaintiffs have a strong interest in protecting the aesthetic

---

NHPA); *Save Our Heritage, Inc. v. F.A.A.*, 269 F.3d 49, 55–56 (1st Cir. 2001) (plaintiffs had standing to challenge agency actions under NHPA because nearby towns had a direct interest in traffic congestion and the owners of nearby historic sites would be affected by noise and pollution).

[26] *Food and Drug Administration*, 602 U.S. at 382.

[27] *City of Dania Beach, Fla.*, 485 F.3d at 1185–87.

[28] *Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 875 F.2d 453 (5th Cir. 1989); *Benton Franklin Riverfront Trailway & Bridge Comm. v. Lewis*, 701 F.2d 784 (9th Cir. 1983); *Ely*, 451 F.2d 1130.

[29] *Pye*, 269 F.3d at 469; *see also Brewery Dist. Soc. v. Fed. Highway Admin.*, 996 F. Supp. 750, 752–53 (S.D. Ohio 1998) (finding standing where plaintiffs do not own historic property they allege will be adversely affected); *Montana Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1151 (D. Mont. 2004) ("[A]ny member of the public who can demonstrate sufficient interest in the preservation of the historical lands at issue falls within the zone of interests protected by the NHPA."); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 (1992) (noting that "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement").

[30] *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000); *Pye*, 269 F.3d at 469.

qualities of their properties. Because the open ocean provides a backdrop for their properties that has remained unchanged for centuries, any changes to the open ocean that destroy this unimpeded ocean view directly impact their aesthetic interests.

Here, the injury-in-fact requirement is satisfied when an individual shows that they have an aesthetic and recreational interest in a particular place and that these interests are impaired by the South Fork Project.[31] Preservation/Green Oceans Plaintiffs meet this injury-in-fact requirement by showing that they have an aesthetic interest and that the challenged activity would reduce the aesthetic and recreational values of the area.[32] Preservation/Green Oceans have the same "backyard" interest as in *Pye* v. *United States*[33]—they own, use, and enjoy homes in South Fork Wind's vicinity and are in the "area of potential effect" that BOEM determined—a finding South Fork never challenged.[34] They have stated an interest in the historic character of their surroundings, just like the plaintiffs in *Pye*[35] or *Brewery District Society*[36] and the hypothetical plaintiff in *Defenders of Wildlife*.[37] Finally, as the NHPA makes clear, Section 106 and its procedural requirements are "designed to protect" Plaintiffs' preservation interests.[38] Therefore, Defendants' actions injured Plaintiffs' interests that the NHPA is supposed to protect.

---

[31] *See, e.g., Friends of the Earth, Inc.*, 528 U.S. 167; *Lujan*, 504 U.S. at 562–63; *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972); *Oregon Nat. Desert Ass'n v. Dombeck*, 172 F.3d 1092, 1094 (9th Cir. 1998).

[32] *See S. Yuba River Citizens League & Friends of the River v. Nat'l Marine Fisheries Serv.*, No. CIVS06-2845 LKK/JFM, 2007 WL 3034887 (E.D. Cal. Oct. 16, 2007) (citing *Friends of the Earth, Inc.*, 528 U.S. at 180–81).

[33] *Pye*, 269 F.3d at 469.

[34] SFW_0078515.

[35] *Pye*, 269 F.3d. at 459.

[36] *Brewery Dist. Soc.*, 996 F. Supp. at 750.

[37] *Defs. of Wildlife*, 504 U.S. at 555.

[38] 54 U.S.C. § 300101; *McMillan Park Comm. v. Nat'l Cap. Plan. Comm'n*, 968 F.2d 1283, 1284 (D.C. Cir. 1992); *Role Models Am., Inc. v. Harvey*, 459 F. Supp. 2d 28, 38 (D.D.C. 2006).

In addition, the Government's admission that Southeast Lighthouse Foundation has proven injury-in-fact—"BOEM found that the Project would adversely affect the lighthouse"[39]—along with the other elements of standing,[40] makes it unnecessary for the Court to examine the injuries-in-fact of other Preservation/Green Oceans Plaintiffs.[41] But even without this concession, the Preservation/Green Oceans Plaintiffs have shown that they have been injured and will continue to be injured by the approval and construction of the South Fork wind turbines.[42]

The Court should reject the company's flatly wrong contention that Preservation/Green Oceans Plaintiffs suffer no injury because, according to BOEM, adverse visual impacts would most likely fall within 20 miles of the turbines.[43] "Most likely" in this context is a weasel word, and as the photos attest, Plaintiffs can see the turbines from their properties.[44]

The declarations of Preservation/Green Oceans Plaintiffs who own historic properties confirm that the South Fork turbines are highly visible from their properties, and have injured the formerly pristine ocean viewshed from their historically significant homes overlooking the Narragansett Bay and Atlantic Ocean:

- "In addition to Newport County's National Historic Landmark properties built to take advantage of proximity to the ocean, other historic sites and cultural resources whose importance depend on unobstructed ocean views include, but are not limited to,

---

[39] Gov't Mem. in Support of Summary Judgment (June 20, 2024), ECF No. 47 at 15 n. 4.
[40] *Id.* ("Federal Defendants do not challenge the Southeast Lighthouse Foundation's standing. Though we agree that the Foundation has not submitted declarations that would otherwise support standing, BOEM found that the Project would adversely affect the lighthouse.")
[41] *Bauer*, 325 F. Supp. 3d at 91.
[42] *See* Ex. 1 ¶ 5; Ex. 2 ¶ 4; Ex. 3 ¶ 3.
[43] Def.-Intervenors Cross-Mot. for S.J. (June 20, 2024), ECF No. 50 at 11.
[44] Ex. 1 ¶ 3; Ex. 2 ¶ 4; Ex. 3 ¶ 3.

Newport's Cliff Walk, Brenton Point, Sachuest National Wildlife Refuge, and historic properties located within the Town of Middletown."[45]

- "The construction of the South Fork turbines has destroyed . . . the view that I and many others cherish."[46]

- "South Fork Wind will permanently and irreparably inflict severe long-lasting damage on the historic character, community, and heritage-tourism-driven economy of Newport County, including historic properties therein that depend on this economy for their maintenance and future preservation activities, including Preservation Society's house museums."[47]

- "I have actively opposed South Fork Wind . . . . because the construction of these projects will negatively impact our enjoyment of this historic property . . . . [Having a] wind farm offshore in plain view would prevent anyone from looking toward the sea from appreciating or comprehending Stoneybrook's historical context, that it was built in 1927-28 in a rural, natural, pristine seaside environment precisely to take advantage of a beautiful ocean view."[48]

- "The value that Bellevue Avenue has as a historic district also comes from the unimpeded, unindustrialized ocean views. The turbines and the offshore substations have destroyed that."[49]

- "The construction of South Fork Wind and its turbines have already altered our previously unimpeded view of the ocean—a view that has remained unchanged for the

---

[45] Decl. of T. Coxe (May 20, 2024), ECF No. 39-6 ¶ 7.
[46] Decl. of C. DuHamel (May 20, 2024), ECF No. 39-3 ¶ 9.
[47] Decl. of T. Coxe (May 20, 2024), ECF No. 39-6 ¶ 9.
[48] Decl. of S. Craig (May 20, 2024), ECF No. 39-7 ¶ 14.
[49] Decl. of K. Blanchard (May 20, 2024), ECF No. 39-11 ¶ 8.

last 170 years. Even though South Fork is smaller than the other projects that are planned

nearby, we can see the project quite clearly, especially at night when the signal lights are

illuminated."[50]

- "I can see South Fork's turbines during the day when it is clear and at night when the

  turbine lights are illuminated. These turbines, as constructed, have destroyed my

  previously unimpeded, pristine ocean view. The destruction of this view, and the impact

  to my property's value, stem directly from the Government's approval of South Fork and

  from the construction and now operation of South Fork Wind.."[51]

- "I can see South Fork's turbines from my property both during the day and at night due to

  their lights. The open ocean view that I used to enjoy from my property no longer

  exists."[52]

- "It is simply untrue that these turbines are not visible from Newport and I can clearly see

  South Fork's turbines from my property. I can see these turbines from my property during

  the day and at night. South Fork's construction and now operation, which occurred only

  after the Government issued its approval, has destroyed the historic, pristine ocean view

  that I have fought to protect and that I and my family have enjoyed for years ."[53]

Preservation/Green Oceans have also explained how South Fork—and its destruction of

the pristine, open ocean views—has caused a loss in their property values:

- "I believe that the value of Indian Spring has already decreased due to the construction

  and now operation of the twelve South Fork turbines. So much of my property's value is

---

[50] Decl. of H. Cushing (May 20, 2024), ECF No. 39-8 ¶ 9.
[51] Ex. 3 ¶ 3.
[52] Ex. 1 ¶ 3.
[53] Ex. 2 ¶ 4.

its connection to nature, offering a tranquil sanctuary to enjoy and reflect upon the unchanged ocean views . . . . With South Fork's turbines, the premium value from the view no longer exists. And my historic property's value will continue to decrease as more and more turbines are installed out in the ocean, cluttering the view with massive metal machines."[54]

- "As mentioned in my first declaration, part of my home's value as a historic property is that it is within a neighborhood that has unimpeded views of the ocean that have been unchanged since the Gilded Age. . . . South Fork's turbines, which are visible from many properties along Ocean Drive, destroy that historic viewshed, pose a critical threat to marine life and environments, and threaten the safety of boaters, sailors, and fishers and, in turn, significantly decrease the value of my property—and the other Ocean Drive properties. . . . People pay a premium to live along Ocean Drive so they can have access to views of the coastal waters and step back into a different world through architecture and scenery. Without easy access to these views, my property is not as valuable as it was before the turbines."[55]

- "The majority of the Ledges' value, perhaps up to 90%, comes from the value of the land and the view. The physical structures are over 150 years old and in need of significant expenditures, which I am not able to do. Any of the remaining value of the property comes from its historic designation and its unique coastal vantage point and water views."[56]

---

[54] Ex. 1 ¶ 5.
[55] Ex. 4, Second Decl. of B. Chapman ¶ 4–5.
[56] Decl. of H. Cushing (May 20, 2024), ECF No. 39-8 ¶ 11.

11

- "As discussed in my first declaration, I have spent upwards of ten million dollars to protect and preserve the pristine, untouched-by-humankind viewsheds that used to exist from my property and exist no longer. While The Waves has changed throughout the years, the one thing that never changed was the open-ocean view. The destruction of this view decreases my property's value because it destroys one of the most important, historically significant features of the home."[57]

- "My beloved, historic view has been destroyed by the construction and now operation of South Fork Wind, degrading my enjoyment of my property and decreasing my property's value. My property is known for its view of the Narragansett Bay, Newport Harbor, and the Atlantic Ocean and part of its value came from the open ocean views. The placement of these twelve South Fork turbines, which are visible from my property, decreases my property's value because they destroy the historic open-ocean views that the property has had for more than 120 years."[58]

- "The construction of the twelve South Fork turbines has already negatively impacted my property's value and the historic viewshed. . . . People pay a premium for ocean-front properties such as mine because of the historically open view. When the view is tainted and degraded by massive turbines, buyers will no longer be willing to pay a premium price for my property because the view that gives the home character no longer exists. I have good reason to believe, as I previously stated, that the presence of South Fork's turbines, and the turbines from other nearby projects, will reduce the fair market value of my home by 50%."[59]

---

[57] Ex. 2 ¶ 8.
[58] Ex. 3 ¶ 6.
[59] Ex 5, Second Declaration of S. Craig ¶ 4–5.

Recent studies analyzing the impact on real estate following construction and operation of the nearby Block Island Project support Plaintiffs' contention that their property values will decrease.[60] Plaintiffs have attached the declaration of Dr. Miles Bidwell, PhD, a professional and academic economist with over forty years of experience. Dr. Bidwell found that homes on Block Island lost 87% of their assessed value following the completion of the five-turbine Block Island Wind Project compared to homes in comparable coastal communities.[61] In Dr. Bidwell's opinion, "the South Fork Wind Project has already and will continue to inflict definite monetary injury on coastal historic property owners such as Richard and Dee Gordon, Michael and Elizabeth Vitton, Stephen Lewinstein, Veter et Nova Trust, Ledges 66 LLC, and Cornwall Lodge LLC."[62]

The owners of three significant historic properties, which are near the historic properties owned by the Preservation Society, recently photographed the South Fork turbines as they appear from their properties. As Dee Gordon (owner of High Tide), Elizabeth Vitton (owner of Indian Springs), and Stephen Lewinstein (part owner of the waves) explain, the turbines are visible from various vantage points on their properties. Plaintiff, Howard Cushing (owner of Ledges 66 LLC), also can see the turbines during the day and night from his property.[63]

Defendants assert that historic property owners lack standing because their injuries are generalized and not specific to South Fork alone. But the injuries Preservation/Green Oceans complain of are from the present destruction—by the South Fork turbines—of their previously

---

[60] Ex. 6, Declaration of M. Bidwell ¶ 12.
[61] *Id.* ¶ 8.
[62] *Id.* ¶ 12.
[63] Decl. of H. Cushing (May 20, 2024), ECF No. 39-8 ¶ 9.

unimpeded ocean viewshed, integral to the historicity of their ocean-view properties. South Fork is the only cause:

- "Even though South Fork is smaller than the other projects that are planned nearby, we can see the project quite clearly, especially at night when the signal lights are illuminated."[64]

- "I can see South Fork Wind, and its twelve turbines, from my property. I can see South Fork's turbines during the day when it is clear and at night when the turbine lights are illuminated. These turbines, as constructed, have destroyed my previously unimpeded, pristine ocean view."[65]

- "The Defendants are wrong when they claim that the turbines are too far away from Newport to be visible—I can see South Fork's turbines from my property both during the day and at night due to their lights."[66]

- "It is simply untrue that these turbines are not visible from Newport and I can clearly see South Fork's turbines from my property. I can see these turbines from my property during the day and at night."[67]

### 1.3    The Government's Approval of the South Fork Wind Project Caused Preservation/Green Oceans' Injuries

The second element of standing, causation, is shown through a "fairly traceable connection"[68] "between the complained-of conduct of the defendant and the injury claimed."[69] To meet this requirement, plaintiffs "must show a predictable chain of events leading from the

---

[64] Decl. of H. Cushing (May 20, 2024), ECF No. 39-8 ¶ 9.
[65] Ex. 3 ¶ 3.
[66] Ex. 1 ¶ 3.
[67] Ex. 2 ¶ 4.
[68] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998).
[69] *Cato Inst. v. Sec. & Exch. Comm'n*, 4 F.4th 91, 95 (D.C. Cir. 2021).

government action to the asserted injury—in other words, that the government action has caused or likely will cause injury in fact to the plaintiff."[70]

The causation here is direct and palpable: BOEM and other Government agencies approved the construction of the South Fork facilities on public lands (the outer continental shelf), and the existence of those facilities injures Preservation/Green Oceans by impairing their ocean viewshed, which is integral to the historic context of their properties, as well as the context of the National Historic Landmark Districts of which their properties are included.[71] Plaintiffs' declarations directly make this point:

- "The Southeast Lighthouse and the entirety of historic Block Island . . . face the prospect of being encompassed by over 500 highly visible offshore wind turbines that will industrialize and severely mar 100% of Block Island's iconic Atlantic Ocean views for at least the next thirty years, stark visual intrusions that will irreparably harm the Southeast Lighthouse's historic context, location, atmosphere, and setting."[72]

- "South Fork Wind . . . will inflict severe and long-lasting effects on the historic character, community, and heritage-tourism-driven economy of Block Island and the viability of the Southeast Lighthouse specifically and to the Foundation's property rights and property value."[73]

---

[70] *Food and Drug Administration*, 602 U.S. at 385.

[71] *See* Decl. of S. Craig (May 20, 2024), ECF No. 39-7 ¶ 12 (As Plaintiff, Sandra Craig, described it, the view from these historic homes is personal and "we derive and share the joy and pleasure from this historic, enduring connection with the sea, the sound of the pounding waves, and the ever-changing colors of the sea, depending on the tides, the clouds, seasons, and the time of day. We value the pristine, natural beauty of the open sea, and while we stand in awe and respect its power, we ardently wish to be able to continue to share this view in its pristine state with friends, family, [and neighbors][.]").

[71] Decl. of G. Abbott (May 20, 2024), ECF No. 39-5 ¶ 8.

[72] *Id*.

[73] *Id.* ¶ 9.

- "In addition to Newport County's National Historic Landmark properties built to take advantage of proximity to the ocean, other historic sites and cultural resources whose importance depend on unobstructed ocean views include, but are not limited to, Newport's Cliff Walk, Brenton Point, Sachuest National Wildlife Refuge, and historic properties located within the Town of Middletown."[74]

- "[BOEM] determined that these historic properties fall within the Area of Potential Effects for the South Fork Wind offshore wind energy development project and thereby subject the Preservation Society's and other historic property owners to adverse effects arising from South Fork Wind."[75]

- "South Fork's construction and now operation, which occurred only after the Government issued its approval, has destroyed the historic, pristine ocean view that I have fought to protect and that I and my family have enjoyed for years."[76]

- "The Government's approval of South Fork is directly responsible for the destruction of my view."[77]

- "I and my historic property have suffered injury from the Government's approval of South Fork Wind and the subsequent construction and now operation of the South Fork Wind Project."[78]

- "These turbines, as constructed, have destroyed my previously unimpeded, pristine ocean view. The destruction of this view, and the impact to my property's value, stem directly

---

[74] Decl. of T. Coxe (May 20, 2024), ECF No. 39-6 ¶ 7.
[75] *Id.* ¶ 8.
[76] Ex. 2 ¶ 4.
[77] Ex. 1 ¶ 3.
[78] Ex. 4 ¶ 3.

from the Government's approval of South Fork and from the construction and now operation of South Fork Wind."[79]

Preservation/Green Oceans have shown that the Government's action has caused their injuries because none of the injuries would exist without the Government's approval of South Fork. Without Government approvals, the turbines and the substations would not have been constructed and the subsequent injuries to historic property values, tourism revenues, and viewshed would not exist. Plaintiffs' declarations show causation connecting the Government's action—the approvals—with their injuries.

Furthermore, Preservation/Green Oceans' discussion of the significant cumulative impacts of the Government's approval of adjacent wind turbine projects and other projects along the Atlantic Seaboard further establish Plaintiffs standing (causation) to assert their claims that BOEM did not conduct an adequate cumulative analysis. The approvals of these other projects, as well as BOEM's approval of South Fork, create further injuries and will continue to exacerbate Plaintiffs' injuries that are directly linked to each Project approval.

### 1.4    Preservation/Green Oceans' Claims Are Redressable

Causation and redressability "are often 'flip sides of the same coin' . . . . If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury."[80] Under the APA, courts have the power to set aside agency decisions,[81] order injunctive relief,[82] or even order the removal of projects for violating the APA and

---

[79] Ex. 3 ¶ 3.
[80] *Food and Drug Administration*, 602 U.S. at 380 (quoting *Sprint Communications Co. v. APCC Services, Inc.*, 554 U.S. 269, 288 (2008)).
[81] 5 U.S.C. § 706(2) ("hold unlawful and set aside agency action.).
[82] *See Ramirez v. U.S. Immigr. & Customs Enf't*, 568 F. Supp. 3d 10, 22 (D.D.C. 2021) ("[T]he APA explicitly contemplates that injunctive relief may be proper when an APA violation is

underlying federal statutes.[83] Furthermore, facts alleged in the Complaint must not only be presumed true, but also construed liberally in favor of the plaintiffs.[84]

Here, Preservation/Green Oceans have proved causation because their injuries are directly connected to the Government's approval of South Fork. Because of that direct link, Preservation/Green Oceans' injuries from South Fork are redressable because a favorable decision could lead to the change or relocation of the turbines, removal of the Project's turbines, or additional mitigation measures.[85] In other words, if the Plaintiffs prevail, then the Federal Defendants will be required to reopen Section 106 and Section 110(f) processes to address the deficiencies that Plaintiffs have alleged. Plaintiffs have therefore shown redressability.[86]

## 2. Green Oceans' Claims Are Not Time-Barred

The FAST-41 Act purports to change the six-year statute of limitations under the APA to two years.[87] South Fork argues that Green Oceans' claims are time-barred because Green Oceans filed their complaint over two years after the Notice of Availability for the Record of Decision. There are two major problems with this argument.

---

[83] *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019).

[84] *Brewery Dist. Soc.*, 996 F. Supp. at 753 (historic preservation appeal challenging approval of interstate highway ramp) (citing CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 at 304 (1990)).

[85] *See City of Dania Beach, Fla.*, 485 F.3d at 1185–87; *see also Food and Drug Administration*, 602 U.S. at 384-85 (recognizing several examples of redressable claims: "when the government regulates . . . a business, the regulation (or lack thereof) may cause downstream or upstream economic injuries . . . . When the government regulates parks, national forests, or bodies of water, for example, the regulation may cause harm to the individual user. . . . When the government regulates one property, it may reduce the value of adjacent property.").

[86] *See, e.g.*, *Pye*, 269 F.3d at 471–72 (consultation); *Brewery Dist. Soc.*, 996 F. Supp. at 754 (injunction).

[87] 42 U.S.C. § 4370m-6(a)(1).

identified. . . . And courts use this broad remedial power to issue permanent injunctive relief for APA violations."); *see also* 5 U.S.C. § 703.

First, on July 1, 2024, the Supreme Court flatly rejected this argument in another APA case involving a challenged statute of limitation, holding that the limitations period starts when the plaintiffs in a suit are injured because "[a]n APA plaintiff does not have a complete and present cause of action until she suffers an injury from final action, so the statute of limitations does not begin to run until she is injured."[88]

In making this decision, the Court relied on the APA's "basic presumption" of judicial review and the "'deep-rooted historic tradition that everyone should have his own day in court.'"[89] Under this interpretation, the statute of limitations would start on the date the injury began—not the date of the Notice of Availability of a Record of Decision. Because construction of South Fork did not start until the Summer of 2023, the statute of limitations did not commence running under the APA until the construction was completed and Plaintiffs' injuries arose.

In addition, BOEM's Notice of Availability did not advise the public about the two-year statute of limitations, as required by the guidelines of the Council of Environmental Quality,[90] which oversees NEPA's implementation. The Executive Office of Management and Budget and the Council on Environmental Quality guidelines for implementing FAST-41[91] expressly require

---

[88] *Corner Post, Inc. v. Board of Governors, FRS*, 603 U.S. __, 6 (July 1, 2024).

[89] *Id.* at 21–22 (quoting *Richards v. Jefferson Cnty., Ala.*, 517 U.S. 793, 798 (1996)).

[90] Executive Office of the President and Council on Environmental Quality, *Memorandum for Heads of Federal Departments and Agencies* (Jan. 13, 2017), https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/memoranda/2017/m-17-14.pdf; Alexander Hergott, *Ensuring that Permitting Council Member Agencies and Covered Project Sponsors Receive Full Benefit of 2-Year Limitations Period Provided in Title 41 of the Fixing America's Surface Transportation Act (FAST-41)* (Jan. 12, 2021), https://www.permits.performance.gov/sites/permits.dot.gov/files/2021-01/2021-01-11%20Permitting%20Council%20ED%20Memo%20re%20Implementing%202017%20Limitations%20Period%20Guidance.pdf; SFW_0087121.

[91] Executive Office of the President and Council on Environmental Quality, *Memorandum for Heads of Federal Departments and Agencies* (Jan. 13, 2017), https://www.whitehouse.gov/wp-content/uploads/legacy_drupal_files/omb/memoranda/2017/m-17-14.pdf.

that agencies "must specifically state in any such notice that the statute of limitations begins to run from the date of publication of the notice."[92]

In January 2021, the Federal Permitting Council, which is tasked with improving transparency, predictability, and outcomes of large-scale environmental reviews,[93] reaffirmed that guidance in a letter to Agency Chief Environmental Review and Permitting Officers stating that the guidance "requires Permitting Council member agencies to publish in the Federal Register all decisions subject to the FAST-41 two-year limitations period with a note informing the public that the limitation period applies."[94]

BOEM's Notice of Availability of the Record of Decision for South Fork is missing the required language informing the public of the limitations period.[95] Because BOEM's notice was deficient,[96] Green Oceans should not be bound by the two-year statute of limitations.

**3.    Preservation/Green Oceans' Claims Are Not Moot**

Contrary to South Fork's assertion, Preservation/Green Oceans' claims are not moot because this Court can order the construction that has been completed to be removed,[97] require

---

[92] *Id.* at 57.

[93] *See* 42 U.S.C. § 4370m-1.

[94] Alexander Hergott, *Ensuring that Permitting Council Member Agencies and Covered Project Sponsors Receive Full Benefit of 2-Year Limitations Period Provided in Title 41 of the Fixing America's Surface Transportation Act (FAST-41)* (Jan. 12, 2021), https://www.permits.performance.gov/sites/permits.dot.gov/files/2021-01/2021-01-11%20Permitting%20Council%20ED%20Memo%20re%20Implementing%202017%20Limitations%20Period%20Guidance.pdf.

[95] SFW_0087121.

[96] *Id.*

[97] *See Slockish v. U.S. Fed. Highway Admin.*, 682 F. Supp. 2d 1178 (D. Or. 2010) (highway widening project completed, but court rejected mootness argument where it had the power to remand the case for additional environmental review and order the project removed for ongoing harm to historic and cultural resources); *see also Van Abbema v. Fornell*, 807 F.2d 633 (7th Cir. 1986) (court can order dismantling or alteration of facility or different method of operation); *Columbia Basin Land Prot. Ass'n v. Schlesinger*, 643 F.2d 585 (9th Cir. 1981) (court could order

more mitigation measures,[98] and enjoin operation of the turbines pending further review,[99] meaning that there is still a live controversy.

If there is still an opportunity to impact a project, even if a permit has been issued and a project constructed, courts have denied a motion to dismiss based on mootness.[100] In *Lemon v. Geren*,[101] the D.C. Circuit evaluated whether the Secretary of the Army failed to comply with the procedural requirements of Section 106 of the NHPA and NEPA before transferring a closed military base to a developer. The Court ruled that plaintiffs had standing because the new development would destroy a historic site that they visited and enjoyed.[102] Even though the transfer of the base had occurred, the court found that the case was not moot because "all of the parties to the transaction are before the court. If unraveling the transfer is necessary after the district court decides the merits [on remand], it will be in the court's power to do so."[103]

In *Sierra Club v. Army Corps of Engineers*,[104] environmental groups challenged the actions of federal agencies that allowed the construction of an oil pipeline and raised NEPA and Clean Water Act claims. By the time the case made it to the D.C. Circuit, the pipeline's construction was complete. Completed construction was not enough to moot the case because "an order wholly or partly enjoining operation of the pipeline, pending further analyses of the

---

removal of power line towers); *Sierra Club v. U.S. Dep't of Agric.*, 777 F. Supp. 2d 44 (D.D.C. 2011) (land transfer does not moot a case if it is possible to unravel the transfer).
[98] *See Ctr. for Food Safety v. Salazar*, 900 F. Supp. 2d 1 (D.D.C. 2012) (mitigation of effects of planting of genetically modified crops possible).
[99] *See Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31 (D.C. Cir. 2015).
[100] *El Rancho La Comunidad v. United States*, No. 90-113 (D.N.M. May 21, 1991) (court rejected mootness claim after finding that the damage done by defendants could be reversed and the site salvaged). *See also Vieux Carre Prop. Owners, Residents & Assocs., Inc. v. Brown*, 875 F.2d 453 (5th Cir. 1989).
[101] *Lemon v. Geren,* 514 F.3d 1312 (D.C. Cir. 2008).
[102] *Id.* at 1315.
[103] *Id.* at 1316.
[104] *Sierra Club v. U.S. Army Corps of Engineers*, 803 F.3d 31 (D.C. Cir. 2015)

pipeline's environmental impact, would provide some degree of 'effectual relief.'"[105] The D.C.
Circuit said that "'[e]ven though it is now too late to prevent or to provide a fully satisfactory
remedy for' the harms Sierra Club identifies, the court has the 'power to effectuate a partial
remedy,' and that 'is sufficient to prevent this case from being moot.'"[106]

   If the court "hold that the agencies' NEPA analysis was inadequate or their decisions
otherwise arbitrary and capricious, [the agencies] 'would have to correct the decision-making
process.'"[107] If the NEPA analysis was legally deficient or inadequate, the court "'could order
that the [pipeline] be closed or impose restrictions on its use' . . . 'until [the agencies] complied
with NEPA."[108] To moot a case where construction is complete would allow agencies and
private parties to "'merely ignore the requirements of NEPA' as well as other statutes requiring
pre-construction authorization or review, 'build [their] structures before a case gets to court, and
then hide behind the mootness doctrine' . . . . 'Such a result is not acceptable.'"[109]

   Defendants fail to discuss *National Parks Conservation Association v. Semonite*,[110] a
precedent-setting appeal decided by the D.C. Circuit. In *Semonite*, conservation and historic
preservation groups, appealed the Army Corps' decision to issue a permit to Dominion Energy to
construct massive electrical transmission lines across the James River within the viewshed of
Carter's Grove, a National Historic Landmark, and through other historically significant sites.
During the pendency of the appeal, Dominion Energy constructed transmission lines over the
appellants' objections. Even though the transmission lines were already constructed, the D.C.

---

[105] *Id. at* 43 (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9-12 (1992)).
[106] *Id.* (quoting *Church of Scientology*, 506 U.S. at 13).
[107] *Id.* (quoting *Columbia Basin Land Protection Ass'n*, 643 F.2d at 591 n. 1 (9th Cir. 1981)).
[108] *Id.* (quoting *Airport Neighbors All., Inc. v. United States*, 90 F.3d 426, 429 (10th Cir. 1996)).
[109] *Id.* at 44 (quoting *Columbia Basin Land Protection Ass'n*, 643 F.2d at 591 n.1).
[110] *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075 (D.C. Cir. 2019).

Circuit agreed with the conservation and preservation groups that the Army Corps had failed to comply with federal law.[111] On remand, the court ordered the Army Corps to prepare an Environmental Impact Statement to correct its NEPA errors and consult with National Park Service as required by Section 110(f) of the NHPA to use all possible planning to minimize harm.[112]

Here, too, Defendants cannot hide behind a mootness defense that its turbines have been built. These turbines pose an ongoing injury—injury to the viewshed and irreplaceable historic properties and devaluation of Plaintiffs' properties—all of which could still be remedied.

Finally, a case is not moot where a federal agency continues to retain monitoring or compliance responsibilities, even after the Section 106 process required by the NHPA has been completed.[113] Here, for example, BOEM continues to retain monitoring or compliance responsibilities arising out of the Memorandum of Agreement that BOEM executed to terminate the Section 106 process required by the NHPA. In addition to its ability to enforce conditions required of South Fork throughout the Record of Decision,[114] the following examples illustrate some of the ways BOEM remains connected to South Fork through BOEM's monitoring or compliance responsibilities under the Section 106 MOA:

- Implementing mitigation proposals (§ III(A));[115]

---

[111] *Id.* at 1088–89.
[112] *Id.*
[113] *Tyler v. Cisneros*, 136 F.3d 603 (9th Cir. 1998) (disbursement of federal funding by HUD for housing project did not render a NHPA lawsuit moot where agency retained limited monitoring responsibilities); *see also Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800 (9th Cir. 1999) (although land transfer between Tribe and federal agency had occurred, the matter was not moot in a case involving application of the NHPA and NEPA where a federal court could set aside the transfer).
[114] *See generally* SFW_0086912.
[115] SFW_0086872.

- Ensuring all consultants retained for services pursuant to the MOA meet federal standards (§VII(B));[116]

- Implementation of post-review discovery plans for unanticipated effects on historic properties (§ IX(A));[117]

- Directing South Fork Wind to complete additional investigations, as appropriate (§ IX(A)(4));[118]

- Working with consulting parties to avoid, minimize, or mitigate adverse effects on historic properties identified through additional investigations (§ 9(A)(5));[119]

- Monitor and review South Fork Wind's annual summary report (§ X);[120] and

- Retain jurisdiction to resolve objections to MOA's implementation and consulting with parties and the Advisory Council on Historic Preservation to resolve objections (MOA § XI(A)).[121]

These examples demonstrate BOEM's continued and substantive connection with South Fork Wind through monitoring and compliance measures, making Plaintiffs' claims not moot.

**4.      This Court No Longer Owes *Chevron* Deference to BOEM's Interpretations of the Law**

Defendants' assertions that BOEM complied with NHPA and NEPA rely on case law requiring the courts to defer to agencies' interpretations of their enabling statutes—commonly called "*Chevron* deference."[122] But in the recent case of *Loper Bright Enterprises v.*

---

[116] SFW_0086882.
[117] SFW_0086883.
[118] SFW_0086884.
[119] *Id.*
[120] *Id.*
[121] SFW_0086884–85.
[122] *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984).

*Raimondo*,[123] the Supreme Court flatly overruled its prior precedent, eliminating *Chevron* deference as a tool of statutory construction, stating that "[t]he deference that *Chevron* requires of courts reviewing agency action cannot be squared with the APA[,]"[124] and that "*Chevron* defies the command of the APA that 'the reviewing court'—not the agency whose action it reviews—is to 'decide *all* relevant questions of law' and 'interpret . . . statutory provisions.'"[125] The Supreme Court made it clear that "[c]ourts need not and under the APA may not defer to an agency interpretation of the law" and "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority."[126] Because of this decision, Government agencies have already begun to withdraw briefs in which they requested deference in other cases.[127]

    *Loper Bright* undermines Defendants' arguments for summary judgment because they rely on the now-invalid *Chevron* deference doctrine. Specifically, Defendants are asking for this court to defer to BOEM's interpretation that the National Historic Preservation Act: (1) does not require BOEM to identify all adversely affected historic properties, (2) does not require measures that minimize effects on National Historic Landmarks to the maximum extent possible (including the Plaintiffs' National Historic Landmark properties), (3) does not require BOEM to provide notice to interested parties that it knows have no knowledge of the review process but who have legal or economic interests at stake or responsibilities under the Section 106 MOA, and (4) allows BOEM to limit its finding of adverse impacts and exclude properties that it identified as

---

[123] *Loper Bright Enterprises v. Raimondo*, 603 U.S. ___, No. 22-451 at 18 (June 28, 2024).
[124] *Id.*
[125] *Id.* at 21 (quoting 5 U.S.C. § 706).
[126] *Id.* at 35.
[127] *Winnebago Tribe of Nebraska v. Department of the Army,* 1:24-cv-78 (E.D. Va.), Notice of Supplemental Authority (July 10, 2024), ECF No. 48 ("In light of *Loper Bright*, Defendants are hereby withdrawing that request for deference.").

being adversely affected. Defendants are also asking this court to defer to BOEM's erroneous interpretation that NEPA does not require BOEM to provide a detailed, thorough list of mitigation measures in its environmental impact statement and does not require BOEM to analyze impacts to all impacted historic properties.

So, in ruling on these cross-motions for summary judgment, the Court—not the agencies—now will declare what the law is and whether the agencies complied with it.

**5.    BOEM Failed to Comply with Section 110(f) and Section 106 of the National Historic Preservation Act's Statutory Requirements**

BOEM failed to comply with Section 110(f) of the National Historic Preservation Act because BOEM failed to use all possible planning to minimize impacts to National Historic Landmarks impacted by South Fork, which include the Plaintiffs' historic properties. BOEM also applied a balancing test to its Section 110(f) analysis that weighed the need to approve the project against the goals of the NHPA. This balancing test is not allowed under the statute. As National Historic Landmarks, Southeast Lighthouse Foundation, Bellevue Avenue Historic District, and Ocean Drive Historic Districts are given the highest degree of protection under Section 110(f),[128] yet BOEM, during its review, opted to exalt its policy of offshore wind energy over the NHPA's directive to protect and preserve landmarks and failed to provide adequate protection to minimize South Fork's impacts on these landmarks.

---

[128] *See Neighborhood Ass'n of the Back Bay, Inc. v. Federal Transit Admin.*, 463 F.3d 50, 63 (1st Cir. 2006) (noting Section 110(f)'s higher standard required for minimizing adverse effects). *Compare* 54 U.S.C. § 306107 ("Federal agency shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to [National Historic Landmarks]" with 54 U.S.C. § 306108 and 36 C.F.R. § 800.6 (Section 106 requiring ways to avoid, minimize, or mitigate harm to historic properties listed in the National Register of Historic Places).

In addition, BOEM's Section 106 consultation was deficient in almost every respect, from failing to provide adequate notice, failing to take into account the effects on all of the impacted historic properties, failing to make a good faith effort to identify impacted properties, failing to completely assess South Fork's adverse impacts, and failing to resolve adverse impacts to all historic properties before issuing a permit. While Defendants assert that BOEM did all it was legally required to do, the Administrative Record detailing BOEM's analysis and its ultimate decision show that BOEM failed to fulfil the statutory directives set out in Section 106. With this legally deficient Section 106 consultation, BOEM has created a case study for the various ways a federal agency can violate the letter and spirit of Section 106.

### 5.1    BOEM Failed to Comply with Section 110(f) by Failing to Minimize Impacts to National Historic Landmarks to the Maximum Extent Possible

Section 110(f) of the NHPA mandates that "[p]rior to the approval of any Federal undertaking that may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark."[129] But, contrary to the statutory directive to minimize harm to National Historic Landmarks to the maximum extent possible, BOEM substituted its own lower standard of striking a balance between minimizing harm and the goals of the Project instead, citing "standards and guidelines" of the agency that are flatly contrary to the statute—and so have no legal effect.

Defendants unfairly trivialize what Preservation/Green Oceans state in our opening brief. We did not argue that Section 110(f) was violated merely because National Historic Landmarks

---

[129] 54 U.S.C. § 306107.

were affected or that Section 110(f) mandates "complete avoidance of adverse effects."[130] Instead, what we argued is that BOEM was required to take planning and actions that minimize harm to landmarks to the maximum extent possible, as the statute requires,[131] and that BOEM failed to do so.[132]

We also pointed out (and Defendants do not deny) that Section 110(f) also requires the federal agency to consult with the Secretary of the Interior or the Secretary's designee—in this case, the National Park Service—when there may be an adverse effect.[133] But the National Park Service never consulted with BOEM, made a determination on adverse effects, or commented on the Project.

By admitting that BOEM disregarded impacts to landmarks in Newport, the Government admits that it failed to even consider minimizing measures to adversely affected National Historic Landmarks that fall within the Area of Potential Effects, as required by the statute.[134] BOEM cites its erroneous conclusion that the turbines "most likely" could not be seen from Newport and that the turbines "would not affect the historic settings" of any National Historic Landmarks.[135] But, as established by the declarations of Preservation/Green Oceans, these

---

[130] Gov't Memo. in Support of Cross-Mot. for S.J. (June 20, 2024), ECF No. 47 at 31; Def.-Intervenors Cross-Mot. for S.J. (June 20, 2024), ECF No. 50 at 31.
[131] 54 U.S.C. § 306107; 36 C.F.R. § 800.10.
[132] Gov't Memo. in Support of Cross-Mot. for S.J. (June 20, 2024), ECF No. 47 at 32 (concluding erroneously that adverse visual effects on the Southeast Lighthouse would be "small" and failing to provide any evidence that BOEM used all possible planning to minimize harm other than asking the Court to take BOEM's word for it).
[133] 54 U.S.C. § 306107; 36 C.F.R. § 800.10; *see* Pls' Memo in Support of S.J. (May 20, 2024) ECF No. 39-1 at 24–27.
[134] Gov't Mem. in Support of Cross-Motion for S.J. (June 20, 2024), ECF No. 47 at 10.
[135] *Id.* at 10.

turbines are quite visible from many of the historic properties in Newport and do impact the historic setting of these properties.[136]

 Defendants' citations to a handful of emails to the National Park Service as evidence of Section 110(f) compliance does not demonstrate compliance with Section 110(f)'s legal standard.[137] The Administrative Record shows only that when repeatedly asked during consultation what they planned to do to comply with Section 110(f), BOEM and South Fork parroted the Section 110(f) legal standard, provided no descriptions of planning or actions they were taking to minimize harm to the National Historic Landmarks, and disregarded public comments calling for stronger mitigation measures.

 Had BOEM undertaken all possible planning and actions to minimize harm to National Historic Landmarks, Defendants would be able to show a record of consultation with the National Park Service about ways to minimize harm or ways they considered to minimize harm. They cannot. No heightened consultation to minimize harm to historic landmarks ever occurred. Had BOEM attempted to comply with Section 110(f)'s mandate, BOEM could have required

---

[136] Ex. 1 ¶ 3; Ex. 2 ¶ 4; Ex. 3 ¶ 3.

[137] For example, the Government points to a few vague emails from South Fork's consultant to the National Park Service regarding an invitation to consult, preparation for a consultation meeting, or referencing undescribed "hearing concerns" do not provide evidence of all possible planning to minimize harm to National Historic Landmarks. *E.g.*, SFW_0060827, 0082060, 0080107, 0082042. One email from BOEM's Section 106 Team Lead to the National Park Service is illustrative and references a single meeting: "I think the meeting went very well. The NPS informed me that they will not be sending a letter on our finding of effect for the South Fork Wind Project. . . . For the majority of the meeting, we discussed their more general recommendations and comments regarding BOEM's renewable energy projects that were not specific to the South Fork Project." SFW_0082060. South Fork points to similar meaningless references, such as restatements of the Section 110(f) legal standard, an invitation to the National Park Service to consult, various Section 106 documents or copies of presentations. *E.g.*, SFW_0078504-05; 0078507, 0057585-612, 0079648-78. In no way do these references demonstrate compliance with Section 110(f)'s heightened legal standard. By contrast, they provide direct evidence that proves BOEM never complied with Section 110(f) and that South Fork's Record of Decision was arbitrary, capricious, and contrary to law.

South Fork to install smaller turbines or could have required that the turbines be moved to less visible positions or further away from shore. BOEM also could have reduced the number of turbines and developed ways to minimize or mitigate nighttime construction lighting.

The evidence Defendants provide for compliance with Section 110(f) is not evidence that shows BOEM "to the maximum extent possible under[took] such planning and actions as [] necessary to minimize harm"[138] to Plaintiffs' historic properties that are Historic Landmarks or are a part of Historic Landmarks. The documents Defendants rely on are, at best, factors to be considered by the court in whether BOEM complied with Section 106, an entirely different statute governing adverse effects to historic properties. Section 110(f)'s requirements differ from those of 106 and compliance with 106 does not equate to compliance with the standards of Section 110(f).

Defendants erroneously conflate the two very different requirements of the NHPA set forth in two separate sections of the statute. Section 110(f) compliance is governed by regulations promulgated by the National Park Service, whereas Section 106 regulations are promulgated by the Advisory Council on Historic Preservation. Not only did the National Park Service never concur with BOEM's approach, but this Court owes "no deference" to BOEM's interpretation of a statute that the agency does not administer.[139] Similarly, this Court owes no deference to the fact that the Advisory Council on Historic Preservation or Rhode Island State Historic Preservation Officer signed the Section 106 Memorandum of Agreement because that agreement does not provide any evidence of compliance with Section 110(f) and for reasons explained below is an invalid agreement that does not comply with Section 106.

---

[138] 54 U.S.C. § 306107; 36 C.F.R. § 800.10.
[139] *Nat'l Parks Conservation Ass'n*, 916 F.3d at 1088.

Defendants also conflate BOEM's NEPA review to show Section 110(f) compliance. But again, compliance with NEPA does not equal compliance with Section 110(f) because those two statutes mandate completely different legal standards. Arguing that BOEM's consideration of the no action alternative—which NEPA requires—is not sufficient to demonstrate compliance under Section 110(f).

Likewise, Defendants points to South Fork's distance from the Southeast Lighthouse National Historic Landmark as evidence of its use of all possible planning to minimize harm.[140] However, that statement is not true because neither BOEM nor its predecessor agency analyzed harm to historic and cultural resources when reviewing the placement of offshore wind energy lease areas under Section 106 of the NHPA or NEPA. South Fork picked that distance for reasons unrelated to Section 110(f) and cannot point to any evidence to show otherwise. For these reasons, the Administrative Record lacks evidence to justify BOEM's Section 110(f) compliance, and South Fork's permit is arbitrary, capricious, and contrary to the law.

**5.2    BOEM also Violated Section 106 By Failing to Consider Impacts to All Properties**

Unlike Section 110(f), Section 106 of the NHPA covers historic properties listed or eligible for listing in the National Register of Historic Places.[141] Section 106 requires agencies approving an undertaking to "take into account the effect of the undertaking on any historic property."[142] NHPA regulations require the consulting agency to seek information "from consulting parties, and other individuals and organizations likely to have knowledge of, or

---

[140] Gov't Memo. in Support of Cross-Mot. for S.J. (June 20, 2024), ECF No. 47 at 32; Def.-Intervenors Cross-Mot. for S.J. (June 20, 2024), ECF No. 50 at 32.
[141] 54 U.S.C. § 300308 (defining "historic property); 36 C.F.R. Part 800 (providing regulatory framework to apply Section 106 to resolve adverse effects).
[142] 54 U.S.C. § 306108.

concerns with, historic properties in the area"[143] and identify historic properties in the area of potential effects. BOEM's failure to (1) consider information given from consulting parties, (2) seek information from individuals it knew had knowledge of historic properties, and (3) identify all historic properties in the affected area resulted in BOEM's failure to comply with Section 106.

### 5.2.1 BOEM Failed to Provide Adequate Notice

Defendants argue that BOEM did everything required to provide notice to the public and property owners with legal or economic interests regarding South Fork.[144] But BOEM did not. Under Section 106's regulations, BOEM was required to consider the views of consulting parties—such as the Southeast Lighthouse Foundation and historic property owners in Newport, Middletown, and Little Compton, Rhode Island—and these consulting parties informed BOEM that several historic property owners had never received any notification that South Fork's permitting review was underway.[145] Yet even though BOEM and South Fork knew that interested property owners had no knowledge of the permitting process or the ability to consult— and that consulting parties urged BOEM to expand its notification efforts for that very reason— BOEM never considered their views and no additional attempts to provide notice were made. Defendants rely on their own failure to argue that the Court should dismiss Green Oceans because they missed opportunities to challenge the process—even though those Plaintiffs knew nothing about the process in the first place because BOEM failed to listen to consulting parties.

---

[143] 36 C.F.R. § 800.4(a)(3).
[144] Gov't Mot. for S.J. (June 20, 2024), ECF No. 47 at 17–20 ; Def.-Intervenors Mot. for S.J. (June 20, 2024), ECF No. 50 at 18–20.
[145] SFW_0073280.

BOEM did the bare minimum to notify state historic preservation officers, Indian Tribes, and local governments as the Section 106 regulations required, but BOEM should not have stopped there because BOEM had a duty to consider the views of consulting parties who urged greater transparency about the South Fork review process, rather than BOEM's approach of playing hide the ball from as many adversely affected property owners as possible. During consultation on South Fork, BOEM failed to notify historic property owners of National Historic Landmarks and properties listed in or eligible for listing in the National Register of Historic Places, including those who were supposed to play a role in the execution of the Section 106 Memorandum of Agreement. Even after consulting parties, such as Southeast Lighthouse Foundation and Preservation Society of Newport County, alerted BOEM of their "serious concerns" about the widespread lack of knowledge regarding the Section 106 consultation within the Block Island and Newport communities,[146] BOEM still refused to notify other historic property owners that South Fork's permitting and environmental review was underway.

Inexplicably, BOEM refused to consider consulting parties' views about the need to provide enhanced notification, an odd posture considering Congress's intent for the NHPA and NEPA to involve the public and increase public understanding and participation of parties with legal or economic interests at stake.[147] The Court should note that BOEM corrected its notification error for its permitting of Sunrise Wind, a project located at a greater distance than

---

[146] SFW_0073280.
[147] 36 C.F.R. § 800.2(c)(5) ("Certain individuals and organizations with a demonstrated interest in the undertaking may participate as consulting parties due to the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties."); 36 C.F.R. § 800.2(d)(1) ("The views of the public are essential to informed Federal decisionmaking in the section 106 process. The agency official shall seek and consider the views of the public in a manner that reflects the nature and complexity of the undertaking and its effects on historic properties, the likely interest of the public in the effects on historic properties.").

South Fork, and notified historic property owners for that project, including the Green Oceans

Plaintiffs, but never offered any justification for its refusal to provide additional notification for

purposes of South Fork.

Section 106's regulations require federal agencies like BOEM to consult with "certain

individuals and organizations with a demonstrated interest in the undertaking . . . due to the

nature of their legal or economic relation to the undertaking or affected properties, or their

concern with the undertaking's effect on historic properties."[148] While Plaintiffs agree that not

every historic owner needs to be notified, once consulting parties point out the need for

additional notices to certain property owners who own historic properties or landmarks, BOEM

should have then notified those property owners and considered their views.[149] BOEM failed to

do so. BOEM also had a duty to consult with historic property owners to assist BOEM in

identifying issues relating to the undertaking's potential effects on historic properties, but BOEM

never notified them and thus never considered information related to South Fork's potential

effects on those properties.[150]

### 5.2.2 BOEM Failed to Meet the Requirements of Section 106 by Failing to Take Into Account the Effects on All of the Impacted Historic Properties and By Failing to Make a Good Faith Effort to Identify Impacted Properties

Defendants argue that they made a reasonably good-faith effort to identify historic

properties—asserting that BOEM's very limited public outreach was enough—and that they

properly limited their consideration to ten properties. Defendants support their erroneous

arguments by asking this court to defer to their interpretation of their regulations and their

---

[148] 36 C.F.R. § 800.2(c)(5).
[149] SFW_0081772-81773 (letter to BOEM pointing out missing Newport historic properties); SFW_0073279 (missing Block Island historic properties that BOEM never considered).
[150] 36 C.F.R. § 800(a)(3).

findings. Defendants are wrong, and this Court no longer owes BOEM the deference it is asking for.[151]

Section 106 of the NHPA requires the head of any federal agency to "take into account the effect of the undertaking on any historic property."[152] Instead of taking into account the effects of South Fork on the historic properties in the area of potential effects—which, as depicted by BOEM's own maps, includes all of Preservation/Green Oceans properties[153]—BOEM improperly limited its analysis to only ten properties, even though dozens more historic properties fell within the area of potential effects.

Because Section 106's steps are designed to be sequential and depend on the completeness and correctness of each previous step, BOEM's failure to identify and consult with additional property owners—including all Newport, Little Compton, and Middletown-based property owners and others on Block Island—contributed directly to BOEM's failure to identify historic properties and assess the adverse effect on those properties. One clear example of BOEM's error is illustrated by BOEM's failure to consider past planning, research, and historic property identification studies for Block Island Wind, which is owned by Orsted, South Fork's developer, and were already within Orsted's possession but never disclosed.[154] Another is identifying only ten properties that would be potentially impacted, even though BOEM had already concluded that the visual impact Area of Potential Impacts would consist of a 40-mile radius.[155]

---

[151] *See Loper Bright Enterprises*, 603 U.S. ___.
[152] 54 U.S.C. § 306108.
[153] SFW_0078487.
[154] 36 C.F.R. § 800.4(b)(1).
[155] *See* SFW_0078515.

Contrary to South Fork's assertion, federal agencies have a duty to identify historic properties in the Area of Potential Effects, not just a subset of properties cherry-picked by BOEM and South Fork's consultants, especially where historic properties are already listed in or eligible for listing in the National Register of Historic Places.[156] Defendants fail to cite any authority that supports their arguments that a fractional sample of historic properties will suffice because no such statute, regulation, or case exists. To the extent that Defendants are relying on BOEM's interpretation of Section 106, that interpretation should no longer be given deference because it goes against Section 106's plain directives. Plaintiffs have explained this issue in more detail in their Memorandum in Support for Motion Summary Judgment on pages 28-31 and do not need to do so again here.

Additionally, BOEM's decision to ignore historic properties is undermined by BOEM's determination that Newport properties would experience "moderate to major"[157] adverse visual effects from South Fork's turbines due to the properties' location on the oceanfront and "high level of sensitivity to visual effects."[158] That finding is also undermined by BOEM's own technical report that concluded Southeast Lighthouse, the Breakers, Marble House, Bellevue Avenue Historic District, and Ocean Drive Historic District—which include Preservation Society's properties, the Southeast Lighthouse Foundation, and Green Oceans' Newport Plaintiffs—would be adversely affected by the Project.[159]

It is also not true, as the Government asserts that Newport was not a part of the Area of Potential Effects for the South Fork Project. BOEM's 2021 Finding of Adverse Effect depicts a

---

[156] 36 C.F.R. § 800.4(b)(1).
[157] SFW_0066458.
[158] SFW_0066458.
[159] SFW_0078487.

40-mile area of visibility that includes the City of Newport.[160] If Newport and its historic properties—as well as properties in Little Compton and Middletown—were not going to be impacted, BOEM should never have included them in the area of potential effects or concluded in its Historic Resources Visual Effects Analysis that South Fork's impacts to these properties would be "moderate to major."[161]

### 5.2.3 BOEM Never Truly Assessed South Fork's Adverse Effects, Including the Cumulative Effects

BOEM never assessed all the adverse effects on historic properties because its inventory of historic properties was never complete. Because BOEM erroneously concluded that South Fork would only adversely affect ten historic properties—opting to ignore dozens of similarly situated properties and Newport-based properties that BOEM had already determined could experience "moderate to major" potential for adverse visual effects[162]—BOEM's assessment of South Fork is severely deficient and falls flat.

The assertion that BOEM's visual simulations were adequate and sufficient is risible. BOEM's visual simulations provided the best-case scenario for South Fork in terms of obscuring adverse visual effects but never the worst-case scenario. Worst-case scenarios are needed for BOEM and consulting parties so they can reasonably understand the nature and scale of what South Fork looks like during a range of seasons and during different times of day when the turbines' visual contrast is greatest. As Plaintiffs have asserted, these simulations failed to reflect the real-world visual impacts, as property owners in Newport can see South Fork's turbines quite clearly.[163]

---

[160] *See* SFW_0078515.
[161] SFW_0066458.
[162] SFW_0066458.
[163] Ex. 1 ¶ 3; Ex. 2 ¶ 4; Ex. 3 ¶ 3.

BOEM never provided consulting parties with an adequate cumulative effects analysis of South Fork and other reasonably foreseeable wind farms, making it impossible for BOEM or anyone else to understand South Fork's direct, indirect, and cumulative effects.[164] The best evidence of BOEM's failure to consider cumulative effects in South Fork is that BOEM considered Newport-based historic properties for purposes of Revolution Wind and Sunrise Wind, even though they are all projects by the same developer under BOEM's review at the same time and will create a disruptive visual mass on the ocean's horizon that (1) cannot be avoided and (2) will harm the historic integrity of Newport's National Historic Landmark Districts.[165] This was clear error because BOEM should have considered the cumulative effects of Revolution Wind and Sunrise Wind when added to South Fork Wind during South Fork's review, which would have included Newport's National Historic Landmarks and other historic properties owned by the Preservation Society and Green Oceans' Plaintiffs.

### 5.2.4 BOEM Failed to Analyze Economic Impacts on Historic Properties

South Fork incorrectly states that BOEM conducted "extensive consideration of potential economic impacts [] and potential tourism impacts. . . ."[166] Although BOEM's so-called analysis for NEPA purposes is flawed and never addressed economic impacts to the local economies of the Town of New Shoreham and the City of Newport—or considered Orsted's own study that shows fifteen percent of tourists are not likely to return after construction of wind farm turbines[167]—BOEM never considered adverse economic impacts to historic properties for Section 106 purposes.

---

[164] SFW_0091286, SFW_0079690 (objections to South Fork's visual simulations).
[165] SFW_0091286.
[166] Def.-Intervenors Cross-Mot. for S.J. (June 20, 2024), ECF No. 50 at 26.
[167] *See* Ex. 7, Orsted Tourism Study for the Ocean Wind Project.

For example, the Preservation Plaintiffs argued repeatedly that BOEM had a duty to assess adverse economic impacts to their historic properties because of South Fork's adverse visual effects, which have the potential to create revenue losses that will adversely impact the ability of current property owners to maintain historic properties, including National Historic Landmarks such as the Southeast Lighthouse and National Historic Landmark museum properties owned by the Preservation Society of Newport County. Yet BOEM ignored their concerns and failed to consider adverse economic effects. For this reason, BOEM failed to comply with Section 106, and South Fork's permit was arbitrary, capricious, and contrary to law.

### 5.2.5 BOEM Failed to Resolve Adverse Effects

Assuming for the sake of argument that BOEM had not failed to comply with previous steps in the Section 106 process, BOEM failed to resolve adverse effects to all historic properties before issuing a permit and violated Section 106's plain language.[168] Instead, BOEM created an unenforceable agreement to extend consultation between South Fork Wind and consulting parties for over fifteen months after issuing South Fork's permit. BOEM then delegated the authority to extend consultation to South Fork Wind, even though BOEM did not have a right to delegate its duty to the project developer.[169] Moreover, the Court owes no deference to BOEM, the Advisory Council on Historic Preservation, or any state historic preservation officers, which erroneously signed a legally deficient MOA because of BOEM's clear legal error in violating the plain and

---

[168] 54 U.S.C. § 306108.

[169] Although BOEM issued the Section 106 Memorandum of Agreement on Nov. 23, 2021, the same day it issued the Record of Decision (South Fork's permit), proposed mitigation plans were not finalized until February 28, 2023. Email from S. Stokely, Section 106 Team Lead, BOEM, regarding BOEM's Resolution of Dispute Regarding South Fork HPTPs for Southeast Lighthouse and Historic Properties in the Town of New Shoreham (Feb. 28, 2023). *See* Ex. 8, BOEM Correspondence Regarding South Fork HPTP Resolution of Dispute.

unambiguous language of Section 106's regulations to resolve all adverse effects before issuing a permit. The ratification cases cited by the Federal Defendants and South Fork do not apply.

6.    **BOEM's Environmental Impact Statement Failed to Take a Hard Look at the Project's Adverse Impacts on Viewshed Resources, as NEPA Requires**

Defendants' assertion that Preservation/Green Oceans overstate the action-forcing nature of NEPA is inaccurate. Not only has Congress,[170] the Supreme Court,[171] the D.C. Circuit,[172] and this Court[173] so stated, but NEPA regulations confirm NEPA's action forcing purpose: "The primary purpose of an environmental impact statement is to serve as an action-forcing device to [e]nsure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government."[174] To ensure NEPA's purpose is carried out, the Government must "provide full and fair discussion of significant environmental impacts" and "inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment."[175]

Yet, in its Final Environmental Impact Statement, BOEM fails to make the statutorily required analysis of South Fork's devastating impacts on the aesthetic and cultural interests of Newport, Little Compton, and Middletown's residents in their historically ocean-oriented

---

[170] 115 Cong. Rc. 40416 (remarks of Sen. Jackson) (To ensure that NEPA's policies are "infused into the ongoing programs and actions of the Federal Government, the act also establishes some 'action-forcing' procedures.").

[171] *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352 (1989) ("[O]mission of a reasonably complete discussion of possible mitigation measures would undermine the 'action-forcing' function of NEPA.").

[172] *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 532 (D.C. Cir. 2018) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)).

[173] *Alabama v. United States Army Corps of Engineers*, No. CV 15-699 (EGS), 2023 WL 7410054 (D.D.C. Nov. 9, 2023) (quoting *Robertson*, 490 U.S. at 349; *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978); *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)).

[174] 40 C.F.R. § 1502.1 (1978).

[175] *Id.*

cities—especially the scores of important historic homes and properties and other historic landmarks for which the unimpaired ocean viewshed is an integral component of their architectural and historic value. BOEM thus utterly failed to inform the public of both the significant impacts on their community and alternative plans that would have avoided or minimized the Project's significant, adverse impacts—as NEPA requires. This failure is particularly crushing for the Plaintiffs who own historic properties and designated historic landmarks, as detailed in our discussion of BOEM's violation of the NHPA.

BOEM's admission that it limited its impacts analysis to only 10 properties is an admission that it failed to take a hard look at the full extent of South Fork's impacts to properties in Newport, Little Compton, and Middletown, even though BOEM outlined a 40-mile area of potential effects of visual impacts from the turbines.[176] Inexplicably, BOEM limited its analysis to ten properties, even though it found that the Breakers, Marble House, Ocean Drive Historic District, and Bellevue Avenue Historic District would be adversely impacted,[177] and BOEM found that impacts to Newport properties would be "moderate to major."[178]

The Environmental Impact Statement's cumulative effects analysis is also deficient because it fails to provide the decision-maker with any information regarding the combined environmental impacts of the South Fork, Revolution Wind, and Sunrise Wind Projects. The EIS fails to answer the question: What will coastal communities along Rhode Island, Long Island, New York, and Massachusetts look like after these projects are built and operating? By failing to consider South Fork's impacts to Newport, Little Compton, and Middletown properties and

---

[176] SFW_0077019; SFW_008515 (Figure A-5. Viewshed Area of Potential Effects).
[177] SFW_0078487.
[178] SFW_0066458.

asserting incorrectly that South Fork would not be visible, BOEM failed to include an adequate

cumulative effects analysis on impacts to Newport properties.

It is not—as Defendants contend—a complete fabrication to assert that Revolution Wind

and South Fork should be looked at as one wind farm. The lease areas for South Fork and

Revolution were originally one lease area, OCS-A 0486, acquired by Deepwater Wind[179] and the

Projects had the same lease area up until BOEM approved a lease segmentation in February

2020.[180] Revolution Wind and South Fork Wind components were ordered at the same time by

Orsted,[181] the Projects share onshore equipment and facilities,[182] and the projects are owned by

the same two majority owners.[183] Additionally, the Projects share the same Site Assessment Plan.

The cumulative effects of these two projects, which, once built will be indistinguishable, cannot

be viewed in isolation, as the Government has done.[184]

---

[179] SFW_00287.

[180] SFW_0053724.

[181] Gurney, *Siemens Gamesa Conditionally Awarded Largest U.S. Offshore Wind Power Order to Date: 1.7 GW from Orsted and Eversource*, Siemens Gamesa (July 18, 2019), https://www.siemensgamesa.com/en-int/newsroom/2019/07/190718-siemens-gamesa-offshore-orsted-usa.

[182] Orsted and Eversource, *Orsted and Eversource Partner with Sea Services to Support Safe Navigation* (May 19, 2021), https://www.eversource.com/content/docs/default-source/investors/orsted-eversource-sea-services-press-release-051921.pdf?sfvrsn=af68da62_0.

[183] C Durakovic, *Siemens Gamesa Receives Firm Order for Two US Offshore Wind Farms*, Offshore Wind.biz (Oct. 1, 2021), https://www.offshorewind.biz/2021/10/01/siemens-gamesa-receives-firm-order-for-two-us-offshore-wind-farms/.

[184] *See Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014); *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976) (Under NEPA, proposals for . . . actions that will have cumulative or synergistic environmental impact upon a region . . . pending concurrently before an agency . . . must be considered together. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action.").

**CONCLUSION**

Preservation/Green Oceans ask the Court to deny the Federal Defendants' and

Defendant-Intervenor's Motions for Summary Judgment and grant Plaintiffs' Motion for

Summary Judgment.

Respectfully submitted,

July 11, 2024

*s/ William J. Cook*
William J. Cook, Bar No. SC0009
CULTURAL HERITAGE PARTNERS, PLLC
2101 L St. NW; Ste. 300
Washington, DC 20037
(202) 567-7594
will@culturalheritagepartners.com

Attorneys for Plaintiffs Preservation Society of
Newport County and Southeast Lighthouse
Foundation

*/s Roger J. Marzulla*
Roger J. Marzulla, Bar No. 394907
Nancie G. Marzulla, Bar No. 400985
MARZULLA LAW, LLC
1150 Connecticut Ave., NW
Suite 1050
Washington, DC 20036
Tel: (202) 822-6760
roger@marzulla.com
nancie@marzulla.com

Attorneys for Green Oceans Plaintiffs