EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| PRESERVATION SOCIETY OF NEWPORT COUNTY, | ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Case No.:  1:23-cv-03510-APM |
| DEB HAALAND, *et al.*, | ) ) | Hon. Amit P. Mehta |
| *Defendants*, | ) ) | |
| and | ) ) | |
| SOUTH FORK WIND, LLC, | ) ) | |
| *Defendant-Intervenor*. | ) ) | |
| SOUTHEAST LIGHTHOUSE FOUNDATION, | ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | Case No.:  1:23-cv-03514-APM |
| DEB HAALAND, *et al.*, | ) ) | Hon. Amit P. Mehta |
| *Defendants*, | ) ) | |
| and | ) ) | |
| SOUTH FORK WIND, LLC, | ) ) | |
| *Defendant-Intervenor*. | ) ) | |
| GREEN OCEANS, *et al.*, | ) ) | |
| *Plaintiffs*, | ) ) | |
| v. | ) ) | Case No.: 1:24-cv-01087-APM |
| UNITED STATES DEPARTMENT OF THE INTERIOR, *et al.*, | ) ) ) | Hon. Amit P. Mehta |
| *Defendants*, | ) ) | |

and                                              )
                                                 )
SOUTH FORK WIND, LLC,                            )
                                                 )
    *Defendant-Intervenor.*                    )
                                      )

**Declaration of Miles Bidwell**

I, Miles Bidwell, PhD., under 28 U.S.C. § 1746, hereby declare:

1.      I am submitting this declaration to provide my professional opinion on the impact of the South Fork offshore wind project on historic property values in Newport, Little Compton, and Middletown, Rhode Island. I have worked as a professional and academic economist for over forty years, specializing in market design and pricing. Over the course of my career, I have conducted economic research, led graduate programs, provided expert testimony, and consulted in high-profile economic cases, such as the electricity pricing crisis related to Enron in California, and the design of the New England electricity forward capacity market.

2.      I have served as the President of Bidwell Associates, Inc., a Principal of Power Economics, Inc., and a Vice President of NERA (National Economic Research Associates, Inc.), firms that provide advice and expert testimony on matters pertaining to the complicated electricity industry. I served as Chief of Regulatory Research for the New York Public Service Commission and directed the Graduate Program in Regulatory Economics at the State University of New York at Albany, where I was an Adjunct Professor. Earlier in my career, I served on the economics faculty at Wake Forest University. I received my Ph.D. in Economics from Columbia University.

3.      I am writing to assert that, in my expert opinion, the South Fork Wind Farm has inflicted financial injury on property owners because ocean views have been degraded by the presence of offshore wind turbines.

4.    I base my opinion on two analyses: 1) a literature review of property analyses from the US and Europe, and 2) original research which was conducted by me or under my supervision. The original research, which I intend to submit to a referred Economics Journal is a retrospective analysis to evaluate the effect of the Block Island Wind Farm on property values in Block Island. I have extrapolated the findings from this study to formulate my opinion, together with the literature I have reviewed. The detailed results of both analyses are in the attached study, but I will provide a brief summary of the highlights here.

**The Literature Review:**

5.    Europe has recognized the concept of "visual pollution" and is not building projects within sight of popular beaches and resort towns. England has sited its largest wind project, Hornsea II, 50-80 miles offshore, out of sight from the coast, almost four times further from shore than the projects destined for the eastern seaboard.[1] A recent study from Sweden demonstrates that onshore wind farms have negative impacts on property values, particularly large wind turbines, in clusters of more than a few isolated towers, a configuration common to industrial developments.[2] The Swedish study corroborates an earlier German report demonstrating that property values with views negatively affected by onshore turbines lost 9-14% of their value.[3] A 2022 review article reports that all of the ten studies included in the

---

[1] Tethys, *Hornsea 2 Offshore Wind Farm*, https://tethys.pnnl.gov/wind-project-sites/hornsea-2-offshore-wind-farm#:~:text=Hornsea%202%20is%20located%2089,of%20the%20Port%20of%20Grimsby (last visited July 10, 2024).
[2] Hans Westlund and Mats Wilhelmsson, *The Socio-Economic Cost of Wind Turbines: A Swedish Case Study* (June 18, 2021), SUSTAINABILITY, https://doi.org/10.3390/su13126892.
[3] Yasin Sunak and Reinhard Madlener, *The Impact of wind farm visibility on property values: A spatial difference-in-difference analysis* (Mar. 2016), ENERGY ECONOMICS, http://dx.doi.org/10.1016/j.eneco.2015.12.025.

analysis from Europe demonstrate a net-negative effect on property values,[4] although studies from North America were not as consistently negative.

6.      Not all studies demonstrate negative impacts, but the "reassuring" studies generally evaluate onshore turbines in areas not generally considered vacation spots. The studies demonstrating negative impacts have more consistently focused on areas known for their natural beauty. One such report focused on a popular North Carolina vacation community revealed that the majority of renters surveyed (55%) would not re-rent a property if offshore turbines were visible from shore even if the price of the rental decreased.[5]

7.      Newport, Middletown, and Little Compton represent vacation destinations known for their natural beauty. Historically, these seaside vacation destinations have boasted pristine ocean views. The South Fork Wind Project has already desecrated the pristine nature of the view, and the subsequent projects will degrade the seascape even more. During the day, South Fork's massive turbines clutter the view of the sea stretching to the horizon. At night, the serene nighttime seascape is shattered by a wall of blinking red lights, that will only get worse as more turbines are built.

**The Original Research**

8.      In the analysis of Block Island property values, comparing pre-construction to post-construction prices and assessed values, we found that

---

[4] George Parsons and Martin Heintzelman, *The effect of wind power project on property values: A decade (2011-2021) of Hedonic Price Analysis* (June 13, 2022), INTERNATIONAL REVIEW OF ENVIRONMENTAL AND RESOURCE ECONOMICS, http://dx.doi.org/10.1561/101.00000132.
[5] Sanja Lutzeyer et al., *The amenity costs of offshore wind farms: Evidence from a choice experiment* (May 2018), ENERGY ECONOMICS, https://doi.org/10.1016/j.eneco.2018.03.020.

i.   Immediately after the construction, assessed home property values on Block Island (n = 55) lost an average of 20% of their value compared to their pre-construction assessments the year before (Figure 1).

ii.  Six years later, when compared to similar homes with equivalent pre-construction assessed values in an RI community not affected by the Block Island Wind Farm, the homes on Block Island were 87% less valuable than the homes that were similar except for not being near a wind farm. ((n = 110), Figure 1).

iii. The appreciation of home market values (using repeat sale prices) on Block Island lagged behind both neighboring communities and the US Home Index (Figure 2).

iv.  Using repeat sale prices (pre vs post-construction), on average, sales of Block Island homes gained 39% less than national home index predictions and 218% less than a group of properties in other RI coastal communities with similar pre-construction sale prices that were not impacted by the wind project (Figure 2).

v.   Using repeat sale prices (pre vs post-construction), post-construction sale prices indicate that individual homeowners on Block Island lost an average of $2,335,000 relative to the gains enjoyed by homeowners who sold their properties during the same time period in other RI coastal communities. These homes (Block Island vs other RI coastal communities) had sold for equivalent prices during the pre-construction years (Figure 2).

**Figure 1**



9.      In Figure 1, the graph of mean assessed property values comparing Block Island (green) to Little Compton (blue) demonstrates that the baseline values did not differ significantly between the two groups in the years between 2012-2015 (n= 110, Block Island n = 55). The red star indicates the year of the BIWF construction. The year after the turbines were completed (2016), the average assessed value of Block Island homes lost $280,500 compared to the previous year and over $500,000 compared to the average assessed value of homes in Little Compton (p < 0.0002). This difference gains significance with time as home values in Little Compton continue to increase. By 2023, assessed home values on Block Island had lost, on average, $1,238,000 compared to the control group of homes in Little Compton (p < 0.0000001) and never regained their preconstruction assessed value. In 2023, homes on Block Island lost 22% of their mean assessed property value compared to their 2012 levels (p < $1.0 \times 10^{-16}$, two-tailed, paired t-test). Whereas similar homes in other coastal communities gained 65% of value compared to 2012 levels (p < $1.0 \times 10^{-13}$, two-tailed, paired t-test). Thus, BI homes lost 87% of their assessed value compared to similar homes in a comparable coastal community.

**Figure 2**



10.    In Figure 2, the blue bars indicate that baseline sale prices were similar between groups (see Table 3). After the installation of the turbines, the sale prices of the homes differed significantly based on location. Home market values on Block Island increased over the 15-year period between sales; however, the sale prices fell short of the predicted price based on the US average price index (grey bar), and below the average price of similar homes in other coastal communities (purple bars). The homes in other coastal communities sold well over the predicted price based on the average US appreciation, and more than twice the price of the homes on Block Island (Block Island mean = $1,847,000 ±212,000(SE); OCC mean = $4,181,000 ±484,000(SE); p < 0.00004, two-tailed t-test).

**Conclusion**

11.     According to the recent Swedish study mentioned in the literature review, taller turbines, in larger clusters, have greater impacts on property values.[6] South Fork Wind is a larger project. Compared to Block Island, the South Fork project has more than double the number of turbines and the turbines are almost 50% taller. Although the South Fork project is farther away from shore, the turbines are clearly visible from Newport, Little Compton, and Middletown.

12.     I cannot predict the exact amount of monetary loss that historic property owners with affected views will suffer, but based on my analysis of Block Island homes and the literature cited, the South Fork Wind Project has already and will continue to inflict definite monetary injury on coastal historic property owners such as Richard and Dee Gordon, Michael and Elizabeth Vitton, Stephen Lewinstein, Veter et Nova Trust, Ledges 66 LLC, and Cornwall Lodge LLC. According to the cumulative impact assessments published by the Bureau of Ocean Energy Management, historic properties in Newport, Middletown, and Little Compton will see well over 400 turbines from their shores. In my expert opinion, the cumulative impact of the nine projects offshore Rhode Island and Massachusetts, with up to 1000 turbines, will have even greater detrimental financial consequences on the property values of historic homes that were constructed around an unimpeded ocean view, including the homes owned by Plaintiffs in this suit.

---

[6] Hans Westlund and Mats Wilhelmsson, *The Socio-Economic Cost of Wind Turbines: A Swedish Case Study* (June 18, 2021), SUSTAINABILITY, https://doi.org/10.3390/su13126892.

I declare under penalty of perjury that the foregoing is true and correct.

*Miles Bidwell*

Miles Bidwell

Date Signed:  Jul 10, 2024

ATTACHMENT 1

# The psychology of offshore wind projects: Do offshore wind projects affect property values? Block Island as a test case.

Miles O. Bidwell, Ph.D.

Mike Armenia, BSME/ MBA

Elizabeth Knight, M.D., Ph.D.

Abstract

Despite the plans to develop offshore wind projects within view of coastal communities from Maine to North Carolina, few studies have evaluated their impact on property values, tax revenues, and home market resale prices. Block Island provides an opportunity to use real-world data for such an evaluation. This study examines historical property values on Block Island both before and after the installation of the Block Island Wind Farm (BIWF). We compared post-turbine Block Island home metrics to pre-turbine home metrics (valuation, tax revenue, resale prices), to a control group of similar properties from an analogous coastal community in Rhode Island, and to expected values based on the national home price index. The results of the study demonstrate an immediate and statistically significant 20% mean loss of assessed home values for properties on Block Island (n = 55) after the construction of the offshore wind turbines compared to their pre-construction assessments the year before, and a 32% loss compared to the control group water view properties in a similar RI coastal community (n = 110). Tax revenues suffered an 18% loss immediately after the installation and only recovered to pre-turbine levels six years later.

Time has only widened the gap between revenues on Block Island compared to the control group. The appreciation of home market values on Block Island lagged behind both neighboring communities and the US Home Index. On average, sales of Block Island homes in the study group gained 39% less than

national home index predictions and 218% less than a group of similar properties in other RI coastal communities. Individual homeowners on Block Island lost an average of $2,335,000 relative to the profits enjoyed by their RI counterparts. Overall, the data indicates that Block Island experienced devalued assessments, depressed tax revenues, and markedly reduced resale market prices compared to other similar coastal communities and compared to the national home index predictions in a time frame that coincides with the construction of the Block Island Wind Farm. All policy decisions should involve a cost-benefit analysis. This study can help inform our understanding of the property value costs of future offshore wind projects on property values in proximate communities.

<u>Introduction</u>

In an effort to urgently address climate change, many coastal states have mandated zero fossil fuel emissions by a specified year. In general, federal policy makers and the state politicians have assumed that reducing greenhouse gas emissions will require the adoption of offshore wind projects above other available options.   Given the sense of urgency, few economists, scientists, or politicians have wanted to raise the specter of property value devaluation; however, because many small communities depend upon the revenue from property taxes for a significant percentage of their budget and many families and individuals have a notable proportion of their personal wealth locked into the value of their homes, a significant devaluation of property values in coastal communities may impose unanticipated economic hardships. Given both the community revenues and the individual wealth at stake, determining the risk of property devaluation can help policymakers, homeowners, and government officials decide whether the current offshore wind adoption makes economic sense compared to the adoption of other less costly climate change solutions.

Our current understanding

Few studies have attempted to determine how the installation of offshore turbines will affect property values in the US. Many proponents of the offshore wind policy have either assumed they will not negatively affect property values, pointing to Europe as proof, or have not wanted to contemplate what common sense would suggest. If people are willing to pay a premium for a beautiful ocean view in a hotel compared to a "garden view," the same might apply to home purchases where buyers may not pay as much for a shoreline home whose view is disrupted by a horizon filled with hundreds of industrial wind turbines.

Europe has recognized the concept of "visual pollution" and is not building projects within sight of popular beaches and resort towns. England has sited its largest wind project, Hornsea II, 50-80 miles offshore, out of sight from the coast, almost four times further from shore than the projects destined for the US eastern seaboard. In contrast to Europe, the US plans to install thousands of offshore turbines beginning just 9-13 miles off the coast, within sight of popular shoreline towns and beaches. New Jersey hosted 114 million visitors to its beaches last year[i], and Rhode Island, 22 million. Many of the closest projects planned for the US will be within sight of the most popular beaches and resort towns in Nantucket, Martha's Vineyard, Rhode Island, and New Jersey.


Although many proponents of wind energy assume opposition arises from conservative partisan supporters, a recent analysis of county-level restrictions on renewable energy developments demonstrates that liberal counties are more likely to restrict wind energy projects than Republican counties.[ii]  A recent study from Sweden demonstrates that onshore wind farms have negative impacts on property values, particularly large wind turbines in clusters of more than a few isolated towers, a configuration common to industrial developments.[iii] The planned developments in the RI-MA wind energy area will be the largest concentration of offshore turbines in the world (up to 1000), with taller turbines (850+ feet) than ever before installed in the offshore environment. The Swedish study corroborates

an earlier German report demonstrating that property values with views negatively affected by onshore turbines lost 9-14% of their value.[iv] A 2022 review article reports that all of the ten studies included in the analysis from Europe demonstrate a net-negative effect on property values,[v] although studies from North America were not as consistently negative.

Not all studies demonstrate negative impacts, but the studies showing neutral or positive impacts generally evaluate onshore turbines in areas not generally considered vacation spots. The studies demonstrating negative impacts have more consistently focused on areas known for their natural beauty. One such report focused on a popular North Carolina vacation community, revealing that the majority of renters (55%) could not be induced to re-rent a property if turbines were sited offshore within view, no matter the price decrease.[vi]

Block Island represents a vacation destination known for its natural beauty. Block Island also has the first offshore wind development in the region. On Block Island, many vacationers own their homes. Historically, this tranquil vacation destination has boasted pristine ocean views (Figure 1).

**Block Island's Seascape**



**Figure 1**. An image of Block Island's Mohegan Bluffs with the beach below.

The introduction of offshore wind turbines (Figure 2), in a community known for its connection to the ocean may negatively affect property values more than the cases studied to date. Like many coastal communities in New England, the housing market attracts second-home buyers. Purchasers of vacation homes generally have more choice than buyers of primary homes. As a result, the market for vacation homes in coastal communities may be particularly sensitive to the negative impacts of offshore wind. Unfortunately, many of the planned wind farms in the RI-MA wind lease area, and along the mid-Atlantic Coast, will be within sight of vacation destinations with both rental properties and second homes.

**View From the South East Light House**



**Figure 2**. View from the SouthEast Light House taken from the Environmental Design Firm's website.[vii]

The Block Island community provides a case study to evaluate an offshore wind project's impact on property values. The five Block Island turbines, 600 feet tall, are placed 3 miles southeast of the Island (Figure 3), with the export cable landing on the eastern beach near the new harbor, and the new bidirectional transmission cable connecting Block Island to the mainland, leaving the Island from approximately the same location. The construction began in 2015 and was completed in 2016. The completion of the sea to shore cable allowed the island to curtail use of its diesel power generators except for emergency backup. Contrary to popular belief, the wind turbines do not deliver electricity directly to the Island, but to the mainland grid which includes Block Island. The island now depends on the grid for all its electricity.  It keeps the diesel generators for backup in case something happens to the underwater cable, or the mainland grid has an outage.

**Map of Block Island Wind Farm with the Sea2shore export cable**



**Figure 3.** The map, taken from the Northeast Ocean Data website[viii], delineates the Block Island Wind Farm in relation to the Island. The purple squares indicate the locations of the five wind turbines on the Island's Southeast shore. The blue line denotes the path of the export cable and the bidirectional Sea2shore cable terminating on the mainland.

One of the rare studies showing that offshore windfarms don't affect property values on block Island was conducted using a complicated hedonic price modeling, and did not look at the property values or sale prices on the Island itself.[ix] The authors argued that the entire Island was affected by the installation, so they could not compare "affected" properties to an "unaffected" control group. Instead, the authors chose to evaluate price changes for properties on the mainland with some portion of the Block Island turbines visible from beyond the Island as their experimental group and used similar properties on the mainland as their control. Although reassuring that 5 distant wind turbines off the coast of Block Island do not affect mainland property values, the study's finding of no

significant impact may not reflect the situation for most coastal towns within sight of the much closer and much larger current projects.

Although none of the projects under construction or planned (Figure 4) reside as close to shore as the Block Island Wind Farm, the density, number of turbines (up to 1,000), and taller height (873+ feet vs 600 ft) may counteract the relative advantage of the increased distance (3 miles versus 9+). Because property values serve as both an indicator of economic health, and a driver, this study attempts to determine how the Block Island Wind Farm affected local home property values, tax revenues, and sale prices on the Island, with the goal of providing some information about the future impact of the currently planned projects in Figure 4 on coastal mainland properties.

**Map of the MA-RI Wind Energy Lease Area.**



**Figure 4.** The nine projects planned off the coast of RI and MA will cover 1,400 square miles of ocean and will host up to 1000 turbines. The closest turbines will be 12.9 miles from the Rhode Island mainland, and even closer to the Elizabethan Islands. The map of the lease areas and the export cables was taken from the Northeast Ocean Data website[x]. The Block Island Wind Farm was manually added to the map for clarity.

Many residents of the coastal communities assume the turbines will be invisible from shore. Figure 5 depicts the visibility given the size of the turbines and the curvature of the earth. This schematic demonstrates that a good proportion of the turbine shafts will be visible from ocean facing property including most public beaches in RI, from the south side of Martha's Vineyard and Nantucket, and from the northeast side of Lond Island.

SouthCoast Wind provides a visual simulation of the planned turbine developments from the coast of Nantucket (Figure 6), published on the BOEM website.[xi]

**Visibility of Revolution Wind project turbines with respect to the earth's curvature.**



**Figure 5**. The schematic depicts the influence of the earth's curvature on the visibility of the turbines, given their height. The figure is adapted from Image 1.2-1 from the Visual Impact Assessment for Revolution Wind.[xii]

**Visual Simulation from Cisco Beach, Nantucket, MA.**



**Figure 6.** The turbines in this simulation are between 16-46 miles offshore. The image of the visual simulation should be blown up to fit on an 11 x 17 inch paper size.

Contrary to many residents' beliefs, the turbines will be quite visible from shore. High humidity reduces visibility. The company building the turbines derived the simulations in August when humidity was 90%. Given that August is the most humid month in Nantucket and the average humidity in August is 88%, the turbines will be more visible than the depiction in this simulation under the less humid conditions existing during most of the year. At night, each turbine will have bright, blinking red lights which will be very visible.

**Enlarged version of the Cisco Beach simulation to reflect the size recommended for printing.**



**Figure 7.** The image represents the visual simulation provided on the BOEM site enlarged to the recommended size. The distance of the turbines in this simulation ranges from 16-46 miles offshore.

Methods

To evaluate the effect on property assessments and tax revenues we obtained public record data for properties on Block Island that had been sold within the past three years from the Zillow® database. Zillow provides an acceptable source for this data and has been used in previous studies.[xiii, 14] Fifty-five properties on Block Island met our search criteria and had available tax records dating back to 2012. We formed our experimental group for the property assessment and tax revenue analysis from this search.

Because approximately 75% of the properties on Block Island have some view of the turbines, and as others have argued, the wind project affects the entire feel of

this small, rural island,[xiv] we did not attempt to separate the Block Island properties into two groups, based on water views. Instead, we compared Block Island properties to properties in comparable coastal communities on the mainland of RI. We randomly selected homes from other coastal communities on the mainland of RI to establish control groups with baseline statisitcal characteristics that matched Block Island home metrics.

Given the similarity between Block Island and Little Compton with respect to population density, lack of commercialization, and a relatively low tax rate, homes in Little Compton served as a control for the assessed property values and tax revenues. To create a control group with similar baseline characteristics, the repeat sales analysis required a control group of properties from other coastal communities in addition to Little Compton.

For the assessment and tax revenue analysis, water view homes in Little Compton were randomly selected to create a matched control group with respect to mean value and variation in value (Table 1). Unfortunately, Little Compton's tax revenue data from 2017 was missing. For the missing data, we used the value from the prior year's assessment as a conservative estimate. The values for 2017, the year of the missing data, were not used for any of our calculations, but merely for the graph (Figure 7) that describes the trends over time. The mean values between the groups did not differ prior to the installation of the turbines in 2012 (n = 110, Block Island n = 55; p = 0.96, two-tailed t-test).

**Table 1.** Group Characteristics in 2012 of Waterview Property Assessments

| Group | Number | Mean Value (2012) | Standard Error | Median |
|-------|--------|-------------------|----------------|--------|
| Block Island | 55 | $ 1,385,750 | ± $85,550 | $1,144,700 |
| Little Compton | 55 | $ 1,379,910 | ± $87,470 | $1,282,100 |

*The two groups were not statistically different in 2012 (two-tailed t-test p=0.96)*

We used the same group of homes to compare tax revenues. Mean tax revenues from the 110 properties did not differ between the two groups in 2012 (Table 2).

**Table 2.** Group Characteristics in 2012 for Tax Revenue Analysis

| Group | Number | Mean Value (2012) | Standard Error | Sum of Tax Bills |
|-------|--------|-------------------|----------------|------------------|
| Block Island | 55 | $6,732 | ± $412 | $370,267 |
| Little Compton | 55 | $6,765 | ± $400 | $372,074 |

*Mean tax revenues were not statistically different between the two groups in 2012 (two-tailed t-test p=0.95)*

Market Value Assessment Methods:

To assess market values, we examined Block Island home sale prices both before and after the construction of the offshore wind turbines to the sale prices for a control group of homes in other RI coastal communities. Only homes that had transferred ownership twice, once prior to 2015 (the date of construction), and

once within the past 3 years, with known sale dates and prices, were included in the analysis. In order to obtain enough data, we extended our search for repeated sales to any home on Block Island, regardless of water views, and found 33 that had adequate records to include in the analysis. Only 21 homes in Little Compton had transferred ownership once prior to 2015 and again within the past three years. The initial (pre-2015) mean sale price of these 21 homes was significantly lower than the pre-turbine mean sale price of the Block Island homes (LC: $550,626 ± 8,9817(SE) vs  BI: $1,255,447 ± $132,126 (SE)**;** p < 0.0003). We thus expanded our control group to include comparable homes from other coastal communities in RI that met our search criteria. The mix of communities in the final control group included: Jamestown (n = 4); Little Compton (n = 11); Middletown (n = 5); Newport (n = 11); Narragansett (n = 1); and Portsmouth (n = 1). In addition to comparable pre-2015 sale prices (Table 3), the average preconstruction year of sale (2007), postconstruction sale year (2022), and number of years between repeat sales (15) were similar for both the Block Island and the control groups (Table 3).

**Table 3.** Group Characteristics for Market Value Analysis

| Group | Number | Mean Sale Price (pre 2015) | Standard Error | Mean Normalized Home Value | Median Normalized Home Value |
|-------|--------|---------------------------|----------------|----------------------------|------------------------------|
| Block Island | 33 | $1,255,447 | ± $132,126 | $815,998 | $723,135 |
| Control | 33 | $1,253,841 | ± $145,010 | $800,771 | $627,626 |

*The two groups of properties sold prior to 2015 were not statistically different (two-tailed t-test of the mean sale price, p = 0.99; two-tailed t-test of the mean index price, p = 0.90)*

Second sale prices (2022-2023) for the two groups were also measured against expected values based on the national home price index. Preconstruction sale prices occurring between 2000-2015 were used to generate a normalized home value (Table 3, column 5) for each house based on the S&P Case Shiller Home price index.[xv]  The normalization attempted to eliminate the variance contained in the data due to differences in the years of sale. The normalized home value was then used to calculate an expected sale price for the later, post-2015 sale date, again using the S&P Case Shiller Home price index. The equations are as follows:

The normalized home value ($V_{norm}$) was determined by dividing the pre-2015 sale price ($P_1$) by the sale date's index coefficient ($C_{year}$) from the S&P Case Shiller Home price index.

$$V_{norm} = P_1 / C_{year1}$$

The expected second sale price was then calculated by multiplying the normalized home value by the index coefficient for the post-construction sale year (2021-2023).

$$P_{exp} = V_{norm} * C_{year2}$$

The recent sale price ($P_2$) was then compared to the expected value ($P_{exp}$) to determine the difference from the expected price and then expressed as a percentage of the expected sale price ($P_{exp}$).

$$D = (P_2 - P_{exp})/P_{exp}$$

Comparison of over 1 million and under 1 million dollar homes

We evaluated whether luxury homes were driving the difference between the resale values of the two groups (Block Island versus other coastal communities). All of the above calculations were performed after subdividing both groups into homes that initially sold over 1 million dollars, and those that sold under 1 million dollars.

Statistics:

Within and between-group comparisons were determined with the standard two-tailed t-test in Excel ®. Paired t-tests assessed within-group differences in price over time. Two-tailed t-tests with equal variance (homoscedastic) evaluated between-group differences.  Because the variance was not as closely similar in later years, we repeated the test using formula for unequal variance. The results were unchanged. [xvi]

Results:

Assessed Property Values

Average property value assessments from public records were not statistically different between the Block Island homes and the control group from a comparable coastal community prior to the construction of the wind farm in 2012 (Table 4, Figure 8). The mean Block Island assessed property value dropped by 20% from 2015 to 2016, and has not yet recovered by 2023, remaining 16% less than the year immediately prior to construction and 22% less than 2012 levels. In contrast, mean assessed property values for homes in Little Compton has steadily risen since 2012 (Figure 6). Time since 2015 has only increased the statistically significant gap. By 2023, Block Island homes lost an average $1,238,360 in value compared to comparable homes in Little Compton ($p < 1.0 \times 10^{-7}$).

**Table 4.  Average Assessments of Properties over Time (Same groups as Table 1.)**

| Group | 2012 (mean) | 2016 (mean) | 2023 (mean) |
|---|---|---|---|
| **Block Island** | $ 1,385,750 ±$86,000 SE | $ 1,047,104* ±$65,500 | $ 1,076,455** ±$65,890 SE |
| **Little Compton** | $ 1,379,905 ± $87,000 SE | $ 1,652,936 ± $139,600 SE | $ 2,314,818 ± $206,050 SE |
| **t-test (p value)** | p = 0.96 | *p < 0.0002 | **p < 1.0 x 10^{-7} |

*Table 4 provides the group mean baseline assessed property values prior to the construction (2012), the year after construction (2016), and the most recent year available (2023). SE denotes standard error. The differences between groups, which did not exist prior to the installation of the turbines, became statistically significant the year after the construction and gained significance with time.*



**Figure 8.** The graph of mean assessed property values comparing Block Island (green) to Little Compton (blue) demonstrates that the baseline values did not differ significantly between the two groups in the years between 2012-2015 (n= 110, Block Island n = 55). The red star indicates the year of the BIWF construction. The year after the turbines were completed (2016), the average assessed value of Block Island homes lost $280,500 compared to the previous year and over $500,000 compared to the average assessed value of homes in Little Compton (p < 0.0002). This difference gains significance with time as home values in Little Compton continue to increase. By 2023, assessed home values on Block Island had lost, on average, $1,238,000 compared to the control group of homes in Little Compton (p < 0.0000001) and never regained their preconstruction assessed value. In 2023, homes on Block Island lost 22% of their mean assessed property value compared to their 2012 levels (p < 1.0 x $10^{-16}$, two-tailed, paired t-test). Whereas similar homes in other coastal communities gained 65% of value compared to 2012 levels (p < 1.0 x $10^{-13}$, two-tailed, paired t-test). Thus, in the final year of our study, the assessed value of BI homes was 87% less than the assessed value of similar homes in a comparable coastal community.

To determine if a subset of homes in the higher price bracket on Block Island might be driving the results, we also evaluated whether assessment values dropped to a greater extent for high-value homes rather than lower-value homes. Although the loss of value, as a percentage, appeared larger for homes valued over 1 million dollars (–23% ±1%) compared to homes valued less than 1 million dollars (–19% ±4%), the difference was not statistically significant with this data set (p = 0.27, two-tailed, t-test; homes < 1M, n = 18; homes > 1M, n = 37).  Nor did price appear to determine the gain in value for the homes in Little Compton. Homes under 1 million gained 66% ± 9% compared to the 64% ± 8% gain in value for homes over 1 million (p = 0.85; homes < 1M, n = 19; homes > 1M, n = 36). However, because the number of homes included in this analysis is quite small, we cannot rule out whether the more expensive homes might have been affected more than the less expensive homes.

Tax revenues

Because small communities without significant commercial revenue rely on property taxes for a good portion of their budget, we also evaluated whether the Block Island Wind Farm reduced property tax revenues. Because it does not support many year-round residents, Block Island has a lower mill rate than many coastal communities. Little Compton has a comparably low mill rate, with a similar lack of commercial activity. Not surprisingly, given the lost property values, Block Island experienced depressed tax revenues after the turbines were constructed (Figure 9).



**Figure 9.** Tax revenues from homes in Block Island over time were compared to tax revenues from similar homes in Little Compton. The red star indicates the year of the BIWF construction. The mean tax revenues from fifty-five homes did not differ between communities prior to 2016 (n = 110, BI = 55, p = 0.95 in 2012; p = 0.83 in 2015, two-tailed t-test). The difference in the average tax levy between groups was statistically significant (p < 0.002) in 2016. A difference that did not exist in 2015 (p = 0.83). By 2023, Little Compton continued to receive on average, $2373 more per home than Block Island, a difference that remained statistically significant (p < 0.005). Cumulatively, Block Island lost $1,052,000 (23%) of tax revenue from 55 homes compared to Little Compton during the years between 2012 and 2023 (p < 0.0003).

In 2016, the Block Island tax revenues for individual homes fell by $1,446 on average, for a cumulative decrease of $74,000 in tax revenue in one year for 55 homes. In contrast, tax revenues from the 55 homes in the Little Compton control group rose, on average, by $500 during this year, for a cumulative increase of $40,000 (Figure 10). Over time, the cumulative loss of tax revenue from the 55 properties on Block Island compared to Little Compton during the years between 2012 and 2023 totaled $1,052,000.



**Figure 10.** Tax revenues from the 55 houses in each group were summed and subtracted from the summation of the baseline year (2015). The difference between groups is significant throughout. Although the total revenue from the 55 Block Island homes recovers back to the 2015 baseline after seven years (by 2022), Bock Island tax revenues continue to lag behind those in Little Compton. The cumulative loss of tax revenue from the 55 properties on Block Island compared to Little Compton during the years between 2012 and 2023 totals $1,052,000.

<u>Repeat Sale Values</u>

Although tax revenues and assessment values will affect the overall financial stability of the city government and the quality of the services it can provide, sale prices, as a reflection of market value, are more relevant to the average homeowner. To evaluate the appreciation of home market value over time on Block Island, we included only homes that had exchanged ownership twice, once

between 2000-2015 (pre-turbine period) and once after the construction, between 2021-2023, (post-turbine period). We identified sale records for 33 homes on Block Island that met this criterion. The mean market value of these homes ($1,255,000) exceeded the mean market value of the homes in Little Compton that sold during both time periods. As a result, we included homes from other RI coastal communities in addition to Little Compton to generate our control group (see methods).

The first evaluation of repeat sale prices involved a straightforward pre and post-turbine price comparison. Sale prices, unlike assessed values, did not decrease relative to pre-2016 values on Block Island. Homes on both Block Island and in the other coastal communities witnessed an increase in value over the average fifteen-year time period between the first and the second sale. The average pre-turbine sale price (Table 3), the average year (2007), and the average time span between the first sale and the second sale (15 years) were similar for both groups. However, the market value of Block Island homes neither kept pace with the average US home price index nor the gains enjoyed by comparable homes in other coastal communities (Figure 11). As depicted in Figure 11, on average, homeowners on Block Island sold their homes for less than half the price of similar homes in other coastal communities despite having a similar market value prior to the construction of the turbines. As a result, individual homeowners received, on average, $2,335,000 less profit for their real estate investment than their counterparts in other coastal communities.



**Figure 11.** The blue bars indicate that baseline sale prices were similar between groups (see Table 3). After the installation of the turbines, the sale prices of the homes differed significantly based on location. Home market values on Block Island increased over the 15-year period between sales; however, the sale prices fell short of the predicted price based on the US average price index (grey bar), and below the average price of similar homes in other coastal communities (purple bars). The homes in other coastal communities sold well over the predicted price based on the average US appreciation, and more than twice the price of the homes on Block Island (Block Island mean = $1,847,000 ±212,000(SE); OCC mean = $4,181,000 ±484,000(SE); p < 0.00004, two-tailed, t-test).

Expected values

Because yearly economic factors in the US affect real estate prices independently from the offshore turbines, we controlled for the year of purchase and the year of sale by conducting an expected value analysis based on the National Home Index. Although the average number of years that elapsed between home sale prices was the same for each group (15 years), the initial sale year was similar (2007), and the year of the second sale was also approximately the same (2022), the results could have been influenced by small differences in the timing between the groups.

The expected value analysis controlled for the possible confound of sale dates (see methods). As Figure 11 demonstrates, the Block Island homes sold for significantly below expected values; whereas, homes in other coastal communities sold significantly higher than the expected prices. Although home market values on Block Island increased, the average sale price fell $591,000 short of the predicted price ($1,847,000 vs. $2,410,00). In contrast, homes from the control group sold on average, $1,803,000 more than predicted ($4,181,000 vs. $2,379,000).

Discussion

Although historical retrospective studies cannot conclusively determine if the construction of the offshore turbines caused the drop in assessed property values, lost tax revenues, and depressed market values observed for homes on Block Island, the temporal correlation of the changes in home metrics with the installation, the high statistical significance of the findings, the incongruity with national price indices, and the lack of alternative explanations suggest that offshore wind farm development negatively affected property values on the island. No other known factors could have harmed property rates on Block Island with the exact timing that we observed. The construction of the Block Island Wind Farm was promoted as an economic boon for the Island. Residents benefitted by using electricity from the mainland grid instead of the diesel generators, but our results suggest that the benefit of connecting their electricity distribution system to the mainland grid was more than offset by the wind farm visual pollution, eliminating the hoped for increase in home values and  town property tax  revenues. .

The results of this study have several implications for communities and homeowners in areas proximate to the construction of future offshore wind projects. Without industry or commercialization to augment tax revenues, many coastal communities rely on property taxes to help fund schools, social programs,

and the workings of government. If property assessment values along the eastern seaboard fall precipitously (-20%) in conjunction with the construction of offshore wind projects, as they did on Block Island, and property tax revenues fall accordingly, coastal communities may face severe unanticipated economic constraints.

If waterfront or water view properties lose more value than inland properties, either overall tax revenues will decrease in these coastal communities, or inland properties whose assessments may be less vulnerable to the devaluation imposed by offshore turbines may find themselves compensating for the shortfall. This would transfer the tax burden from formerly high-value homes to lower and middle-value homes and would represent a regressive tax adjustment. Future studies could address this issue more explicitly.

If market property values fail to keep up with the national home index, relative personal wealth will decline in the regions close to offshore wind developments. The most relevant finding for individual property owners is the depressed resale price of homes on Block Island compared to their analogous counterparts in other local communities not exposed to the turbines. If buyers had taken out a mortgage on the property for their initial purchase, many of the homeowners may not have made a net profit from their sales. If some of the 16 buyers, who purchased the homes initially priced over one million dollars, took out a 30-year mortgage for $1,000,000 at 6% interest (the average was 6.23% in 2008), and sold the same home approximately 14-15 years later, they would still owe approximately $725,000 on this mortgage (having only paid off $75,000 of the principle). The average profit after the construction for the 1 million dollar plus homes was $721,000. This profit would not have covered the cost of the remaining mortgage. As a result, local homeowners in communities affected by offshore wind turbines may be stuck paying mortgages that are higher than the value of their homes and

local economies could retract. Politicians may not have anticipated this degree of impact.

These economic outcomes may be acceptable to many, but others may not support imposing such a financial burden on both property owners and local governments in coastal communities without clear assurances that the projects will reduce carbon dioxide, wean us off fossil fuels, and help combat climate change. At this point, only computer models support deploying offshore wind, and these models are deeply flawed.[xvii] No empirical evidence supports the notion that offshore wind projects will help combat climate change. In fact, the Bureau of Ocean Energy Management, the Federal agency that permits the projects admits, "Overall, it is anticipated that there would be no collective impact on global warming as a result of offshore wind projects, including the Proposed Action."[xviii] Without any benefit to climate change, and with recognizable risks to property values, residents may not continue to support these projects.

Our analysis of Block Island assessed property values, tax revenues, and sale prices suggests the construction of wind turbines has negatively affected the financial value of homes on Block Island, , particularly with respect to similar homes in other RI coastal communities.

Limitations:

The study is limited by several factors. The small and intimate nature of Block Island limited our ability to compare properties on the Island that might remain unaffected by the turbines to those directly affected. Approximately 75% of homes on Block Island, even those without traditional water views, can see the turbines in the distance. The wind farm arguably affects the entire feel of the Island. Other factors also limited our ability to compare inland to water-view properties. The mean property value and the value per square foot were not

comparable between water-view and inland properties. The difference in baseline values prevented us from conducting an analysis between groups within Block Island and required a control group from similar coastal communities on the mainland. As a result, we were limited to comparing the Block Island homes to a control group from other coastal communities that may not be entirely comparable even though they have the same statistical characteristics.

Given the small number of Block Island properties that changed ownership both before and after the installation of the turbines, an analysis of direct-view turbine-affected properties versus non-turbine view properties within Block Island itself was not possible. Further studies could try to determine the extent to which the turbines affect individual views and see if a correlation between view encumbrances and repeat sale prices exists.

Although the timing of the construction is closely correlated with the loss of tax revenues, assessment values, and market value depression, other, unknown factors may have influenced the effects that we witnessed. We have controlled for as many confounds as possible, including average price, median, range, year of first sale, year of second sale, and initial price, other economic pressures exclusive to Block Island, unknown to the authors of this study, may have contributed to the outcomes we describe.

Finally, although our analysis demonstrated highly significant results with a relatively small number of properties, this study was not exhaustive.

Conclusion

Both the offshore wind industry and various groups have attempted to reassure the public about the impact of offshore wind projects on property values by publishing studies that demonstrate no impact. Such conclusions belie common

sense. Hotels charge more for a pristine ocean view than a garden view, and visitors historically pay that premium. If home views are destroyed by the presence of massive, industrialized wind projects, and if the historical feel of a community transforms from a coastal paradise to an industrial park, buyers may no longer be willing to pay a premium for these homes. Our analysis did not include rental rates, but future studies could evaluate both rental rates and the impact on tourism.

Unlike the study published by the University of Rhode Island[xix], our study demonstrates significant negative impacts. Our analysis of homes on Block Island demonstrates that the Block Island wind farm has detrimentally affected assessed property values and tax revenues relative to pre-construction levels for almost every property we evaluated. In our group of fifty-five Block Island homes, not a single property was valued at a higher price the year after the turbines were installed. Fifty-four properties lost value, and one remained unchanged. Our analysis comparing post-turbine sale prices of homes on Block Island to sales in other coastal communities suggests the wind farm has also lowered the relative gain in market value for homes on Block Island. This finding suggests the offshore wind project negatively affected properties on the entire Island, not just ocean front homes. Our findings of negative impacts are both dramatic and statistically significant.

Extrapolating our findings to the anticipated projects planned for the RI-MA wind energy lease area raises some caveats. Given the close proximity of the Block Island Wind Farm, we cannot conclusively infer that the planned industrialization with the nine wind projects off our coastal waters will have a similarly negative impact; however, the number of turbines (close to 1000 planned vs 5 off Block Island) and the larger size (850-1100 feet versus 600 feet) may counterbalance the difference in distance (3 miles versus 9-36). According to the cumulative impact assessments published by the Bureau of Ocean Energy Management, Newport,

Little Compton, Westport, Nantucket, Martha's Vineyard, and the other coastal communities in the area will see well over 400 turbines from their shores.

Given the impact on tax revenues and the percentage of personal wealth invested in homes, the massive industrialization of our coastal waters will likely negatively impact all homeowners in our coastal communities.

As more data about the impacts of wind projects emerges, attitudes may change. Because the US has taken a "wait and see" approach to the environmental impacts and the effectiveness of emissions reductions, we may know more about both the harm and the benefits as time elapses. The environmental impact statements all predict that the cumulative impact of the developments will inflict harm on visual resources of historic properties and fail to assure us of benefits to climate change. Without any empirical evidence that offshore wind projects will help combat climate change, we are sacrificing the environment and property values today without proof that these projects will help climate change in the future.

[i] https://njbiz.com/state-tourism-officials-expect-strong-summer-travel-season/

[ii] Ko I, Dols˘ak N, Prakash A (2023) Wind turbines as new smokestacks: Preserving ruralness and restrictive land-use ordinances across U.S. counties. PLoS ONE 18(12): e0294563. https://doi.org/10.1371/journal. pone.0294563.

[iii] Westlund,H.;Wilhelmsson, M. The Socio-Economic Cost of Wind Turbines: A Swedish Case Study. Sustainability 2021, 13, 6892. https://doi.org/10.3390/su13126892

[iv] Sunak, Y and Madlener, R. The Impact of wind farm visibility on property values: A spatial difference-in-difference analysis, Energy Economics, 55 (2016) 79-91. http://dx.doi.org/10.1016/j.eneco.2015.12.025

[v] Parsons, G and Heintzelman, M. The effect of wind power project on property values: A decade (2011-2021) of hedonic price analysis. International Review of Environmental and Resource Economics, 16 (2022) 93-170.

[vi] Lutzeyer, S., Phaneuf, D.J., Taylor, L.O. The amenity costs of offshore wind farms: Evidence from a choice experiment. Energy Economics, 72 (2018) 621-639. https://doi.org/10.1016/j.eneco.2018.03.020

[vii] https://www.landscapeperformance.org/case-study-briefs/block-island-wind-farm

[viii] https://www.northeastoceandata.org/

[ix] Dong, L., & Lang, C. (2022). Do Views of Offshore Wind Energy Detract? A Hedonic Price Analysis of the Block Island Wind Farm in Rhode Island. Energy Policy, 167, 113060. https://doi.org/10.1016/j.enpol.2022.113060

[x] https://www.northeastoceandata.org/

---

[xi] Appendix H: Seascape, Landscape, and Visual Impact Assessment, SouthCoast wind (formerly Mayflower Wind; https://www.boem.gov/renewable-energy/state-activities/mayflower-deis-apph-slvia

[xii] Appendix U3 (Visual Impact Assessment) from the COP for Revolution Wind, p. 8. https://www.boem.gov/renewable-energy/state-activities/appu3-visual-impact-assessment

[xiii] Guo, W., Wenz, L., Auffhammer, M. The visual effect of wind turbines on property values is small and diminishing in space and time. PNAS 2024 Vol. 121 No. 13 e2309372121 https://doi.org/10.1073/pnas.230937212.

[xiv] Dong, L., & Lang, C. (2022). Do Views of Offshore Wind Energy Detract? A Hedonic Price Analysis of the Block Island Wind Farm in Rhode Island. Energy Policy, 167, 113060. https://doi.org/10.1016/j.enpol.2022.113060

[xv] https://www.spglobal.com/spdji/en/indices/indicators/sp-corelogic-case-shiller-20-city-composite-home-price-index-nsa-index/#overview; https://www.statista.com/statistics/199360/case-shiller-national-home-price-index-for-the-us-since-2000/

[xvi] Comparison of two tailed test with heteroscedastic and homoscedastic variance.
_For 2012
Equal variance = 0.96
Unequal variance = 0.96
for 2016
Equal variance = 0.00015
Unequal variance = 0.00019
for 2023
equal variance = 0.0000001
unequal variance = 0.0000003[xvi]

[xvii] Koonin, Steven, "Unsettled (Updated and Expanded Edition): What Climate Science Tells Us, What It Doesn't, and Why It Matters," BenBella Books; Updated, Expanded edition (June 11, 2024), ISBN-13 ： 978-1637745250.

[xviii] BOEM, Vineyard Wind FEIS, Vol 2, p. A-66, https://www.boem.gov/renewable-energy/state-activities/vineyard-wind-1-feis-volume-2

[xix] Dong, L., & Lang, C. (2022). Do Views of Offshore Wind Energy Detract? A Hedonic Price Analysis of the Block Island Wind Farm in Rhode Island. Energy Policy, 167, 113060. https://doi.org/10.1016/j.enpol.2022.113060

ATTACHMENT 2

# MILES O. BIDWELL, Ph.D.

## BUSINESS ADDRESS

62 Ferry Landing Circle
Portsmouth, RI 02871
401 545 0931

Dr. Bidwell is President of Bidwell Associates, Inc. A firm that provides advice and expert testimony on matters pertaining to the electricity industry, its regulation, and its movement toward a more competitive and efficient industry structure.  Dr. Bidwell holds B.A., M.A. and Ph.D. degrees in Economics from Columbia University, where he specialized in applied microeconomic theory and econometrics.

Until 1996, Dr. Bidwell was a Vice President of National Economic Research Associates, Inc. (NERA).  At NERA, Dr. Bidwell directed projects, conducted studies and presented testimony on behalf of Producers of electricity, of electric, gas and telephone utilities, and on behalf of the customers of regulated utilities.  He also performed market and cost studies in antitrust and merger cases and frequently advised clients on topics such as analyzing the implications of different industrial structures and alternative forms of regulation.  For the last 25 years, Dr. Bidwell has been conducting research and advising clients on issues related to the electricity industry's transformation from regulation to competition.  He was an early proponent of the market type structure that became the basis for the electricity industry in England and Wales, worked extensively on a new industry structure in California (not the one adopted), and has participated in each of the industry restructuring proceedings in New York State.  As part of his work in California, he developed a method for including demand side bidding in a day-ahead and spot electricity market.  In 2002, as part of a project for the California ISO, Dr. Bidwell developed a new approach for ensuring market stability and resource adequacy along with optimal reliability by using a new instrument, the Reliability Option (RO).  He has conducted a major study on electricity markets for a consortium of European Union Electricity Regulators and he is one of the major architects of the new (2006) market in New England which is derived from his RO market design.  The design was accepted by FERC in June 2006, and the first auction took place in February 2008.  Recently, Dr. Bidwell has been working on ways to restructure the electricity market in Britain.

Before joining NERA, Dr. Bidwell served as Chief of Regulatory Research for the New York State Public Service Commission.  During this period he was responsible for the further application of economic theory to regulation and to ratemaking involving the areas of electric utilities, telecommunications, water, and gas, including developing a method for using New York Power Pool data to estimate the time varying marginal cost of electricity.  At the same time, Dr. Bidwell designed and directed the Graduate Program in Regulatory Economics at the State University of New York at Albany, where he was an adjunct professor.  Earlier in his career, he served on the economics faculty at Wake Forest University.

As an expert witness, Dr. Bidwell has appeared before Federal and State courts and in hearings before numerous State regulatory Commissions, the U.S. Nuclear Regulatory Commission, the Federal Energy Regulatory Commission, the Federal Communications Commission, and the House of Lords.

**EDUCATION**

> **COLUMBIA UNIVERSITY**
>
> Ph.D. Economics, 1973
>
> **COLUMBIA UNIVERSITY**
>
> M.A. Economics, 1969
>
> **COLUMBIA UNIVERSITY**
>
> B.A. Economics, 1966 (with honors)

**EMPLOYMENT**

1996-2013    BIDWELL ASSOCIATES, INC.  www.BidwellEconomics.com

> President.  At Bidwell Associates, Inc., Dr. Bidwell provides advice and expert testimony on matters pertaining to the electricity industry, its regulation, and its movement toward a more competitive industry structure.  He has worked on resource adequacy and the design of electricity markets in several European countries.

1999-2009    POWER ECONOMICS, INC.  www.PowerEconomics.com

> Principal.  Until Power Economics suspended operations in 2009, Dr. Bidwell worked with various members of Power Economics for more than 25 years.  In collaboration with the economists at Power Economics, Dr. Bidwell's work has included assistance to the California State Legislature, litigation on prices during the California Energy Crisis, and the structure of the Capacity Market in New England.

1985-1996    NATIONAL ECONOMIC RESEARCH ASSOCIATES, INC.

> Vice President.  At NERA, Dr. Bidwell directed projects, conducted studies and presented testimony on behalf of Independent Power Producers, electric and telephone utilities and on behalf of customers of regulated utilities.  He performed market and cost studies in merger and antitrust cases and advised clients on issues pertaining to the privatization and alternative industrial structures in the US and in England and Wales.

1978-1985    NEW YORK STATE PUBLIC SERVICE COMMISSION.

> Chief of Regulatory Research.  During his more than seven years on the staff of the New York State Public Service Commission, Dr. Bidwell developed methods for measuring and analyzing economic costs and marginal costs which are now used in rate setting. He has been responsible for the further application of economic theory to regulation and to ratemaking involving the areas of electric utilities, telecommunications, water and gas.

1981-1985    STATE UNIVERSITY OF NEW YORK AT ALBANY

> Adjunct Professor.  Dr. Bidwell designed and directed the Graduate Program in Regulatory Economics at the State University of New York at Albany where he was an Adjunct Professor of Economics.

1973-1978    WAKE FOREST UNIVERSITY

> Assistant Professor.  Dr. Bidwell taught courses in microeconomic theory, economic growth and development, international trade, and industrial organization.

1970-1973    COLUMBIA UNIVERSITY

Preceptor in Economics

**PROFESSIONAL ACTIVITIES**

The American Economic Association

The American Bar Association (Associate)

**RECENT ACTIVITIES  (Publications)**

"A New England Capacity Market that Works," with Randall Speck, Esq.  *Public Utilities Fortnightly*, August 2006.

"Why Reliability Options Are the Answer in New England."  *The Electricity Journal,* Vol. 19, Issue 4, May 2006.

"Reliability Options:  A Market-Oriented Approach to Long-Term Adequacy."  *The Electricity Journal,* Vol. 18, Issue 5, June 2005.

"Will NETA Ensure Generation Adequacy?" with Alex Henney.  Platts *Power UK*, Issue 122, April 2004, McGraw Hill, London.  This article is the first part of the study listed next.

"Will NETA Ensure Generation Adequacy?" with Alex Henney.  This study was supported by various organizations including Energywatch.  April 29, 2004.  The first third if this study has been published in *Power UK*.

**RECENT ACTIVITIES  (Reports and Presentations)**

**Designing the electricity market in New England.**  As the economics expert for the State of Connecticut and other Load Parties, Dr Bidwell wrote many memoranda and gave many presentations to the Load group and to the entire group.  At the same time Dr. Bidwell worked with the ISO-NE and the two other lead economists and they jointly designed the market and auction rules for the NE market based on Dr. Bidwell's proposed RO approach as summarized in his June 2005 *Electricity Journal* article.  This intense activity took place from November 2005 to March 2006, and it is continuing with less intensity as the detailed market rules are developed and revised.

"The New England Forward Capacity Market and Reliability Options," with Alex Henney.  A multi-client study primarily for European regulators, this report explains the mechanisms used in the new market, summarizes the basic market rules, and provides a timetable of events as the market moves toward its first auction.  May 2007

"Generation Adequacy Study for European Regulators," with Alex Henney.  This confidential study consists of three reports, Report 1: A Review of Practices and Proposals in Various Jurisdictions;  Report 2: The Behaviour of Energy-Only Markets: Will They Ensure Generation Adequacy?  Report 3: The RO Method of Assuring Adequacy.  August 2005

"Assuring Resource Adequacy."  Report and presentation to the Amsterdam Power Exchange. Amsterdam, September, 2003.

"Assuring Resource Adequacy."  Report and presentation to the Ministry of Energy, The Hague, October, 2003.

"Assuring Resource Adequacy and Market Stability."  Presentation to NordPool, Helsinki, November, 2003.

**RECENT ACTIVITIES  (Testimony)**

FERC                    Affidavit in Behalf of the NRG Companies concerning mitigation of de-listed plants.  Docket No. ER09-1144-000, July 2009

FERC                    Affidavit on Behalf of the Boston Gen Companies concerning flaws in the NE market rules, buyer market-power abuse, and needed new market rules.  Docket No. ER10-787-000, March 15, 2010

FERC                    Affidavit on Behalf of PSEG and NRG concerning needed rule changes for the NE market including better aligning costs and prices in different zones.  Docket ER10-787-000 and EL10-50-000, April 2, 2010

FERC                    Affidavit on Behalf of NRG concerning renewal of the CONED Wheeling contracts. Docket ER08-858-000 and EL02-23-000, April 21, 2010

FERC                    Affidavit on Behalf of PSEG and NRG concerning needed rule changes for the NE market.  Docket ER10-787-000 and EL10-57-000, July 1, 2010

FERC                    Affidavit on Behalf of Boston Generating concerning needed rule changes in the NE market and the importance of including all costs in the determination of OOM.  Docket No. ER10-787-000 and EL10-57-000, July 1, 2010

FERC                    Affidavit on Behalf of PSEG and NRG concerning needed rule changes for the NE market so that the market clears price based on competition between non-subsidized resources instead of a suppressed price that does not afford any possibility for generators to recover their fixed costs.  Docket ER10-787-000 and EL10-57-000, September 1, 2010

FERC                    Affidavit on Behalf of Boston Generating concerning needed rule changes in the NE market and the importance of including all costs in the determination of which resources are offering at less than cost due to subsidies.  The consequence of allowing an artificially low price was underlined by the Boston Generating Company filing for Bankruptcy the week before this testimony was filed.  Docket No. ER10-787-000 and EL10-57-000, September 1, 2010

## SELECTED SPEECHES

"Using Marginal Costs in Electric Rate Design." Presented at the Second NARUC Biennial Regulatory Information Conference, Ohio State University, Columbus, Ohio, September 1980.

"Optimal Rate Structure:  An Empirical Examination."  Presented at the Workshop on Regulatory Economics, Rutgers University, Newark, New Jersey, March 1981.

"Efficiency and Equity of Kilowatt and Kilowatt Hour Charges: An Empirical Examination." Presented at the Annual Conference of the Advanced Workshop in Regulation and Public Utility Economics, Mohonk Mountain House, New Paltz, New York, June 3-4, 1982.

"Deriving an Appropriate Capital Carrying Charge in a Time of Inflation."  Presented at the Third NARUC Biennial Regulatory Information Conference, Ohio State University, Columbus, Ohio, September 1982.

"Efficient Pricing for Cogenerators:  Marginal Energy Cost and Power Pool Contracts." *Proceedings of the Third NARUC Biennial Regulatory Information Conference*, with Mark Reeder, Ohio State University, Ohio, September 1982.

"Marginal Cost Analysis and Rate Base Allocation Under Suboptimal Inflationary Conditions." Presented at the 1983 Rate Symposium on Problems of Regulated Industries, Kansas City, Missouri, February 6-9, 1983.

"Optimal Prices, Economic Depreciation, and Regulated Utilities."  Presented at the 23rd Annual Iowa State Regulatory Conference, Ames, Iowa, May 1984.

"Avoiding Rate Shock:  The Search for Optimal Intertemporal Cost Allocation."  Presented at the Institute of Public Utilities Fifteenth Annual Conference, 1984.

"Regulatory Guidelines for Pricing Electricity in Times of Excess Capacity."  Presented at the Michigan State University Conference, Public Utility Papers, 1985.

"The Significance of Economic Depreciation for the Future Viability of the Bell Operating Companies."  Talk given at the Touche Ross Conference on Capital Recovery in Telecommunications, Washington, D.C.  October 24-25, 1985.

"Indexing Electric Utility Rates."  Presented at the February 18-19, 1987, Energy Research Group Meeting.

"Depreciation Policy in a Competitive Environment."  Presented at a conference sponsored by NERA at Camelback Inn, Scottsdale, Arizona, March 4-7, 1987.

"U.S. Economic Regulation of Electricity."  Presented in London, England, June 26, 1987.

"Equity Versus Efficiency."  Presented at Innovative Pricing Conference, Syracuse, New York, September, 1988.

"Marginal Cost and Bad Fish."  Presented at the conference of Industrial Energy Bulletin, New York, New York, 1989.

"From Revenue Requirements To Rates: An Economist's Perspective." Continuing Education Lecture sponsored by the Ohio Bar Association, May 15, 1989.

"Regulatory Scrutiny of Marketing Expenses:  Competitive Necessity vs. Regulatory Hang Ups." Presented at NERA Telecommunications Seminar, Scottsdale, Arizona, April 12-14, 1989.

"Are New York's Demand Side Management Programs Economic?" Presented at the Multiple Intervenors' Annual Meeting, Syracuse, November 1-2, 1989.

"Measuring The Value Of Unserved Energy."  Presented at the March 13-14, 1990, Energy Research Group Meeting in Washington, D.C.

"Price Discrimination Is Not Hazardous To Your Health." Presented at the Conference on "Problems of Mixed Competitive and Regulated Markets:  The Issue of Undue Price Discrimination" in Windsor, England, May 19, 1990.

"Estimating Customer Preferences." Presented at NERA, U.K., May 21, 1990.

"The Value of Unserved Energy—Revealed." Presented at the June 26-27, 1990 Energy Research Group Meeting in Washington, D.C.

"An Analysis of New Rate Design Techniques."  Presented at the Multiple Intervenors' 1990 Annual Meeting, Syracuse, New York.

"The Value of Reliability and Least Cost Planning." Presented at the 1991 Electric Utility Business Environment Conference & Exhibition, Denver, CO, March 20-22, 1991.

"Measuring the Value of Reliability." Presented at the 1991 Marginal Cost Working Group Seminar, Seattle, WA, April 25, 1991.

"Less is More."  Presented at the 1991 Annual Multiple Intervenors' Meeting in Syracuse, New York, October 30, 1991.

"Accurate Depreciation Rates And Rapid Amortization Benefit Customers (Or Everything You Always Wanted To Know About Depreciation But Were Afraid To Ask)."  Presented at the Minnesota Public Utilities Commission, March 9, 1992.

"Is Environmentalism Good for Business?"  A talk at the Economic Recovery & Environmental Responsibility Conference.  Presented by Sound Waters & SACIA, The Southwestern Area Commerce & Industry Association, May 13, 1992.

"Green Economics."  A speech presented at the Green & Clean 6th Annual Corporate Breakfast Forum, Greenwich, Connecticut, October 28, 1992.

"Opportunities and Challenges in Privatization."  A talk presented at the 2nd Annual European Business Conference, Chicago, IL, May 1, 1993.

"Rockets & Feathers:  The Asymmetry of Response to Telephone Price Change."  Presented at the Advanced Workshop in Regulation and Public Utility Economics Twelfth Annual Conference, Cape Cod, Massachusetts, May 26-28, 1993.

"Opening the Flood Gates of Competition—Industrial Customers and Independent Power Producers' Stake in Competitive Electricity Supply." Presented at the IPPNY Annual Membership Meeting and Conference, Albany, October 6, 1993.

"Issues In Incentive Regulation:  Theory Versus Practice." Presented at the Rutgers Research Seminar, "Incentive Regulation for Public Utilities," in Newark, New Jersey, October 22, 1993.

"Retail Wheeling and the Future US Electricity Industry." Presented at the National Independent Energy Producers Winter Quarterly Meeting, in Washington, DC, January 25, 1994.

"Measuring the Value of Unserved Energy." Presented at the Advanced Workshop in Regulation and Public Utility Economics at Rutgers University in Newark, New Jersey, April 15, 1994.

"Restructuring the Electricity Industry." Presented at "Markets in Motion."  Independent Power Producers of New York's Annual Spring Legislative Conference in Albany, May 18, 1994.

"Rockets & Feathers II:  Empirical Estimation of Asymmetric Response and Reconciliation of Asymmetric Behavior with Classical Utility Theory."  Presented at the Advanced Workshop in Regulation and Public Utility Economics Thirteenth Annual Conference, Newport, Rhode Island, May 25-27, 1994.

"International Lessons for Electricity Restructuring." Presented to the Economic Planning Institute, Government of Japan, Tokyo, Japan, March 1995.

"Reduce Stranded Cost – Restructure Rates." Presented before Parties to the New York Public Service Commission Competitive Opportunities Docket, Albany, New York, May 3, 1995.

"Rules For A Speedy And (Less) Painful Transformation To Competition," presented at the Advanced Workshop in Regulation and Public Utility Economics 14th Annual Conference, Newport, Rhode Island, May 26, 1995.

"Accommodation of the System to IPPs with Open Access." Presented at the III Workshop on Independent Power Production in Brazil, Belo Horizonte, Brazil, June 30, 1995.

"Promoting Electricity Consumption to Ease the Transition into Competition." Presented at the 107th Annual Convention, Regulatory, Symposium, National Association of Regulatory Utility Commissioners, New Orleans, Louisiana, November 13, 1995.

"Stranded Costs: There is a Solution." Presented at the Rutgers University Advanced Workshop in Regulation and Public Utility Economics, Newark, New Jersey, November 17, 1995.

"Update on Electricity Restructuring Across the Northeast." Presented at the New Jersey Business & Industry Association, Business to Business Seminar, Shrinking Your Electric Bill: How Your Business Can Save Money on Electric Bills, Jamesburg, New Jersey, December 12, 1995.

"How to Minimize Stranded Costs Through Rate Restructuring." Presented before a conference of the Parties to the New York Public Service Commission, Competitive Opportunities Docket, Albany, New York, February 14, 1996.

"Structuring Markets--Finding the Optimal Amount of Regulation." Presented at the Rutgers Research Seminar, Pricing and Regulatory Innovations Under Increasing Competition, in Newark, New Jersey, May 3, 1996.

"Market Clearing Prices on Peak Days," with Mark Reeder, presented at the Advanced Workshop in Regulation and Public Utility Economics, 15th Annual Conference, Lake George, New York, May 30, 1996.

"Market Power Issues."  Presented at the Independent Power Producers of New York's 11th Annual Fall Conference, Albany, New York, September 25, 1996.

"Norway and England Have Very Different Electricity Market Structures: We Can Learn From Both."  Presented at the 1996 Multiple Intervenors Annual Membership Meeting, Syracuse, New York, October 1996.

"Creating New Markets: The Role of ISO's, Power Exchanges, and Reliability." Presented at the Rutgers University Advanced Workshop in Regulation and Competition, Newark, New Jersey, April 1997.

"Transmission System Planning and Investment:  Can a Private Market Determine and Provide the Investments That Minimize System Costs?" Presented at the IBC Group's Reliability for Competitive Power Conference, San Francisco, California, September 29-30, 1997.

"Driving on the Same Side of the Road—Avoiding Collisions on the Road to Competition." Presented at the Independent Power Producers of New York's 12th Annual Fall Conference, Albany, New York, October 8, 1997.

"Marginal Cost Methods for Electric Utilities." Co-taught NERA Course with Dr. Hethie Parmesano, Redondo Beach, California, October 20-22, 1997.

Presentation at Docket no. EEP-02-38, Des Moines, Iowa, Avoided Cost Workshop 12/15/05

## PUBLICATIONS AND CONSULTING REPORTS

"The Family Labor Supply Decision:  A Trade Model." Ph.D. dissertation, Columbia University, 1973.

"The Price of Children and Factor Reversals." *Atlantic Economic Journal*, Vol. II, Number 2, November 1974.

"Family Structure, The Marriage Market, and Time Allocation." *Atlantic Economic Journal*, Vol. III, Number 2, November 1975.

"Comments on the Economic Impact of Damming the New River."  United States Department of the Interior, Bureau of Outdoor Recreation, Washington, D.C. *Final Environmental Statement Proposed South Fork New River National Wild and Scenic River*, pages 500-503, 1976.

"Comment on Interactions Between Population and Environment." *Atlantic Economic Journal*, Vol. IV, 1976.

"A Peak Load Pricing Policy for North Carolina Utilities."  *Carolina Planning*, Vol. III, Number 1, pages 16-22, Winter 1977.

"Some Thoughts on Social Responsibility and Scientists." *Spring*, Vol. I, Winston-Salem, North Carolina, November 1977.

"Efficient Pricing for Cogenerators:  Marginal Energy Cost and Power Pool Contracts." *Proceedings of the Third NARUC Biennial Regulatory Information Conference*, with Mark Reeder, Ohio State University, Ohio, September 1982.

"Avoiding Rate Shock:  The Search for Optimal Intertemporal Cost Allocation." *Changing Patterns in Regulation, Markets, and Technology:  The Effect on Public Utility Pricing*.  Proceedings of the Institute of Public Utilities Fifteenth Annual Conference, Michigan State University Public Utilities Papers, 1984, P.C. Mann and H.M. Trebing, eds., pages 481-507.

"Regulatory Guidelines for Pricing Electricity in Times of Excess Capacity." *The Impact of Deregulation and Market Forces on Public Utilities:  The Future Role of Regulation*.  Michigan State University Public Utility Papers, 1985, P.C. Mann and H.M. Trebing, eds., pages 455-470.

"The Shortage Cost of Electricity Supply."  Report for the Long Island Lighting Company, August 1986.

"Is Shoreham's Operation Economic?"  Report for the Long Island Lighting Company, 1986.

"Indexing Electric Utility Rates."  Proceeding of the February 18-19, 1987, Energy Research Group Meeting.

"Depreciation Policy in a Competitive Environment." *Proceedings of NERA Seminar Telecommunications in a Competitive Environment* (March 1987).

"U.S. Economic Regulation of Electricity."  Proceeding of Seminar in London, England, June 26, 1987.

"Report to Oglethorpe Power Corporation on the Optimal Generation Expansion Plan."  Report to Oglethorpe Power Corporation, 1987.

"Will a Government Takeover of LILCO Save Money for Consumers:  An Update."  Report for the Long Island Lighting Company, 1987.

"Methods for Measuring the Costs of Service Interruptions and the Demand for Interruptible Rates."  Study Proposal for Long Island Lighting Company, 1987.

"Economic Impact of a Premature Shutdown of the Vermont Yankee Nuclear Plant."  Report for the Vermont Yankee Nuclear Power Corporation, May, 1988.

Report to Dayton Power & Light Company on DP&L's avoided costs and the optimal amount and pricing of cogeneration, June, 1988.

"Need For The Halfmoon Cogeneration Project."  Report for Inter-Power of New York, Inc., on the economic value of and "need" for the Halfmoon Cogeneration Project, September, 1988.

"Equity Versus Efficiency," Proceeding of Innovative Pricing Conference, Syracuse, New York, September, 1988.

"Marginal Cost and Bad Fish," Proceedings of Conference, Industrial Utilities: Redefining The Relationship. *Industrial Energy Bulletin*, New York, New York 1989.

"New Directions In Telecommunications Planning" (Confidential Report) April, 1989.

"Regulatory Scrutiny of Marketing Expenses Competitive Necessity vs. Regulatory Hang Ups," proceeding of NERA Seminar *Telecommunications In A Competitive Environment,* April 1989.

"Comments on the Energy Efficiency Options Study Prepared for the Iowa State Utilities Board by Morgan Systems Corporation."  Report for Iowa Electric Light & Power Company, November 16, 1989.

"Evaluating a Public Utility's Investments," *Public Utilities Fortnightly*, May 10, 1990.

"The Value of Reliability and Least Cost Planning," proceedings of *1991 Electric Utility Business Environment Conference & Exhibition*, Denver, CO, March 20-22, 1991.

"Optimal Pricing of Water," report for Long Island Water Company, March 4, 1991.

"Illuminating Externalities," Letter to the Editor, *Public Utilities Fortnightly*, April 1, 1991.

"Measuring the Value of Reliability," proceedings of *1991 Marginal Cost Working Group Seminar*, Seattle, WA, April 25, 1991.

"Public Disclosure of Bids and Bidders," report prepared for New York Telephone, June, 1991. (Confidential)

"An Overview of Public Utility Regulation in the United States," prepared for NERA London as part of a paper for the Sydney, Australia Water Board, July 1991.

"The Price Elasticity of Demand for Touchtone," a report for New York Telephone Company, July, 1991. (Confidential)

"The Privatization of Pakistan's Telephone Services:  Outline of Economic Issues," prepared for the Government of Pakistan, August 13, 1991.

"The Time-Differentiated Marginal Costs of New York State Electric and Gas Corporation," prepared for New York State Electric and Gas Corporation, August 27, 1991.

"A Study of Demand for Optional New York Telephone Residence Services," prepared for New York Telephone Company and Telesector Resources Group, Inc., August, 1993

"Efficient Imputation and Transfer Pricing:  Past, Present, and Future." Prepared for NYNEX Corporation, October 21, 1993.

"The Value of Unserved Energy." Prepared for the Los Angeles Department of Water and Power, April 8, 1994.

"The Indexation of Shipping Costs." Prepared for Burmah Gas Transport LTD, November 17, 1994.

"Issues In Incentive Regulation: TFP in State Regulatory Reform—Theory Versus Practice," *Incentive Regulation for Public Utilities*, pages 185-213, Michael A. Crew, Ed., Kluwer Academic Publishers, Boston, 1994.

"An Analysis of Asymmetric Demand Response to Price Changes: The Case of Local Telephone Calls," with Bruce X. Wang and J. Douglas Zona, *Journal of Regulatory Economics*, pages 285-298, Michael A. Crew, Ed., Kluwer Academic Publishers, Boston, 1995.

"How to Reduce Stranded Costs?" Prepared for Southern California Edison, April, 1995.

"Survey Of Studies On The Elasticity Of Demand For Electricity," with P. Della Valle. Prepared for Southern California Edison, August 1, 1995.

"Transmission Congestion and Pricing." Appendix to the New York Public Service Commission's Final Report on Electricity Competition, September 1995.

"Report on Preliminary Evaluation of Purchased Electricity Pass Through Cost Issue in Connection with GDRRA/MWE Litigation and Proposed Study Plan," with L. Guth, December 14, 1995

"Restructure Rates to Cut Stranded Costs," with P. Della Valle, The Electricity Journal, December 1995.

"Structuring Markets--Finding the Optimal Amount of Regulation," in, *Pricing and Regulatory Innovations Under Increasing Competition,* Michael A. Crew, Ed., Kluwer Academic Publishers, Boston, 1996

Report on the Electricity Industry Structure in the United States and the UK, prepared for the Queensland Electricity Reform Unit, Brisbane, Australia, August 1997.

"Reforming the Pool of England & Wales," with Alex Henney.  Report for the Minister for Energy, Science & Industry and Pool Members, November 1997.

"A Demand Response Will Lower Peak Prices," with Carl Pechman, Duane Chapman, Tim Mount, prepared for Multiple Interveners for presentation to the New York Independent System Operator, January 18, 2001.

"The California Electricity Crisis: A Report To the Building Owners And Managers Association (BOMA) of California," with Carl Pechman, prepared for BOMA California, March 19, 2001.

"Assuring Resource Adequacy."  Report and presentation to the Amsterdam Power Exchange. Amsterdam, September, 2003.

"Assuring Resource Adequacy."  Report and presentation to the Ministry of Energy, the Hague, October, 2003.

"Assuring Resource Adequacy and Market Stability."  Presentation to NordPool, Helsinki, November, 2003.

"Report on Power Sector Reform Alternatives in Thailand," with Carl Pechman, prepared for Probe International, December 7, 2003.

"Will NETA Ensure Generation Adequacy?" with Alex Henney. Platts *Power UK,* Issue 122, April 2004*,* McGraw Hill, London.  This article is the first part of the study listed next.

"Will NETA Ensure Generation Adequacy?" with Alex Henny.  This study was supported by various organisations including Energywatch.  April 29, 2004.  The first third if this study has been published in *Power UK*.

"Reliability Options:  A Market-Oriented Approach to Long-Term Adequacy."  *The Electricity Journal,* Vol. 18, issue 5, June 2005

"Generation Adequacy Study for European Regulators," with Alex Henney.  This confidential study consists of three reports, Report 1: A Review of Practices and Proposals in Various Jurisdictions;  Report 2: The Behaviour of Energy-Only Markets: Will They Ensure Generation Adequacy?  Report 3: The RO Method of Assuring Adequacy.  August 2005

**TESTIMONY**

| | |
|---|---|
| N.C. Utilities Commission | "Electricity Pricing."  Expert witness testimony before the North Carolina Utilities Commission, Raleigh, North Carolina, December 18, 1975. |
| N.C. Utilities Commission | "Rebuttal Testimony to Duke Power Testimony of Forecasting Future Electricity Demand."  Expert witness testimony before the North Carolina Utilities Commission, Raleigh, North Carolina, January 27, 1976. |
| U.S. Nuclear Regulatory Commission | "Projecting Future Demand for Electricity."  Expert witness testimony before United States Nuclear Regulatory Commission hearings on the proposed Duke Power Company Perkins Station (includes original econometric analysis of electricity demand in North Carolina). Mocksville, North Carolina, April 27, 1976. |
| U.S. Nuclear Regulatory Commission | Additional expert testimony on econometric models and applications, United States Nuclear Regulatory Commission hearings, Mocksville, North Carolina, April 29, 1976. |
| N.C. Utilities Commission | "The Use of Econometrics in Forecasting Electricity Demand." Expert witness testimony presented before the North Carolina Utilities Commission in hearings on the Investigation, Analysis and Estimation of Future Growth in the Use of Electricity, Raleigh, North Carolina, January 25, 1977. |
| U.S. Nuclear Regulatory Commission | "The Future Demand for Electricity and the Misuse of Forecasting Methodology."  Expert witness testimony presented before the United States Nuclear Regulatory Commission, Charlotte, North Carolina, March 10, 1977. |
| NYPSC Case 27350 | New York Telephone—1978. |
| NYPSC Case 27344 | Orange & Rockland Utilities—1979. |
| NYPSC Case 27215-16 | Niagara Mohawk Power Corporation—1979. |
| NYPSC Case 27353 | Consolidated Edison Company—1980. |
| NYPSC Case 27353 | Consolidated Edison Company—1980 (Rebuttal). |
| NYPSC Case 27626 | Central Hudson Gas & Electric Corporation—1980. |
| NYPSC Case 27909 | Orange & Rockland Utilities—1981. |
| NYPSC Case 27986 | Niagara Mohawk Power Corporation—1981. |

| | |
|---|---|
| NYPSC Case 27774 | Long Island Lighting Company—1982. |
| NYPSC Case 28525 | Long Island Lighting Company—Shoreham 1983. |
| NYPSC Case 28470 | Central Hudson Gas & Electric Corporation—1983. |
| NYPSC Case 28598 | Niagara Mohawk—Imprudence 1984. |
| NYPSC Case 29069 | Niagara Mohawk 1985—Nine Mile II Phase In. |
| NYPSC Case 29433 | Central Hudson Gas and Electric Corporation—1987. |
| NYPSC Case 29541-42 | New York State Electric & Gas Corporation—1987. |
| NYPSC Case 29541-42 | New York State Electric & Gas Corporation—1987 (Rebuttal). |
| NYPSC Case 29469 | New York Telephone—1987 (Reply). |
| Minnesota PUC Docket P-421/CI-86-354 | Northwestern Bell—1987 (Rebuttal). |
| NYPSC Case 29674-76 | Rochester Gas & Electric—1987. |
| NYPSC Case 29674-76 | Rochester Gas & Electric—1988 (Surrebuttal). |
| NYPSC Case 29670-71 | Niagara Mohawk Power Corporation—1988 (Rebuttal). |
| Federal Court | Expert's Report and Deposition Testimony in the United States District Court for the Eastern District of New York, In Re:  LILCO Securities Litigation, on materiality and causation, 1988. |
| Federal Court | Expert's Report and Deposition Testimony in the United States District Court for the Eastern District of New York, In Re:  LILCO RICO litigation, on materiality, 1988. |
| New York State Board on Electric Generation Siting | Testimony on Certificate of Environmental Compatibility and Public Need—1988. |
| NYPSC Case 88-E-077 | Central Hudson Gas & Electric Corporation—1988. |
| NYPSC Case 88-E-077 | Central Hudson Gas & Electric Corporation—1988 (Rebuttal). |
| PSC Article VIII Application | Halfmoon Cogeneration Project—9/88. |
| Federal Court | Long Island Lighting Company:  Testimony and Expert Report before the U.S. District Court for the Eastern District of New York, County of Suffolk v. LILCO, et al., concerning the materiality of charges against LILCO in a RICO action, November 1988. |

| | |
|---|---|
| NYPSC Case 28860 | New York Telephone Company—1988 |
| Federal Court | Long Island Lighting Company:  Testimony and Expert Report before the U.S. District Court for the Eastern District of New York, Suffolk County, et. al. v. Long Island Lighting Company, et. al., concerning the expected time required for a nuclear power plant to go from fuel load to commercial operation, January, 1989. |
| Case No.: 88-T-132 | Pursuant to Article VII of the Public Service Law, New York Public Service Commission.  Testified on behalf of Empire State Pipeline before the New York Public Service Commission on "Need," competition, economically efficient rate structures and depreciation, March, 1989. |
| FERC, Case ER88-630-000, ER88-631-000, and ER89-38-000 | New England Power Company—4/89 (Rebuttal).  Testimony on the economic efficiency of marginal cost pricing of electricity.  This testimony supported the first successful FERC decision allowing marginal cost pricing of wholesale electricity. |
| NYPSC Case  89-F-107 | Central Hudson Gas & Electric Company—October 6, 1989. |
| NYPSC Case  89-F-107 | Central Hudson Gas & Electric Company—October 19, 1989 (Additional Direct). |
| NYPSC Case 89-E-166 | Rochester Gas & Electric Corporation on behalf of Multiple Intervenors—December 15, 1989. |
| Missouri Case TR-89-196 | Contel of Missouri, Inc.—December 29, 1989 (Surrebuttal). |
| VT PSC Docket No. 5372 | Central Vermont Public Service Corporation—February 8, 1990 (Rebuttal). |
| Iowa Docket No. RPU-89-9 | Iowa Electric Light and Power Company—March 8, 1990 (Rebuttal). |
| NYPSC Case No. 80010 | Inter-Power of New York, Incorporated—April 13, 1990 (Rebuttal). |
| NYPSC Case 89-E-175, 89-E-176 | Orange & Rockland Utilities, Inc. on behalf of Multiple Intervenors—April 19, 1990. |
| NYPSC Case No. 80010 | Inter-Power of New York, Incorporated—April 27, 1990 (Supplemental). |
| NYPSC Case No. 90-C-0191 | New York Telephone Company—July 24, 1990 (Rebuttal). |
| NYPSC Case No. 80010 | Inter-Power of New York, Incorporated—July 30, 1990 (Rebuttal). |
| NYPSC Case No. 90-C-0191 | New York Telephone Company—August 3, 1990 (Rejoinder). |

| | |
|---|---|
| NYPSC Case 90-E-0647, 90-E-1648 & 90-G-0649 | Rochester Gas & Electric Corporation on behalf of Multiple Intervenors—December 3, 1990. |
| NYPSC Case 90-E-0647, 90-E-1648 & 90-G-0649 | Rochester Gas & Electric Corporation on behalf of Multiple Intervenors—December 3, 1990 (Rebuttal). |
| NYPSC Case 91-W-0505 | Long Island Water Corporation—May 15, 1991 (Direct). |
| NYPSC Case 91-W-0505 | Long Island Water Corporation—August 26, 1991 (Supplemental Direct). |
| NYPSC Case 91-E-0506 | Central Hudson Gas & Electric Corporation on behalf of Multiple Intervenors—September 20, 1991 (Direct Testimony). |
| NYPSC Case 91-W-0505 | Long Island Water Corporation—October 10, 1991 (Rebuttal). |
| NYPSC Case Nos. 91-E-0785, 91-E-0766 & 91-G-0767 | Rochester Gas & Electric Corporation—December, 1991 (Rebuttal). |
| NYS Regulatory Filing | A section of a filing before the New York State Regulatory Commission. The section presents and explains the cost and demand models used to calculate the effects of the rate restructuring and explains why the restructuring will increase the economic welfare of New York Telephone customers—June 5, 1992 |
| NYPSC Case Nos. 92-T-0114 & 92-T-0252 | Independence Station-Clay 345kV Transmission Line Project—November 4, 1992 (Rebuttal Testimony). |
| NYPSC Case Nos. 92-T-0114 & 92-T-0252 | Independence Station-Clay 345kV Transmission Line Project—November 4, 1992 (Additional Rebuttal Testimony). |
| NYPSC Case Nos. 92-E-0814 & 88-E-082 | Niagara Mohawk Power Corporation Petition for Approval of Curtailment Procedures and Proceeding on Motion of the Commission to Establish Conditions Governing Curtailment Clauses in Contracts for On-site Generation—February 24, 1993 (Direct Testimony on behalf of Falcon Seaboard Power Corporation.) |
| NYPSC Case Nos. 92-E-0814 & 88-E-082 | Niagara Mohawk Power Corporation Petition for Approval of Curtailment Procedures and Proceeding on Motion of the Commission to Establish Conditions Governing Curtailment Clauses in Contracts for On-site Generation—March 19, 1993 (Rebuttal Testimony on behalf of Falcon Seaboard Power Corporation.) |

NYPSC Case Nos.
92-E-1055 & 92-G-1056        Central Hudson Gas & Electric Corporation on behalf of Multiple Intervenors—March, 1993 (Direct Testimony)

NYPSC Case Nos.
92-E-1055 & 92-G-1056        Central Hudson Gas & Electric Corporation on behalf of Multiple Intervenors—April, 1993 (Rebuttal Testimony)

NYPSC Case Nos.
92-E-1055 & 92-G-1056        Central Hudson Gas & Electric Corporation on behalf of Multiple Intervenors—April, 1993 (Additional Rebuttal Testimony)

Georgia PSC
Docket No. 4451-U           Atlanta Gas Light Company—September 2, 1993 (Rebuttal Testimony)

FCC Case No. ENF-93-44      BellSouth Corporation, BellSouth Telecommunications, Inc. & BellSouth Enterprises, Inc.—November 1, 1993—Petition to Impose Conditional Grant to Create a Competitive Market, or Deny as Filed (Affidavit)

Georgia PSC
Docket No. 4132-U           Atlanta Gas Light Company—December 30, 1993 (Direct Testimony)

NYPSC Case
No. 94-E-0136               Sithe Independence Station—May 20, 1994—Petition for Original Certificates of Public Convenience and Necessity Under Public Service Law ¶ 68 to Provide Electric Service to Alcan Rolled Products Company and Liberty Paperboard, L.P. (Direct Testimony)

NYPSC Case
No. 94-E-0136               Sithe Independence Station—June 24, 1994—Petition for Original Certificates of Public Convenience and Necessity Under Public Service Law ¶ 68 to Provide Electric Service to Alcan Rolled Products Company and Liberty Paperboard, L.P. (Rebuttal Testimony)

Vermont Public Service
Board - Docket No. 5744     Green Mountain Power Corporation on behalf of International Business Machines Corporation (IBM)—August 1, 1994—Petition of Green Mountain Power Corporation for a change in rates. (Direct Testimony)

NYPSC Case Nos. 94-E-0098,
94-E-0099 and 94-G-0100     Niagara Mohawk—August 31, 1994—Regarding Competition Issues on behalf of Independent Power Producers of New York, Inc. (Direct Testimony)

NYPSC Case Nos. 94-E-0098,

| | |
|---|---|
| 94-E-0099 and 94-G-0100 | Niagara Mohawk—September 21, 1994—Regarding Competition Issues on behalf of Independent Power Producers of New York, Inc. (Rebuttal Testimony). |
| Iowa Docket RPU-94-2 | IES Industries, Inc.—December 12, 1994—Examine IES Industries' proposed price changes and explore the consequences of equalizing electricity prices throughout the IES service territory (Direct Testimony). |
| NYPSC Case Nos. 95-E-0673 and 95-G-0674 | Rochester Gas & Electric Corporation on behalf of Multiple Intervenors—January, 1996 (Direct Testimony). |
| NYPSC Case Nos. 95-E-0673 and 95-G-0674 | Rochester Gas & Electric Corporation on behalf of Multiple Intervenors—January, 1996 (Rebuttal Testimony). |
| NYPSC Case No. 95-C-0341 | Pole Attachment Proceedings—Policy Issues, on behalf of Seven Investor Owned Electric Utilities—October 28th 1996. |
| NYPSC Case No. 95-C-0341 | Pole Attachment Proceedings—Fact Issues, on behalf of Seven Investor Owned Electric Utilities—January 27th 1997. |
| NYPSC Case Nos. 96-E-0134 and 96-E-0135 | Proceeding on Motion of the Commission as to the Rates, Charges, Rules and Regulations of the Niagara Mohawk Power Corporation for Electric Service on behalf of IPPNY—January, 1997. |
| State of New York Supreme Court, County of Warren | Seventeen Independent Hydro Power Producers vs. Niagara Mohawk Power Corporation re: contract issues—January 28th 1997. |
| NYPSC Case No. 96-E-0897 | In the Matter of Consolidated Edison Company of New York, Inc.'s plans for electric rate/restructuring pursuant to Opinion No. 96-12, Direct Testimony on behalf of IPPNY and ENRON—February 12, 1997. |
| NYPSC Case No. 96-E-0897 | In the Matter of Consolidated Edison Company of New York, Inc.'s plans for electric rate/restructuring pursuant to Opinion No. 96-12, Direct Testimony re: the Proposed Settlement, on behalf of IPPNY and ENRON—April 8th 1997. |
| NYPSC Case No. 96-E-0891 | In the Matter of New York State Electric & Gas Corporation's plans for electric rate/restructuring pursuant to Opinion No. 96-12. Direct testimony on behalf of IPPNY and ENRON—February 12th 1997. |
| NYPSC Case No. 96-E-0909 | In the Matter of Central Hudson Company of New York, Inc.'s plans for electric rate/restructuring pursuant to Opinion No. 96-12. Direct testimony on behalf of IPPNY and ENRON—April 11th 1997. |
| NYPSC Case No 96-E-0900 | In the Matter of Orange & Rockland Utilities, Inc. Direct testimony on behalf of IPPNY and ENRON. April 24th 1997. |

| | |
|---|---|
| NYPSC Case No. 96-E-0891 | In the Matter of New York State Electric & Gas Corporation's plans for electric rate/restructuring pursuant to Opinion No. 96-12. Rebuttal testimony on behalf of IPPNY and ENRON—May 5th 1997. |
| NYPSC Case No. 96-E-0898 | In the Matter of Rochester Gas and Electric Corporation plans for electric rate/restructuring pursuant to Opinion No. 96-12. Direct testimony on behalf of IPPNY and ENRON. May 6th 1997. |

FERC Docket Nos. ER97-1523-000

| | |
|---|---|
| and OA97-470-000 | Direct testimony on behalf of Enron Power Marketing, Inc. in opposition to the request for market based authority by Central Hudson Gas & Electric Corp., et al and New York Power Pool. October 31st 1997. |

NYPSC Case Nos. 94-E-0098

| | |
|---|---|
| and 94-E-0099 | In the Matter of Niagara Mohawk Power Corporation PowerChoice Settlement. Direct testimony on behalf of Enron Capital & Trade Resources Corp. November 3rd 1997. |
| NYPSC Case | In the Matter of New York State Electric & Gas Corporation. Affidavit on behalf of New York State Electric & Gas Corporation, regarding measurement of customer costs and introducing competitive billing and metering. April 2001. |
| FERC | FERC 95 Rebuttal Testimony (with Carl Pechman) on behalf of The California Parties before the Federal Energy Regulatory Commission in San Diego Gas & Electric Company, Complainant v. Sellers of Energy and Ancillary Services into Markets Operated by the California Independent System Operator Corporation and the California Power Exchange (Dockets EL00-95-045, EL00-98-042) February 2002 |
| FERC | Rebuttal Testimony on behalf of Public Utility District No. 1 of Snohomish County, WA, and Southern California Water Company. FERC Docket Nos. EL02-26-000, et al. September 2002. |
| FERC | Prepared Direct Testimony on behalf of PacifiCorp. Docket Nos. EL02-80-000, et al. October 2002. |
| FERC | Prepared Rebuttal Testimony on behalf of PacifiCorp. Docket Nos. EL02-80-000, et al. November 2002. |
| FERC | Prepared Direct Testimony of Miles O. Bidwell, Ph.D. on behalf of the City of Tacoma and the Port of Seattle, Washington. Docket No. EL01-10-005. March 2003 |

| | |
|---|---|
| Iowa | Direct Testimony of Miles Bidwell, Ph.D. on behalf of Interstate Power and Light Co. on measuring the benefits from Interstate Power Co's interruptible rate program. 03/29/04 |
| Iowa | Rebuttal Testimony of Miles Bidwell, Ph.D. on behalf of Interstate Power and Light Co. on measuring the benefits from Interstate Power Co's interruptible rate program. 05/28/04 |
| FERC | Prepared Direct and Answering Testimony of Miles Bidwell and Carl Pechman on behalf of the Connecticut Department of Public Utility Control, et al.  Docket No. ER03-563-030.  November 4, 2004 |
| FERC | Cross Answering Testimony of Carl Pechman and Miles Bidwell on behalf of the Connecticut Department of Public Utility Control, et al.  Docket No. ER03-563-030.  January 10, 2005 |
| FERC | Affidavit on Behalf of the Maryland Public Service Commission Concerning PJM Offer Price Caps.  Docket No EL08-34-000, November, 2007 |
| FERC | Affidavit on Behalf of The Connecticut Department of Public Utility Control, concerning compensation of Must-Run units.  Docket N. ER08 1209-000, August 28, 2008 |
| FERC | Affidavit on Behalf of the NRG Companies concerning mitigation of de-listed plants.  Docket No. ER09-1144-000, July 2009 |
| FERC | Affidavit on Behalf of the Boston Gen Companies concerning flaws in the NE market rules, buyer market-power abuse, and needed new market rules.  Docket No. ER10-787-000, March 15, 2010 |
| FERC | Affidavit on Behalf of PSEG and NRG concerning needed rule changes for the NE market including better aligning costs and prices in different zones.  Docket ER10-787-000 and EL10-50-000, April 2, 2010 |
| FERC | Affidavit on Behalf of NRG concerning renewal of the CONED Wheeling contracts. Docket ER08-858-000 and EL02-23-000, April 21, 2010 |
| FERC | Affidavit on Behalf of PSEG and NRG concerning needed rule changes for the NE market.  Docket ER10-787-000 and EL10-57-000, July 1, 2010 |
| FERC | Affidavit on Behalf of Boston Generating concerning needed rule changes in the NE market and the importance of including all costs in the determination of OOM.  Docket No. ER10-787-000 and EL10-57-000, July 1, 2010 |

FERC                           Affidavit on Behalf of PSEG and NRG concerning needed rule changes for the NE market so that the market clears price based on competition between non-subsidized resources instead of a suppressed price that does not afford any possibility for generators to recover their fixed costs.  Docket ER10-787-000 and EL10-57-000, September 1, 2010

FERC                           Affidavit on Behalf of Boston Generating concerning needed rule changes in the NE market and the importance of including all costs in the determination of which resources are offering at less than cost due to subsidies.  The consequence of allowing an artificially low price was underlined by the Boston Generating Company filing for Bankruptcy the week before this testimony was filed.  Docket No. ER10-787-000 and EL10-57-000, September 1, 2010

March 2016