# EXHIBIT 8



# United States Department of the Interior

## BUREAU OF OCEAN ENERGY MANAGEMENT
WASHINGTON, DC  20240-0001

February 28, 2023

Ref:    *South Fork Project – Resolution of Dispute Regarding Specific Historic Preservation Treatment Plans for the Southeast Lighthouse National Historic Landmark and Historic Properties in the Town of New Shoreham, Block Island, Rhode Island (Spring House Hotel and Cottage, Spring Street Historic District, Capt. Mark L. Potter House, Vaill Cottage, and Old Harbor Historic District)*

Dear Consulting Parties,

This letter announces the Bureau of Ocean Energy Management's (BOEM) final decision on resolution of a dispute over several historic property treatment plans (HPTPs) pursuant to Stipulation XI.A.1 of the *Memorandum of Agreement Among the Bureau of Ocean Energy Management, the Massachusetts State Historic Preservation Officer, the Rhode Island State Historic Preservation Officer, the New York State Historic Preservation Officer, and the Advisory Council on Historic Preservation Regarding the South Fork Wind Farm and South Fork Cable Project* (the "MOA").  A copy of the MOA is found in Appendix E. The HPTPs at issue are for historic properties in New Shoreham on Block Island in Rhode Island and include: (1) the Block Island Southeast Lighthouse National Historic Landmark (NHL), (2) the Spring House Hotel and the Spring House Hotel Cottage, (3) the Spring Street Historic District and the Capt. Mark L. Potter House, (4) the Vaill Cottage, and (5) the Old Harbor Historic District.  The HPTPs were developed following the procedures in Stipulation IV of the MOA.  The MOA provides a substantive baseline of mitigation measures for adversely affected historic properties along with a procedure for developing HPTPs for either the substantive baseline mitigation measures or measures that are, at least, their equivalent.

- On May 23, 2022, BOEM received notice from South Fork Wind (SFW) that the Southeast Lighthouse Foundation (SELF), through its attorneys Cultural Heritage Partners (CHP), was objecting to the final version of the HPTP for the Block Island Southeast Lighthouse.  On May 30, 2022, BOEM received notice from SFW that the Town of New Shoreham (the "Town"), also represented by CHP, was objecting to the other HPTPs listed above.  (This letter refers to the Town and SELF collectively as the "disputing parties.")  The disputing parties asserted that the mitigation measures in these HPTPs were inadequate, duplicative, or unnecessary.
- Following the procedure specified in Stipulation IV.B.1.vi for resolving disagreements over HPTPs, BOEM met with CHP, representing the disputing parties, on June 10, 2022, to discuss both disagreements.  In advance of this meeting, BOEM requested

documentation to substantiate the disputing parties' assertions that mitigation measures in the HPTPs were inadequate, duplicative, or unnecessary.

- On June 17, 2022, BOEM notified the disputing parties, the Rhode Island State Historic Preservation Officer (RISHPO) (also referred to as the Rhode Island Historical Preservation & Heritage Commission), SFW, and the Advisory Council on Historic Preservation (ACHP), that BOEM would use the procedures under Stipulation XI of the MOA to resolve the disputes referred to BOEM on May 23 and 30.

- On September 26, 2022, BOEM forwarded all relevant documentation and its proposed resolution of the dispute to the ACHP.

- On October 31, 2022, the ACHP provided BOEM with a letter containing advice and comments. The ACHP's letter recommended that BOEM attempt to engage in one additional round of consultation with the disputing parties and the RISHPO to ensure the measures in the HPTPs meet the goals outlined in the MOA. The ACHP further recommended that the consultation focus on whether the HPTPs contain any duplicative mitigation measures.

- Following the ACHP's recommendation, on November 4, 2022, BOEM sent an email to the disputing parties, the RISHPO, and SFW requesting documentation relating to whether mitigation measures were duplicative of other activities, and indicating that BOEM would consider meeting further, based on any documentation submitted by the disputing parties. BOEM requested responses by November 14.

- On November 14, 2022, the disputing parties submitted a letter with several attachments, purporting to provide the requested documentation. Then, on November 15, the disputing parties submitted an updated version of their letter which added text to the version from the previous day. Hereafter, this letter is referred to as the November 15th letter.

- On November 29, 2022, BOEM received a letter from SFW responding to assertions in the November 15th letter.

- On December 12, 2022, the disputing parties submitted an additional letter replying to SFW's response. Hereafter, this letter is referred to as the December 12th letter.

For the reasons explained below and with the modifications described in the conclusion section, BOEM has decided to accept as final both the HPTP for the Southeast Lighthouse NHL and the HPTPs for the other New Shoreham properties. BOEM concludes that the mitigation measures in the HPTPs meet the requirements in the MOA and that no information in neither the November 15th or December 12th[1] letters demonstrate that those mitigation measures are duplicative, unnecessary, or infeasible so as to warrant alternative mitigation measures.

---

[1] BOEM notes that the December 12th letter does not mention any HPTP or provide information relevant to the specific assertions in the November 15th letter about the HPTPs. The December 12th letter instead focuses on assertions about the impact to Block Island's tourist economy and broad allegations about purported procedural issues or the insufficiency of mitigation in the MOA. Because the content of the December 12th letter is not relevant to the specific dispute at issue here, BOEM has focused its resolution of the dispute on the November 15th letter.

The HPTP development process in the MOA (*see* stipulations III and IV) was intended to provide flexibility.  Under this process, consulting parties participating in the development of an HPTP could consult on implementation of the substantive baseline mitigation laid out in the MOA.  This process allowed "deviations" from the substantive baseline mitigation measures to be incorporated into HPTPs after the MOA was executed, provided they "remain comparable to the Substantive Baseline established" in the MOA.  Stipulation III.C.2.i.  The disputing parties failed to suggest new or alternative mitigation measures, comparable to the substantive baseline in the MOA.  Rather, the disputing parties have used the HPTP process to raise objections to BOEM's determinations about the effects to historic properties similar to those raised prior to the MOA and to repeat requests for mitigation measures whose scale and scope is well beyond the mitigation agreed to by all required signatories to the MOA (i.e., ACHP, RISHPO, New York State Historic Preservation Officer, Massachusetts State Historic Preservation Officer, and BOEM).  The HPTP process in the MOA was not intended for raising objections to BOEM's Finding of Effect and the adequacy of the MOA.  The appropriate time to raise such objections was prior to the execution of the MOA, and the disputing parties failed to suggest new or alternative mitigation measures comparable to the substantive baseline in the draft MOA that was distributed for comments prior to execution.

The discussion below describes the relevant provisions of the MOA and the mitigation measures in the HPTPs at issue, documents BOEM's consideration of the ACHP's comments, and responds to the relevant objections raised by the disputing parties in the November 15th letter.  Appendix A to this letter responds to other assertions in the November 15th and December 12th letter that are outside the scope of this HPTP dispute.

### MOA Provisions on HPTPs and Substantive Baseline Mitigation Measures

The HPTPs for the Southeast Lighthouse NHL and the Town of New Shoreham historic properties were developed based on the substantive baseline measures specified in the MOA.  As the MOA explained:

> HPTPs will provide the details and specifications for actions, consisting of or at least equivalent to those substantive baseline mitigation measures BOEM has identified in Stipulation III.B and III.C below to resolve the adverse effects to each historic property. . . . The range of mitigation measures and conditions specified at III.B and III.C for potential inclusion in the HPTPs were developed by individuals who meet the qualifications specified in the SOI's Qualifications Standards for Archeology, History, Architectural History, and/or Architecture (36 CFR 61, Appendix A) and are appropriate to fully address the nature, scope, size, and magnitude of adverse effects including cumulative effects caused by the Project, [National Register of Historic Properties-qualifying] … characteristics of each historic property that would be affected, and the heightened significance and concerns of the NHL. These mitigation measures also include actions to respond to some reasonably foreseeable hazards unrelated to the Project that pose risks to the long-term preservation of affected historic properties, such as climate change. The HPTPs will be developed and implemented following the process described

in Stipulation IV to ensure such measures provide adequate details on specific measures and are carried out fully, and effectively.

Stipulation III.A.  Elsewhere in the same Stipulation, the MOA clarifies the mitigation measures that constitute this substantive baseline mitigation.  The following table summarizes the relevant mitigation measures in Stipulation III.C:

| Historic Property | Mitigation Measures in Stipulation III.C of the MOA |
|---|---|
| Southeast Lighthouse NHL | <ul><li>Long-term resiliency planning,</li><li>Design and development of interpretive and educational materials, and</li><li>Development of a cyclical maintenance plan</li></ul> |
| The Old Harbor Historic District | <ul><li>Amendment to the National Register of Historic Places Nomination Form and Coastal Hazard and Resiliency Plan</li></ul> |
| Spring House Hotel and Spring House Hotel Cottage | <ul><li>Development of an Interpretive Report and</li><li>Development of a Website, Social Media Presence and Interpretive Exhibits</li></ul> |
| The Spring Street Historic District and the Capt. Mark L. Potter House | <ul><li>Development of National Register of Historic Places Nomination Form</li></ul> |
| The Vaill Cottage | <ul><li>Development of National Register of Historic Places Nomination Form</li></ul> |

Attachment 3 of the MOA presents good faith estimates of the funding amounts associated with the mitigation measures in Stipulation III.C.

## Summary of this Dispute

After the MOA was executed, during the HPTP development process, the disputing parties (among others), submitted comments outlining concerns on the draft HPTPs on March 14, 2022, and on the final HPTPs on May 17, and May 24, 2022.  In the March 14 letter, the disputing parties noted "the total of $450,000 in proposed financial mitigation for 30 years of adverse impacts is laughable" and described the final HPTPs as "…woefully inadequate and [] not needed by the Town or the Southeast Lighthouse Foundation."  Instead they requested "Ørsted [the lessee's parent company] to capitalize a mitigation fund like the one the Town of Nantucket and Vineyard Wind developers adopted."[2] In their March 14th letter, the disputing parties listed

_____

[2] The disputing parties' September 20, 2021 comment on a draft MOA discussed the Vineyard Wind fund. A copy of the agreement governing the fund was attached to the disputing parties' Nov. 8, 2021 letter commenting on a draft of the MOA.  As the ACHP noted in its comments on this dispute, the terms of that fund were developed outside of the Section 106 process for the relevant undertaking and "is not a fair analogy" to the MOA for this undertaking. Letter from Reid Nelson, Director of the Office of Federal Agency Programs, Advisory Council on Historic Preservation, to Jessica Stromberg, Acting Chief, Office of Renewable Energy Programs, Bureau of Ocean Energy Management  (Oct. 31, 2022).  ACHP explained that the Vineyard Wind fund was "not specific to addressing

a range of projects that such a fund could support.  These included the following measures (for which the letter estimated costs): shoreline restoration ($5 to $26 million per mile of shoreline); development of affordable housing for the workers that staff and serve Block Island's historic properties ($300,000 to 600,000 per unit); an ongoing, 30-year marketing campaign to address anticipated harm to Block Island's historic properties from decreased tourism revenue and property tax revenue ($30 million); development of a historic preservation grant program for Block Island's historic property owners to address immediate and future needs over the next 30 years ($20 million); establishment of an endowment for the Southeast Lighthouse Foundation to include operating costs for the next 30 years considering expected harm to the Southeast Lighthouse NHL's tourism revenues ($10 million); and the potential relocation of the Southeast Lighthouse NHL to protect it from shoreline erosion ($7 million).[3]  This list is repeated in the November 15th letter.

Overall, the disputing parties neither agree with the dollar amounts to be spent on the mitigation measures, nor with the specific measures identified in the MOA.  The disputing parties do not raise any specific failure by SFW or BOEM to follow the procedures for developing the HPTPs in Stipulation IV of the MOA.  Moreover, the disputing parties do not appear to raise objections that the HPTPs fail to meet the substantive baseline mitigation in Stipulation III.C.  The disputing parties' comment letters instead raise a host of concerns about BOEM's determinations

---

adverse effects to historic properties but rather were aimed more broadly at a range of environmental and social impacts."  BOEM notes that the agreement attached to the November 8 letter does not require that funds paid into the community fund go to activities that would have any particular nexus with the adverse effects on historic properties that BOEM identified in its Finding of Adverse effect that it reached reviewing the Vineyard Wind 1 COP.

[3] BOEM received the March 14 letter with this specific list of proposals after execution of the MOA containing substantive baseline mitigation measures.  Prior to the execution of the MOA, the disputing parties requested a "fund" but their September 20 and October 4 comment letters on drafts of the MOA did not provide any specific examples of measures to be paid by the fund that would mitigate adverse effects.  (BOEM compiled and responded to all the consulting parties' comments on the drafts of the MOA, including comments from the disputing parties, on October 22, 2021.).  They submitted comments on another draft of the MOA on November 8, 2021, in which they suggested that the amount of funding in the mitigation fund should be based on the "cost to rent the viewshed" of various historic properties, the risk of tourism revenue loss, etc.  In November 2021, BOEM responded to those comments by pointing out that "the specific considerations offered in the comment to inform the level of mitigation do not appear to be connected to the qualifying characteristics of the properties in the APE for this undertaking and do not bear an obvious connection to the ways in which BOEM has found this undertaking might alter those character-defining characteristics."  The same response to comments on the MOA noted that "BOEM has requested comments from consulting parties multiple times on mitigation measures and the measures in the MOA reflect the mitigation recommendations and proposals received from all consulting parties."  The response indicated that the MOA did allow for a "fund," but that the funds must be spent on measures specified in the MOA.  And that, "[t]he nature and magnitude of mitigation are commensurate to the size and character of the Project and its adverse effects."  Indeed, some of the mitigation measures that make up the substantive baseline in the MOA address similar issues as the activities on this March 14th list (e.g., regarding the concern over "shoreline restoration," see MOA. section III.C.2.i.b on resiliency planning; regarding a marketing campaign, see MOA section III.C.2.i.h and its implementation in the Spring House Hotel and Cottage HPTP at section 4.2.)  Prior to the execution of the MOA, like during the HPTP development process, the gravamen of the disputing parties' objection seems to have been the amount of funding appropriate for mitigation measures and how it would be paid out, not about what activities would mitigate adverse effects.  (*See e.g.*, the conclusion of the November 8th letter: "If Orsted agrees to establish a Community Benefit Fund that addresses adequately the known and potential direct, indirect, and cumulative effects that South Fork will cause, then our clients will consider supporting the MOA and waiving their objections to BOEM's illegal permitting process.")

leading to the MOA and about the Section 106 consultation procedures conducted before the execution of the MOA.  However, the resolution of this dispute is properly limited to the implementation of the MOA, not pre-MOA issues.  As the ACHP's comment letter on this dispute stated:

> In regard to the mitigation measures themselves, the ACHP believes the terms of the HPTPs meet the requirements of the 2021 MOA. **The current dispute does not include reconsideration of the terms of the MOA; it is about the implementation of the 2021 MOA stipulations.**  Further, the disputing parties do not appear to challenge whether the measures in the HPTPs meet the substantive baseline requirements in the 2021 MOA.  Rather, the dispute questions BOEM's and SFW's decision not to accept the alternate mitigation measures proposed by consulting parties.

ACHP comments at p. 3 (emphasis added).  The ACHP concluded:

> In conclusion, the ACHP believes the BOEM has met the requirements in the 2021 MOA for the development of the HPTPs.  However, as noted above, the ACHP sees merit in attempting once more to clarify what, if any, mitigation measures currently listed in the HPTPs would be duplicative of actions already taken. We recommend that the BOEM facilitate additional discussions on this point prior to finalizing the HPTPs.  If no additional information is forthcoming in a reasonable amount of time, we agree with the BOEM that HPTPs may be implemented as written.

BOEM agrees with ACHP's observation that this dispute does not include reconsideration of the terms of the MOA.  While the disputing parties may wish to use this dispute resolution process to challenge the adequacy of the measures agreed to in the MOA, the time for that has passed, and BOEM addressed those concerns prior to executing the MOA.  The required signatories, including BOEM, ACHP, RISHPO, the Massachusetts State Historic Preservation Officer, and the New York State Historic Preservation Officer, have already agreed, "consistent with 36 C.F.R. 800.6(b)(2), that adverse effects will be resolved in the manner set forth in the MOA." Accordingly, BOEM has considered the points raised by the disputing parties in its November 15th letter about whether the mitigation measures in each of the HPTPs are duplicative of actions already taken, as requested by ACHP's comments.  As described in more detail in the following sections, BOEM determined that the mitigation measures in each of the HPTPs are not duplicative of measures already taken and the disputing parties have failed to provide information showing otherwise.  (The discussion below also responds to various arguments in the November 15th letter that certain mitigation measures are infeasible.)

**Southeast Lighthouse HPTP**

**Coastal Resilience Plan**[4] – The disputing parties assert that SELF already has a coastal resilience plan and that the HPTP's provision for such a plan would be duplicative, but SELF has never provided a copy of the alleged plan or any documentation that it exists.  Rather, the disputing parties' November 15th letter appears to suggest that SELF's awareness of hazards, photographic documentation of the eroding shoreline, and its scientific work on costal erosion, along with SELF's cost estimate for moving the lighthouse, constitute such a plan.

Given the evident lack of an alleged preexisting plan, BOEM does not believe that the mitigation measure in the HPTP is duplicative or unnecessary.  The mitigation measure described in the HPTP will result in a plan, for use by SELF and other parties, that identifies current and future hazards and identifies and prioritizes short and long-term measures.[5]  As to the disputing parties' claims that photography and documentation of existing conditions, as well as research into the scientific knowledge relating to the erosion threatening the lighthouse, are duplicative, these background tasks are in service of the main goal of the mitigation measure, which is to develop an actual plan.  To the extent that the activities described (identifying hazards, photographing conditions, participating in scientific pursuits) in the November 15th letter would contribute to the activities in the scope of work, the process of developing a plan could account for and incorporate that work.  Accordingly, the disputing parties' November 15th letter does not support the conclusion that the additional analysis and consideration of developing a plan is duplicative or unnecessary.

**NHL Interpretation and Education** – The November 15th letter asserts that SELF already has "an exhibit on cliff erosion," that SELF does not need "even more exhibits on cliff erosion," and that the existing guided tour of the lighthouse "focuses in depth on the threat of cliff erosion." The attachments to the November 15th letter include photographs of: (1) a 1985 aerial photograph of the lighthouse with a corresponding caption, (2) a poster with text, illustrations, and photographs on how the lighthouse was moved back from the bluffs in 1993, (3) photographs of that move, and (4) a poster with text and photographs of the Block Island Wind Farm.  BOEM's understanding is that these 4 photographs are the exhibits on display and referenced in the attachment section of the letter.

BOEM disagrees with the characterization of the mitigation measure in the HPTP as "an exhibit on cliff erosion" or "even more exhibits on cliff erosion."  As envisioned in stipulation III.C.2.i.a, and as described specifically in Section 4.2.1 of the HPTP, the purpose of this measure is "to present and expand upon current interpretations of the history of shoreline change from the period of lighthouse construction to the present, the mechanisms of bluff retreat, and

---

[4] The disputing parties' November 15th letter refers to a "Coastal Resilience Plan", while the relevant HPTP itself refers to a "Long Term Resiliency Plan."

[5] Section 4.1 of the April 2022 version of the Final HPTP for the Southeast Lighthouse indicates that the Town of New Shoreham identified in its 2016 Comprehensive Plan the need for additional planning for the effects of projected sea level rise.  The same section goes on to describe the importance of developing a plan for coastal bluff erosion.

how the integrity of the Block Island Southeast Lighthouse, NHL's setting atop the bluffs contributes to its significance of the NHL." This description includes more than "cliff erosion."

Moreover, the attached photographs of exhibits on display at the lighthouse do not appear to convey the same content envisioned in the mitigation measure at issue. The existing exhibits focus on presenting the fact that the lighthouse was, by 1993, close to the edge of the bluff and information about how the lighthouse was subsequently moved. The MOA and HPTP describe interpretive materials that are intended to build and expand upon existing materials and include much more context, specifically about coastal erosion and the historic setting of the lighthouse.

While the HPTP itself does not specify the details of what the interpretive materials would include, there is no reason to think that the deliverable described in the HPTP would duplicate any existing posters or materials. As described in the HPTP, these interpretive materials would present changes that have occurred over time, up to the present day, including changes to the historic landscape and the seascape settings of the historic property (not just the 1993 relocation) and on the future of the lighthouse related to coastal erosion. Finally, the design of this mitigation measure in the HPTP accounts for the existence of current interpretive material. As described in 4.2.1 of the HPTP, one of the goals of the mitigation measure is to "expand upon current interpretations." The description of the Scope of Work in 4.2.2 explicitly acknowledges the existence of current and future planned interpretations at the lighthouse. Indeed, one element in the scope of work is to invite relevant parties to consult on exhibit content "with a focus on enhancement of current exhibits and visitor expectations."

For these reasons, BOEM does not believe this mitigation measure is duplicative or unnecessary.

**Cyclical Maintenance Plan** – SELF asserts that it has a cyclical maintenance plan and that the HPTP's proposal for a such a plan is duplicative, but SELF has never provided a copy of the plan. SELF also asserts that it has already completed the scope of work at 4.3.2 in the HPTP and that it has regular maintenance and repair schedules and associated costs. SELF has not provided documentation of any of its efforts. Contrary to the insinuations in SELF's letter, BOEM has no reason to doubt that SELF is a responsible steward of the Southeast Lighthouse NHL, nor has BOEM suggested that SELF does not have information it needs. Rather, BOEM has requested documentation of activities that would render the mitigation measures in the signed MOA duplicative, and SELF has not provided documentation of the existence of a cyclical maintenance plan nor documentation of activities within the scope of work that are designed to support the development of such a plan. As with the coastal resilience plan, to the extent that there are specific activities that SELF has performed that could contribute to the development of a cyclical maintenance plan, these do not render the development of an actual plan duplicative or unnecessary. As described in the HPTP, "[t]he intent of this mitigation measure is to *have a document* to guide the property owners and custodians of this NHL and to maintain the lighthouse in good physical repair and sound structural condition for future generations of visitors." (emphasis added). Similarly, the MOA indicates that the purpose of this mitigation measure is a documented plan that would assist in the long-term preservation of the structure and

its good repair.  For these reasons, BOEM does not believe that this mitigation measure is duplicative or unnecessary.[6]

**Old Harbor Historic District HPTP**

**NRHP Nomination Form Amendment** – The disputing parties assert that "no one asked" for this mitigation and that it will lead to no "tangible benefits for the community."  They further assert that the measure is not feasible because they have no awareness of BOEM notifying owners of historic properties in the district.  They assert that SFW has not obtained the consent of a majority of the historic property owners in the district to alter the boundary.

As an initial matter, BOEM's understanding is that CHP does not represent any owners of historic properties within this district.  BOEM also notes that neither of the disputing parties raised the issue of needing an owner's "consent" to modification of a historic district NRHP nomination form in any comments prior to the execution of the MOA.  CHP has not asserted that any of the actual property owners have expressed any particular objection to the preparation of a nomination form amendment.

In addition, the disputing parties' assertions are not persuasive reasons to reject the HPTP.  The November 15th letter appears to misstate the mitigation measure at issue.  The mitigation measure proposed in Stipulation III.C is to develop an updated nomination form for the already-listed district.  It is accurate that property owners in a historic district must concur in order for the listing to be amended (*see* 36 C.F.R. Part 60), but this concurrence is not necessary for preparing the documentation to support an amendment.

Ideally, updating the nomination form would lead to updating the NRHP itself, but the process of collecting and synthesizing the extensive information needed to update the nomination form for the district itself has value.  As the HPTP notes, "Nomination Forms can be used as educational tools for both the owners of the properties and the community as a whole and can help guide the future restoration and rehabilitation of the buildings."  BOEM also notes that the first policy in the cultural resources section of the Town's 2016 Comprehensive plan is to "Support efforts to identify and recognize historic and cultural resources."  See p. 2-11.  Preparation of an update to the District's nomination form is consistent with that goal.  For these reasons, BOEM does not believe that this mitigation measure is infeasible or unnecessary.

**Coastal Hazard and Resiliency Plan** – The disputing parties assert that the Town already has a Coastal Hazard and Resiliency Plan, and that the Town's pressing need is for money to implement such plan.  The disputing parties' letter cites the Town's 2016 Comprehensive Plan and asserts that "the Town has already identified specific measures that will help protect Block Island."  They further assert, "the time for 'planning' has passed, and the community has identified the need for implementation."  The November 15th letter stops short of specifying the

---

[6] While BOEM takes the failure to provide documentation of the existence of a plan as evidence that it does not exist, even if such a plan did already exist, then the funds proposed for this measure could be go toward  other activities, including those identified in that plan, pursuant to section 4.4 of the HPTP, since maintenance will remain a constant and on-going need to for historic structures immediately adjacent to the ocean.

"specific measures" that the disputing parties have in mind or making specific suggestions for substitute mitigation measures.

BOEM finds these assertions unpersuasive.  The suggestion that the Town should cease efforts to plan for coastal resilience is contradicted by the Town's planning documents.  The 2016 Comprehensive Plan states that the Town should "*continue to plan for* and implement adaptation measures to lessen the impacts of climate change and sea level rise." p.at 1-4.  Although the plan has identified certain specific measures as a result of planning efforts already performed, there is no indication that on-going planning efforts would not be useful.  Moreover, the measures identified in the Town's planning efforts do not have any specific nexus to particular historic properties identified as adversely affected by this undertaking.  Whereas the planning efforts described in the HPTP would be focused on historic properties affected by this undertaking.  As described in the HPTP, "[t]he intended outcome is to develop measures that the Town of New Shoreham and historic property owners can take to maintain the maritime setting and the integrity of the historic properties within the [Old Harbor historic district]."  For these reasons, BOEM believes that development of a plan as described in the HPTP is neither unnecessary nor duplicative.

**Spring House Hotel and Spring House Cottage Hotel HPTP**

**Interpretive Report –** The disputing parties assert that the proposed interpretive report is unnecessary because information on the influence of seasonal tourism is "already known and well documented."  As examples of this dynamic the November 15th letter refers to "existing National Register nominations as well as information documented in determinations of eligibility for Block Island Wind Farm."[7]

BOEM finds these assertions unpersuasive.  The existence of information on seasonal tourism on Block Island does not imply that further study of the subject is unnecessary or duplicative.  One goal of the mitigation measures in Stipulation III.C of the MOA is to "[e]nhance public awareness, appreciation, and understanding of the historic resort industry and community at New Shoreham and exemplifying Block Island's historic hospitality and recreation properties..."  The interpretive report described in this HPTP will serve this goal.  As described in the HPTP, the "purpose of the mitigation measure is through research, to develop scholarly documentation on the effects of the influx of seasonal tourism in the mid-to-late nineteenth century on the economy, built environment, and culture of Block Island. The research will be able to be used to develop heritage tourism marketing, public education materials, and interpretative exhibits for the Town of New Shoreham to enhance public awareness, appreciation, and understanding of the

---

[7] The letter further notes that "this documentation" (apparently referring to the allegedly unnecessary interpretive report) should have been completed "as part of the FEIS" and that the existence of the HPTP is "prima facie evidence that BOEM never considered "this information as it was required to do under NEPA."  The SFW EIS considered information on the impacts of the SFW project to recreation and tourism.  SFW Final EIS, Appendix H, pp. H-107 through H-120; see also p. I-100 (responding to comment from the same parties).  Since the interpretive report does not yet exist, it is unclear what specific information the disputing parties think ought to have been considered in the EIS.  Their comments on the DEIS did not mention any particular studies or reports that BOEM should have considered on this topic.

historic resort industry at New Shoreham." The mere existence of the documentation cited in the letter does not demonstrate that the interpretive report is unnecessary or duplicative.

**Website, Social Media, and Interpretive Exhibits –** The November 15th letter asserts that this mitigation measure is not needed because comparable materials already exist. The letter cites as examples the website for the Block Island Tourism Council, the website for the Spring House Hotel, the website for the Town of New Shoreham, a webpage on TripAdvisor listing resorts on Block Island, a website for a travel agency, a web page on Block Island Hotels that is part of a New England Today Travel's website, a page on Vimeo with virtual exhibits, and a page from the Block Island Historical Society. It also cites three Facebook groups generally associated with Block Island tourism and a Facebook group from the Block Island Historical Society. The letter further asserts that the mitigation measure is infeasible because BOEM "never notified the property owners or consulted with them" and because the property owners "will have responsibilities under the [MOA] and the HPTP."

These assertions are unpersuasive. Nothing in the mitigation measure described in Stipulation III.C of the MOA or in the specific activities associated with this measure in the HPTP depends on the existence of websites or social media groups. The fact that two private hotels and the Block Island Tourism Council have a presence on the web is unsurprising. This fact alone does not render this mitigation measure, as described in the HPTP, unnecessary or duplicative. Notably, the disputing parties' March 14th comment letter requested $30 million dollars for a marketing campaign. Although the parties did not provide any details about the kinds of marketing materials they would like to see as a part of that campaign, the request for this campaign is, as a general matter, in significant tension with the argument that this mitigation measure is unnecessary. Moreover, the disputing parties' assertion that the property owners will have responsibilities under this HPTP is inaccurate. Although BOEM hopes that the property owners will participate in the development of these materials, the HPTP itself does not assign any party, other than SFW, any responsibilities. For these reasons, BOEM does not believe that this mitigation measure is duplicative, unnecessary, or infeasible.

**Spring Street Historic District and Potter House HPTP and the Vaill Cottage HPTP**

**NRHP nomination forms** – The disputing parties suggest that these mitigation measures are not "meaningful" because the Spring Street Historic District and the contributing Potter House and Vaill Cottage were already determined to be eligible for the NRHP during the permitting review for the Block Island Wind Farm. They also assert that the mitigation measure is infeasible because, "BOEM never notified the owners of the properties… and never consulted with them about the 106 processes." The disputing parties further assert that the property owners will have responsibilities under the MOA and HPTP.

These arguments are misplaced for the reasons set forth with respect to the Old Harbor Nomination Form, above. Moreover, this mitigation measure supports the Town's policy of identifying and recognizing historic resources. See 2016 Comprehensive plan at p. 2-11. The mere fact that these properties were determined to be eligible in a previous Section 106 consultation does not negate the value of preparing a nomination form. The determination that a

property is eligible does not require the same level of historical research, the same effort to synthesize that research, and the same level of documentation. The Nomination form will add an additional level of research, documentation, and analysis beyond the mere determination of eligibility. Furthermore, the preparation of documentation to support a property's inclusion in the NRHP is a widely used form of mitigation to resolve adverse effects for a range of undertakings. For all these reasons, BOEM does not believe that this mitigation measure is duplicative, unnecessary, or infeasible.

**Conclusion**

Nothing in the disputing parties' November 15th letter provided documentation that the mitigation measures in the subject HPTPs are duplicative, unnecessary, or infeasible. Rather, the disputing parties' November 15th letter resurfaces the same broad complaints previously raised regarding BOEM's Section 106 consultation. Accordingly, BOEM will accept the subject HPTPs as final with the addition of the following provision to HPTPs for the Spring House Hotel and the Spring House Hotel Cottage, the Spring Street Historic District and the Capt. Mark L. Potter House, the Vaill Cottage, and the Old Harbor Historic District (and as already included in the SE Lighthouse HPTP – Section 4.4 Replacement Mitigation Option):

> **Replacement Mitigation Option** - In the event South Fork Wind [SFW] determines that any of the mitigation measures listed in this Historic Preservation Treatment Plan (HPTP) have already been performed or otherwise become redundant, SFW will notify the parties listed in this HPTP (a "Replacement Mitigation Notice"). SFW will consult with the parties listed in this HPTP (under Table [###]. Parties) for no more than 45 days and, after consultation, will propose replacement mitigation measure(s) at least equivalent to the substantive baseline in the MOA, for BOEM acceptance.

Copies of the final, accepted HPTPs with this addition are attached to this letter as Appendix D.

BOEM consulted in good faith with the consulting parties. Following the regulatory requirements under 36 C.F.R. 800.6, BOEM sought input from the consulting parties on appropriate measures to resolve adverse effects to historic properties prior to the MOA, and BOEM continued to consult on implementation of those measures after execution of the MOA. The Section 106 regulations require BOEM to consult with the Federally-recognized Tribes, State Historic Preservation Officers, the ACHP, and other consulting parties to seek methods to avoid, minimize and mitigate adverse effects. BOEM, the RISHPO, the Massachusetts Historic Preservation Officer, and the ACHP agreed on how the adverse effects will be resolved and executed a MOA. Further, the executed MOA and the implementation of the measures in the MOA evidence BOEM's compliance with Section 106, and BOEM will ensure that the undertaking is carried out in accordance with the MOA. Following the dispute measures in the MOA, BOEM attempted further consultation with the disputing parties regarding the specific disputed HPTPs. Nonetheless, the disputing parties did not provide suggestions for mitigation measures comparable to those agreed upon in the MOA. After consideration of the ACHP's opinion on this dispute, and, subsequent to BOEM's request of additional information from the disputing parties, BOEM has decided to accept the subject HPTPs as final with the addition of

the redundancy provision to HPTPs for the Spring House Hotel and the Spring House Hotel Cottage, the Spring Street Historic District and the Capt. Mark L. Potter House, the Vaill Cottage, and the Old Harbor Historic District.

If you have questions or need additional information, please contact Ms. Sarah Stokely, Lead Historian and Section 106 Team Lead, at 703-787-1085 or via email at Sarah.Stokely@boem.gov.

Sincerely,

JESSICA
STROMBERG
Digitally signed by
JESSICA STROMBERG
Date: 2023.02.28
17:02:45 -05'00'

Jessica Stromberg
Acting Chief, Office of Renewable Energy Program

Enclosures

Appendix A--Response to Other Assertions Outside the Scope of this Dispute Resolution

Appendix B--Relevant Correspondence

Appendix C--Responses to Comments on Drafts of the MOA

Appendix D--Final HPTPs

Appendix E –Memorandum of Agreement

**Appendix A – Response to Other Assertions Outside the Scope of this Dispute Resolution**

In addition to the assertions about the particular HPTPs at issue, the November 15th and Dec. 12th letters from the disputing parties are scattered with allegations of deficiencies in BOEM's Section 106 consultation for SFW's COP. The Final MOA for the SFW COP was executed on November 23, 2021, almost a year before BOEM received those letters. Several of the assertions rehash comments that the disputing parties made prior to the MOA's execution, and others were raised only after that. While the dispute at issue does not require any response to those allegations, to demonstrate BOEM's good faith in consulting, this appendix summarizes BOEM's responses. However, the brief summaries provided here are no substitute for BOEM's record itself, including the extensive documentation supporting BOEM's findings, the written responses that BOEM provided on drafts of that documentation and on the finding itself, and the responses that BOEM provided to feedback on drafts of the MOA. Accordingly, by providing these summaries, BOEM does not waive any defense to any potential claim for noncompliance with the NHPA or any other law.

**Public availability of information**. The November 15th letter asserts that "BOEM has failed to conduct a meaningful consultation process by hiding information from the public." The disputing parties argue that BOEM inappropriately withheld information "in a blanket fashion" pursuant to Sec. 304 of the NHPA and thereby denied the public a full understanding of the analysis of effects the SFW project will have on the viewshed.

**Response**. BOEM provided to the consulting parties, including the disputing parties and other CHP clients, all information and documentation related to this Section 106 consultation, *including* documentation that BOEM identified as potentially sensitive and potentially subject to NHPA, Sec. 304. (Indeed, in the November 15th letter CHP acknowledges that it has reviewed the documents it argues BOEM should have made public.) Accordingly, there is no basis for the argument that the disputing parties or CHP's other clients were denied any information about the project. As to the public, BOEM posted SFW's COP, visualizations of the project, the technical reports or summaries thereof supporting the Finding of Effect, the Finding of Effect itself, and the final MOA on BOEM's website. The only documents that BOEM did not post on its website were ones that BOEM expected would need protection under Section 304 of the NHPA. Certain reports and documents included information about the location, ownership, and character-defining elements of the historic properties that would require confidentiality and protection under Section 304 of the NHPA. For these documents, BOEM worked with SFW to prepare summaries that it posted on its website. After the 106 consultation was completed and all BOEM's documentation was finalized, BOEM conducted the consultation with the National Park Service and the ACHP, as required under Sec. 304 and 36 C.F.R. 800.11(c). Contrary to the assertion that the documentation did not contain any sensitive material, the NPS and the ACHP agreed that certain information in those technical reports was subject to Sec. 304.

The publicly available materials described above were posted on BOEM's website during and after consultation on the MOA and the materials currently remain posted on BOEM's website, including:

> – Publicly available summary of the Marine Archaeological Resources Assessment: https://www.boem.gov/sites/default/files/documents/renewable-energy/SFW%20Revised%20MARA%20Non%20Technical%20Summary.pdf
> – Publicly available summaries of the terrestrial archaeological resources assessment: https://www.boem.gov/sites/default/files/documents/renewable-energy/App%20S_SFW%20Terrestrial%20Archaeology%20Non-Technical%20Summary.pdf and https://www.boem.gov/sites/default/files/documents/renewable-energy/App%20S2_SFW_Phase%20IB%20Onshore%20Archaeological%20Report.pdf
> – Publicly available summary of the historic resources visual effects assessment: https://www.boem.gov/sites/default/files/renewable-energy-program/State-Activities/NY/App-T_SFWF_Historic-Resources-Report---Substation_2018-05-30.pdf; https://www.boem.gov/sites/default/files/documents/renewable-energy/App%20BB1_SFWF_OM%20Facility_HRVEA.pdf;
> – Publicly available finding adverse effect report: https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/SFWF_FOE_FINAL_0.pdf
> –Final MOA: https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/ma-ny-ri-south-fork-moa.pdf

Moreover, BOEM notes that, during its review of the COP, it did not receive comments (either in connection with the NHPA consultation or on the Draft Environmental Impact Statement) indicating that the public needed additional documentation about the identification of historic properties or the assessment of effects to them or suggesting that the public was in any way prevented from engaging in those reviews due to a lack of documentation on those issues.


**Involving Property Owners.** The disputing parties make repeated assertions that BOEM failed to consult with the owners of the subject historic properties.

**Response**: Under the Section 106 regulations, certain individuals and organizations with a demonstrated interest in the undertaking may participate as consulting parties due to the nature of their legal and economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties (36 C.F.R. 800.2(c)(5)). There is no requirement in 36 C.F.R. Part 800 that the owners of historic properties must be consulting parties. Early in the Section 106 consultation, BOEM invited over 46 consulting parties including federally and non-federally recognized Tribes, federal, state, and local government agencies, property owners, and historic preservation organizations. Further, the MOA required SFW to invite the specific

private property owners who own the adversely affected properties to the consultation on the development of the HPTPs. Attachment 2 of the MOA lists the consulting parties invited to the Section 106 consultation and contains a separate list of the consulting parties who accepted the invitation to consult. (https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/ma-ny-ri-south-fork-moa.pdf)

As discussed in the response letter to the dispute here, the disputed HPTPs include mitigation measures that are feasible since the private property owners' concurrence is not required to prepare documentation that would support amending an already existing NRHP nomination form or to produce a new NRHP nomination form. These activities include background research, archival research, in the field surveys, and synthesizing already existing information, all of which do not require private properties agreement or concurrence. CHP's statements that these mitigation measures are infeasible mischaracterize these measures.

**Justification for mitigation in MOA.** The disputing parties note that they has asked BOEM for "justification" of the mitigation measures in the MOA and asserts that BOEM has failed to provide that justification.

**Response.** The ACHP's guidance clarifies that federal agencies are responsible to consult on proposed resolution measures, and that consultation does not mandate a specific outcome. Rather, consultation is the process of seeking, discussing, and considering the views of consulting parties as to how project effects on historic properties should be resolved. (ACHP's A Citizen Guide to Section 106; https://www.achp.gov/sites/default/files/documents/2017-01/CitizenGuide.pdf). BOEM sought consulting parties' comments and input on proposed measures to resolve adverse effects, including mitigation measures starting in August 2021 through MOA execution in November 2021 (November 23, 2021). Further, through implementation of the MOA, BOEM, with the assistance of SFW, continued to seek the interested consulting parties' comments and input on development of proposed mitigation measures well after January 2022. For your reference, BOEM has included the comment matrices summarizing the consulting parties' comments on the finding of adverse effects report and the MOA and BOEM's responses to comments, which was previously circulated to consulting parties. As BOEM discussed in those responses, BOEM included mitigation measures that were responsive to the proposals for mitigation it received from consulting parties. Where BOEM rejected a suggestion, that document provides reasons. As that document explains, BOEM rejected the suggestion to include an open-ended mitigation fund that did not specify particular mitigation measures in favor of using funds to pay for the activities in the substantive baseline mitigation spelled out in the MOA. Regarding the appropriate "level" of mitigation, that document explains BOEM believes that the mitigation in MOA is commensurate to the adverse effects to historic properties that BOEM identified. In response to the considerations offered by the disputing parties to inform the level of mitigation (which included lost tourism revenue), BOEM noted that those considerations, "do not appear to be connected to the qualifying characteristics of the properties in the APE for this undertaking and do not bear an obvious connection to the ways in which BOEM has found this undertaking might alter those

character-defining characteristics." That same reasoning applies to the arguments in the November 15th letter about the dollar-values of the alleged impacts to Block Island's tourist economy. In other words, BOEM has consistently maintained that the demands for a mitigation fund that funding alone does not actually resolving the particular adverse effects to historic properties that BOEM identified.

In addition, BOEM did not merely pay "lip service" to the suggestion to establish a mitigation fund. As BOEM stated in its response to CHP's November 8th comments on the draft MOA:

> BOEM has included a mitigation fund as one of the measures in the MOA, based on the comments received from consulting parties, including those represented by CHP. Per ACHP and others' comments, BOEM has made it more specific in the MOA what the mitigation fund process would consist of—regardless of whether it is called a community benefit fund, a mitigation fund, or by another name. The mitigation fund must be applied to the adverse effect and mitigation of adverse effects to historic properties resulting from the Project. Simple creation of a fund will not serve to mitigate adverse effects.

Response to comment document at p. 8.


**Tourism Studies.** The November 15th letter cites a number of studies on tourism and wind farms to support their assertions about losses to the tourism industry on Block Island.

**Response.** BOEM first notes that in the context of the NHPA Sec. 106 consultation for this project, information about the economic impacts to tourism revenue are irrelevant. BOEM focused its NHPA analysis on the impacts to historic properties, not the tourism industry. The South Fork Environmental Impact Statement (EIS) analyzes potential impacts to recreation and tourism associated with the Project, finding that the project would have negligible or minor impacts to those resources. FEIS, Appendix H, Sec. 3.5.8.

The November 15 letter cites the following:

- Sanja Lutzeryer et al., North Carolina State University, *The Amenity Costs of Offshore Wind Farms: Evidence from a Choice Experience* (2016) (studying close-to-shore wind projects, and finding that "the negative effects of any size turbine diminish rapidly once placed more than 8 miles from shore")
- Anna Dora Saeborsdottir et al., *Wealth of Wind and Visitors: Tourist Industry Attitudes towards Wind Energy Development in Iceland* (2021) (survey of Icelandic tour operators soliciting their views about potential onshore windfarms)
- Jean Vissering et al., *Clean Energy States Alliance, State Clean Energy Program Guide: A Visual Impact Assessment Process for Wind Energy Projects* (May 2011) (outlining a methodology for assessing visual impacts of onshore windfarms)
- Tom Broekel et al., *Gone with the wind? The impact of wind turbines on tourism*, Energy Policy 86 (2015) (economic modeling of the effects of presence of turbines on tourism

demand in Germany; finds a small negative effect for onshore windfarms, and a "more complex" result for coastal areas including a small positive effect)

SFW's November 29 response letter notes additional studies finding an increase in tourism associated with the existing Block Island Wind Farm:

- Andrew Carr-Harris & Corey Land, *Sustainability and Tourism: the Effect of the United States' First Offshore Wind Farm on the Vacation Rental Market*, 57 Resource and Energy Economics 51 (2019)
- Tiffany Smythe, et al., *Beyond the Beach: Tradeoffs in Tourism and Recreation at the First Onshore Wind Farm in the United States, Energy Research & Social Science* (2020)
- Simona Trandafir, et al., *How Are Tourists Affected by Offshore Wind Turbines? A Case Study of the First U.S. Offshore Wind Farm*, Journal of Ocean and Coastal Economics (2020)

While these dueling studies are interesting, they do not materially affect BOEM's conclusions in the EIS regarding impacts to recreation and tourism.[8]

Finally, the December 12th response from the disputing parties notes an "internal" study conducted by SFW's parent company that, allegedly, shows 15% of New Jersey residents who regularly visit the New Jersey shore would not return after offshore wind projects are built. The weblink provided in the Dec. 12th letter does not provide any information on the methodology of the survey, which BOEM would need to assess its application broadly. Moreover, the December 12th letter provides no reasoning whatsoever for the authors' assertion that it "anticipates" a similar result related to the SFW project.

**Effects to Newport Properties.** The November 15th letter asserts that BOEM failed to consider adverse effects to Newport properties.

**Response.** This assertion is not supported by the record. In response to the concerns that Newport, Rhode Island, historic properties were not considered in this Section 106 consultation, and they could be visually adversely affected by this Project, BOEM specifies in its Finding of Adverse Effect report how the agency formally delineated the area of potential effects (APEs) and assessed effects to historic properties located in Newport, RI and within the visual APE. The Finding of Adverse Effects states the following:

> Although the HRVEA [Historic Resources Visual Effects Assessment] identified five other historic properties on mainland RI where it considered adverse effects might result—The Breakers NHL, Marble House NHL, Bellevue Avenue Historic District NHL, Ocean Road Historic District NHL, and Ocean Drive Historic District (NRHP listed)—these properties are all at

---

[8] Also, BOEM notes that the studies cited in CHP's letter were all available at the time that CHP submitted comments on the Draft EIS but were not mentioned in those comments.

distances of between 25 and 26 miles from the nearest proposed SFWF WTG (EDR 2021). While their size and siting may afford these historic properties some view toward the Lease Area, other existing buildings, vegetation, and elements of the built environment at each result in limited, screened views and increased presence of existing nighttime lighting. The shortest distance between any of these historic properties and the nearest potential WTG location is over 25 miles. Visibility would be especially minimized by distance. At these distances, atmospheric, environmental, and other obscuring factors, such as fog, haze, sea spray, wave height, and normal viewer acuity, serve to further minimize the visual intrusion posed by offshore WTGs. The ability of these historic properties to convey the significance of their architectural and social history would be unaltered by the Project. BOEM finds that the undertaking would result in no adverse to these and other historic properties within the viewshed APE with limited to no views of SFWF WTGs.

Finding of Effect, p. 23, available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/SFWF_FOE_FINAL_0.pdf).

Further, the RISHPO concurred with BOEM's adverse effect finding for this Project including BOEM's finding that these specific historic properties in Newport, RI, would not be visually adversely affected.

**Cumulative impacts on National Historic Landmarks**.  CHP argues that BOEM violated 110(f) by failing to consider and mitigate the cumulative impacts of SFW, Block Island Wind Farm, and the proposed Revolution Wind and Sunrise Wind projects on the Southeast Lighthouse National Historic Landmark.

**Response**. BOEM met its Section 110(f) of the NHPA requirements regarding the National Historic Landmarks that could be affected by this Project, as noted in the Finding of Adverse Effect and the executed MOA.  The Finding of Adverse Effect includes a specific section on National Historic Landmarks that summarizes BOEM's consultation on National Historic Landmarks conducted pursuant to the Section 106 regulations (36 C.F.R. 800.10) and Section 110(f) of the NHPA (Section 6 - pages 30 -33; https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/SFWF_FOE_FINAL_0.pdf).  The SHPOs concurred with the agency's finding of adverse effects for this Project, including one National Historic Landmark (Block Island Southeast Lighthouse) would be adversely affected.  Further, the SHPOs and the ACHP signed the MOA which summarizes BOEM's findings for the NHLs of concern and BOEM's resolution measures for the one adversely affected National Historic Landmark.  With regard to the cumulative impacts of other offshore wind projects, BOEM appropriately analyzed the cumulative impact on the Southeast Lighthouse.  *See, e.g.*, the Finding of Effect at pp. 22-23; the Cumulative Historic Resources Visual Effects Analysis (describing BOEM's cumulative analysis

which considered the impacts of the full build-out of all reasonably foreseeable offshore wind projects to those historic properties that SFW would adversely affect).  BOEM does not believe that it is appropriate to require SFW to mitigate impacts that would be caused by other offshore wind projects, and BOEM will comply with Sections 106 and 110(f) for each of the other OCS projects mentioned.

***