**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| PRESERVATION SOCIETY OF NEWPORT COUNTY, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| DOUG BURGUM,[1] et al., | ) ) ) | Case No. 23-cv-03510 (APM) |
| Defendants, | ) ) ) | |
| and | ) ) ) | |
| SOUTH FORK WIND, LLC, | ) ) ) | |
| Defendant-Intervenor. | ) ) | |

|  |  |  |
|---|---|---|
| SOUTHEAST LIGHTHOUSE FOUNDATION, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) ) | |
| DOUG BURGUM, et al., | ) ) ) | Case No. 23-cv-03514 (APM) |
| Defendants, | ) ) ) | |
| and | ) ) ) | |
| SOUTH FORK WIND, LLC, | ) ) ) | |
| Defendant-Intervenor. | ) ) | |

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the court substitutes the current Secretary of the Interior as the defendant in these cases.

|  |  |  |
|---|---|---|
| | ) | |
| **GREEN OCEANS, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNITED STATES DEPARTMENT OF THE INTERIOR, et al.,** | ) | **Case No. 24-cv-01087 (APM)** |
| | ) | |
| **Defendants,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **SOUTH FORK WIND, LLC,** | ) | |
| | ) | |
| **Defendant-Intervenor.** | ) | |
| | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

**I.      INTRODUCTION**

In 2013, Defendant Bureau of Ocean Energy Management ("BOEM") awarded a lease to Defendant-Intervenor South Fork Wind, LLC to construct a wind energy facility off the coast of Rhode Island.  South Fork later submitted to BOEM its proposal for developing the lease.  Because of the project's potential impacts on both nearby historic properties and the environment, BOEM undertook reviews pursuant to the National Historic Preservation Act ("NHPA") and National Environmental Policy Act ("NEPA"), among other statutes, before ultimately approving the project.  South Fork also applied for and received a permit for construction and dredging under section 404 of the Clean Water Act ("CWA") from the U.S. Army Corps of Engineers.  Plaintiffs— Preservation Society of Newport County, Southeast Lighthouse Foundation ("SELF"), and a group including the nonprofit Green Oceans and several historic property owners ("Green Oceans

Plaintiffs")—each filed suit alleging deficiencies in the agencies' reviews.  The court consolidated these matters as they all present challenges to regulatory approvals of the South Fork Wind project.

Before the court in the *Preservation Society* and *Southeast Lighthouse Foundation* matters are Plaintiffs' combined Motion for Summary Judgment, ECF No. 39 [hereinafter Pls.' Mot. for Summ. J.],[2] Federal Defendants' Cross-Motion for Summary Judgment, ECF No. 46 [hereinafter Fed. Defs.' Mot. for Summ. J.], and Defendant-Intervenor's Cross-Motion for Summary Judgment, ECF No. 50 [hereinafter Def.-Intervenor's Mot. for Summ. J.].[3]  For the reasons that follow, the court grants Defendants' motions and denies Plaintiffs' motion.  BOEM adequately reviewed the proposed project under both the NHPA and NEPA.

Also, before the court in the *Green Oceans* matter are both Federal Defendants' and Defendant-Intervenor's Motion to Dismiss the Green Oceans Plaintiffs' Amended Complaint, ECF Nos. 52 [hereinafter Fed. Defs.' Mot. to Dismiss], 53 [hereinafter Def.-Intervenor's Mot. to Dismiss].  The court largely grants these motions.  All but one of the Green Oceans Plaintiffs' claims are time-barred.  The only one that is not arises under the CWA, and it alone will proceed to summary judgment briefing.

## II.    BACKGROUND

### A.    Statutory Background[4]

#### 1.    NHPA

The NHPA is intended to "discourage[] federal agencies from ignoring preservation values in projects they initiate, approve funds for or otherwise control."  *Lee v. Thornburgh*, 877 F.2d 1053, 1056 (D.C. Cir. 1989).  Two of its provisions are relevant here.  The first, Section 106,

---

[2] The Green Oceans Plaintiffs join in this motion, too.  Pls.' Mot. for Summ. J. at 2.

[3] Unless otherwise noted, all citations are to the docket in Case No. 25-cv-3510.

[4] Although Plaintiffs bring claims under several statutes, the court provides background only on the statutes for which it will reach the merits of Plaintiffs' claims.

requires agencies to "take into account the effect of the undertaking on any historic property" before licensing or spending any federal funds on a project. 54 U.S.C. § 306108. The steps of this process are spelled out by regulation. *See* 36 C.F.R. pt. 800. The first is initiation, during which the agency must determine whether the project has "the potential to cause effects on historic properties." *Id.* § 800.3(a). If it does, the agency must identify appropriate stakeholders to consult in the review process and set up avenues for public comment. *Id.* § 800.3(c)–(f). At the second step—identification—the agency must make "a reasonable and good faith effort" to "[d]etermine and document the area of potential effects" and account for any historic properties in that area. *Id.* § 800.4. The third step—assessment—involves determining whether the project would have an "adverse effect" on those historic properties. *Id.* § 800.5(a). An "adverse effect" is one that "may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register [of Historic Places] in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association." *Id.* § 800.5(a)(1). This includes any "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features." *Id.* § 800.5(a)(2)(v). The final step is resolution, during which the agency must "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." *Id.* § 800.6(a). At the end of this process, the agency produces and executes a Memorandum of Agreement ("MOA") that "evidences the agency official's compliance with section 106 and this part and shall govern the undertaking and all of its parts." *Id.* § 800.6(c).

The second provision, Section 110(f), is specific to National Historic Landmarks. Section 110(f) requires that, "[p]rior to the approval of any Federal undertaking that may directly and adversely affect any National Historic Landmark," the agency "shall to the maximum extent

4

possible undertake such planning and actions as may be necessary to minimize harm to the landmark." 54 U.S.C. § 306107. In so doing, the agency "should at least 'consider prudent and feasible alternatives' to avoid adverse effects." *Presidio Hist. Ass'n v. Presidio Trust*, 811 F.3d 1154, 1170 (9th Cir. 2016) (quoting H.R. Rep. No. 96-1457, at 38 (1980)); *see also* The Secretary of the Interior's Standards and Guidelines for Federal Agency Historic Preservation Programs Pursuant to the National Historic Preservation Act, 63 Fed. Reg. 20496, 20503 (Apr. 24, 1998). The agency must also "request the [Advisory Council on Historic Preservation] to participate in any consultation," as well as "notify the Secretary [of the Interior] of any consultation . . . and invite the Secretary to participate in the consultation where there may be an adverse effect." 36 C.F.R. § 800.10(b)–(c).[5]

### 2.    NEPA

NEPA reflects "a broad national commitment to protecting and promoting environmental quality." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989) (citing 42 U.S.C. § 4331). It imposes "procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756–57 (2004). These requirements apply when, as here, an agency decides whether to issue a permit for private action. *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015). "At the heart of NEPA is the procedural requirement that federal agencies prepare and make publicly available . . . an Environmental Impact Statement (EIS) that assesses the action's anticipated direct and indirect environmental effects, and that the agencies consider alternatives that might lessen any adverse

---

[5] "The Council issues regulations to implement section 106, provides guidance and advice on the application of the procedures in this part, and generally oversees the operation of the section 106 process. The Council also consults with and comments to agency officials on individual undertakings and programs that affect historic properties." 36 C.F.R. § 800.2(b).

environmental impact." *Id.* at 37 (citing 42 U.S.C. § 4332(C); 40 C.F.R. § 1508.11).   The EIS should reflect a "hard look" at the "proposed actions' environmental consequences in advance of deciding whether and how to proceed," including by engaging with public comments. *Id.*

### 3.    CWA

"The CWA provides that 'the discharge of any pollutant by any person shall be unlawful' except as in compliance with specifically enumerated CWA provisions." *Mingo Logan Coal Co. v. EPA*, 714 F.3d 608, 609 (D.C. Cir. 2013) (quoting 33 U.S.C. § 1311(a)).  One such provision is section 404, which authorizes the U.S. Army Corps of Engineers to issue permits for the discharge of dredged or fill material into navigable waters. *Id.* at 610; 33 U.S.C. § 1344(a).  Again here, the agency may do so only "after notice and opportunity for public hearings."  33 U.S.C. § 1344(a). In deciding whether to issue a permit, the agency must evaluate "the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest," such as the project's effects on conservation, fish and wildlife values, navigation, water quality, and safety, among other considerations. *See* 33 C.F.R. § 320.4(a)(1).

### B.    Factual Background

In September 2013, BOEM entered into a "Commercial Lease of Submerged Lands for Renewable Energy Development on the Outer Continental Shelf" with South Fork.[6]   J.A., ECF Nos. 59–62, at 287.  The lease provided for the development of wind energy. *Id.*  Prior to developing the lease, South Fork needed to submit a Construction and Operations Plan for BOEM's review. *See* 30 C.F.R. § 585.600.  South Fork did so in June 2018. J.A. at 389.  The proposed facility included up to 15 wind turbine generators ("WTGs") to be located approximately 20 miles off the coast of Rhode Island. *Id.* at 391.

---

[6] BOEM awarded the lease to South Fork's predecessor in interest, Deepwater Wind New England, LLC, which later changed its name to South Fork Wind, LLC.  *See* J.A. at 86916.

6

Four months later, BOEM published a Notice of Intent to prepare an EIS for the proposed project in the Federal Register.  83 Fed. Reg. 53104, 53104 (Oct. 19, 2018).  In the same notice, BOEM indicated that it would "use the NEPA commenting process to initiate the Section 106 consultation process under the National Historic Preservation Act," as permitted by the governing regulations.  *Id.* (citing 36 C.F.R. § 800.2(d)(3)).  The notice also provided the details for three public scoping meetings to be held the next month.  *Id.*

BOEM reached out to 40 potential consulting parties for its Section 106 review.  J.A. at 78489–91.  Twenty-nine ultimately participated, including Rhode Island's, New York's, and Massachusetts's respective State Historic Preservation Offices; the Advisory Council on Historic Preservation; the National Park Service; several Indian tribes; several local governments; and a handful of nongovernmental organizations.  *Id.* at 78491–92.  Although not initially invited, Plaintiffs Preservation Society and SELF requested to be included as consulting parties, and BOEM granted their requests.  *See id.* at 78293, 81772–73; Pls.' Mot. for Summ. J., Ex. 4, ECF No. 39-5 [hereinafter Abbott Decl.], ¶ 4; Pls.' Mot. for Summ. J., Ex. 5, ECF No. 39-6 [hereinafter Coxe Decl.], ¶ 10.

In January 2021, BOEM published a Notice of Availability of a draft EIS.  86 Fed. Reg. 1520, 1520 (Jan. 8, 2021).  The notice also included dates for three additional virtual public meetings.  *Id.*  BOEM received 388 comments on the draft EIS, and over 400 people participated across the three meetings.  J.A. at 77602.

In August 2021, BOEM published both a Finding of Adverse Effect on historic properties and a final EIS.  *Id.* at 78471; 86 Fed. Reg. 46879 (Aug. 20, 2021).  The former was primarily concerned with visual effects, as the turbines had the potential to obstruct the properties' "significant seaward views" that contribute to their eligibility for the National Register of Historic

Places.  J.A. at 78496.  Relying on tools like visual effects analyses, mapping studies, and field observations, BOEM identified 10 properties that would be subject to adverse effects.[7]  *See id.* at 78481–88.  The studies started from a radius of 40 miles around the proposed project site, which contained 113 historic properties.  *Id.* at 78487.  The analyses then evaluated the "true visibility of the Project (e.g., visual barriers such as topography, vegetation, and non-historic structures that greatly reduce the visibility of Project WTGs)" from each property, *id.*, and the properties' distances from the turbines, as long distances may "especially minimize[]" visibility, *id.* at 78497.  BOEM also considered a cumulative effects analysis that "quantified the total number of WTGs from all planned future developments theoretically visible (daytime or nighttime) within the [Area of Potential Effects]."  *Id.* at 78496.  Based on these studies, BOEM "concluded that most of the [113] properties would not be adversely affected by the Project."  *Id.* at 78487.

    In the same report, BOEM explained how the project could be built to mitigate or minimize any "unavoidable adverse effects to historic properties."  *Id.* at 78501.  Such measures included "use of aircraft detection lighting systems . . . to reduce the effect of nighttime lighting," reducing the number of WTGs, and using a paint color that "blend[s] with background sea and skies."  *Id.* at 78501–02.  These measures, along with others, were later memorialized in a Memorandum of Agreement signed by BOEM, the Advisory Council on Historic Preservation, and the three State Historic Preservation Offices.  *See id.* at 86872, 86889–92.  South Fork was to "install no more than 12 WTGs," "use uniform WTG design, speed, height, and rotor diameter to reduce visual contrast and decrease visual clutter," "use uniform spacing . . . to decrease visual clutter," "color the WTGs an off white/gray color . . . to reduce visual contrast during daytime hours," and "use

---

[7] The 10 properties were Block Island Southeast Lighthouse, Old Harbor Historic District, Spring House Hotel, Spring House Hotel Cottage, Spring Street Historic District, Capt. Mark L. Potter House, Vaill Cottage, Gay Head Light, Gay Head – Aquinnah Shops, and Vineyard Sound and Mushup's Bridge TCP.  J.A. at 78494.

an [aircraft detection lighting system] to limit the time in which WTG lights are on and visible from adversely affected properties." *Id.* at 86872. The Memorandum also included a "substantive baseline" of "specific mitigation measures" to guide BOEM, South Fork, and the relevant stakeholders in developing plans "sufficient to resolve adverse effects for each historic property." *Id.* at 86875–81.

The final EIS took a broader look at the project's environmental effects. It weighed the potential impacts of each of "three action alternatives and a No Action alternative for the Project" across environmental measures such as air quality, water quality, fish and wildlife populations, and recreation and tourism. *See id.* at 76839–40, 76858, 76879–82. The first action alternative was South Fork's proposed project, which would include the 15 proposed turbines. *Id.* at 76858. The second, the Vessel Transit Lane alternative, would include a transit lane through the lease area in which any proposed "WTGs located within the transit lane would be eliminated." *Id.* at 76869. The third, the Fisheries Habitat Impact Minimization ("Habitat") alternative, would have "up to four fewer WTG locations" to "exclude certain WTGs and associated cable locations within complex fisheries habitats." *Id.* Finally, "[u]nder the No Action alternative, BOEM would not approve" the Project, and no construction would occur. *Id.* at 76873.

In the joint Record of Decision ("ROD") published by BOEM and the National Marine Fisheries Service ("NMFS") on November 30, 2021, BOEM further considered what it viewed as the "environmentally preferable alternatives"—the No Action Alternative and the Habitat Alternative. *Id.* at 86923; *see also* Notice of Availability of a Joint Record of Decision (ROD) for the South Fork Wind, LLC Proposed Wind Energy Facility Offshore Rhode Island, 86 Fed. Reg. 67969, 67969 (Nov. 30, 2021). BOEM analyzed the No Action Alternative as follows:

> Adverse environmental impacts in the Project area would generally
> be less under the No Action Alternative because construction,

9

> operation, and decommissioning activities and disturbances related to the proposed Project would not occur and, hence, impacts on physical, biological, or cultural resources from the Proposed Action would be avoided. Nonetheless, the No Action Alternative would probably result in moderate, long-term, adverse impacts on regional air quality because other energy generation facilities would be needed to meet future power demands. These facilities might be fueled with natural gas, oil, or coal, which would emit more pollutants than wind turbines and would have more adverse impacts on air quality and contribute greenhouse gases that cause climatic change. Adverse impacts on air quality also tend to disproportionally impact environmental justice communities, which often include low-income and minority populations. These air quality impacts might be compounded by other impacts because selection of the No Action Alternative could negatively impact future investment on U.S. offshore wind energy facilities, which could result in the loss of beneficial cumulative impacts such as increased employment, improvements in air quality, and reductions in greenhouse gas emissions.

J.A. at 86923.  Ultimately, BOEM did not select the No Action alternative "because it would not allow expeditious and orderly development of DOI-managed resources and would not meet the purpose and need of the Proposed Action." *Id.* at 86929.

By contrast, BOEM reasoned that "the Habitat Alternative allows for the generation of electricity from sources that do not adversely affect the air quality in the region" and "could encourage investment on U.S. offshore wind energy facilities, which could in turn result in beneficial cumulative impacts such as increased employment, improvements in air quality, and reductions in greenhouse gas emissions." *Id.* at 86923. And even during construction and operation, this alternative would reduce impacts on complex fish habitats relative to the proposed project. *See id.* at 86923, 86929.  BOEM accordingly authorized the Construction and Operations Plan with modifications, adopting the Habitat Alternative. *Id.* at 86928.  Under this alternative, BOEM permitted South Fork to construct only 12, rather than 15, turbines. *Id.* at 86928.  The ROD

10

also reiterated the mitigation measures outlined in the Memorandum of Agreement and added others. *See id.* at 86927, 86936–78.

On January 18, 2022, BOEM sent a letter to South Fork stating it had approved the Construction and Operations Plan. First Am. Compl., ECF No. 34 [hereinafter FAC], ¶ 78. The same day, the U.S. Army Corps of Engineers issued dredge-and-fill permits to South Fork. *Id.* ¶ 259; *see* Fed. Defs.' Mot. to Dismiss, Ex. D, ECF No. 52-5 [hereinafter Permit]. The permit authorized South Fork to lay several miles of cable to deliver wind-generated electricity and dredge sediment both during construction and then annually over a 10-year period. Permit at 1–2.

### C.    Procedural History

Plaintiffs Preservation Society and SELF filed suit on November 22, 2023, alleging BOEM's authorization violated the Administrative Procedure Act ("APA"), NHPA, and NEPA. *See generally* Compl., ECF No. 1 [hereinafter Preservation Society Compl.]; Compl., *Se. Lighthouse Found. v. Burgum*, No. 23-cv-3514-APM (D.D.C.), ECF No. 1 [hereinafter SELF Complaint]. The court granted South Fork's Motion to Intervene as Defendant shortly thereafter. Minute Order, Dec. 12, 2023. The parties then moved to consolidate the two cases, and the court granted the motion. Order, ECF No. 17.

On January 16, 2024, the Green Oceans Plaintiffs filed suit. *See* Compl., *Green Oceans v. U.S. Dep't of Interior*, No. 24-cv-1087-APM (D.D.C.), ECF No. 1 [hereinafter Green Oceans Compl.]. Plaintiffs alleged violations of the APA, NEPA, NHPA, Endangered Species Act, Marine Mammal Protection Act, Migratory Bird Treaty Act, and Coastal Zone Management Act. *See generally id.* The case was originally assigned to another judge in this District, but he granted Federal Defendants' motion to sever all claims related to the South Fork project and transfer them to this court. *See* Mem. & Order, *Green Oceans v. U.S. Dep't of Interior*, No. 24-cv-1087-APM

11

(D.D.C.), ECF No. 25, at 1, 10.  The Green Oceans Plaintiffs filed an amended complaint on May 8, 2024, adding claims for violations of the Outer Continental Shelf Lands Act and Clean Water Act.  *See* FAC at ¶¶ 85–166, 253–280.

The parties have since filed the instant motions.  All Plaintiffs in the *Preservation Society* and *Southeast Lighthouse* matters moved for summary judgment and the Green Oceans Plaintiffs joined their motion, and both Federal Defendants and South Fork cross-moved for summary judgment.  Federal Defendants and South Fork then each moved to dismiss the Green Oceans Plaintiffs' Amended Complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction and Rule 12(b)(6) for failure to state a claim on which relief can be granted.[8]

## III.    DISCUSSION

The court begins with three threshold issues: timeliness, standing, and mootness.  The court then analyzes the merits of the surviving claims: Plaintiffs Preservation Society and SELF's NHPA and NEPA claims and the Green Oceans Plaintiffs' CWA claim.

### A.    Timeliness

The court begins with timeliness, which bars most of the Green Oceans Plaintiffs' claims. Although Defendants also raise jurisdictional issues like standing, the court may first "address certain nonjurisdictional, threshold issues so long as those issues can occasion a dismissal short of reaching the merits."  *Matar v. TSA*, 910 F.3d 538, 541 (D.C. Cir. 2018) (cleaned up). Timeliness is one such issue, as dismissal on timeliness grounds "does not involve any consideration of the merits of [Plaintiffs'] claims."  *Id.*

---

[8] The Green Oceans Plaintiffs also filed a Motion for Partial Summary Judgment on Standing, ECF No. 64.  South Fork moved to stay briefing on the motion until after the court decided the motions to dismiss.  *See* Def.-Intervenor's Mot. to Stay Briefing on *Green Oceans* Pls.' Mot. for Partial Summ. J., ECF No. 66.  The Federal Defendants joined South Fork's motion.  *See* Fed. Defs.' Notice of Joinder in Mot. to Stay Briefing on *Green Oceans* Pls.' Mot. for Partial Summ. J., ECF No 67.  The court granted the motion.  *See* Minute Order, Sep. 6, 2024.  The court therefore does not consider the Green Oceans Plaintiffs' motion for partial summary judgment here.

The Fixing America's Surface Transportation Act ("FAST-41") supplies the applicable time limit here.  In relevant part, FAST-41 provides that "a claim arising under Federal law seeking judicial review of any authorization issued by a Federal agency for a covered project shall be barred unless . . . the claim is filed not later than 2 years after the date of publication in the Federal Register of notice of final agency action on the authorization."  42 U.S.C. § 4370m-6(a)(1)(A). The parties do not dispute that South Fork Wind is a "covered project" under FAST-41.  *See* Fed. Defs' Mot. to Dismiss, Mem. in Supp. of Fed. Defs.' Mot. to Dismiss, ECF No. 52-1 [hereinafter Fed. Defs.' Mot. to Dismiss Mem.], at 15–16; South Fork's Mot. to Dismiss at 12–13; Pls.' Corrected Opp'n to Defs.' Mots. to Dismiss, ECF No. 78 [hereinafter Pls.' Corrected Opp'n], at 32–35.  So the question is whether Plaintiffs filed their claims within two years of notice of the project's "authorization."

The statute defines "authorization" in relevant part as "any license, permit, approval, finding, determination, or other administrative decision issued by an agency . . . in order to site, construct, reconstruct, or commence operations of a covered project administered by a Federal agency."  42 U.S.C. § 4370m(3).  BOEM published notice of the availability of the joint ROD by BOEM and NMFS on November 30, 2021.  *See* 86 Fed. Reg. at 67969.  The ROD in turn states that it "constitutes the final decision of the Department of the Interior" to "approve, with modifications, the [Construction and Operations Plan] for South Fork Wind adopting the Habitat Alternative."  J.A. at 86928, 86932; *see also* 86 Fed. Reg. at 67969 ("NMFS has decided to adopt, in part, BOEM's Final EIS and issue a final Incidental Harassment Authorization (IHA) to South Fork Wind.").  The ROD qualifies as an "authorization."  It contains the agencies' "approval[s]," "finding[s]," and "determination[s]" necessary to complete reviews under several of the statutes on which Plaintiffs base their claims before South Fork could start to "site, construct, . . . or

13

commence operations." Those statutes include: NEPA, *see* J.A. at 86914; NHPA, *see id.* at 86937; Outer Continental Shelf Lands Act, *see id.* at 86914; Endangered Species Act, *see id.* at 86930; Marine Mammal Protection Act, *see id.* at 86914; Migratory Bird Treaty Act, *see id.* at 86914, 77505–56; and Coastal Zone Management Act, *see id.* at 87012. *Cf. Gov't of Province of Manitoba v. Zinke*, 849 F.3d 1111, 1115 (D.C. Cir. 2017) ("The issuance of a ROD constitutes final agency action.").

Plaintiffs therefore had to file claims based on any of the above-listed statutes by November 30, 2023. Plaintiffs Preservation Society and SELF did so, filing suit on November 23, 2023. *See* Preservation Society Compl.; SELF Compl. The Green Oceans Plaintiffs, however, did not. They filed suit on January 16, 2024. *See* Green Oceans Compl. Their claims under the above-listed statutes are thus time-barred. That leaves only the Green Oceans Plaintiffs' claim under the CWA, which is timely because the U.S. Army Corps of Engineers did not grant its permit until January 18, 2022. FAC ¶ 259. That claim therefore falls within the two-year limitations period.

The Green Oceans Plaintiffs raise three arguments in response. None are persuasive. They first argue that the ROD did not trigger the limitations period because it lacked the required notice about the limitations period. *See* Pls.' Corrected Opp'n at 33. Plaintiffs cite guidance documents concerning FAST-41—one dated January 2017 from the Office of Management and Budget and Council on Environmental Quality and another dated January 2021 from the Federal Permitting Improvement Steering Council—that provide that an agency "must specifically state in any such notice that the statute of limitations begins to run from the date of publication of the notice," *id.* & nn.213–14, which BOEM did not do here, *see* 86 Fed. Reg. at 67969. These guidance documents, however, are nonbinding, and more importantly, the statute imposes no such requirement. *See* 42 U.S.C. § 4370m-6; *cf. Gentiva Health Servs. v. Cochran*, 523 F. Supp. 3d 81, 95 (D.D.C.

14

2021) ("[G]uidance could not override the plain meaning of the statute.").  Moreover, the 2017 guidance specifically states that it is directed toward agencies and "is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person."  Office of Management and Budget & Council on Environmental Quality, *Memorandum for Heads of Federal Departments and Agencies*, at 8 n.1 (Jan. 13, 2017), https://perma.cc/E588-QKEL.  Plaintiffs therefore cannot rely on the guidance documents to alter the statute's clear directive that the clock begins to run upon notice of authorization.

Plaintiffs next argue that the ROD was not the agency's "authorization."  *See* Pls.' Corrected Opp'n at 34.  Instead, they insist, the approval letter BOEM sent to South Fork on January 18, 2022, constituted such authorization.  *Id.*  But as noted above, the ROD reflected BOEM's and NMFS's "final decision" to "approve" construction of the South Fork project following the necessary statutory reviews.  J.A. at 86928, 86932; 86 Fed. Reg. at 67969.  Plaintiffs acknowledged as much in their Amended Complaint.  *See* FAC at 1 ("On November 24, 2021, the United States Bureau of Ocean Energy Management ('BOEM') issued a Record of Decision to approve the Construction and Operations Plan for the South Fork Wind Project."); *id.* (referring to the ROD as "final agency approval").  And the substance of Plaintiffs' challenges is to the agency's reasoning as reflected in the ROD, none of which appears in the two-page approval letter. *See* Fed. Defs.' Mot. to Dismiss, Ex. C, ECF No. 52-4.  Lastly, the statute specifies "publication *in the Federal Register* of notice of final agency action on the authorization."  42 U.S.C. § 4370m-6(a)(1)(A) (emphasis added).  Only the public notice of the ROD—not a notification letter directed only to South Fork—fits that bill.

15

Plaintiffs finally invoke the Supreme Court's recent decision in *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 603 U.S. 799 (2024), for the proposition that "the statute of limitations for challenging final agency action under the Administrative Procedure Act does not begin at the time of Federal Register publication of future agency action—as the Government contends here—but at the time the plaintiff is injured in fact by the government action."[9]  Pls.' Corrected Opp'n at 35.  There, the Court analyzed not FAST-41, but the "default statute of limitations for suits against the United States," which "requires 'the complaint [to be] filed within six years after the right of action first accrues.'"  *Corner Post*, 603 U.S. at 804 (alteration in original) (quoting 28 U.S.C. § 2401(a)).  For that reason alone, *Corner Post* is inapposite.  True, the Court held that a claim "accrues" under the APA "when the plaintiff is injured by final agency action."  *Id.*  But in doing so, the Court drew a distinction between statutes of limitations, like the one at issue there, with statutes of repose, like the one at issue here.  A statute of limitations allows a prospective litigant to file a case "based on the date when the claim accrued."  *Id.* at 812 (internal quotation marks and citation omitted).  A statute of repose, by contrast, bars "any suit that is brought after a specified time since the defendant acted . . . even if this period ends before the plaintiff has suffered a resulting injury."  *Id.* (alteration in original) (internal quotation marks and citation omitted).  The latter is how FAST-41 operates.  It requires any suit within its ambit to be filed "not later than 2 years after the date of publication in the Federal Register of notice of final agency action on the authorization"—that is, two years after the agency acts, not two years after a claim accrues through injury.  42 U.S.C. § 4370m-6(a)(1)(A).  *Corner Post* therefore does not save Plaintiffs' time-barred claims.

---

[9] The court does not understand Plaintiffs to argue that the longer APA limitations period, as opposed to shorter FAST-41 period, applies to their claims.  But if that were their argument, the specific FAST-41 statute would control over the more general APA provision.  *See Howard v. Pritzker*, 775 F.3d 430, 438 (D.C. Cir. 2015) (stating that usual rule of statutory construction that the specific governs the general "is no less true with to statutes of limitations").

From here, the court will consider only the claims that are not time-barred: Plaintiffs Preservation Society and SELF's NHPA and NEPA claims and the Green Oceans Plaintiffs' CWA claim.

### B.    Justiciability

Defendants argue both that Plaintiffs lack standing to bring their claims and that Plaintiffs' claims are moot.  To have standing, Plaintiffs must meet three requirements: (1) they "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of," in that the injury must be "fairly traceable" to Defendants' conduct; and (3) the injury must be "redress[able] by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).  For APA claims like the ones brought here, Plaintiffs' injuries must also "fall[] within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for [their] complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990).  With respect to mootness, "a suit becomes moot[] when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (internal quotation marks and citations omitted).  The court will take each justiciability requirement for each group of Plaintiffs in turn.

### 1.    *Preservation Society and SELF*

Plaintiffs Preservation Society and SELF's NHPA and NEPA claims are on summary judgment.  To prevail, Defendants must "establish that there exists no genuine issue of material fact as to justiciability." *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 329 (1999).  They have not done so.

17

a.    Standing

Each Plaintiff has "introduce[d] sufficient evidence into the record to at least raise a disputed issue of fact as to each element of standing" for these two claims. *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 836 F.3d 42, 49 (D.C. Cir. 2016).

*Injury-in-Fact.*  It is well-established that aesthetic harm can amount to an injury-in-fact. *See, e.g.*, *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972).   And it is "clear" that a plaintiff is "alleging injury to a legally protected interest" under these two statutes when they seek to "maintain[] the environmental and historic quality of their neighborhood."  *Soc. Hill Towers Owners' Ass'n v. Rendell*, 210 F.3d 168, 176 (3d Cir. 2000).  By these measures, Plaintiffs have demonstrated sufficiently concrete injuries.

SELF's injury is straightforward.  It is the "non-profit owner and steward" of the Southeast Lighthouse.  Abbott Decl. ¶ 3.  Its "mission is to 'restore, preserve and protect the Southeast Lighthouse on Block Island' and to support its ongoing maintenance for present and future generations."  *Id.*  The president of SELF, Gerald Abbott, avers that South Fork's "highly visible" turbines are "stark visual intrusions that will irreparably harm the Southeast Lighthouse's historic context, location, atmosphere, and setting."  *Id.* ¶ 8.  During its review process, BOEM concurred, concluding that "the Project would have adverse visual effects on Block Island South East Lighthouse [National Historic Landmark]" that would "diminish the integrity of [its] significant historic features."  J.A. at 78497.  Defendants accordingly do not challenge that SELF has demonstrated an injury-in-fact.  *See* Fed. Defs.' Mot. for Summ. J., Mem. in Supp. of Fed. Defs.' Mot. for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J., ECF No. 46-1 [hereinafter Fed. Defs.' Summ. J. Mem.], at 15 n.4; Def.-Intervenor's Mot. for Summ. J. at 10–11 (arguing that SELF lacks standing only for failure to show redressability).

Preservation Society alleges similar injuries.  It is "the owner and steward" of historic properties in the area, and it "advocates for the protection and future preservation of the National Historic Landmarks and other historic properties in Newport County for generations of residents and visitors to appreciate and experience."  Coxe Decl. ¶ 3.  In relevant part, Preservation Society asserts injuries on behalf of its members.[10]  *See* Pls.' Mot. for Summ. J., Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J., ECF No. 39-1 [hereinafter Pls.' Mem.], at 13.  It may do so as long as, among other requirements, "its members would otherwise have standing to sue in their own right."  *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (internal quotation marks omitted).[11]  That condition is met.

Dee Gordon and her husband are longtime members who own a property in Newport's Ocean Drive Historic District.  Pls.' Mot. for Summ. J., Ex. 11, ECF No. 39-12, ¶¶ 1–5.  Gordon avers that the "views of the Atlantic Ocean from our house contribute to our aesthetic enjoyment of our house and property" and that "[m]uch of our home's value as a historic property is that it has unimpeded views of the ocean that have been unchanged since its construction over a century ago."  *Id.* ¶ 7.  The turbines, Gordon continues, "will destroy the ocean views that we and many

---

[10] South Fork argues that Plaintiffs have waived any representational standing argument for failure to discuss it in their combined opposition and reply.  Def.-Intervenor South Fork Wind, LLC's Reply in Supp. of Def.-Intervenor's Mot. for Summ. J., ECF No. 58, at 5.  South Fork cites no case to support this proposition.  Plaintiffs raised this argument in their opening brief, which is sufficient to present it to the court.  *See, e.g.*, *Cullen v. Dep't of Homeland Sec.*, No. 20-cv-113 (TJK), 2023 WL 5607425, at *3 (D.D.C. Aug. 30, 2023) ("Generally, to preserve a summary-judgment argument, a party must assert it in its opening brief.").

[11] Representational standing's two additional requirements are that "the interests [the organization] seeks to protect are germane to the organization's purpose" and that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Nat'l Ass'n of Home Builders*, 667 F.2d at 12 (internal quotation marks and citation omitted).  Preservation Society's mission to protect and preserve historic properties in Newport directly aligns with the interests it and its members assert in preserving ocean views that they believe are integral to the historic character of their properties.  The last requirement is also satisfied, as "[m]ember participation is not required where a suit raises a pure question of law and neither of the claims pursued, nor the relief sought require the consideration of the individual circumstances of any aggrieved member of the organization."  *Healthy Gulf v. U.S. Dep't of the Interior*, 152 F.4th 180, 191 (D.C. Cir. 2025) (internal quotation marks and citation omitted).  Like in *Healthy Gulf*, Preservation Society challenges the agency's compliance with review procedures under the relevant statutes, which is a legal question.  And Preservation Society seeks relief with respect to the South Fork project as a whole, which does not require considerations of its members' individual circumstances.  *See id.*

others cherish and enjoy." *Id.* Elizabeth Vitton and her husband are also members of Preservation Society and make similar representations. *See* Pls.' Mot. for Summ. J., Ex. 12, ECF No. 39-13, ¶¶ 1–3, 6–7, 10–12. In supplemental declarations, both Gordon and Vitton included photographs showing views of the turbines from their properties. Pls.' Opp'n to Defs.' Mots. for Summ. J. & Reply in Supp. of Pls.' Mot., ECF No. 54 [hereinafter Pls.' Reply], Ex. 1, ECF No. 54-1 [hereinafter Second Vitton Decl.], ¶ 4; Pls.' Reply, Ex. 3, ECF No. 54-3, ¶ 4.[12] Preservation Society can sue on these members behalf as they have established concrete injuries.

South Fork disputes the sufficiency this showing based on the accuracy of the photographs. Citing an expert's affidavit, South Fork contends that "the zoom levels used in many of Plaintiffs' photographs significantly overstate the scale of the Project's [WTGs] by a factor of close to 600%." Def.-Intervenor South Fork Wind, LLC's Reply in Supp. of Def.-Intervenor's Mot. for Summ. J., ECF No. 58 [hereinafter Def.-Intervenor's Reply], at 6 (citing Def.-Intervenor's Reply, Expert Rebuttal Decl. of Gordon Perkins in Supp. of Def.-Intervenor's Mot. for Summ. J., ECF No. 58-1, ¶¶ 18–21.). That would be a relevant fact, if true. But "[t]he court must avoid weighing evidence and making credibility determinations" at summary judgment. *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015). It cannot enter judgment when, as here, "dueling affidavits create a genuine dispute over issues of material fact." *Gov't Accountability Project v. FDA*, 206 F. Supp. 3d 420, 430 (D.D.C. 2016) (collecting cases). The court therefore does not take either side's position on whether the photographs fairly represent the viewshed seen with the human eye from these

---

[12] Plaintiffs may submit additional evidence to support standing with their second brief because they had already made a "substantial showing of standing" based on the evidence submitted with their opening brief. *See Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 111 (D.C. Cir. 2021) (internal quotation marks and citation omitted). Additionally, there is no prejudice to Defendants in considering this evidence, as Plaintiffs' supplemental affidavits relate to the same theory of standing as originally asserted and Defendants could (and did) respond to the supplemental affidavits in their own reply briefs. *See id.* at 112.

properties.  For now, Preservation Society has met its burden to "at least raise a disputed issue of fact as to" injury-in-fact.  *Scenic Am.*, 836 F.3d at 49.

The parties' alleged injuries also fall within the "zone of interests" protected by each statute.  *Lujan*, 497 U.S. at 883.  Because "[t]he purpose of the NHPA is to preserve historic sites for public use," "[a] party dedicated to preserving such resources has standing to sue under the statute."  *Role Models Am. Inc. v. Harvey*, 459 F. Supp. 2d 28, 38 (D.D.C. 2006), *aff'd sub nom. Role Models Am. Inc. v. Geren*, 514 F.3d 1308, 1311–12 (D.C. Cir. 2008).  SELF and Preservation Society both have such missions.  Abbott Decl. ¶ 3; Coxe Decl. ¶ 3.  As for NEPA, the Supreme Court has held that a primary interest both Plaintiffs seek to preserve—"aesthetic enjoyment"—is "among the sorts of interests [NEPA was] specifically designed to protect."  *Lujan*, 497 U.S. at 886.  Plaintiffs therefore have made the requisite showing for injury on summary judgment.

*Causation and Redressability.*  Causation and redressability "are closely related[] and can be viewed as two facets of a single requirement," so the court analyzes them together.  *Scenic Am.*, 836 F.3d at 54.  Plaintiffs' injuries are "fairly traceable" to Defendants' conduct, as BOEM authorized South Fork's construction.  *See Stand Up for Cal.! v. U.S. Dep't of the Interior,* 919 F. Supp. 2d 51, 56 n.7 (D.D.C. 2013).  For that reason, a favorable decision could redress Plaintiffs' injuries through, for example, remand to the agency to consider additional measures to mitigate viewshed impacts.  *See City of Dania Beach v. FAA*, 485 F.3d 1181, 1186 (D.C. Cir. 2007) (finding redressability satisfied because a court can "remand[] to the agency for completion of the review process").

Defendants respond that Plaintiffs cannot establish causation or redressability because their injuries are caused by "ostensibly indivisible viewshed harm from the Project *and other projects*," including existing and proposed wind farms, so "the requested relief in this case would not redress

21

any Plaintiff's alleged harm." Def.-Intervenor's Mot. for Summ. J. at 14–15; *see also* Fed. Defs.' Summ. J. Mem. at 16. But Plaintiffs allege direct injury from the South Fork turbines. *See, e.g.*, Second Vitton Decl. ¶¶ 3–4 (describing views of South Fork's turbines from her property and providing photographs). If the court were to remand to the agency to consider additional mitigation measures for the South Fork turbines, that could redress the alleged injuries. Moreover, even if the court accepts Defendants' characterization of Plaintiffs' allegations, although the court cannot address the viewshed impacts of other nearby projects, it is sufficient for standing that a favorable decision could redress Plaintiffs' injuries "at least in part." *Defs. of Wildlife v. Gutierrez*, 532 F.3d 913, 925 (D.C. Cir. 2008). Plaintiffs thus have provided sufficient evidence for each element of standing at summary judgment.

### b.     Mootness

South Fork also contends that Plaintiffs' claims are moot because the project is already constructed and operational. *See* Def.-Intervenor's Mot. for Summ. J. at 17–18. But a "live controversy" remains where "the Court could still grant [the plaintiffs] some form of effective relief." *Ctr. for Food Safety v. Salazar*, 900 F. Supp. 2d 1, 5–7 (D.D.C. 2012) (citing *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)). Even though construction is complete, the court still can order additional mitigation measures in the form of modifications or remand for the consideration thereof. *See id.* While South Fork questions how meaningful any additional consultation could be, *see* Def.-Intervenor's Mot. for Summ. J. at 18, there need only be "*some* form of effective relief [that] *could* be available to [Plaintiffs] should they prevail—however partial the remedy, however uncertain its potential to truly address Plaintiffs' concerns." *Salazar*, 900 F. Supp. 2d at 7. The court thus concludes that Plaintiffs Preservation Society and SELF's claims are justiciable.

22

>        2.      *Green Oceans*

The Green Oceans Plaintiffs' CWA claim is only at the motion to dismiss stage.  At this juncture, Plaintiffs' burden for establishing justiciability is not as steep.  *See Lujan*, 504 U.S. at 561.  The court "accept[s] as true all material allegations of the complaint" and draws all inferences in Plaintiffs' favor.  *Warth v. Seldin*, 422 U.S. 490, 501 (1975).  Plaintiffs need only plausibly plead justiciability, and "general factual allegations . . . may suffice."  *Lujan*, 504 U.S. at 561.

>                a.      <u>Standing</u>

*Injury-in-Fact.*  Multiple Green Oceans Plaintiffs submitted declarations demonstrating an injury-in-fact.  In *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 183–84 (2000), the Supreme Court held that citizens had standing to sue under the CWA where they alleged a project's "discharges, and the affiant[s'] reasonable concerns about the effects of those discharges, directly affected those affiants' recreational, aesthetic, and economic interests."  The affiants there had averred that, for example, they would no longer fish in the area because of concerns about the harmful effects of the discharges.  *See id.* at 181–83.  Plaintiffs raise similar concerns here.  Plaintiff Chris Brown, a commercial fisherman, represents that the "construction and now operation of South Fork Wind has had and will continue to have a devastating impact on [his] commercial fishing operation" because it "drastically reduce[s] the fish population in the area."  Pls.' Mot. for Leave to Suppl. Their Resp. to Defs'. Mots. to Dismiss with Decls. Supporting Standing, ECF No. 70 [hereinafter Pls.' Mot. to Suppl.], Decl. of Chris Brown, ECF No. 70-3 [hereinafter Brown Decl.], ¶¶ 1, 8, 10.  Plaintiff Richard Hittinger, a longtime recreational fisherman in the area, "tried fishing at some of [his] previously productive spots near the project but found that there were no cod or sea bass close to the turbines."  Pls.' Mot. to Suppl., Decl. of Richard Hittinger, ECF No. 70-8, ¶¶ 1, 6.  Both expect that they will reduce their fishing

23

activities in the area. *See id.* ¶¶ 6, 10; Brown Decl. ¶¶ 10, 13. In light of these declarations, the Federal Defendants do not challenge that Plaintiffs have plausibly alleged an injury-in-fact. *See* Fed. Defs.' Suppl. Reply Br. Addressing Pls.' Standing Decls., ECF No. 79 [hereinafter Fed. Defs.' Suppl. Reply], at 1.

South Fork submits that "Plaintiffs overstate the impacts of the Project on fish and fishing, which BOEM carefully minimized and mitigated." Def.-Intervenor South Fork Wind, LLC's Suppl. Reply in Supp. of Def.-Intervenor's Mot. to Dismiss [hereinafter Def.-Intervenor's Suppl. Reply], ECF No. 80, at 14. Notably though, South Fork stops short of stating there is no harm at all. Even if the agencies took efforts to minimize harm, that does not change that Plaintiffs plausibly allege some injury. While evidence may bear out South Fork's position about the extent of Plaintiffs' alleged harm at later stages of litigation, for now, Plaintiffs "need only 'state[] a plausible claim' that each element of standing is satisfied." *Hancock v. Urban Outfitters, Inc.*, 830 F.3d 511, 513 (D.C. Cir. 2016) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009)). They have done so.

*Causation and Redressability.* Causation likewise is established because the U.S. Army Corp of Engineers authorized South Fork to lay cables and dredge. And a favorable decision could redress Plaintiffs' injuries if the court were to remand to the agency to consider, among other possibilities for corrective action, additional restrictions on future dredging.

Defendants respond that a favorable decision could not redress Plaintiffs' injuries because the permit only authorized construction, and construction is already complete. *See* Fed. Defs.' Mot. to Dismiss Mem. at 24–26; Def.-Intervenor's Mot. to Dismiss at 24–25. The court agrees that, to the extent Plaintiffs take issue with the elements of the permit authorizing construction, the court can no longer redress those injuries. But the permit authorizes activity beyond just

construction.  The permit also authorizes South Fork to dredge sediment annually over a 10-year period.  *See* Permit at 2.  And some of the injuries Plaintiffs allege correspond to this prospective activity.  *See* FAC ¶ 280 ("The Army Corps of Engineers violated the Clean Water Act when it issued the Section 404 permits for the South Fork Wind Project because this permit allows for the discharge of dredge and fill material that will significantly degrade the waters of the United States.").  Because some activity authorized by the permit continues, a favorable ruling can redress Plaintiffs' ongoing injuries.

South Fork also contends that both causation and redressability are attenuated because fish populations were already declining before South Fork began construction and operation, and Plaintiffs have not alleged that this trend will reverse if approvals are vacated.  Def.-Intervenor's Mot. to Dismiss at 24–25.  Plaintiffs have plausibly alleged that the project has had a direct effect on their fishing activities.  *See, e.g.*, Hittinger Decl. ¶ 6 (stating that, after construction started, he "tried fishing at some of [his] previously productive spots near the project but found that there were no cod or sea bass close to the turbines").  Even if the project is only partially responsible for these harms, once again, it is sufficient that the court is capable of redressing Plaintiffs' injuries "at least in part."  *Defs. of Wildlife*, 532 F.3d at 925.

Defendants lastly argue that Plaintiffs' harms are not redressable because the Army Corps' jurisdiction only extends three nautical miles from shore, and Plaintiffs' alleged injuries relate primarily to effects on fish populations near the turbines, which are further out.  *See* Fed. Defs.' Suppl. Reply at 2–3; Def.-Intervenor's Suppl. Reply at 13–14.  At this stage, the court cannot evaluate, for example, how far the impacts of the authorized dredging reach.  It is plausible that those dredging activities can affect fish populations in the broader area around the project, and that is sufficient to survive a motion to dismiss.

25

b.    Mootness

South Fork also points to the completion of construction as a basis for mootness.  Def.-Intervenor's Mot. to Dismiss at 30–31.  Again, the court agrees that Plaintiffs' claims are moot to the extent they relate to the authorization of construction.  But because the permit also allows dredging for 10 years into the future, South Fork is incorrect that "any . . . dredge or fill activity has already occurred."  *Id.* at 31.  There is still a "live controversy" for which the court can order relief with respect to this continued activity, so Plaintiffs' CWA claim is not moot.  *See Salazar*, 900 F. Supp. 2d at 6–7.

**C.    Plaintiffs Preservation Society and SELF's Claims**

The court now proceeds to the merits, beginning with Plaintiffs Preservation Society and SELF's NHPA and NEPA claims.  The APA is the court's mechanism for reviewing these claims. *See Karst Env't Educ. & Protection, Inc. v. EPA*, 475 F.3d 1291, 1295 (D.C. Cir. 2007).  Under the APA, the court must "set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "Review of agency action under those APA standards is generally considered to be deferential."  *Blanton v. Off. of the Comptroller of the Currency*, 909 F.3d 1162, 1170 (D.C. Cir. 2018).  The scope of review is "narrow and a court is not to substitute its judgment for that of the agency."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 39, 43 (1983).  The court considers only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."  *Id.* (internal quotation marks omitted).

In APA cases, "summary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016).  But

26

instead of deciding whether there is a genuine dispute of material fact under Federal Rule of Civil Procedure 56, the district court "sits as an appellate tribunal," *Am. Biosci., Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), and determines "whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did," *Sierra Club v. Maniella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) (internal quotation marks omitted).

    *1.  NHPA*

Plaintiffs contend that BOEM failed to comply with Sections 106 and 110(f) of the NHPA. The court takes each in turn.

    a.  <u>Section 106</u>

Recall that the Section 106 process has four steps: initiation, identification, assessment, and resolution. BOEM complied with the statute and governing regulations at each step.

*Initiation.* At the initiation stage, BOEM first determined that the South Fork project had the potential to affect historic properties. *See* J.A. at 78478; 36 C.F.R. § 800.3(a). It then moved to identifying and engaging the necessary consulting parties. *See* 36 C.F.R. § 800.3(c). The regulations require BOEM to consult with the appropriate State Historic Preservation Offices; tribes, if the project may affect historic properties on tribal lands; and affected local governments, among other parties. *See id.* § 800.3(c)–(d), (f). BOEM sent invitations to 40 potential consulting parties, including the State Historic Preservation Office of all three affected states, three federal agencies, ten tribes, fifteen local governments, and several historic preservation groups. *See* J.A. at 78489–91. In addition to the parties that accepted BOEM's invitation, Plaintiffs Preservation Society and SELF requested to be consulting parties. *See* 36 C.F.R § 800.3(f)(3) (providing for such requests). BOEM granted their requests. Abbott Decl. ¶ 4; Coxe Decl. ¶ 10. Lastly, BOEM developed plans to involve the public in the process. *See id.* § 800.3(e). When it published its

Notice of Intent to prepare an EIS in the Federal Register, it indicated that it would use the NEPA commenting process to seek input for its Section 106 review as well. 83 Fed. Reg. at 53104; *see* 36 C.F.R. § 800.3(b) (permitting agencies to coordinate the Section 106 process with other reviews, such as NEPA). The same notice also included locations and dates for three public scoping meetings. 83 Fed. Reg. at 53014. BOEM thus did all that was required of it at this stage of the Section 106 process.

Plaintiffs take issue with the sufficiency of BOEM's notice efforts, as it did not directly notify many property owners, who accordingly did not know about the proposed project. *See* Pls.' Mem. at 30–31. Property owners, however, are not required consulting parties under the regulations. *See* 36 C.F.R. §§ 800.2, 800.3. So, just as it is for all members of the public, publication in the Federal Register is sufficient notification. *See, e.g.*, *Taylor v. Huerta*, 856 F.3d 1089, 1094 (D.C. Cir. 2017) (citing 44 U.S.C. § 1507). What's more, BOEM publicized the project and public meetings both on its website and in local newspapers. *See, e.g.*, J.A. at 18353, 19423–28; *cf. Cobell v. Norton*, No. 96-cv-1285 (RCL), 2005 WL 8182003, at *4 (D.D.C. Nov. 8, 2005) (finding a combination of website and local newspaper notice to be sufficient for class notice). BOEM was not required to do more. Whether individual property owners had actual knowledge does not change the reasonableness of the provided notice. *See Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384–85 (1947).[13]

*Identification and Assessment.* With input from consulting parties, BOEM then had to determine the project's "area of potential effects" ("APE") and account for any historic properties in that area. *See* 36 C.F.R. § 800.4. For those properties, BOEM then needed to assess whether

---

[13] Plaintiffs also argue that they raised similar concerns about public notice to the agency during the review process, but the agency did not address them. Pls.' Mem. at 30. Setting aside that BOEM gave sufficient notice, the record shows that BOEM responded to Plaintiffs' comment to explain the notice it provided and how it had added consulting parties who requested to be part of the review process along the way. J.A. at 78316.

they would be adversely affected in a way that would diminish their integrity as historic properties. *See* 36 C.F.R. § 800.5. Because of the close relationship between these steps and Plaintiffs' overlapping objections to BOEM's actions at each, the court analyzes them together.

BOEM defined the APE to include "the viewshed from which renewable energy structures, whether located offshore or onshore, would be visible." J.A. at 78480, 78486–88. Relying on a visual effects analysis, BOEM started by considering all affected properties within a 40-mile radius of the proposed project. *Id.* at 78481. Further analysis, such as mapping studies, revealed "areas with obstructed views toward [South Fork Wind Farm] WTGs, such as those views impeded and obscured by intervening topography, vegetation, and structures." *Id.* BOEM accordingly included in the APE only "[a]reas with unobstructed views of offshore Project elements." *Id.*

From there, BOEM identified 10 adversely affected historic properties. BOEM found that the 10 properties had "seaward views" that "contribute[] to the properties' [National Register of Historic Places] eligibility." *Id.* at 78496. BOEM noted that reducing the number of proposed turbines would "effectively minimize visual effects," but no alternative would "completely avoid visual adverse effects." *Id.*

BOEM also performed a cumulative effects analysis that "quantified the total number of WTGs from all planned future developments theoretically visible (daytime or nighttime) within the APE." *Id.* Of nearly 1,000 turbines, as many as 564 would be visible from the 10 properties. *Id.* at 78496–97. South Fork would comprise approximately 3% of them. *Id.* at 78497. BOEM accordingly concluded that "[t]he nature and contribution of [South Fork Wind Farm] WTGs to cumulative visual effects (daytime and nighttime) on historic properties would be proportionately small in magnitude and extent when combined with past, present, and reasonably foreseeable offshore wind energy development activities in the viewshed APE." *Id.* And more significantly,

29

BOEM determined that, although the properties would be adversely affected, "due to the distance [from the project] and open viewshed, the integrity of the property would not be so diminished as to disqualify any of [the properties] for [National Register of Historic Places] eligibility." *Id.* The entirety of this analysis satisfies BOEM's obligations at the identification and assessment stages.

Plaintiffs contend that "BOEM never made a good faith effort to identify historic properties and never arrived at anything close to a comprehensive list." Pls.' Mem. at 31. Instead, Plaintiffs claim, "BOEM identified only a handful of historic properties out of hundreds in the area that South Fork had the potential to adversely affect." *Id.* The detailed nature of BOEM's analysis described above, along with its solicitation of information from consulting parties, *see* J.A. at 78492, are indicative of a good faith effort to identify affected properties, *see* 36 C.F.R. § 800.4(b)(1). In fact, BOEM addressed a similar objection during the consultation process from Rhode Island's State Historic Preservation Office, who, like Plaintiffs, initially expressed that additional properties should be included in the APE. *See* J.A. at 81784–87. After BOEM presented findings from the studies and explained why it excluded certain properties from the APE, the State Historic Preservation Office ultimately concurred with BOEM's conclusion. *See id.*

While Plaintiffs continue to disagree, the NHPA does not give the court the authority to determine whether 10 or some greater number is the correct number of affected properties. The NHPA "mandates a review process that does not dictate particular decisional outcomes, but merely prohibits uninformed—rather than unwise—agency action." *United Keetowah Band of Cherokee Indians v. FCC*, 933 F.3d 728, 734 (D.C. Cir. 2019) (internal quotation marks omitted). The court's deferential review thus only goes as far as ensuring that the agency engaged in reasoned decisionmaking that complied with the applicable law. *See id.* at 738. BOEM did so with respect to identifying adversely affected historic properties.

Plaintiffs also challenge BOEM's analysis of adverse effects on a more granular level in several ways. All are belied by the record. First, as part of the identification process, BOEM was required to "take into account past planning, research, and studies." 36 C.F.R. § 800.4(b)(1). Plaintiffs fault Defendants for failing to consider past studies for Block Island Wind, a nearby wind energy facility owned by South Fork's developer. Pls.' Reply at 35. But the visual effects analysis on which BOEM relied noted that it took account of prior studies, including a survey to "evaluate the potential visual effects of the Block Island Wind Farm." J.A. at 66401–02. BOEM thus had and considered prior studies.

Plaintiffs next point out that the same visual effects analysis found that some Newport properties would experience "moderate to major" adverse visual effects as a result of the project, which "undermine[s]" BOEM's ultimate conclusion that the properties would not suffer adverse effects. Pls.' Reply at 36 (quoting J.A. at 66458). Plaintiffs misconstrue the nature of this finding. The study reflects not BOEM's findings, but those of the third party who prepared it. *See* J.A. at 66379. After considering additional studies, BOEM concluded that the distance between the Newport properties and the turbines, combined with "atmospheric, environmental, and other obscuring factors, such as fog, haze, sea spray, wave height, and normal viewer acuity," would "minimize the visual intrusion posed by offshore WTGs" to the point that "[t]he ability of these historic properties to convey the significance of their architectural and social history would be unaltered by the Project." *Id.* at 78497. Rhode Island's State Historic Preservation Office ultimately concurred. That one study found differently earlier in the process does not change the reasoned nature of BOEM's determination.

Plaintiffs also question more fundamentally the adequacy of the visual effects analysis. They argue that it "did not account for South Fork's worst-case scenarios, only its best-case ones

31

on hazy, low-contrast days from an inappropriately narrow set of observation points." Pls.' Mem. at 32–33. The visual effects analysis, however, describes "a total of 35 simulations from 29 unique viewpoints." J.A. at 66400. It included photographs taken "under a range of sky conditions (overcast to clear)." *Id.* at 66397. One of the simulations specifically involved "the highest contrast sunset conditions." *Id.* at 70524. And while Plaintiffs contend that "[t]here were no simulations depicting construction impacts," Pls.' Mem. at 33, the visual effects analysis notes that it included a "construction simulation," J.A. at 66400. The analysis does not appear to suffer from any of the supposed shortcomings.

Plaintiffs take issue with the cumulative effects analysis, as well. They argue that BOEM did not "correctly assess the cumulative effects of" two other projects proposed by South Fork's developer, which would add a substantially greater number of turbines to the viewshed. Pls.' Mem. at 35. As outlined above, BOEM reviewed a cumulative effects analysis that considered the viewshed impacts of approximately 1,000 proposed turbines, including the turbines from the two projects Plaintiffs reference. *See* J.A. at 70501. Plaintiffs do not otherwise explain how this analysis was flawed.

Plaintiffs lastly contend that BOEM should have, but failed to, provide an analysis of economic impacts as part of its adverse effects analysis. Pls.' Mem. at 35. Federal Defendants respond that Section 106 does not require such an assessment because property value and revenue potential are not part of what qualifies a property for inclusion in the National Register. *See* Fed. Defs.' Summ. J. Mem. at 27 (citing 36 C.F.R. § 800.5(a)(1)). The court need not decide this legal question. Although separately from its Section 106 analysis, BOEM still analyzed economic impacts as part of its decision to approve the project. *See* J.A. at 78323. The Final EIS included a full section on recreation and tourism. *See id.* at 77570–84. The report concluded that "[s]ome

32

seaside locations could experience reduced recreational and tourism activity as a result of visible in-water structures, but the visibility of large offshore structures is unexpected to impact shore-based recreation and tourism as a whole." *Id.* at 77580. The report continued that "[c]umulative visual impacts on recreation and tourism resulting from the Proposed Action when combined with past, present, and reasonably foreseeable future projects would be short term and minor for onshore viewers at sensitive viewing locations because of the distance and natural atmospheric interference." *Id.* BOEM also responded specifically to a comment about the impacts on tourism at the Southeast Lighthouse. It acknowledged that visitors "could experience adverse effects when environmental conditions permit visibility of the new WTGs . . . and visibility is not overshadowed by the existing Block Island WTGs," but ultimately found that such adverse effects were not certain. *Id.* at 77699. While Plaintiffs may disagree with BOEM's findings, this is a far cry from Plaintiffs' claim that BOEM "ignored their concerns and failed to consider adverse economic effects." Pls.' Reply at 39. The court's power to review BOEM's decision on adverse effects goes no further. *See State Farm*, 463 U.S. at 43.[14]

*Resolution.* At the final step of the process, the agency must work with consulting parties to "develop and evaluate alternatives or modifications to the undertaking that could avoid, minimize, or mitigate adverse effects on historic properties." 36 C.F.R. § 800.6(a). Once it has done so, the agency executes an MOA, signed by the appropriate parties. *Id.* § 800.6(c).

After holding a meeting to discuss "appropriate avoidance, minimization, and mitigation measures for this undertaking," J.A. at 78740, and receiving feedback from consulting parties on a draft MOA, *see, e.g.*, *id.* at 80354–64, 81789–826, BOEM executed a final MOA signed by all

---

[14] Plaintiffs also accuse BOEM of neglecting South Fork's developer's own study about the project's potential impacts on tourism. Pls.' Reply at 38. The argument, however, relies on a study outside the administrative record, and Plaintiffs have not moved to supplement the record. *See City of Dania Beach v. FAA*, 628 F.3d 581, 590 (D.C. Cir. 2010).

three State Historic Preservation Offices and the Advisory Council on Historic Preservation, *see id.* at 86867–91. The MOA included mitigation and minimization measures like limiting the project to 12 (instead of 15) turbines, uniform turbine design and spacing, requiring a paint color that "reduce[s] visual contrast during daytime hours," and use of an aircraft detection lighting system "to limit the time in which WTG lights are on and visible from adversely affected properties." *Id.* at 86872. The MOA also included mitigation requirements specific to each adversely affected property. *See id.* at 86874–79. This MOA "evidences the agency official's compliance with section 106." 36 C.F.R. § 800.6(c).

Plaintiffs claim that BOEM must have failed to avoid, mitigate, or minimize adverse effects because "not a single material thing changed about South Fork in terms of harm to historic properties from BOEM's beginning of the Section 106 process until the end of the Section 106 process." Pls.' Mem. at 36. But as already discussed, the NHPA does not require any specific outcomes, like changes being made to the proposed project. It requires only that the agency undertake the appropriate review to determine whether any such changes are necessary to preserve the characteristics of affected historic properties. *See United Keetowah Band of Cherokee Indians*, 933 F.3d at 734. BOEM did so. In any event, the allegation is wrong. BOEM made the changes listed above to mitigate adverse effects on historic properties in the area. And far from "ignoring the views of consulting parties and their objections to the MOA," Pls.' Mem. at 36, BOEM finalized these measures after consultation at each step of the process and feedback on the draft MOA.

Plaintiffs also argue that the MOA is "unenforceable" because it "leaves unresolved [the] mitigation of the adverse effects of the South Fork Project." Pls.' Mem. at 30, 36. Plaintiffs seize on language stating that "BOEM, with the assistance of [South Fork Wind], *will* develop and

implement," along with the consulting parties and other relevant stakeholders, additional plans "to resolve the adverse effects to each historic property."  J.A. at 86872 (emphasis added); *see* Pls.' Mem. at 36–37.  Plaintiffs also accuse BOEM of "putting South Fork (the fox) in charge of mitigation (the henhouse)."  Pls.' Mem. at 31.  The last of these points can be disposed of quickly.  The MOA tasks *BOEM* with developing these plans, with South Fork's *assistance* and the assistance of other stakeholders, just as was the case throughout the entire Section 106 consultation process.  On Plaintiff's primary point, they cite no caselaw for the proposition that BOEM's decision to defer some specifics on mitigation measures renders the MOA unenforceable.  But more importantly, this is not an MOA that did little to nothing in terms of mitigation.  Most significantly, among the measures mentioned above, BOEM reduced the number of turbines from 15 to 12.  In addition, BOEM and the consulting parties agreed on "substantive baseline mitigation measures" that the individualized plans must meet "regardless of the specific mitigation measures to be implemented."  J.A. at 86872, 86874.  The baselines vary for each property, but they include the development of public education materials, regular maintenance, restoration work, and coastal hazard planning.  *See id.* at 86875–78.  Far from "leav[ing] unresolved mitigation of the adverse effects of the South Fork Project," Pls.' Mem. at 36, the MOA sets binding baselines for the relevant parties to implement.  Plaintiffs provide no authority to show this arrangement runs afoul of Section 106.

At each step of the process, BOEM complied with Section 106's requirements.

b.    Section 110(f)

When, as here, a proposed project may adversely affect a National Historic Landmark ("NHL"), the agency "shall to the maximum extent possible undertake such planning and actions as may be necessary to minimize harm to the landmark," 54 U.S.C. § 306107, including by

35

considering feasible alternatives, *see Presidio Hist. Ass'n*, 811 F.3d at 1170; 63 Fed. Reg. at 20503. The agency must also invite both the Advisory Council on Historic Preservation and the Secretary of the Interior to participate in consultation. *See* 36 C.F.R. § 800.10(b), (c).

BOEM complied with these requirements. When BOEM first discerned the potential for adverse effects to NHLs, it notified the National Park Service, the Secretary's delegate, and the Advisory Council of this finding and invited them to be consulting parties. J.A. at 78504; *see also id.* at 75446.

BOEM eventually found that one NHL, the Southeast Lighthouse, would be adversely affected by the project. *Id.* at 78504. BOEM "determined that all feasible alternatives, including all feasible turbine layouts, would result in adverse visual effects on this NHL." *Id.* at 78505. Accordingly, "the only alternative that BOEM was able to identify that avoids any effects on the Block Island South East Lighthouse NHL was the no-action alternative." *Id.* An alternative that limits the number of turbines to 12, rather than 15, however, would reduce adverse visual effects on the lighthouse. *See id.*

BOEM continued: "When prudent and feasible alternatives 'appear to require undue cost or to compromise the undertaking's goals and objectives, the agency must balance those goals and objectives with the intent of section 110(f).'" *Id.* (quoting 63 Fed. Reg. at 20503). BOEM noted that "the magnitude of the visual effects on the NHL is minor given the small number of turbines, their distance from the NHL, and the presence of existing WTGs visible from the NHL." *Id.* BOEM also reasoned that the minimization measures previously discussed, along with other measures adopted specifically for the lighthouse through continued consultation, would serve to further minimize harm. *See id.* at 78506; *supra* Section III.C.1.a. Additionally, aside from visual effects, the project "would not affect any other character-defining features or aspects of the NHL's

historic integrity." J.A. at 78505–06. On the other side of the ledger, "BOEM recognize[d] there is generally substantial and highly supportive public interest in . . . develop[ing] clean energy sources" and that the project would create jobs. *Id.* at 78506. So, BOEM decided to move forward. The record shows that, in deciding to do so at the proposed distance and with the necessary mitigation measures, BOEM to the "maximum extent possible undert[ook] such planning and actions as may be necessary to minimize harm to the landmark." 54 U.S.C. § 306107.

Plaintiffs first allege a procedural shortcoming. They argue that BOEM did not sufficiently involve the National Park Service in the process. As they see it, BOEM's only evidence of the Park Service's involvement is "a smattering of emails and phone call references" that have little substance to them. Pls.' Mem. at 26. The Park Service, they continue, "never consulted with BOEM, made a determination on adverse effects, or commented on the Project." Pls.' Reply at 28. Even accepting that characterization, the regulations do not require more. BOEM need only "notify the Secretary of any consultation involving a National Historic Landmark and invite the Secretary to participate in the consultation where there may be an adverse effect." 36 C.F.R. § 810.10(c). That is exactly what BOEM did. *See, e.g.*, J.A. at 75446. How the Park Service responds does not alter the fact of BOEM's compliance.

Plaintiffs also accuse BOEM of "substitut[ing]" for the requirements of Section 110(f) "its own lower standard of striking a balance between minimizing harm and the goals of the Project." Pls.' Reply at 27. But the applicable regulations expressly permit such balancing. *See* 63 Fed. Reg. at 20503. An agency following its own rules and regulations "seldom acts arbitrarily." *Nat. Res. Def. Council v. EPA*, 25 F.3d 1063, 1073 (D.C. Cir. 1994). And Plaintiffs do not challenge the validity of these regulations beyond a conclusory statement in their reply brief that they are "flatly contrary to the statute." Pls.' Reply at 27. A party forfeits an argument raised in

"single, conclusory statement," so the court need not address it. *United States v. TDG Mgmt. Corp.*, 827 F.3d 1127, 1130 (D.C. Cir. 2016) (internal quotation marks omitted). In any event, the statute's plain language does not appear to prevent the agency from engaging in such balancing. *See* 54 U.S.C. § 306107; *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 297 (D.C. Cir. 2003) (noting that, in evaluating agency authority, courts "begin, as always, with the plain language of the statute in question" (internal quotation marks omitted)).

As evidence that no "heightened consultation to minimize harm to historic landmarks ever occurred," Plaintiffs cite minimization measures BOEM could have adopted, like installing smaller turbines, moving the turbines further away, reducing the number of turbines, or minimizing nighttime construction lighting. Pls.' Reply at 29–30. As already discussed, BOEM adopted some of these very measures. *See supra* Section III.C.1.a. It also concluded that the distance at which the proposed turbines would be located from the lighthouse already minimized adverse visual effects. J.A. at 78505. Plaintiffs argue that Defendants cannot point to this latter consideration as evidence of compliance because South Fork chose this distance "for reasons unrelated to Section 110(f)." Pls.' Reply at 31. Plaintiffs cite no authority for this proposition. Nor is it sensible. It seems logical that, as part of its Section 110(f) planning, BOEM would evaluate the visual impacts of the turbines at the proposed distance and adjust as necessary to minimize adverse effects. Regardless of why the initial distance was selected, through consultation, the agency decided it was proper. The court sees no reason why this evaluation cannot evidence the agency's compliance with Section 110(f). On the contrary, it clearly does.

Yet Plaintiffs attempt to downplay the significance of evidence like this consultation or the mitigation measures adopted in the MOA. They characterize it as relevant to compliance with Section 106, "an entirely different statute governing adverse effects to historic properties."

*See* Pls.' Reply at 30.  Plaintiffs reason that "Section 110(f)'s requirements differ from those of 106 and compliance with 106 does not equate to compliance with the standards of Section 110(f)." *Id.*  The governing regulations suggest otherwise.  Although Section 110(f) requires the additional step of inviting both the Advisory Council on Historic Preservation and the Secretary to participate as consulting parties, the agency must otherwise use the processes set forth for Section 106 while "giv[ing] special consideration to protecting National Historic Landmarks."  *See* 36 C.F.R. § 800.10.  Like other courts in this District, the court reads the statute and governing regulations to require no more than "what was necessary to comply to the fullest extent possible with, and in the spirit of, the Section 106 consultation process and with [any] Historic Preservation Plan." *Nat'l Tr. for Hist. Pres. v. Blanck*, 938 F. Supp. 908, 925 (D.D.C. 1996); *accord Oglala Sioux Tribe v. U.S. Army Corps of Eng'rs*, 537 F. Supp. 2d 161, 173 (D.D.C. 2008).  Accordingly, any evidence relevant to BOEM's compliance with Section 106—and especially its detailed discussion of the project's effects on the Southeast Lighthouse—is relevant to its compliance with Section 110(f).  The evidence shows BOEM complied with both.

Plaintiffs lastly renew their argument about BOEM's failure to identify historic properties that they contend are adversely affected by the project.  *See* Pls.' Mem. at 26.  They point out that additional NHLs fell within the APE, so BOEM's failure to consider minimization measures for those properties violates Section 110(f).  *See* Pls.' Reply at 28.  As already discussed, the APE is exactly that—the Area of *Potential* Effects.  Through further analysis, the agency concluded that only ten properties would be adversely affected, and among them only one NHL.  *See supra* Section III.C.1.a.  BOEM thus determined that there was no "harm" to "minimize" except as to

39

the lighthouse.  *See* 54 U.S.C. § 306107.  As the court has already explained, that conclusion was not arbitrary and capricious.  *See supra* Section III.C.1.a.

For all these reasons, BOEM complied with Section 110(f).

### 2.     *NEPA*

BOEM also complied with NEPA.  *See Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 183 (2025) ("Courts should afford substantial deference and should not micromanage . . . agency choices [about NEPA compliance] so long as they fall within a broad zone of reasonableness.").  The final EIS, which spanned over 1,000 pages, "contains sufficient discussion of the relevant issues and opposing viewpoints" and led the agency to a "fully informed" and "well-considered" decision.  *Nevada v. Dep't of Energy*, 457 F.3d 78, 93 (D.C. Cir. 2006) (internal quotation marks omitted).   It "assesse[d] the action's anticipated direct and indirect environmental effects," *Sierra Club*, 803 F.3d at 37, including effects on air and water quality, *see* J.A. at 77464–97; wildlife populations, *see id.* at 76887–969, 77497–558; and "socioeconomic and cultural resources" such as fishing, navigation, tourism, and historic properties, *see id.* at 76969–77101, 77559–84.  For each resource, BOEM "consider[ed] alternatives that might lessen any adverse environmental impact." *Sierra Club*, 803 F.3d at 37; *see, e.g.*, J.A. at 76896–932.  It primarily considered three action alternatives—the Proposed Action Alternative, the Vessel Transit Lane Alternative, and the Habitat Alternative, which differed along dimensions like the number of turbines or spacing between the turbines—and the No-Action Alternative, in which no construction would occur.  *See* J.A. at 76858–83.  In its ROD, the agency ultimately selected and provided its reasoning for selecting the Habitat Alternative.  *See id.* at 86922–32.  And the agency responded to hundreds of public comments along the way.  *See id.* at 77603–78127.  All in all, the

record shows the agency took the requisite "hard look" at the potential environmental effects of the project before approving it.  *Sierra Club*, 803 F.3d at 37.

Plaintiffs identify three perceived shortcomings of the EIS.  None render it deficient.  Plaintiffs' first argument overlaps with its NHPA arguments, in that they argue Defendants failed to properly analyze the project's impacts on historic properties.  *See* Pls.' Mem. at 39–40.  They once again point to BOEM's alleged failures to notify property owners, analyze adverse effects on Newport properties, and finalize all mitigation measures in advance.  *Id.*; Pls.' Reply at 39–40.  The court has already rejected each of these arguments.  *See supra* Section III.C.1.  They fare no better as challenges to the EIS, which included an analysis of and responses to comments about the project's visual effects on historic properties.  *See, e.g.*, J.A. at 77019–20, 77026–29, 77699.

The only unique challenge Plaintiffs raise on this score is one of timing.  They contend that by failing to complete the Section 106 process before publishing the final EIS, BOEM "unlawfully committed to approving the project before resolving adverse effects to historic properties."  Pls.' Mem. at 40.  Plaintiffs' premise is incorrect.  BOEM did not approve the project when it published the final EIS.  BOEM's final approval came via the ROD, which followed (and incorporated parts of) the MOA that resolved adverse effects.  *See* J.A. at 86927–28, 86932.  At the EIS stage, details like mitigation measures need not be finalized.  *See Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 45 F.4th 291, 305–306 (D.C. Cir. 2022).  They need only be "adequately considered," *id.* at 305, as the agency did here, *see* J.A. at 77027, 77036 (discussing mitigation measures like uniform design, paint color, and lighting).  Plaintiffs do not otherwise cite authority mandating the order in which an agency must complete the steps of parallel NHPA and NEPA reviews, which the governing regulations contemplate may overlap.  *See* 36 C.F.R. § 800.3(b).  In fact, they expressly provide that agencies "may use information developed for other reviews

41

. . . to meet the requirements of section 106." *Id.*  The court thus sees no issue with the agency using the EIS to inform the mitigation measures outlined in the MOA, *see* J.A. at 86927, and eventually the ROD.

Plaintiffs also argue that the EIS failed to consider the cumulative impacts of the project when considered alongside other similar ones in the area.  *See* Pls.' Mem. at 41.  Plaintiffs focus specifically on the South Fork developer's other projects, stating that "South Fork is merely the first phase of the much larger Deepwater Wind Project," which altogether "will fill the ocean panorama from Plaintiffs' historic properties with hundreds of giant turbines." *Id.*  Yet, Plaintiffs argue, BOEM impermissibly "chose to segment out the 12 South Fork turbines" and analyze them in isolation.  *Id.* at 42; *see Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1326–27 (D.C. Cir. 2015).[15]

The EIS adequately assessed cumulative impacts.  It noted the developer's additional projects, among others, in its section on "past, present, and reasonably foreseeable projects that could contribute to cumulative impacts." *See* J.A. at 77248–50.  When the EIS analyzed viewshed impacts for each alternative, it analyzed them not based on South Fork alone, but based on all "[r]easonably foreseeable future offshore wind projects," with an estimation of over 1,000 turbines in total.  *See id.* at 77023–36.  For the plan BOEM ultimately selected, it concluded that "[t]he cumulative visual impacts on historic properties in the APE for viewshed resources and associated

---

[15] The regulations for analyzing related actions under NEPA have since been repealed.  *See* Removal of National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 10610, 10611 (Feb. 25, 2025) (rescinding in relevant part 40 C.F.R. pt. 1508); National Environmental Policy Act Implementing Regulations, 90 Fed. Reg. 29498, 29498 (July 3, 2025) (partially rescinding 43 C.F.R. pt. 46).  Because the APA requires the court to review the reasonableness of the agency's action at the time of its decision, the court will consider whether BOEM acted arbitrarily in light of the regulations as they existed at the time.  *See USPS v. Postal Regul. Comm'n*, 963 F.3d 137, 142 (D.C. Cir. 2020).

with the Habitat alternative . . . when combined with past, present, and reasonably foreseeable activities would be long term and negligible to moderate." *Id.* at 77035.

BOEM also did not improperly "segment" the three projects into separate EISs. Actions are "connected" and must be analyzed in the same EIS if, as relevant here, they "[c]annot or will not proceed unless other actions are taken previously or simultaneously," or are "interdependent parts of a larger action and depend on the larger action for their justification." *Sierra Club*, 803 F.3d at 49 (quoting 40 C.F.R. § 1508.25(a)(1)). The purpose of this requirement is to prevent agencies from dividing a single action into separate projects to avoid confronting "the true scope and impact of the activities that should be under consideration." *Myersville Citizens*, 783 F.3d at 1326. The developers' projects are not so connected. The record shows that each project is the subject of a separate Construction and Operations Plan and subject to distinct Power Purchase agreements to supply power to different areas. *See* J.A. at 77250–51. And Plaintiffs do not point to any evidence in the record to suggest that the South Fork project could or would not proceed without the others. The agency's cumulative effects analysis was therefore sufficient as is.

Plaintiffs lastly fault Defendants for "summarily reject[ing] the no-action alternative without further analysis on the erroneous grounds that 'it would not allow [expeditious and orderly] development of DOI-managed resources and would not meet the purpose and need' of the South Fork Project." Pls.' Mem. at 43 (quoting J.A. at 86929). Plaintiffs reason that the short shrift BOEM gave to the no-action alternative violates NEPA's requirement to adequately consider it. *See id.* at 43–44 (citing 43 C.F.R. § 46.30). But Plaintiffs' selective focus on a single quotation from the ROD does not negate the substantial analysis BOEM devoted to the no-action alternative. As previously noted, the final EIS compared the effects on each resource for each alternative, including the no-action alternative. *See, e.g.*, *id.* at 76896–932. Then, in the ROD, BOEM

43

explained the shortcomings of the no-action alternative in detail.  *See* J.A. at 86923.  While BOEM noted that the no-action alternative would eliminate the adverse environmental effects from construction, operation, and decommissioning, it would "probably result in moderate, long-term, adverse impacts on regional air quality because other energy generation facilities would be needed to meet future power demands," and such energy demands might be met through pollutant-emitting sources such as natural gas, oil, or coal.  *Id.*  BOEM continued that "selection of the No Action Alternative could negatively impact future investment on U.S. offshore wind energy facilities, which could result in the loss of beneficial cumulative impacts such as increased employment, improvements in air quality, and reductions in greenhouse gas emissions."  *Id.*  It therefore concluded that the no-action alternative "would not allow expeditious and orderly development of DOI-managed resources and would not meet the purpose and need of the Proposed Action."  *Id.* at 86929.  The D.C. Circuit has upheld an agency's rejection of the no-action alternative based on similar reasoning.  *See Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1182 (D.C. Cir. 2023) (upholding an agency's rejection of the no-action alternative on the basis that "it would not fulfill the Project's purpose" and that, if the project were not approved, other proposals "would not appreciably reduce environmental impacts").  Far from a summary rejection, BOEM both considered and explained its rejection of the no-action alternative.  That is all NEPA requires. *See id.* at 1181.

### D.    Green Oceans Plaintiffs' CWA Claim

The court lastly turns to the Green Oceans Plaintiffs' CWA claim.  Defendants primarily moved to dismiss this claim for lack of standing and mootness, but the court already has held otherwise.  *See supra* Section III.B.2.  There is one additional ground on which South Fork alone moves to dismiss.  South Fork contends that, because "Plaintiffs do not allege in their FAC that

they or others raised the issues in Plaintiffs' CWA claims to the [Army Corps] during the agency's public comment period," they "failed to plead sufficient facts to show their CWA claims are not waived."  Def.-Intervenor's Mot. to Dismiss at 32–33 (citing *Healthy Gulf v. U.S. Army Corps of Eng'rs*, 81 F.4th 510, 521–26 (5th Cir. 2023)).

The parties do not appear to dispute the general principles of the APA's exhaustion requirement.  Generally, a party "must first raise an issue with an agency before seeking judicial review."  *ExxonMobil Oil Corp. v. FERC*, 487 F.3d 945, 962 (D.C. Cir. 2007).  However, the plaintiff need not necessarily be the one to have raised the issue.  *See* Def.-Intervenor's Mot. to Dismiss at 32; Pls.' Corrected Opp'n at 35–36.  "[S]o long as the agency 'in fact considered the issue' raised by 'another party,' a plaintiff does not have to be the one to 'raise [the] issue' before suing."  *Bates Cnty. Mem'l Hosp. v. Azar*, 464 F. Supp. 3d 43, 49 (D.D.C. 2020) (second alteration in original) (quoting *Washington Ass'n for Television & Children v. FCC*, 712 F.2d 677, 682 & n.10 (D.C. Cir. 1983)).

The court agrees with South Fork that Plaintiffs did not plead specific facts demonstrating exhaustion.  *See* FAC ¶¶ 253–80.  Whether dismissal at this stage is appropriate boils down to whether they had to.

They did not.  "[W]hen exhaustion is non-jurisdictional, plaintiffs 'are not required to specially plead or demonstrate exhaustion in their complaints.'"  *Fontanez v. U.S. Soc. Sec. Admin.*, No. 17-cv-2844 (RDM), 2020 WL 5545439, at *10 (D.D.C. Sep. 16, 2020) (quoting *Jones v. Bock*, 549 U.S. 199, 216 (2007)).  The APA's exhaustion requirement is not jurisdictional. *M2Z Networks, Inc. v. FCC*, 558 F.3d 554, 558 (D.C. Cir. 2009).  Plaintiffs are thus "free to omit" exhaustion from the complaint, and "the defendant bears the burden of pleading and proving" the lack thereof as an affirmative defense.  *Fontanez*, 2020 WL 5545439, at *10 (first quoting *Kim v.*

45

*United States*, 632 F.3d 713, 719 (D.C. Cir. 2011), then *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997)); *see also T.H. v. District of Columbia*, 255 F. Supp. 3d 55, 58–59 (D.D.C. 2017).

South Fork has not met that burden here. It argues only that *Plaintiffs* have not adequately demonstrated exhaustion. *See* Def-Intervenor's Mot. to Dismiss at 31–32; Def.-Intervenor South Fork Wind, LLC's Reply in Supp. of Def.-Intervenor's Mot. to Dismiss, ECF No. 75, at 18. But Plaintiffs do not bear a pleading burden. *See Ortega v. Mayorkas*, No. 23-cv-2417 (GMH), 2024 WL 4119390, at *8 (D.D.C. Sep. 9, 2024); *Adamski v. McHugh*, 304 F. Supp. 3d 227, 238–39 (D.D.C. 2015). South Fork does not otherwise put forward any of its own facts showing that no one presented to the agency the issues Plaintiffs now raise. And the record appears to the contrary. The public comments that South Fork cites in their brief, *see* Def.-Intervenor's Mot. to Dismiss at 32, overlap with the matters Plaintiffs advance before the court. Plaintiffs allege that the discharges from dredging "will significantly and adversely affect the health of the aquatic ecosystem, the marine mammals and fish that habituate in the area, and the fishing and shellfishing grounds where the turbines, platforms, cables, and associate structures will be located," as well as "significantly degrade the waters of the United States." FAC ¶ 280. The Army Corps' ROD reflects responses to comments about, among other topics, fish and wildlife populations and water quality. *See* Fed. Defs.' Mot. to Dismiss, Ex. E, ECF No. 52-6, at 51–52, 56. The court accordingly will not dismiss Green Ocean Plaintiffs' CWA claim for failure to exhaust administrative remedies at this stage.

46

## V.   CONCLUSION AND ORDER

For the foregoing reasons, the court denies Plaintiffs' Motion for Summary Judgment, ECF No. 39, and grants Defendants' Motions for Summary Judgment, ECF Nos. 46, 50, with respect to Plaintiffs Preservation Society and SELF's claims.

The court grants Defendants' Motions to Dismiss the Green Oceans Plaintiffs' First Amended Complaint, ECF Nos. 52, 53, in all respects except one.  The court dismisses Plaintiffs' claims under the Outer Continental Shelf Lands Act (Count II), NEPA (Count III), Endangered Species Act (Count IV), Marine Mammal Protection Act (Count V), Migratory Bird Treaty Act (Count VI), Coastal Zone Management Act (Count VIII), and NHPA (Count IX).  The court denies Defendants' motions with respect to Plaintiffs' claims under the CWA (Count VII) and the APA (Count I) to the extent it relates to the CWA.

The Green Oceans Plaintiffs and Defendants shall meet and confer and, by March 27, 2026, submit a Joint Status Report that proposes a schedule for summary judgment briefing on the CWA claim.

Dated:  March 20, 2026

Amit P. Mehta
United States District Judge